UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-md-02183-PAS

IN RE: BRICAN AMERICA LLC EQUIPMENT
LEASE LITIGATION
_____/

## OMNIBUS ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ON THE "JUGULAR" ISSUE

This matter is before the Court on Plaintiffs' Motion for Summary Judgment Against NCMIC Finance Corporation and PSFS 3 Corporation on the "Jugular Issue" [DE-337], the *Wigdor* Plaintiffs' Supplement to *Blauzvern* Plaintiffs' Motion for Summary Judgment as to the "Jugular" Issues [DE-339], and Defendants NCMIC Finance Corporation and PSFS 3 Corporation's Motion for Summary Judgment on "Jugular" Issue [DE-341].[1]  The central issue concerns the interaction of two agreements (a marketing agreement and a financing agreement) completed in connection with the purchase and financing of a media display system and the legal significance of NCMIC's knowledge of a "Cancellation" clause in the marketing agreement.[2]

The Court has reviewed the cross-motions, the respective responses [DE-335, 350, 352 ], replies [DE-363, 364 365], counsel's oral argument [DE-379], and the record.  Because (1) the

---

[1] Defendants Brican America, Inc. ("Brican, Inc.") and Brican America, LLC ("Brican, LLC") are not parties to these motions.  The Court refers to these entities collectively as "Brican."  Similarly, for purposes of this Order the Court refers to NCMIC Finance Corporation and PSFS 3 collectively as "NCMIC."

[2] In a Notice to All Parties Concerning Status Conference dated March 21, 2012 [DE-279], the Court identified the "jugular" issue of this case as "involving the interplay of the financing and marketing agreements, and more specifically, NCMIC's knowledge of the cancellation provision in the marketing agreements." [DE-279].  Thereafter, in an Order denying the Plaintiffs' Motion for Class Certification [DE-226], the Court emphasized that "[r]esolving whether NCMIC had knowledge in 2006 that the Brican business model allowed Lessees to cancel the financing agreements with no further liability could be a case dispositive issue."

"Cancellation" clause in Versions 5-8 of the marketing agreement can be reconciled with the hell or high water clause in the financing agreements; (2) there is an issue of fact as to NCMIC's knowledge of the "Cancellation" clause in Versions 1-4 of the marketing agreement; and (3) there is an issue of fact regarding whether Brican's sales representatives acted as NCMIC's apparent agents in their presentation of the marketing agreements, Plaintiffs and *Wigdor* Plaintiffs' motions are denied, and NCMIC's motion is granted in part and denied in part.

## I.    Introduction

This multidistrict litigation consists of four cases: (1) *Peter M. Blauzvern DDS PC, et al. v. Brican America, Inc., et al.*, C.A., Case No. 10-20782; (2) *Vijay Patel, et al. v. NCMIC Finance Corp., et al.*, Case No. 10-22959; (3) *Vijay Patel et al v. NCMIC Finance Corporation et al.*, Case No. 11-20462; and (4) *Steven Wigdor O.D., PA, et al. v. NCMIC Finance Corp., et al.*, Case No. 10-21608.  These cases were consolidated for pretrial purposes. *See* Pretrial Order [DE-25].

In each of these actions, Plaintiffs allege that they were victimized by a scheme in which they agreed to purchase a flat screen television, a computer, and software (the "Display System"),[3] used to display advertising in each Plaintiff's office.  Between 2005 and 2009, Plaintiffs purchased the Display Systems from Brican, LLC or Brican, Inc. and financed the purchase through an installment sales or loan agreement labeled as a financing lease (the "Financing Agreement").[4]  Plaintiffs claim that Brican represented that Plaintiffs could purchase

---

[3] Brican refers to the Display System alternatively as the "MediaDoc" system, the "Brican Information Center," or the "Exhibeo Concept."

[4] The Financing Agreements were either in a single-column or a three-column format. The three-column format was used primarily between July, 2005 and October 2008, and the one-

the systems for effectively no cost.  According to Plaintiffs, Brican proposed that it – or a company related to Brican known as Viso Lasik Medspas, LLC – would pay Plaintiffs, under a simultaneously-executed marketing agreement (the "Marketing Agreement"), a sum of money to offset the monthly lease payments Plaintiffs had to pay under Financing Agreements for advertising the services offered either by Brican or Viso Lasik on the Display Systems.

In 2005, Brican entered into a Vendor Agreement with NCMIC (doing business as Professional Solutions Financial Services ("PSFS")).  As a result of this agreement, NCMIC became the lessor under the Financing Agreement in return for making a lump sum payment of approximately $22,000 to Brican for each Financing Agreement.[5]  Some Plaintiffs signed Financing Agreements, formatted in a single-column style, in which Brican, Inc. was identified as the initial lessor ("one-column" Financing Agreements) and NCMIC became the lessor through an assignment.[6]  Other Plaintiffs signed agreements formatted in a three-column style directly with PSFS ("three-column" Financing Agreements).  In these agreements, PSFS was identified as the lessor.  As a result, NCMIC ultimately wound up being the lessor for the vast

---

column lease was used primarily between November, 2008 and April, 2009.

[5] On March 30, 2010, NCMIC formed Defendant PSFS 3, a wholly-owned subsidiary of NCMIC, and transferred all of the three-column Financing Agreements to this subsidiary.  The three-column lease contains a forum selection clause which requires that, in the event the lease is assigned, proper venue will lie in the state where the assignee's corporate headquarters is located – in this case, Iowa.  *See* [DE 342-2, at 3].  Six weeks earlier, on February 10, 2010, NCMIC had resolved its lawsuit against Brican in the federal district court for the Southern District of Florida.  *See NCMIC Finance Corp. v. Brican America, Inc.*, Case No. 1:09-cv-21192-PCH.  By assigning the agreements to PSFS 3, NCMIC sought to avoid issues regarding proper venue and proceeded to file individual lawsuits in Iowa seeking to enforce these Financing Agreements.

[6] A variation of the one-column Agreement shows Brican Financial, LLC as the lessor and Brican, LLC as the vendor.  *See* [DE 223-32].  However, it is uncertain on the present record how many of these agreements were executed.

majority of the Financing Agreements.[7]

Both the three-column and the one-column forms of the Financing Agreement include a "hell or high water" clause generally providing that the Plaintiffs' obligation to pay is non-cancellable. Each of the Marketing Agreements, however, contains a clause – labeled "Cancellation" – which generally provides that if Brican (or, in later versions of the agreement, Viso Lasik) fails to pay the amounts due for advertising services, a customer may be relieved of its obligations under the Financing Agreement. The "jugular" issue concerns what effect, if any, arises from the interplay between these two provisions.

## II.     Undisputed Material Facts[8]

### A.     The Participants

Plaintiffs are either individual dentists or optometrists, or the business entities under which these individuals operated. Stipulated Facts [DE-224], ¶ 1. Brican, Inc., a Florida corporation, was formed on July 30, 2004 by Laurent Goldstein and Jean-Francois ("Jeff") Vincens. *Id.*, ¶ 13. Vincens, Goldstein, and a third individual, Jacques Lemacon, were the three initial stockholders in Brican, Inc. and its sister corporations, each of which were also incorporated in Florida. *Id.*, ¶ 14. These included Brican, LLC; Brican Financial Services, LLC;

---

[7] At some point, Brican Inc. began to assign some of the Financing Agreements to Brican Financial Services, a Florida corporation. Defendants do not contest venue for transactions involving agreements assigned to Brican Financial Services and the Court need not address proper venue for the small number of Plaintiffs who executed a Financing Agreement that was transferred to this entity. Only six of the *Wigdor* plaintiffs entered a Financing Agreement that was assigned to Brican Financial Services.

[8] Deciphering the facts in this case is akin to solving a Rubik's cube. As such, due to the myriad of factual issues in this case, the Court will only address those background facts bearing directly on the issues raised in the motions.

4

and JJR Investments, LLC. JJR Investments in turn was a part owner of Viso Lasik Medspas, LLC, Viso Lasik Medspas of Charlotte, LLC, and Viso Lasik Medspas of San Antonio, LLC. *Id.*, ¶ 32.

Defendant NCMIC Finance Corporation is a part of NCMIC Group, Inc., an Iowa holding company consisting of six businesses providing malpractice, personal, and business insurance; equipment loans; merchant processing; business credit cards; and other forms of financing.[9] NCMIC Insurance Company, NCMIC Group's flagship company, was formed in 1945 as National Chiropractic Mutual Insurance Company. *See* Ex. 2 to Declaration of Ronald P. Gossett [DE 223-1, at 7]. According to the NCMIC Group's website, NCMIC Insurance Company "insures more than 50% of doctors of chiropractic and chiropractic colleges and universities" across the United States, and is licensed in all fifty states.[10] NCMIC Finance Corporation was created to provide a payment plan for NCMIC Insurance Company's policyholders. *See* Ex. 3 to Deposition of Patrick McNerney [DE 218-15, at 10]. Beginning in the mid-1990s, NCMIC expanded this business to include "equipment financing, business credit cards, and other financing needs of health care professionals." *Id.*

About July 16, 2005, Brican, Inc. and NCMIC entered into a Vendor Agreement. *Id.*, ¶ 86. Fred Scott, NCMIC's Business Development Manger, signed the Vendor Agreement on NCMIC's behalf. Stipulated Facts, ¶ 87. Pursuant this agreement, NCMIC was to receive gross income of approximately $6,000 per lease. *Id.*, ¶ 90. Throughout its relationship with Brican,

---

[9] *See* NCMIC Group, Inc., http://www.ncmicgroup.com/AboutNCMIC/Default.aspx (last visited Jul. 29, 2013).

[10] NCMIC Group, Inc., http://www.ncmicgroup.com/AboutNCMIC/Companies.aspx (last accessed Jul. 29, 2013).

5

NCMIC issued or obtained a total of 1,672 leases. *Id.*, ¶ 91. The total gross income to be received by NCMIC from the 1,672 leases was approximately $10,032,000. *Id.*, ¶ 92.

Brican, Inc. served as either vendor – or, later in its relationship with its customers, lessor – of the Display System. *Id.*, ¶¶ 16, 93. For the vast majority of sales in which Brican, Inc. was the lessor, Brican, LLC's primary role was to serve as vendor of the Display System. At the time Brican began to sell the Display Systems as part of its partnership with NCMIC, it was the exclusive vendor of the systems, and NCMIC, doing business as PSFS, was the lessor. This arrangement continued until around October or November, 2008, when Brican, Inc. became the lessor of the Display System and then assigned the Financing Agreements to NCMIC after they were executed.

### B.    The Agreements

The resolution of the "jugular" issue lies in the terms of the two agreements. Thus, this section begins with a summary of the relevant terms of the eight versions of the Marketing Agreement, particularly the provisions relating to the purchase of advertising and the "Cancellation" clause. Next is a description of the seven material provisions of the Financing Agreements, namely, the Prologue; Paragraphs 1, 2, 10, 12; the Unconditional Guarantee clause; and the "No Agent" clause in the one-column Financing Agreement. The last subsection summarizes the interplay between the Financing and Marketing Agreements.

### 1.    Marketing Agreements

There were at least eight versions of the Marketing Agreement.[11] Each version contains a

---

[11] NCMIC filed representative copies of each of the eight versions as Exhibit 4 in support of its motion for summary judgment. [*See* DE 342-4]. Plaintiffs identify only *seven* distinct versions of the agreement, coded A-G. [*See* DE 376-2]. Other than minor formatting changes,

promise by either Brican, Inc. or Brican, LLC to purchase a portion of advertising space from the buyer of the Display System.  The agreements provide as follows:

| | |
|---|---|
| Versions 1-3: | **Purchase of Advertising**: Brican shall purchase from the Client $5,800 worth of advertising space for each year that this agreement remains in effect.  The purchase of Advertising space hereunder may be made by Brican or any other entity in which Brican owns shares of voting stock.[12] |
| Version 4: | **Purchase of Advertising**: Brican America Inc. shall purchase from the Client $5800 worth of advertising space for each year that this agreement remains in effect.  The purchase of Advertising space hereunder may be made by Brican or any other entity in which Brican owns shares of voting stock as long as the Client is current regarding payments to the leasing institution financing the Exhibeo Concept. |
| Versions 5, 7: | **Purchase of Advertising**: Brican America LLC (Brican), **on behalf of VISO LASIK MEDSPAS LLC,** [s]hall purchase advertising space from the Client in accordance with the terms of this Agreement for each year that this Agreement remains in effect. The purchase of the advertising space hereunder may be made by Brican or any other entity in which Brican is related by ownership. |
| Version 6: | **Purchase of Advertising**: Brican America Inc., **on behalf of VISO LASIK MEDSPAS, LLC,** shall purchase advertising space from the Client in accordance with the terms of this Agreement for each year that this Agreement remains in effect.  The purchased advertising space hereunder may be made by Brican or any other entity in which Brican owns shares of voting stock. |
| Version 8: | **Purchase of Advertising**: Brican America LLC (Brican), **on behalf of VISO LASIK MEDSPAS LLC,** will purchase advertising time on the Client's Exhibeo Concept, in accordance with the terms of this Agreement, for each year that this Agreement |

---

NCMIC's versions 5 and 7 appear to have identical language.  *Compare* Ver. 5 [DE 342-4 at 13], *with* Ver. 7 [DE 342-4 at 17].  For the sake of consistency, the Court will adopt NCMIC's numeration system in differentiating between the versions of the agreement.

[12]  In these versions of the Advertising Agreement, "Brican" is expressly identified as Brican America, Inc.

is in effect.  The purchase of the advertising hereunder may be made by Brican or any other entity in which Brican is related by ownership.[13]

[DE 342-4, at 3, 5, 8, 11, 13, 15, 17, 19] (emphasis in original).

Each version of the Advertising Agreement includes slight variations in the wording of the "Cancellation" clause, as set forth below:

| | |
|---|---|
| Version 1: | Cancellation: IF BRICAN FAILS TO HONOR ITS FINANCIAL COMMITMENT PURSUANT TO THIS AGREEMENT, THEN ALL RELATED AGREEMENTS CAN BE CANCELLED BY THE CLIENT. |
| Version 2: | Cancellation: If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled by the Client, *and Brican will, on client's demand, buy back the lease agreement.*[14] |
| Version 3: | **Cancellation:** If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement. |
| Version 4: | **Cancellation:** If the advertised VISO LASIK MEDSPAS fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement. |
| Version 5, 7: | **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it, Brican will repurchase the Client's lease agreement in regard to the Exhibeo Concept. |

---

[13] Versions 5, 7, and 8 of the Advertising Agreement included several alterations and additions not present in other versions.  First, these agreements state that Viso Lasik Medspas will provide certain incentives to the purchasers of the Exhibeo systems in exchange for their agreement to provide advertising space.  These include: complimentary Viso Lasik Medspa gift cards for the doctor's patients, membership in the "Viso network," and preferred rates on Lasik procedures.

[14] The portion shown in italics is handwritten.

Version 6:        **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees, the Client may request that Brican repurchase the Client's lease agreement in regard to the Exhibeo Concept.

Version 8:        **Cancellation:** If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreements in regard to the Exhibeo Concept.

[See DE 342-4] (emphasis in original).

### 2.    The Financing Agreements

Both the one-column and the three-column Financing Agreements contain various terms germane to the Parties' cross-motions.[15] First, there are two places, the Preamble and Paragraph 1, that refer to the non-cancellation of the agreement.   These terms, commonly known as "hell or high water" clauses, state:

By signing this Agreement: (i) you acknowledge that you have read and understand the terms and conditions on the front and back of this agreement, (ii)You agree that this Agreement is a fixed term financing agreement that you cannot terminate or cancel...you have an unconditional obligation to make all payments due under this agreement, and you cannot withhold, set-off or reduce such payments for any reason, even for defects of failures in the equipment.

\*          \*          \*

1. **LEASE AGREEMENT AND FEES**: ... This Lease is NON-CANCELLABLE FOR THE ENTIRE LEASE TERM.  YOU UNDERSTAND THAT WE ARE BUYING THE EQUIPMENT BASED ON YOUR UNCONDITIONAL ACCEPTANCE OF THE EQUIPMENT AND YOUR PROMISE TO PAY US UNDER THE TERMS OF THE LEASE, WITHOUT SET-OFFS, EVEN IF THE EQUIPMENT DOES NOT WORK PROPERLY OR IS DAMAGED FOR ANY

---

[15] Any differences in the wording of these provisions between the three-column and the one-column lease are noted in the text.  In addition, the relevant provisions are set out in the same formatting as the Financing Agreements.

9

REASON INCLUDING REASONS THAT ARE NOT YOUR FAULT.[16]

[DE 342-2, at 2; DE 342-3, at 2].

Similarly, both the three-column and the one-column financing agreements contain

provisions disclaiming any warranties for the faulty performance of the Display System:

> 2. **NO WARRANTY**: We are leasing the Equipment to You AS IS. We do not manufacture the Equipment and are not related to the Vendor. You selected the Equipment and the Vendor, based on Your own judgment. You may contact the Vendor for a statement of the warranties, if any, that the Vendor or manufacturer is providing. We hereby assign to You the warranties given to Us, if any. WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN CONNECTION WITH THIS LEASE. You agree to settle any dispute You may have regarding performance of the Equipment directly with the manufacturer or Vendor.[17]

---

[16] Although the effect is the same, the wording of the hell or high water clause in the one-column agreement is slightly different, and reads as follows:

> This Lease is NON-CANCELLABLE FOR THE ENTIRE LEASE TERM. YOU UNDERSTAND THAT WE ARE BUYING THE EQUIPMENT BASED ON YOUR PROMISE TO PAY US UNDER THE TERMS OF THE LEASE, WITHOUT SET-OFFS, EVEN IF THE EQUIPMENT DOES NOT WORK PROPERLY OR IS DAMAGED FOR ANY REASON INCLUDING REASONS THAT ARE NOT YOUR FAULT.

[DE 342-3, at 2].

[17] The wording of Paragraph 2 of the one-column agreement is slightly different from the three-column version, and reads as follows:

> **NO WARRANTY**:   We are leasing the Equipment to You **AS IS** and with **ALL FAULTS**. We do not manufacture the Equipment. You selected the Equipment and the Vendor, based on Your own judgment. You may contact the Vendor for a statement of the warranties, if any, that the Vendor or manufacturer is providing. We hereby assign to You the warranties given to Us, if any. **WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN CONNECTION WITH THIS LEASE, OR THE EQUIPMENT**. You agree to settle any dispute You may have regarding performance of the Equipment directly with the manufacturer or Vendor.

10

[DE 342-2, at 2].

Further, the Financing Agreements contain the following provision regarding the

assignment of the leases, as well as integration and unconditional guaranty provisions as set forth

below:

> 10. **ASSIGNMENT:** ... We may sell, assign or transfer the Lease and Our rights
> in the Equipment without notice to You or consent by You. *You agree that if We*
> *sell, assign or transfer the Lease the new owner will not be subject to any claim,*
> *defense or set-off that You assert against Us or any other party.*

> \*        \*        \*

> 12. **MISCELLANEOUS**: You agree that this Lease is the entire agreement
> between You and Us regarding the lease of the Equipment, and supersedes any
> purchase order You issue.  Any change must be in writing and signed by each
> party. ...

> ### UNCONDITIONAL GUARANTY
> The undersigned unconditionally guarantees that the Lessee will timely perform
> all obligations under this Agreement.  The undersigned also waives any
> notification if the Lessee is in default and consents to any extensions or
> modifications granted to the Lessee.  In the event of default, the undersigned will
> immediately pay all sums due under the terms of this Agreement without requiring
> Lessor to proceed against Lessee, any other party or the Equipment.  The
> undersigned consents to personal jurisdiction, venue, choice of law, and jury trail
> [sic] waiver as stated in the "Governing Law, Consent to Jurisdiction and Venue
> of Litigation" paragraph above and agrees to pay all costs end expenses, including
> attorney's fees, incurred by Lessor related to this guaranty. This guarantee is joint
> and several.

[DE 342-2, at 3; DE 342-3, at 3].

Finally, in addition to the above provisions, the one-column lease also contains a "No

Agent" clause which provides:

---

[DE 342-3, at 2].

11

15. **NO AGENT: YOU AGREE THAT THE VENDOR, MANUFACTURER, SALES PERSON, EMPLOYEE OR AGENT OF THE VENDOR OR MANUFACTURER IS NOT OUR AGENT AND HAS NO AUTHORITY TO SPEAK FOR US OR TO BIND US IN ANY MANNER. IT IS FURTHER UNDERSTOOD THAT WE ARE NOT THEIR AGENT.**

*Id.*, at 3.

### C.   Interplay of the Financing Agreements and the Marketing Agreements

In preparation for the hearing on the Parties' cross-motions for summary judgment, the

Court requested that the Parties prepare a summary explaining when the particular versions of the

Marketing and Financing Agreements were used throughout the vendor-based relationship

between Brican and NCMIC. *See* October 11, 2012 Order [DE-373]. This information is

essential to understanding the interplay between these agreements and the legal significance, if

any, of this interplay. *See* Defendants' Summary in Response to Endorsed Order [DE-377];

Plaintiffs' Notice of Compliance with Endorsed Order [DE-376].

The Parties' summaries, taken together with the Statement of Material Facts and

supporting documents, establish the following:

- The first transaction involving a Brican entity as vendor and NCMIC as lessor took place on or around July-August, 2005. *See* [DE 376-1].

- NCMIC used the **three-column** financing agreement almost exclusively from July-August, 2005 until the end of October, 2008, at which time it began to rely, apparently with only a few exceptions, on the **one-column** form of the agreement. *See* [DE 376-1; DE 377-1].

- Versions 1, 2, and 3 of the Marketing Agreement were executed in connection with 42 sales beginning on June, 2006 and ending on or about December, 2006. *See* [DE 376-2].

- According to Plaintiffs' summary, Versions 1-3 of the Marketing Agreement were used exclusively in sales involving the **three-column** lease agreements. *Id.* This information is not contradicted by NCMIC's summary. *See* [DE-377-2].

12

- Version 4 of the Marketing Agreement was used with more than 360 NCMIC-financed sales.[18]  NCMIC's summary indicates that the **one-column** agreement was used in about forty of these sales.  *See* [DE 377-2].

- Versions 5-8 of the Marketing Agreement were used, with only a few exceptions, in sales involving the **one-column** lease agreement.  *See* [DE 377-2].  These transactions accounted  for 908 sales.  *See* [DE 376-2].

- Based on Plaintiffs' records, from the beginning of NCMIC's relationship with Brican on August, 2005 thru June, 2006 when the Marketing Agreement was implemented, NCMIC financed **35** Display Systems.  From July to December 2006, NCMIC financed **65** Display Systems.  *See* [DE 376-1]

- NCMIC financed **183** Display Systems in 2007.  *See id.*

- In 2008, NCMIC financed **789** Display Systems.  *See id.*  The average number of units financed increased substantially beginning in May 2008.  From January to April 2008, NCMIC financed an average of **18** units per month.  From May to December 2008, this average increased to **90** units per month.  *See id.*

- In 2009, NCMIC financed an additional **682** Display Systems before cutting off funding in mid-April 2009.  *See id.*

   **D.**    **Facts Relevant to NCMIC's Alleged Knowledge of the Marketing Agreements**

      **1.**    **The Fred Scott Letter and Brican's "Return Policy"**

Fred Scott began working as NCMIC's sales representative on July 8, 2004.  Deposition of Fred Scott ("Scott Dep.") [DE 223-20], 9:12.  Scott was primarily responsible for developing the business relationship between Brican and NCMIC.  *Id.*, 27-30.  Jean-Francois Vincens testified that around May or June 2006, he and Scott discussed the use of Marketing Agreements as an incentive for customers to purchase the Display System.  Deposition of Jean-Francois Vincens ("Vincens Dep.") [DE 223-27], Vol. II, at 150:5-20.  Vincens further testified that Scott

---

[18]  Plaintiffs' summary indicates that Version 4 was used in 366 transactions.  *See* [DE 376-2].  However, NCMIC's submissions show 377 sales.  *See* [DE 377-2].

13

gave Brican permission to use the Marketing Agreements. *Id.*, 153:20-24.

In an email dated June 19, 2006 from Scott to William Artino, NCMIC's Vice President

and Manager of the Equipment Leasing Division, Scott wrote:

> This email represents our agreement with Brican America to support the Return Guarantee conditions as discussed.
>
> This agreement will remain between Brican America and the customer. This agreement will not be connected with Professional Solutions Financial Services and not written into the Lease Agreement under Terms & Conditions.
>
> In the event that a customer chooses to return the Brican System, Brican's obligation to unwind the lease would be as follows:
>
> At 6 Months the principle (*sic*) balance remaining, plus $1000 would be due to PSFS.
>
> At 12 Months the principle (*sic*) balance remaining, plus $1750 would be due to PSFS.
>
> Any Returns under 6 months would be prorated.

June 19, 2006 E-mail from F. Scott to B. Artino [DE 223-23, at 1]. On the same day, Scott sent a

second email with the subject heading "BRICAN RETURN POLICY AGREEMENT" to

Raymond Briscoe[19] and Vincens attaching a letter (the "Scott Letter") with PSFS's logo at the

header and Scott's name in the signature block, and stating in relevant part:

> Professional Solutions Financial Services is pleased to provide these terms to support Brican America's return policy. This letter represents the understanding that the payoff Professional Solutions will give Brican in the event of a cancellation by their customer. This program may be cancelled or suspended at any time.

---

[19] Vincens testified that Briscoe owned a third of Brican, Inc. "for a short period of time" and also owned 33% of Brican, LLC at the time of its inception. *See* Vincens Dep., at 42:4-8. Briscoe sold his interests in Brican, LLC and Brican, Inc. and resigned as managing member of Brican, LLC on or around June 29, 2007. *Id.*, at 61:1-12. According to Vincens, Briscoe continued working for Brican as a consultant after this date. *Id.*, at 63:10-18.

14

> If the Lease Agreement is terminated by the customer due to Brican's return policy, we will credit all amounts collected toward our funded amount. Brican agrees to reimburse the remainder of the funded amount plus $1000 if the agreement terminates in the first 6 months. If the agreement terminates in months 7 though 12, the same formula applies except that the amount in addition to original funding will be $1,750....
>
> This agreement is between Brican America and Professional Solutions and is not intended to pass to the customer for direct pay off from the customer in the event Brican cannot perform. This is merely a preferred payoff available only to Brican and not to be included in any agreement between the customer and PSFS....

[DE 223-23, at 3]. The Scott Letter is unsigned. *Id.* Briscoe responded: "Fred: This is great for the file. Thanks for your quick turnaround on this matter. Have a great week." *Id.*, at 4.

According to Vincens, the "return policy" in the Scott Letter referred to the cancellation clause in the Marketing Agreement. Vincens Dep., Vol. II, at 158:2-11. Vincens testified that Brican's business with NCMIC from June 19, 2006 to April 19, 2009 was completed in reliance on the Scott letter. *Id.*, at 165:21-24. In the same deposition, Vincens testified that the language of the Marketing Agreement[20] was changed to add the words "and Brican will buy back the related lease agreement" in order to make it clearer to potential customers that if the advertising payments stopped, the lease obligations would continue. *Id.*, at 278:25; 279: 1-5. Vincens also testified that he instructed his salesmen, in the course of their sales presentations, to tell potential customers that they could not "simply stop paying the lease" if the marketing payments stopped. *Id.*, at 279:6-13. According to Vincens, Brican did this because it "didn't want the customer to be under the impression that he could cancel the lease," and did not want "to give the impression

---

[20] This testimony pertained to Deposition Exhibit 38 [DE 223-31], which is a copy of a signed Marketing Agreement dated July 10, 2006. The language of this specific agreement matches Version 3 of the Marketing Agreement. *See supra*, at 7.

that Professional Solutions was going to accept to cancel the lease." *Id.*, at 279:15-20.

Vincens also testified that Brican issued a general warranty with all of the equipment that protected the customer in the event the equipment stopped working. *Id.*, at 273:22-25; 274:1. Additionally, there is a document in the record, entitled "Money Back Guarantee," which states, in relevant part:

1.   This return policy applies only to the GalleryDoc version of the Exhibeo Products purchased from Brican America, LLC.

2.   If you decide you don't want to keep the Exhibeo Product subject to Purchase Order #_____, simply notify us of your request and return the product at your expense. If the returned product is received complete and undamaged, we will process a credit for the full amount paid for the returned item, less initial and return shipping, or we will repurchase your lease from your financial institution. This guarantee supersedes any inconsistent provisions contained in your Brican America Purchase Order.

[DE 230-9]. This document is unsigned. It is unclear from the record if Brican implemented this or any other written return policy with its customers.

### 2.   The Todd Cook Email - July 2008

Todd Cook became NCMIC's Vice President and General Manager of Equipment Finance on March 1, 2007. Pls.' SOF [DE 338-1], ¶ 100. In this capacity, Cook was responsible for certain aspects of the relationship with Brican. Stipulated Facts, ¶ 99.

At some point around July 2008, Daniel Del Castillo, a dentist who purchased the Display System, called Jean Thompson, a NCMIC employee working under Cook. Deposition of Daniel Del Castillo ("Castillo Dep.") [DE 344-11], at 24:16-20. Del Castillo called to discuss his concerns regarding a Ponzi scheme involving Recomm International, a company Raymond Briscoe and Vincens founded in the early 1990s. *Id.*, at 25:1-13. Del Castillo also sent an email

16

to Thompson with the subject line "FW: Recomm-Brican." Stipulated Facts, ¶ 101. The email

included three newspaper articles appearing in the *Tampa Tribune* in February, March and April,

1996, and a document with the heading "Warning: Possible Scam to Dentists." *Id.*

    The newspaper articles summarized various lawsuits against Recomm alleging, generally,

that Recomm had perpetrated a Ponzi scheme involving the sale of message boards to small

businesses. *See* [DE 223-29, at 3]. As part of these transactions, Recomm's customers would

pay a finance company about $300 a month to lease the message boards. *Id.* "In return, Recomm

was to pay the equivalent of $270 a month" to its customers "from revenues raised from

advertisements run on the signs." *Id.* Because these revenues never materialized, however,

Recomm funded its advertising rebate obligations with the money it received from the financing

company for new customers. *Id.* At some point in 1994, Briscoe and Vincens sold their interest

in Recomm and left the company. *Id.* By mid-1995, Recomm stopped making the advertising

payments, even as the financing company continued to demand the payments from Recomm's

customers. *Id.* On January 31, 1996, Recomm filed for bankruptcy. *Id.* According to the

*Tribune* articles, at the time of the bankruptcy Recomm "owed about 12,000 creditors more than

$220 million," and was the subject of about 60 lawsuits throughout the United States. *Id.*

    On July 23, 2008, Thompson forwarded Del Castillo's email to Cook, who in turn

forwarded it to Jacques Lemacon at Brican. Email from T. Cook to J. Lemacon [DE 223-11, at

1]. Lemacon responded that the materials were from Harold Meredith, a Brican "competitor who

is mad at us." *Id.*, at 2. In the same email, Lemacon also stated that:

1.    The newspaper articles had been a "screen of smoke" created by Recomm's
owners as a way to justify the company's bankruptcy;

2.    Brican had marketing agreements with "some dentists in order to advertise VISO LASIK centers." The use of these marketing agreements had "nothing to do with a scam."

3.    NCMIC was welcome to visit Viso Lasik's locations in Wellington, Charlotte, or San Antonio, "to verify the reality of the venture."

*Id.*, at 2. Attached to this email was a Powerpoint presentation titled "A Strategic Alliance," apparently prepared by Brican as a sales tool for potential customers. *See* [DE 223-11, at 3-32]. The presentation includes information regarding the advertising payments from Viso Lasik to the doctors. *Id.*, at 27. However, it does not provide information regarding what happens if Viso Lasik stops making the payments, nor does it provide information on the customer's right to cancel the lease if Viso Lasik does not meet its obligation to pay. *See id.*

**E.    November 2008 Meeting in Miami**

In November, 2008, several NCMIC employees, including Cook and Thompson, traveled to Brican's offices in Miami, Florida for a series of meetings. Deposition of Todd Cook [DE 223-4] ("Cook Dep."), at 93:5-17.[21] According to Cook, the trip was for general due diligence purposes, and included a visit to a Viso Lasik Medspa location in Wellington, Florida. *Id.*, at 99:7-16. Cook testified that, during these visits, he understood that Viso Lasik was the same entity that was being advertised on the Display Systems. *Id.*, at 99:17-22. Cook further testified that it was his understanding that the Marketing Agreement was offered only to those customers "within the area of the Viso Lasik centers." *Id.*, at 100:4-10.[22]

---

[21] NCMIC financed 471 Display System sales from July, 2008 – when it received Del Castillo's email – through November, 2008. *See* [DE 376-1].

[22] According to Brican, the three Viso Lasik centers were located in Wellington, Florida, in Charlotte, North Carolina, and in San Antonio, Texas.

**F.     Cook Provides Feedback on the "Cancellation" Provision**

On November 25, 2008, Cook sent an email to Maureen Ryan, a Brican employee, with

proposed changes to the Marketing Agreement's Cancellation provision. *See* Email from T.

Cook to M. Ryan [DE 223-10].  The original language of the provision, as it appears in the email,

reads as follows:

> **Cancellation**: If VISO LASIK MEDSPAS fails to honor its commitments relating
> to the advertising fees, the Client may request that Brican repurchase the Client's
> lease agreement in regarding to (sic) the Exhibeo Concept.[23]

*Id.*, at 2.  After Cook's changes, the clause read as follows:

> **Cancellation**: If VISO LASIK MEDSPAS fails to honor its commitments relating
> to the advertising fees, the Client may request that Brican repurchase the Exhibeo
> Concept.  Upon acceptance by Brican of the Client's request, Brican agrees to
> refund to the title/lien holder the outstanding balance due.  Brican does not
> assume or relieve any obligation, financial or otherwise, that the Client has
> entered into with regard to the Exhibeo Concept.

*Id.*, at 2.

Of the eight versions of the Marketing Agreement, none contains language similar to that

proposed by Cook in 2008.  Thus, it appears that Brican did not implement Cook's suggestions in

any of the Marketing Agreements with Plaintiffs.  The record is silent as to whether Cook

followed up with Brican regarding these suggestions.

**G.     NCMIC Terminates the Financing Program**

Gregory Cole, NCMIC's president and Cook's supervisor, testified that on or about April

13, 2009 he received an anonymous phone message "regarding a problem with a vendor

relationship."  Affidavit of Gregory Cole ("Cole Aff.") [DE 342-1], ¶ 13.  Cole later learned that

the caller was a Brican salesman named James Adams.  *Id.*  According to Cole, Adams informed

---

[23] This language corresponds to Version 6 of the Marketing Agreement.

him "of Brican's business model, including the fact that Brican and Viso Lasik had entered into Marketing Agreements with virtually all of Brican's customers." *Id.*

On April 15, 2009, NCMIC stopped funding the Brican leases. *Id.*  The following week, Cole, Cook, and several other NCMIC employees returned to Miami for a second meeting with Brican.  Cole Aff., ¶ 13; Cook Dep., at 111:12-19.  According to Cook, during this meeting NCMIC was told that: (1) Brican had used the Marketing Agreements in connection with all sales financed by NCMIC; and (2) Brican was funding Viso Lasik to cover the advertising payments. *Id.*, at 111:12-25; 112:1.  By the time of the April 2009 meeting, NCMIC also knew that Brican had an ownership interest in Viso Lasik. *Id.*, at 112:6-9.

## III.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001).  Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)).  The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## IV. Analysis

### A. Threshold Issues

#### 1. Plaintiffs' Representations That This is a "Paper Case"

On May 18, 2011, at the Status Conference at which all the Parties' counsel were present, Plaintiffs' counsel stated that Plaintiffs' claims "are not premised on oral representations at all but written misrepresentations which are identified in the [First Amended Common] Complaint." [DE-193], at 42:24-25; 43:1-2.[24]  Based on these representations, the Court required Plaintiffs to amend their statement of Legal Claims and Elements. *See* May 20, 2011 Order [DE-192].[25]

---

[24] *See also id.*, at 43:3-8 ("THE COURT: So what you are saying is you are agreeing it is a paper case?  MR. GOSSETT: Yes, ma'am.  THE COURT: So you are also agreeing that what was involved in the sales presentation is really not relevant to your case?  MR. GOSSETT: Yes, ma'am.").

[25] The Order states, in pertinent part:

> Plaintiffs stipulated that the allegations of the First Amended Common Complaint...are not premised on oral representations.  In other words, this is a "paper case," not an oral case or even a hybrid case (written misrepresentations coupled with oral misrepresentations).  The Court will hold Plaintiffs to these stipulations.

*Id.*, at 1.

Plaintiffs' Amended Statement of Legal Claims and Elements [DE-196] contains an admission that the "basis for claims to misrepresentations made in the First Amended Common Complaint (FACC) **are based upon written documents**, specifically the Equipment Lease Application and Agreement signed by every Plaintiff, and the Marketing Agreement also signed by them as part of the singular transaction to acquire the Exhibeo information display system and a stream of marketing and advertising fees to pay for said system(s)." Pls.' Am. Stmt. of Leg. Cls., at 11 (emphasis supplied). Specifically, Plaintiffs point to the following four variations of the Marketing Agreement's "Cancellation" provision:

> **Cancellation**: If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement.

> **Cancellation**: If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled by the Client.

> **Cancellation**: If the advertised Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, the Client may request that Brican repurchase the Client's lease agreement in regard to the Exhibeo Concept.

> **Cancellation**: If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreement in regard to the Exhibeo Concept.

*Id.*, at 12.

On May 29, 2013, Plaintiffs elaborated further on this issue:

> Plaintiffs are not repudiating their prior stipulation that this is a "paper case," but rather, are explaining to the [C]ourt the proper application of the parol evidence rule to interpret the [Marketing Agreements and the Financing Agreements], and to reconcile the seemingly contradictory cancellation provisions – the financing contract (non-cancellable) and the advertising agreement (lease cancellable if advertising fees not paid).

Reply to NCMIC's Resp. To Pls.' Notice of Compliance [DE 411-1], at 1.  Plaintiffs also

reiterated their position that

> [T]his is a paper case concerning the conflict between the two documents presented to the doctors in one sales program where one document says it's cancellable, the other document says it is not.  And when the marketing fees were not paid triggering the ability to cancel the documents, the doctors attempted to cancel and NCMIC says it's not cancellable.

*Id.*, at 3-4.

Florida law[26] is clear that "[t]he parol evidence rule bars claims arising out of prior extrinsic agreements, oral or written, which vary, alter, or modify the terms of a clear, unambiguous, and fully integrated document." *Ali R. Ghahramani, M.D., P.A. v. Pablo A. Guzman, M.D., P.A.*, 768 So.2d 535, 537 (Fla. 4th DCA 2000).  Thus, "[u]nless an ambiguity exists because contractual terms cannot be reconciled, a court need not (and should not) look to extrinsic sources to determine the parties' intent." *Harris v. School Bd. of Duval County*, 921 So.2d 725, 733 (Fla. 1st DCA 2006) (citations omitted).[27]

Based on Plaintiffs' statements and representations to the Court, the question of whether the Court may consider the oral representations of Brican's sales representatives in connection with the sales to individual Plaintiffs only comes into play if the terms of the relevant agreements cannot be reconciled as a matter of law.  Thus, to the extent these terms are found to be mutually consistent, the Court will focus its analysis on the terms of the Marketing Agreements.

---

[26] The law applicable to the Financing Agreements is determined by their respective choice of law provisions.  The one-column agreements contain a choice of law provision requiring that all disputes in connection with the agreements be resolved in accordance with Florida law.  The three-column agreements, on the other hand, provides that the law of the state where NCMIC is incorporated (*i.e.* Iowa law) applies.  The Parties do not dispute this issue.

[27] Iowa law is consistent with this principle.  *See Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991) ("It is the cardinal principle of contract construction that the parties' intent controls; and except in cases of ambiguity, this is determined by what the contract itself says.").

### 2.    The Parol Evidence Rule Does Not Preclude the Introduction of Other Extrinsic Evidence.

Plaintiffs' stipulation that this is a paper case, however, does not resolve the issue of whether the Court may consider other evidence extrinsic to the Financing Agreements in ruling on the pending motions.  Plaintiffs urge the Court to consider the following evidence – (1) the Marketing Agreements; (2) the Scott Letter; (3) the emails between Jean Thompson and Dr. Del Castillo regarding the Recomm matter; (4) other evidence regarding Recomm, including the *Tampa Tribune* articles; (5) evidence regarding Brican's Powerpoint presentation to the doctors explaining the Marketing agreements; (6) communications between NCMIC and Brican with suggested changes to the Marketing Agreement's "Cancellation" provision; and (7) evidence of communications with Adams regarding Brican's fraud.

NCMIC opposes the introduction of this evidence on the grounds that it is extrinsic to the financing agreements and thus barred by the parol evidence rule. However, this evidence is not being offered to alter or amend the lease agreement's hell or high-water clause, but rather to establish that NCMIC knew or should have known that the Marketing Agreement provided that the Plaintiffs could terminate their leases in the event they stopped receiving the advertising payments.  Further, the "jugular" issue which the Court identified for the Parties relates to what NCMIC knew about the Marketing Agreement's "Cancellation" provision and what legal effect, if any, this knowledge has on NCMIC's responsibilities in this matter.  Obviously, it would be impossible for the Court to resolve this issue without resorting to evidence extrinsic to the Financing Agreements.  As such, this evidence is not barred by the parol evidence rule, and the Court will consider it in ruling on the instant motions.

**B.      The "Cancellation" Clause in Versions 5-8 of the Marketing Agreement can be Reconciled with the Hell or High Water Clause.**

Plaintiffs' grounds for relief can be distilled to the following statement: despite the existence of the apparently ironclad hell and high water clause, NCMIC knew that Brican was executing Marketing Agreements with its customers that expressly allowed them to cancel the Financing Agreement if Viso Lasik stopped making monthly advertising payments. *See* Pls.' Mot., at 9.  Plaintiffs contend that because the hell and high water clause cannot be reconciled with the Marketing Agreements "Cancellation" provision, it is not enforceable.

In response, NCMIC argues that the hell or high water clauses and the "Cancellation" clause can be harmonized such that the advertisement agreement's "Cancellation" provision does not result in a cancellation of Plaintiffs' obligations under the lease agreements.  NCMIC points specifically to versions 5-8 of the Marketing Agreements.  These versions provide, in relevant part:

> Version 5, 7:   **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it, Brican will repurchase the Client's lease agreement in regard to the Exhibeo Concept.
>
> Version 6:   **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees, the Client may request that Brican repurchase the Client's lease agreement in regard to the Exhibeo Concept.
>
> Version 8:   **Cancellation:** If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreements in regard to the Exhibeo Concept.

According to Plaintiffs, NCMIC financed 908 sales in conjunction with versions 5-8 of the Marketing Agreement.  *See* [DE 376-2].  With few exceptions, the one-column Financing Agreement was used in these transactions.  *See* [DE 376-1].  Brican began using the one-column

Financing Agreements in November, 2008. *Id.* It appears that more than half of the leases

NCMIC financed were completed between this date and April, 2009. *Id.*

The non-cancellation clauses in both the three-column and the one-column leases are

found in the Preamble and Paragraph 1 of both versions of the leases. Through these provisions,

each Plaintiff agreed that its obligation to pay was unconditional and non-cancellable. *See, e.g.,*

Three-Column Lease, [DE 342-2], ¶ 1 ("This Lease is NON-CANCELLABLE FOR THE

ENTIRE LEASE TERM. YOU UNDERSTAND THAT WE ARE BUYING THE

EQUIPMENT BASED ON YOUR UNCONDITIONAL ACCEPTANCE OF THE

EQUIPMENT AND YOUR PROMISE TO PAY US UNDER THE TERMS OF THE

LEASE....") (emphasis in original).

Viewing the undisputed facts in the light most favorable to Plaintiffs, the "Cancellation"

clauses in versions 5-8 of the Marketing Agreement have no effect on the enforceability of the

hell or high water clauses in the Financing Agreements. By their own terms, these clauses do not

allow for the cancellation of the financing agreements, but merely provide that (1) if Viso Lasik

Medspas fails to make its advertising payments, and (2) if a client requests it, then Brican

promises to assume the client's obligations in the financing agreements.[28] In fact, Version 6 of

the Marketing Agreement does not include a promise by Brican to assume any of the client's

obligations, but states only that "the Client *may* request that Brican repurchase the Client's lease

_____

[28] Although the Marketing Agreements are hardly a model of clarity as to what Brican,
LLC's promise to "repurchase" or "assume assignment" of the leases encompassed – *e.g.*, for the
vast majority of the transactions Brican, LLC never owned the leases and to "assume
assignment" suggests that Brican, LLC would become the obligee under the leases – there is no
ambiguity in these versions of the Marketing Agreement to suggest that the obligations under the
Financing Agreements could be cancelled.

agreement in regard to the Exhibeo Concept." There is nothing in the agreements, however, that requires Brican to accept this request.

That fact that the clause at issue is entitled "Cancellation" does not by itself give rise to a question of fact as to whether the hell or high water clause in the leases can be reconciled with the "Cancellation" provision. Florida law is clear that "the headings or subheadings of a document do not dictate the meaning of the entire agreement, especially where the literal language of the heading is contrary to the agreement's overall scheme." *Hinely v. Florida Motorcycle Training, Inc.*, 70 So.3d 620, 624 (Fla. 1st DCA 2011)[29]; *see also U.S. v. R.F. Ball Const. Co.*, 355 U.S. 587, 593 (1958) (Whittaker, J., dissenting) ( "Substance, not form or labels, controls the nature and effect of legal instruments.").

Plaintiffs also contend that the "underlying reality" of the transactions at issue "is that the cancellation provision was placed in the advertising or marketing agreements by Brican, with the express authority of NCMIC, to inform the customers that if the advertising fees were not received by them, they would no longer be responsible for making the lease payments." Pls.' Resp., at 10. However, the unambiguous terms of Version 6 of the Marketing Agreement belie this assertion because the Cancellation provision states only that a customer "may request" that Brican repurchase the Lease Agreement, but does not require Brican to do so if the customer makes such a request. Similarly, as to Versions 5, 7, and 8, the clauses contain no indication whatsoever giving rise to a client's right to cancel the financing agreement. Quite to the

---

[29] Iowa law is in accord with this principle. *See Greenberg v. Alter Co.*, 124 N.W.2d 438, 441(Iowa, 1963) ("In interpreting a contract words should be given their plain ordinary meaning and interpreted in the context in which used. The entire contract is to be considered to determine the meaning of each part. A clause or sentence is not assumed to have no effect when it can have reasonable intendment.")

contrary, as NCMIC points out, at best they only provide a promise by Brican to "repurchase" or "assume assignment" of the agreements.

Here, the "Cancellation" provisions in version 5-8 of the Marketing Agreement are not inconsistent with the Financing Agreement's hell or high water clause so as to nullify the Financing Agreements executed in conjunction with these versions of the Marketing Agreement. Thus, because these terms can be reconciled, Plaintiffs have failed to establish a genuine issue of material fact precluding summary judgment in NCMIC's favor.  Therefore, NCMIC's motion for summary judgment is granted as to the transactions involving Versions 5-8 of the Marketing Agreements.

**C.    There is an Issue of Material Fact Regarding NCMIC's Knowledge of the Extent of Brican's Use of Versions 1-4 of the Marketing Agreement and the "Cancellation" Clause in these Agreements.**

The analysis of the "Cancellation" clause in Versions 1-4 of the Marketing Agreement produces a different outcome from the analysis of Versions 5-8.  This is because, in the case of Versions 1-4, the agreement's language is ambiguous as to whether the Financing Agreements could be cancelled.[30]  Thus, a determination of (1) when NCMIC learned about the "Cancellation" clause in these Marketing Agreements, and (2) what actions NCMIC took as a result of this knowledge, is relevant to the issue of the Parties' intent in entering these agreements,[31] and, more specifically, whether NCMIC intended to create an exception to the hell or high water clause.

---

[30]  *See, e.g.,* Marketing Agreement, Version 4 [DE 342-4, at 11] ("...all related agreements can be cancelled....").

[31]  According to Plaintiffs, approximately 408 NCMIC-financed transactions involved Versions 1-4 of the Marketing Agreement.

On the present record, there is a genuine issue of material fact regarding these factual questions. First, Vincens' testimony that Fred Scott knew about the Marketing Agreements as early as June 2006 – and authorized Brican to use the agreements – is at odds with the June 19, 2006 email from Scott to Artino and the Fred Scott letter. These documents make no reference to advertising and/or marketing payments, but state only that NCMIC's proposed preferred repayment plan is being offered to support Brican's "Return Guarantee" or "return policy." Further, Vincens' testimony on this issue is contradictory. He testified that Brican sold the Display Systems in reliance on NCMIC's representation in the Scott Letter that it would receive a preferred payoff if a customer cancelled the Financing Agreement, but also stated, in the same deposition, that Brican expressly instructed its sales staff to inform all customers that the agreements could not be cancelled even if the advertising payments stopped. These inconsistent statements present issues of fact to be resolved by the jury.

Second, the fact that NCMIC became aware of the allegations against Recomm described in the *Tampa Tribune* articles does not by itself irrefutably establish that it was aware of the interplay of the Marketing and Financing Agreements and – more specifically – of the Marketing Agreement's "Cancellation" clause. While there is evidence supporting the argument that NCMIC should have done more to investigate Brican's activities after learning about Recomm, there is nothing in the *Tribune* articles or the Powerpoint presentation attached to the July 23, 2008 e-mail from Lemacon to Cook, indicating that Brican was informing its customers that the Financing Agreements could be cancelled under certain circumstances. Similarly, Lemacon's explanation that the Marketing Agreements were being implemented with "some dentists," and that NCMIC was welcome to visit a Viso Lasik Medspa, is consistent with NCMIC's allegation

that it believed that Brican was offering the agreements only to those customers located in the vicinity of the Viso Lasik Medspas, and not, as would become clear later, to all customers.

The same is true of the events following the November 2008 meeting between NCMIC and Brican in Miami. Although it is undisputed that Cook knew about and suggested a modification to the "Cancellation" clause, as explained in Section IV.B., this version of the Marketing Agreement (Version 6) can be reconciled with the hell and high water clause. Moreover, Cook's suggested changes are not a clear indication that NCMIC interpreted the original clause to allow Plaintiffs a right to cancel the Financing Agreements. Rather, the modification could be interpreted as Cook's attempt to clarify (1) that Brican's offer to the customer was to repurchase the Display System, *not* the financing agreement; and (2) that the customer's obligations under the Financing Agreement would continue even after Brican agreed to purchase the Display System. Because the evidence is susceptible to multiple reasonable inferences, the Court cannot decide this issue as a matter of law.

**D.      There is an Issue of Fact as to Whether Brican's Sales Representatives Acted as NCMIC's Apparent Agents in Their Presentation of the Marketing Agreements.**

Plaintiffs assert that Brican acted as NCMIC's agent such that Brican's actions should be attributed to NCMIC. Plaintiffs argue that NCMIC's status as Brican's agent is legally significant for the following reasons. First, by giving Brican authority to tell Plaintiffs that the Financing Agreement were cancellable if the advertising fees were not paid, NCMIC effectively modified the Financing Agreements and created an exception to the hell or high water clause. *See* Pls.' Mot., at 16-19. Second, as Brican's principal, NCMIC is estopped from enforcing the hell or high water clause where Brican represented to its customers – both in writing (through

30

the Marketing Agreements) and orally as part of the sales presentations – that the Financing

Agreements could be cancelled under specified circumstances. *See Wigdor* Pls. Motion, at 7.

Third, Plaintiffs argue that, as a matter of law, Brican's fraud can be attributed to NCMIC as its

principal, even though Brican may have acted in a manner adverse to NCMIC's interests. *Id.*, at

9. Fourth, Plaintiffs contend that a determination as to Brican's agency is essential because "the

existence of that agency makes NCMIC and Brican the equivalent of a single party" for purposes

of determining whether the Marketing and Financing Agreements should be interpreted as a

single document. *Id.*, at 10.

      NCMIC urges the Court to reject Plaintiff's agency theory on several grounds. As a

threshold matter, NCMIC argues that Plaintiffs failed to properly plead agency in violation of

Federal Rule of Civil Procedure 8(a)(2). *See also Molinos Valle Del Cibao, C. Por A. v. Lama*,

633 F.3d 1330, 1351-52 (11th Cir. 2011) (refusing to consider a plaintiff's agency theory because

it was never pled in the complaint and plaintiff "did not raise an agency theory in any of its court

filings up until trial.").

      Here, agency was properly pled pursuant to Federal Rule of Civil Procedure 8. The

*Blauzvern* Complaint alleges that "the parties agreed that [Brican America, Inc. and Brican

America, LLC], would be agents for NCMIC" based on various specific agreements between

NCMIC and Brican, Inc. and/or Brican, LLC, including:

(1)    that NCMIC...would supply an equipment financing form which would be printed with the logo of Brican America, LLC, prominently displayed on the top of the page;

(2)    that sales agents sent by [Brican] would be the only interface between the potential customer and NCMIC;

(3)    that the sales agents would gather the information as directed by NCMIC, and...would transmit it to NCMIC for a credit decision;

(4)    that the sales agents would complete the equipment financing agreements;

> (5)   [that the sales agents] would answer all questions which the customer might have about the financing agreements;
>
> (6)   [that the sales agents] would obtain the signature of the direct contract obligor and a personal guarantor on the agreements; and
>
> (7)   [that the sales agents] would transmit the information to NCMIC.

*Blauzvern Compl.*, ¶¶ 113-114.  Similarly, Paragraph 109 of the First Amended Common Complaint asserts that the sales agents who presented the Viso Lasik system to the relevant customers "would be agents for NCMIC and Brican."  FACC, ¶ 110.  These allegations are sufficient to satisfy the Federal Rule's pleading requirements.

### 1.   Three-column Financing Agreements

The next issue is whether Plaintiffs have established sufficient facts for their agency theory as to the three-column agreements, in which NCMIC was the lessor and Brican, Inc. was the vendor.  Plaintiffs contend that an express agency exists between Brican, Inc. and NCMIC based on the "Partnering for Success" document [DE 344-46] and the General Vendor Agreement [DE 223-22].  According to the *Wigdor* Plaintiffs, an express agency between Brican, Inc. and NCMIC also exists based on the "conduct associated with Brican's marketing efforts and of Brican's sales personnel in the marketing of the equipment."  *Wigdor* Pls.' Mot., at 7.

NCMIC responds that there is no evidence of an express or implied actual agency between Brican, Inc. and itself.  Under Iowa law, "[a]gency ... results from [the] (1) manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to the former's control and, (2) consent by the latter to so act."  *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 100 (Iowa, 2011).  Thus, "[a]n agency relationship exists where an agent has actual (express or implied) authority or apparent authority to act on behalf of a principal."  *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 79 (Iowa, 2011) (citation

omitted).

Actual authority exists "if the principal has either expressly or by implication granted the agent the authority to act on the principal's behalf." *Schafer*, 797 N.W.2d at 102. Actual authority is composed of either "express" or "implied" authority. *Id.* Express authority exists where there is direct evidence the principal granted authority to the agent to act on its behalf. *Id.* Where circumstantial evidence proves the agent's authority, such authority is implied. *Id.*

The record does not support a finding of either express or implied actual authority for Brican, Inc.'s employees to act on NCMIC's behalf. The undated "Partnering for Success" document appears to be only a business proposal. It is not enforceable against either NCMIC or Brican, Inc. because the document states that it "is not intended to, and does not, create a legally binding commitment or obligation on the part of either party." [DE 344-46, at 5]. Moreover, the document is not executed. *Id.* Similarly, the Vendor Agreement does not establish an agency relationship. This document contains no manifestation of consent by either NCMIC or Brican, Inc. to act as either agent or principal, or any indication that NCMIC granted Brican, Inc. authority to act on its behalf in connection with the financing transactions. Finally, there is no evidence on the record that NCMIC or Brican, Inc. made representations that either conferred authority on the other party to act on its behalf, or created a relationship giving rise to this implied relationship. Therefore, as a matter of law, it is undisputed that no express or implied agency relationship existed between NCMIC and Brican, Inc.

However, there is an issue of fact regarding whether NCMIC acted as Brican Inc.'s apparent agent. "Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing." *Wolfe*, 795 N.W.2d at 79 (internal quotations and citation omitted).

The focus is on the principal's actions and communications to the third party, not the agent's. *Id.* The lease and sale program established between Brican, Inc. and NCMIC was vendor-based, and pursuant to the Vendor Agreement, Brican, Inc. relied on NCMIC for financing. The Parties do not dispute that the customers dealt exclusively with Brican's sales representatives during the transactions at issue. The three-column agreements – which lists PSFS as the lessor – and the one-column agreements – listing Brican, Inc. as the lessor and Brican, LLC as the vendor, and which were ultimately assigned to NCMIC – both feature Brican's logo prominently at the top of the page. According to the established procedure between NCMIC and Brican, Inc., lease applications were forwarded to NCMIC for approval. Furthermore, NCMIC's d/b/a name, Professional Solutions Financial Services, appears in each of the lease agreements under the "lessor" field, an indication that NCMIC allowed Brican's representatives to hold themselves out as PSFS's agents.

The aforementioned facts constitute sufficient circumstantial evidence to create a genuine issue of material fact that NCMIC knowingly permitted and/or held out Brican, Inc. as possessing authority to negotiate the terms of the Financing Agreement as well as prepare the paperwork used to execute the agreement. Although a fact-finder may conclude that NCMIC did not permit or hold out Brican, Inc. as its agent, a genuine issue of material fact exists.

## 2.      One-column Financing Agreements

NCMIC opposes Plaintiffs' agency theory on the grounds that the one-column version of the Financing Agreement expressly disclaims an agency relationship. NCMIC points to the agreement's "No Agent" clause, which provides:

**YOU AGREE THAT THE VENDOR, MANUFACTURER, SALES PERSON, EMPLOYEE OR AGENT OF THE VENDOR OR MANUFACTURER IS NOT OUR AGENT AND HAS NO AUTHORITY TO SPEAK FOR US OR TO BIND US IN ANY MANNER.  IT IS FURTHER UNDERSTOOD THAT WE ARE NOT THEIR AGENT.**

[DE 342-3, at 3].  This clause, however, does not apply to NCMIC because Brican, Inc., not

NCMIC, was the original lessor under the one-column agreement lease.  In fact, the agreement

itself defines "We", "Us", and "Our" as used in the lease to mean Brican, Inc.  *Id.*, at 2.  As the

assignee of the lease agreement, NCMIC could certainly raise the No Agent clause to argue that

the vendor (Brican, LLC) and Brican, Inc. did not have an agency relationship.  However, this is

quite different from NCMIC's position that it, as the assignee of the lease, did not have an

agency relationship due to this provision.  *See, e.g., Colonial Pacific Leasing Corp. v. McNatt*,

486 S.E.2d 804, 808 (Ga. 1997) (holding that an equipment lessees' acknowledgment in a

finance lease that the employees of an equipment supplier were not the agents of a finance lessor

was not necessarily conclusive as to the nonexistence of an agency relationship).

As with the three-column financing agreements, the record does not support an express

agency between Brican and NCMIC in connection with the one-column agreements.  Both

Plaintiffs and *Wigdor* Plaintiffs argue that the General Vendor Agreement [DE-339] created an

express agency relationship between the two entities.  A finding of express agency under Florida

law requires: (1) an acknowledgment by the principal that the agent will act for it; (2) the agent's

acceptance of the undertaking; and (3) control by the principal over the action of the agent.

*Reynolds American, Inc. v. Gero*, 56 So. 3d 117, 119 (Fla. 3d DCA 2011) (internal citations

omitted).  Plaintiffs acknowledge that the written agreements between NCMIC and Brican do not

include any agreement that Brican will act as NCMIC's agent.  *See* Pl.'s Mot., at 18.  Similarly,

the "Partnering For Success" document [DE 344-46] does not evidence a mutual agreement between NCMIC and Brican to establish an agency relationship.  Therefore, no express agency has been established.[32]

There is also an issue of fact, however, as to whether an apparent agency existed between Brican, Inc. as lessor and Brican, LLC as vendor of the Display System.[33]  In Florida, apparent authority exists

> [W]here a principal allows or causes others to believe the agent possesses such authority, as where the principal knowingly permits the agent to assume such authority or where the principal by actions or words holds the agent out as possessing it.  The doctrine rests on the premise that one who allows another to serve as his agent must bear the loss which results to a third party from that party's dealings in reliance on that agent's supposed authority.  But...the doctrine rests on appearances created by the principal and not by agents who often ingeniously create an appearance of authority by their own acts.

*Jackson Hewitt, Inc. v. Kaman*, 2011 WL 3962886, *9 (Fla. 2d DCA 2011).

The one-column agreements show a logo for Brican, Inc. directly below the "lessor" field.  In all cases, Brican, LLC is listed as the vendor.  For most transactions, the Brican entity identified in the Marketing Agreements is also Brican, LLC.  Based on a review of the record, it

---

[32] Plaintiffs' argument that an actual agency exists because "neither party made an effort to avoid" or disclaim the agency relationship is unconvincing.  An express agency requires an express delegation of authority, and "a failure to deny an agency relationship" is not sufficient to support a claim for agency.  *Koens v. Royal Caribbean Cruises, Ltd.*, 774 F. Supp.2d 1215, at *1222 (S.D. Fla. Mar. 25, 2011).

[33] The question of whether an agency relationship existed between the Brican entities is relevant to the "jugular" issue because Brican, Inc. assigned the one-column agreements to NCMIC.  A copy of the lease assignment states that the lessor (*i.e.* Brican, Inc.) "warrants the Lease *and documents related in any way to the Lease* are genuine, enforceable and constitutes (*sic*) the entire agreement with respect to the lease" of the Display Systems.  [DE 223-34, at 5] (emphasis supplied).  A jury finding that an agency relationship existed between the Brican entities, coupled with the express terms of the assignment, would support Plaintiffs' argument that the Marketing and Financing Agreements constituted a single transaction, thus potentially affecting the enforceability of the hell or high water clauses.

is unclear whether the representatives who presented Plaintiffs with the relevant documents in connection with the purchase of the Display System were employed by Brican, Inc. or Brican, LLC. Thus, there is an issue of fact as to who acted as the principal in connection with the one-column leases, precluding summary judgment.

### E.      Plaintiffs' Estoppel by Acquiescence Argument Fails

Plaintiffs assert that "[t]he creation by NCMIC of the program to support Brican America's return policy was a freely voluntary act on behalf of NCMIC which recognizes the ability of Plaintiffs to cancel the financing contracts." Pls.' Mot., at 20. Plaintiffs contend that, as a result, "NCMIC is estopped to enforce the cancelled agreements." *Id.*

Plaintiffs' argument fails under both Florida and Iowa law. In Florida, the elements of estoppel are: (1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it. *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So.2d 1098, 1103 (Fla. 5th DCA, 2006) (citations omitted). "Estoppel rests on the premise that the party asserting the estoppel has acted in reliance upon the prior inconsistent conduct." *Id.*

Here, the record is devoid of facts showing detrimental reliance to establish estoppel. Plaintiffs do not allege that they received the Fred Scott letter. Arguably, only Brican, as the sole recipient of the letter, would have relied on its content by representing to its customers that the Financing Agreements could be cancelled. There is no evidence, however, that Plaintiffs even saw the letter in the course of their relationship with Brican. As such, there can be no equitable

37

estoppel.

The same analysis applies to those agreements governed by Iowa law. Iowa law provides that "[e]stoppel by acquiescence applies when (1) a party has full knowledge of his rights and the material facts; (2) remains inactive for a considerable time; and (3) acts in a manner that leads the other party to believe the act [now complained of] has been approved." *Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa, 2005). Plaintiffs do not allege, and the record does not show, that Plaintiffs knew of the Scott Letter or of NCMIC's discussions regarding Brican's "return policy." Plaintiffs' assertion that NCMIC created a program to support this policy is insufficient to show that it acted in a manner that would lead Plaintiffs to believe that the Financing Agreements could be cancelled because there is no evidence that Plaintiffs knew of this program. Thus, the equitable estoppel claim fails.

## V.     Conclusion

Based on the foregoing, Defendants are entitled to a summary judgment establishing that, for the approximately 900 transactions involving Versions 5-8 of the Marketing Agreement, the "Cancellation" provision does not invalidate the hell or high water clauses in the Financing Agreements. However, as to the remaining transactions involving Versions 1-4 of the Marketing Agreement – which number approximately 400 – there remains an issue of fact regarding Defendants' knowledge of Brican's implementation of the "Cancellation" provision. An issue of fact also remains as to whether Brican acted as NCMIC's apparent agent in the presentation of the Marketing Agreements to Plaintiffs, which could potentially have an impact on all of the Financing Agreements. These factual issues, if resolved in Plaintiffs' favor, would support Plaintiffs' arguments regarding the enforceability of the hell and high water clause in the

Financing Agreements.[34]  Accordingly, it is

ORDERED that

1.      Plaintiffs' Motion for Summary Judgment Against NCMIC Finance Corporation and PSFS 3 Corporation on the "Jugular Issue" [DE-337] is DENIED.

2.      *Wigdor* Plaintiffs' Supplement to *Blauzvern* Plaintiffs' Motion for Summary Judgment as to the "Jugular" Issues [DE-339] is DENIED.

3.      Defendants NCMIC Finance Corporation and PSFS 3 Corporation's Motion for Summary Judgment on "Jugular" Issue [DE-341] is GRANTED in part and DENIED in part.

4.      The Parties shall confer and submit a joint report on a proposed mechanism for resolving the issues remaining in this case pursuant to this Order.  This report must be submitted on or before **August 30, 2013**.

5.      A status conference in this matter is hereby scheduled for **September 13, 2013 at 10:00 a.m.**  Plaintiffs' Motion for Status Conference [DE-399] is DENIED as MOOT.

DONE AND ORDERED in Miami, Florida, this *1st* day of August, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Magistrate Judge Simonton
All Counsel of Record

---

[34] The conclusions of law set forth in this Order are limited to the "jugular" issue directly before the Court, namely, the interplay between the Marketing Agreement's "Cancellation" clause and the hell and high water clause in the Financing Agreement.  Thus, this Order does not decide Plaintiffs' fraud-based claims against NCMIC, which are not based on the interpretation of the contractual terms and, as such, fall outside the scope of the "jugular" issue.  *See* Plaintiffs' Amended Statement of Legal Claims and Elements [DE-196].

39