# United States District Court
# Southern District of Florida

In re: Brican America, LLC, Equipment
Lease Litigation

_____/

Case No.: 10-md-02183-PAS

This Document Relates to
Case No: 10-cv-20782-PAS

Putative Class Action

# Third Amended
# Complaint in *Blauzvern*

Plaintiffs, being all of those entities and individuals listed on the attached schedule, by
and through their undersigned attorneys, sue Defendants, **Brican America, Inc.,** a Florida
corporation, **Brican America, LLC,** a Florida limited liability company, **Brican Financial
Services, LLC,** (hereafter "Brican Financial"), a Florida limited liability company, **Jean
Francois Vincens,** (hereafter "Vincens"), **Jacques Lemacon,** (hereafter, "Lemacon"), **NCMIC
Finance Corporation,** doing business as Professional Solutions Financial Services, an Iowa
corporation, (hereafter, "NCMIC") and **PSFS 3 Corporation,** an Iowa corporation, (hereafter,
"PSFS 3") and allege:

## Allegations as to All Counts

### Jurisdiction and Venue

1.      This court has jurisdiction over this matter under 28 U.S.C. § 1332(d)(2)(A) (the Class
        Action Fairness Act, hereafter "CAFA") because the sum or value of the amount in
        controversy exceeds $5,000,000, exclusive of costs and interest, and is a putative class
        action in which one or more members of the class of Plaintiffs is a citizen of a State

different from any Defendant.

2.    This court does not lose subject matter jurisdiction under CAFA where the Court does not certify a class under CAFA, and thus, continues to have subject matter jurisdiction. *See* 28 U.S.C. § 1332(d)(5)(B), *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 127 S.Ct. 2411, 2416-17 (2007)(The general rule is that post-removal events to not deprive federal courts of subject matter jurisdiction.); and, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 fn. 12 (11th Cir. 2009). *See also, Colomar v. Mercy Hospital, Inc.*, 2007 WL 2083562 *1 (S.D.Fla.)(Seitz, J.).

3.    Finally, this case meets the definition of "mass action" found in 28 U.S.C. § 1332(d)(11)(B)(i), and more than one Plaintiff has a claim which exceeds $75,000.  For instance, Plaintiff David Lauren Fitzgerald, O.D., P.A., has claims based on seven contracts which, according to Defendant PSFS 3 Corp., have an aggregated balance owing of $122,233.11.  (*See PSFS 3 Corp. v. David Lauren Fitzgerald, O.D., P.A.,* CL No. 118498 (Iowa Dist. Crt.).)  Therefore, this Court continues to have subject matter jurisdiction even after denial of class certification.

4.    Venue is properly vested in this court because almost all of the Defendants are residents of the Southern District of Florida, or are authorized to do business in the State of Florida, many of the contracts were entered into within the jurisdiction of this court, and because many of the applicable contracts contain a choice of situs provision (also known as a forum selection clause) whereby the parties have agreed that any action related to the contract shall be situated in Miami-Dade County, Florida.

2

## Parties

5.     Plaintiffs are listed by name and citizenship on the schedules attached hereto.  Each Plaintiff is listed under the column headed "Organization Name" and "Guarantor." The state of citizenship of each Plaintiff is listed under the column labeled "St."

6.     Plaintiffs are dentists or optometrists, or the business entity under which the dentists and optometrists conduct business.

**(Defendants ¶¶ 7 - 93.a.iii, pp. 3 - 21)**

**Brican America, Inc.**

7.     Brican America, Inc., at all material times hereto, was a corporation organized and existing under the laws of the State of Florida, having its principal place of business in Miami-Dade County, Florida, and at all material times hereto was authorized to sue and be sued.

8.     Brican America, Inc., at all material times hereto, was a citizen of the State of Florida, and had its principal office at 5301 Blue Lagoon Drive, Suite 520, Miami, FL, as did Brican America, LLC, Brican Financial and the registered agent of JJR Investments, LLC.

9.     Brican America, Inc., was formed on July 30, 2004, by Laurent Goldstein and Vincens, (also known as Jeff Vincens) who at the time was an owner of 50% of the outstanding stock of Brican Systems Corporation Vancouver (hereafter Brican Canada). [Vincens Tr., pp. 16-18[1].]

---

[1] "[Vincens Tr.,]" refers to the transcript of the deposition of Vincens taken on Oct. 8, 2009, in the case of *NCMIC Finance Corporation v. Brican America, Inc.,* case number 09-CV-21192 (Huck) (S.D.Fla.).

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

10.     The original stockholders of Brican America, Inc., were Vincens, Lemacon, and Laurent Goldstein.  [Vincens Tr., p. 17.]

11.     The last known stockholders of Brican America, Inc., were Vincens and Lemacon. [Vincens Tr., p. 18.]

12.     Brican America, Inc., presently has no business, but when it did business, the primary business of Brican America, Inc., was to sell Display Systems to raise money to open and operate the business of Viso Lasik Medspas, LLC.  At one point in time during its sales process, the primary business of Brican America, Inc., (selling Display Systems to raise money for Viso Lasik Medspas, LLC), was transferred to Brican America, LLC, to act as vendor under equipment financing agreements, and the business of Brican America, Inc., became to act as the lessor of equipment financing agreements which were to be immediately assigned to NCMIC.

13.     The use of Brican America, Inc., to be the lessor and assignor, and the use of Brican America, LLC, to act as vendor, was done at the direction of NCMIC.

**Brican America, LLC**

14.     Brican America, LLC, at all material times hereto was a limited liability company organized and existing under the laws of the State of Florida, having its principal place of business in Miami-Dade County, Florida, and was authorized to sue and be sued.

15.     Brican America, LLC, was a citizen of the State of Florida, and had its principal office at 5301 Blue Lagoon Drive, Suite 520, Miami, FL.

16.     Brican America, LLC, was formed on July 18, 2006.

17.     The managing members of Brican America, LLC, were Vincens and Lemacon.

4

18.     The primary business of Brican America, LLC, was to sell Display Systems to raise money to open and operate the business of Viso Lasik Medspas, LLC, and to thereby act as vendor under equipment lease agreements to be entered into by Brican America, Inc., immediately assigning those agreements to NCMIC.

**Brican Financial Services, LLC**

19.     Brican Financial at all material times hereto was a limited liability company organized and existing under the laws of the State of Florida, having its principal place of business in Miami-Dade County, Florida, and at all material times hereto was authorized to sue and be sued.

20.     Brican Financial was a citizen of the State of Florida, and had its principal office at 5301 Blue Lagoon Drive, Suite 520, Miami, FL.

21.     Brican Financial was formed on April 17, 2009, the day after NCMIC stopped funding contracts for Brican America, Inc.

22.     The managing members of Brican Financial were Vincens and Lemacon.

23.     The primary business of Brican Financial was to act as the lessor under supposed equipment financing agreements which were intended to be (and some were) sold to leasing companies in connection with the sale of Display Systems by Brican America, LLC.

24.     Brican Financial had, by not later than April 19, 2009, "taken over the business of Brican America, LLC." [Vincens Tr. pp. 95-96.]

5

**Jean Francois Vincens**

25. Vincens is a citizen of the countries of France and Canada, and at all material times hereto was in the United States of America on a visa.  [Vincens Tr., p. 8.]

26. While in the United States of America, Vincens, resided in Miami-Dade County, Florida.

27. Vincens is over the age of 18 and is *sui juris*.

28. Vincens at all material times hereto was a substantial stockholder and officer in the following corporations which are involved in this suit, and was a managing member or an officer of a corporation which is a managing member, of limited liability companies which are involved in this suit:

   a. Brican America, Inc.;

   b. Brican America, LLC,;

   c. Brican Financial Services, LLC;

   d. JJR Investments, LLC, which itself is a managing member of the following limited liability companies involved in this suit:

      i. Viso Lasik Medspas, LLC;

      ii. Viso Lasik Medspas of Charlotte, LLC; and

      iii. Viso Lasik Medspas of San Antonio, LLC.

29. Vincens has previously been involved in an equipment financing fraud described by the United States Court of Appeals, Eleventh Circuit as:

   This case involves a scheme to use electronic billboards and kiosks (collectively "kiosks") for advertising. The promoters of the scheme[FN1] executed it in the following way. First, they organized Optical Technologies, Inc., and a

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

group of affiliated companies, Recomm International Display Corp., Recomm Operations, Inc., and Recomm Enterprises, Inc. (hereafter referred to collectively with Optical Technologies, Inc., as "Recomm").[FN2] Recomm, in turn, (1) convinced several advertising agencies of the merits of advertising via kiosks, and (2) convinced pharmacists, veterinarians, optometrists, and others of the profits they would earn by locating the kiosks at their places of business. Having accomplished this, Recomm (3) acquired the necessary kiosks, leased them to the pharmacists and others (the "Lessees"), assigned the leases to finance companies (the "Lessors"),[FN3] and (4) entered into advertising contracts with the Lessees. These contracts provided that the Lessees would receive a stated percentage of the fees Recomm received from the advertising agencies. Recomm, the Lessees, and the Lessors contemplated that the Lessees' share of the advertising fees would more than cover the Lessees' lease payments.

FN1. Jean Francois Vincens and Raymond Manklow.

FN2. The promoters formed other Recomm corporations as well. Although it is unnecessary to refer to them by name, all ultimately became part of the Chapter 11 bankruptcy case involved in this appeal.

FN3. As far as we can tell from the record, the lease assignments were without recourse.

The scheme worked for the benefit of all parties for a few years, until mid-1995, when Recomm began to experience cash-flow problems and ceased remitting to the Lessees their portions of the advertising fees. The Lessees responded in two ways. First, they quit paying the Lessors the rent due on the kiosk leases; then, they sued Recomm. As the law suits multiplied, Recomm turned to the bankruptcy court for relief. In January 1996, Recomm filed a Chapter 11 petition[FN4] in the Bankruptcy Court for the Middle District of Florida.[FN5]

*In re: Optical Technologies, Inc.*, 425 F.3d 1294, 1296-97 (11th Cir. 2005)[2].

---

[2]Contrary to the assertion made by Vincens' former counsel at the hearing on the cross-motions for summary judgment, that "But in any event it [sic–he, meaning Vincens] had nothing to do with the fraud or alleged fraud that later occurred under different management" (Tr. 72:4-5), witness James Thompson of Oldsmar, Florida (who was personally recruited by Mr. Vincens from his position as Vice-President of American Express Thomas Cooke in New York to come to Florida to run the travel business arm of Mr. Vincens' companies) advises that the fraudulent sales of advertising kiosks by the Recomm Companies, including Optical Technologies, was done under the direction of Mr. Vincens.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

30.     In February, March and April, 2006, the *Tampa Tribune* published one article in each month about Recomm and Vincens.  (Vincens Dep. Ex. 31.)

a.      The first such article included information that Vincens had allegedly "absconded with the money [$7,788,170] in [sic]a foreign country," and that:

The alleged scheme has all the properties of a Ponzi scheme.  Recomm marketed the electronic signs to customers, promising that the signs would attract advertising dollars that would be shared with sign owners.  Recomm would sell or assign leases for the electronic signs to a finance company, which would collect monthly lease payments from customers.   But the advertising dollars never materialized as expected, and the company found itself subsidizing rebate checks with money from the finance companies.

This system let Recomm to build [sic] its sign-marketing business, but left it with commitments worth at least $100 million.  The arrangement, where old customers were kept happy with dollars from new customers, is not disputed by Recomm's current officials.

(Vincens Dep. Ex. 31, p. 4.)

b.      The second *Tampa Tribune* article reported:

Eleven states, including Florida, have started to look into the marketing practices of Recomm, a Tampa company at the heart of thousands of consumer complaints nationwide. ...

... "Should the finance companies know, or should have known, that Recomm couldn't make the agreements work, it is my position that they were engaging with Recomm in civil fraud," said William Brauch, Iowa's assistant attorney general. ... Besides Iowa, the other states looking into Recomm are Alabama, Arkansas, Florida, Kansas, Idaho, Kentucky, Michigan, North Carolina, Oklahoma and Texas.

One of the major sources of investigator interest is Recomm's practice of promising each customer a rebate check that would nearly cover the monthly lease payment for the message board.  The promised rebate check, say customers, made it seem like the $300 lease payment would hardly make a dent in their pocketbook.  The message board, meanwhile, was supposed to advertise services and products that would boost sales.

But Recomm stopped sending those checks out, even as the finance companies continued to demand payment on the leases.  It turns out, company officials acknowledge, that Recomm attracted few companies to place advertisements on the

8

message boards.  Recomm used cash from the finance companies to send out the
rebate checks until the practice became financially untenable.  That practice, of
paying off old customers with cash generated from new customers, with the intent
to defraud, is the definition of a Ponzi scheme.

(Vincens Dep. Ex. 31, p. 5.)

        c.      The last *Tampa Tribune* article included:

Recomm ... marketed electronic message boards to small businesses, typically
veterinarians and pharmacists.  The agreements had a business pay a finance
company about $300 a month for using the sign, which would flash messages to
waiting patrons.  In return, Recomm was to pay the equivalent of $270 a month to the
business from revenues raised from advertisements run on the signs.  By mid-1995,
however, Recomm stopped paying the advertising rebates, even though the finance
companies continued to seek the lease payments.   About 15,000 businesses
throughout North America have the signs and most are waiting for $152 million in
rebates.

Those customers allege Recomm was a Ponzi scheme, where new customers were
signed up merely to pay off old customers until not enough new customers could be
found.

(Vincens Dep. Ex. 31, p. 4.)

        d.      These articles were sent to NCMIC July 15, 2008, by Dr. Daniel DelCastillo[3] along

with a cover sheet which includes the following warning:

In the 1990's [sic], Mr. Manklow and his partners scammed millions of dollars from
unsuspecting pharmacists, chiropractors, veterinarians, and others selling LED
signboards with the premise to cover most of the lease costs with advertising dollars.

As you will see from the attached Tampa Tribune articles, you need to make sure that
the leasing company that is charging you the $500 for your equipment is aware you
are expecting $450 a month for advertising!!!

(Vincens Dep. Ex. 31, p. 2.)

        e.      These articles were received by NCMIC employee Jean Thompson, who personally

spoke with Dr. DelCastillo.

---

[3]Dr. DelCastillo is a Plaintiff in the *Wigdor* suit.

9

      f.     Jean Thompson forwarded these documents to her superior, Todd Cook, who was vice-president and general manager of the equipment leasing division of NCMIC.

      g.    Todd Cook testified that he advised his superior, Gregory Cole, president of NCMIC Finance Corp., that NCMIC had received the above documents. [Cook Tr. 73:4-12.]

      h.    Mr. Cole denies receiving that advice.  [Cole Tr., p. 15.]

31.    Vincens duplicated the Optical Technologies scheme using Brican America, Inc., Brican America, LLC, and Brican Financial.

32.    Vincens sold his stock in the Recomm Companies to three Recomm employees in 1994, and received a total of $8,965,170 for his stock in Recomm International, Recomm Enterprises and/or Recomm Operations.  *In re: Optical Technologies, Inc.*, 252 B.R. 531,  534-536 (M.D.Fla. 2000).

33.    In 2004, Vincens returned to the United States to begin the business of Brican America, Inc., which was to sell advertising to be displayed in the offices of optometrists (and later, dentists and other health care providers) utilizing a flat screen television, a computer and inexpensive computer software, as a means of raising money to equip, build-out and open a business through which to sell spa treatments in upscale offices referred to as a medical spa.  [Vincens Tr., p. 9.]

**Jacques Lemacon**

34.    Upon knowledge, information and belief, Plaintiffs allege that Lemacon is a citizen of a country other than the United States of America, and was present in the United States pursuant to a visa.

35.    While in the United States of America, Lemacon resided in Miami-Dade County,

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828  • Fax (954) 983-2850

Florida.

36.     Lemacon is over the age of 18 and is *sui juris*.

37.     Lemacon at all material times hereto was a substantial stockholder and officer in the following corporations which are involved in this suit, and was a managing member or an officer of a corporation which is a managing member, of limited liability companies which are involved in this suit:

    a.     Brican America, Inc.;

    b.     Brican America, LLC,;

    c.     Brican Financial Services, LLC;

    d.     JJR Investments, LLC, which itself is a managing member of the following limited liability companies involved in this suit:

        i.     Viso Lasik Medspas, LLC;

        ii.     Viso Lasik Medspas of Charlotte, LLC; and

        iii.     Viso Lasik Medspas of San Antonio, LLC.

38.     Lemacon at all material times hereto was the owner of the company used to supply the computer hardware and television systems for the Brican Display Systems.

**NCMIC Finance Corporation**

39.     NCMIC is a corporation organized and existing under the laws of the State of Iowa, is a resident and a citizen of the State of Iowa, having its principal place of business in the State of Iowa.

40.     NCMIC was incorporated on September 9, 1993.

41.     NCMIC adopted the fictitious name "Professional Solution Financial Services" on July

6, 2009[4].

42.   NCMIC is authorized to sue and be sued.

43.   NCMIC at all times material hereto, was and is authorized to do business in, and is
doing business in, the State of Florida.

44.   NCMIC began life as National Chiropractic Mutual Insurance Company, whose purpose was
to sell malpractice insurance to chiropractors.  (Plaintiffs' Ex. 2 to Gossett Declaration.)

45.   It remains a mutual company which is owned by its 40,000 insureds.  (Cole Tr. 6, 20.)

46.   NCMIC Finance Corporation was created to finance the payment of malpractice premiums
for its members.  (McNerney Dep. Ex. 3, p. 10.)

47.   The existing chief executive officer of the parent company, NCMIC Group, Inc., introduced
the financing of office equipment for professions other than chiropractic to NCMIC Finance
Corporation.  (McNerney Dep. Ex. 3, p. 10.)

48.   Fred Scott was hired by NCMIC on June 21, 2004, as one of its business development
managers.  (Scott Tr. 10, 21.)

49.   Mr. Scott was responsible for developing the business relationship between NCMIC and
Brican America, Inc.  (Scott Tr. 27-30.)

50.   He believes that the relationship began when NCMIC received a call seeking to finance an
information display system sold either by Brican America, Inc., or a Canadian corporation

_____

[4]Sometimes in this complaint, Professional Solution Financial Services is used in place
of NCMIC Finance Corporation, but only for clarification purposes.  At all times material to
the facts alleged herein, NCMIC Finance Corporation used Professional Solution Financial
Services as a trade name.

selling the same product, Brican Corporation[5].  (Scott Tr. 27.)

51.    After receiving the call, Scott spoke with Brican America about establishing a vendor/lessor relationship between Brican America and NCMIC.  (Scott Tr. 27.)

**PSFS 3 Corporation**

52.    PSFS 3 is a corporation organized and existing under the laws of the State of Iowa, is a resident and a citizen of the State of Iowa, having its principal place of business in the State of Iowa.

53.    PSFS 3 was incorporated on March 30, 2010, and is a wholly-owned subsidiary of NCMIC.

54.    PSFS 3 is authorized to sue and be sued.

55.    PSFS 3 has no real existence.  It was formed simply to attempt to invoke a floating jurisdiction clause which would arguably give the Iowa courts jurisdiction over the Plaintiffs who entered into contracts directly with NCMIC.

56.    The minutes of the action taken by the Board of Directors of NCMIC by unanimous written consent, dated March 30, 2010, state:

> **WHEREAS** *in accordance with advice of counsel* NFC wishes to assign certain "three column leases" [which are those financing contracts entered into directy with the customers] to a newly created wholly owned subsidiary of the Corporation,

>                          * * *

> **BE IT FURTHER RESOLVED** that upon the incorporation of PSFS 3 Corporation, the Board of Directors authorizes the President of NFC to assign

---

[5]Because Brican Corporation sold to chiropractors, and because NCMIC financed business equipment for chiropractors, it is likely that the call was received from a Brican Corporation customer.

such "three Column leases" to PSFS 3Corporation as he deems necessary ***to conform to the aforementioned advice of counsel***.

[Emphasis added.]

57.  Plaintiffs have knowledge, information and belief, and therefore, allege that PSFS 3 has no physical offices, it has no phone number apart from NCMIC, it pays no rent, it pays no payroll, it receives no income, it paid nothing for the purported assignment of contracts to it, and it collects nothing from those contracts purportedly assigned to it[6]. Its entire existence is as an artifice to attempt to have what truth does not provide—someone to whom the lease contracts could be assigned from NCMIC, thereby hopefully triggering a floating jurisdiction clause in financing contracts held by NCMIC.

58.  The purported assignment was simply to correct a unilateral mistake—the poor language of the equipment financing agreement form used by NCMIC in connection with its business with the Brican fraud victims.

59.  The purported assignment was done after two putative class actions were filed against NCMIC in South Florida—one in state court, later removed to this court, and one in this court.

60.  Under Iowa law, every contract contains an implied covenant of good faith and fair dealing. *Fogel v. Trustess of Iowa College*, 446 N.W.2d 451, 456 (Iowa 1989) citing with approval RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981).

---

[6]After the purported assignment, every lessee received a letter advising of the assignment and directing that each lessee should continue making payment to Professional Solution Financial Services, and the previous address.

61.     NCMIC has breached that implied covenant of good faith and fair dealing by instrumenting a false assignment of the contracts solely in an effort to trigger the conditional phrase found in the forum selection clause, after Plaintiffs had already chosen an appropriate forum within which to litigate their dispute over the subject contracts.

62.     NCMIC continues to be the party that is the beneficiary of the revenue of the leases, and thus, there has been no real assignment. *See Red Giant Oil Co. v. Lawlor,* 528 N.W.2d 524, 533 (Iowa 1995) ("[a]n assignment is a transfer to another of the whole of any property or right in the property. In such transfers, the assignee assumes the rights, remedies and benefits of the assignor.") (internal citations omitted); *Broyles v. Iowa Dept. of Soc. Services,* 305 N.W.2d 718, 721 (Iowa 1981) ("An assignment is a transfer to another of the whole of any property or right therein. 6A C.J.S. Assignments § 2 (1975)."); 6A C.J.S. Assignments § 2 (2009) ("An assignment is a transfer of any property or any right or estate in property. The word `assignment,' in its most general sense, denotes a transfer or making over to another of the whole of any property, real or personal, in possession or in action, or of any estate or right in the property. An assignment is a transfer or setting over of property, or of some right or interest in the property, from one person to another, or the act by which one person transfers to another, or causes to vest in another, his or her right or property, or an interest in the right or property.").

63.     NCMIC was and remains party to the rights to the Lease payments and as such no assignment has been made.

15

64.     Because "headquarters" is not defined in the applicable contracts, the court should look to common dictionary definitions to find an appropriate definition. "Headquarters" is defined as "A center of operations or administration." The American Heritage Dictionary of the English Language 4th Ed. (2009). "Any center or building from which operations are directed, as in the military, the police, etc." Collins English Dictionary Complete and Unabridged 6th Ed. (2003). "The office that serves as the administrative center of an enterprise." Wordnet 3.0, Princeton University, Farlex Inc. (2003-2008).

65.     It is clear that PSFS 3 exists on paper only, and does not in the real world actually have a corporate headquarters. The office, personnel, phone numbers, bank accounts, and all other apparatus that could qualify as a corporate headquarters, remain those of NCMIC.

66.     PSFS 3 has no corporate headquarters to establish the situs for purposes of the forum selection clause.

67.     Because the lease was never legally assigned to anyone else, the consent to jurisdiction clause contained in ¶ 13 is never triggered.

68.     Because the lease was never legally assigned to PSFS 3, PSFS 3 has no interest in the subject contracts.

69.     The purported assignment by NCMIC to PSFS 3 is a contractual undertaking by PSFS 3, as is clear from the following language of the Assignment of Lessor's Interest in Leases and Assumption of Liability Under Leases (hereafter "Assignment"):

    By its acceptance hereof, Assignee hereby assumes and agrees to perform all of the terms, covenants, and conditions required to be performed on the part of the lessor under any of the Leases from and after the effective date of this Assignment, and agrees to indemnify and hold Assignor harmless from and against all claims, causes of action, losses, damages and costs or expenses

16

(including reasonable attorneys' fees in the enforcement of this indemnification and otherwise) arising out of or in connection with any failure by Assignee to keep, fulfill, observe, perform or discharge any covenant, debt or obligation that accrues or becomes performable, due or owing after the date of this Assignment under the terms, provisions or conditions of any of the Lessees including, but not limited to, the obligation to repay or credit all security and prepaid rental deposits, if any, to the lessees under the Leases in accordance with the terms thereof, to the extent such deposits are delivered to the Assignee by Assignor or such lessees.

All the covenants, terms, and conditions set forth herein shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

70.    Said Assignment is signed on behalf of PSFS 3 only by its secretary.

71.    However, the By-Laws of PSFS 3, and a resolution of the Board of Directors of PSFS 3, dated March 30, 2010, require Patrick E. McNerney, as president of PSFS 3 "to sign such documents as necessary to execute this arrangement effective March 31, 2010 in the form to which he may agree, and execute such other documents as may be necessary to accomplish the foregoing." and "The President may sign, with the Secretary, and any other proper Officer of the Corporation thereunto authorized by the Board of Directors, any ... contracts, or other instruments which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly ..."

72.    Patrick E. McNerney did not sign the Assignment.

73.    The secretary of PSFS 3 had no authority to sign the Assignment on behalf of PSFS 3.

74.    Accordingly, the Assignment was ineffective to assign to PSFS 3 the contracts owned by NCMIC.

75.    After these deficiencies were pointed out in documents file with this Court in this matter, NCMIC ratified and affirmed the signature by the secretary to bind PSFS 3.

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

76.     Although the contracts were ostensibly assigned to PSFS 3, said contracts remained pledged to the agent for the warehouse lenders of NCMIC, Wells Fargo Capital Finance, LLC, (hereafter "Wells Fargo"), to satisfy the obligation of NCMIC to repay the loans made by the warehouse lenders to NCMIC.

## Non-Party Actors

### Salvatore M. DeCanio, Jr.

77.     DeCanio at all material times hereto was a substantial stockholder and officer in the following corporations which are involved in this suit, and is a managing member or an officer of a corporation which is a managing member, of limited liability companies which are involved in this suit:

    a.     Lifestyle of Vision, Inc., a Florida corporation, which itself is a managing member of the following limited liability companies involved in this suit:

        i.     Viso Lasik Medspas, LLC;

        ii.     Viso Lasik Medspas of Charlotte, LLC; and

        iii.     Viso Lasik Medspas of San Antonio, LLC.

78.     DeCanio was the architect of the business plan whereby money, which was raised through the sale of the Exhibeo systems, was diverted to fund the origination of the business of the Viso Lasik Medspas.

79.     Pursuant to the business plan crafted by DeCanio over $7 million of money obtained through the fraudulent sale of the Exhibeo display systems to the Plaintiffs was funneled from the Brican companies to originate and operate the businesses of Viso Lasik Medspas, LLC, Viso Lasik Medspas of San Antonio, LLC, and Viso Lasik Medspas of

18

Charlotte, LLC, without reserving any funds in the Brican companies to provide the means whereby the Brican companies could perform their obligations under the contracts with the defrauded customers.

**Viso Lasik Medspas, LLC**

80.    Viso Lasik Medspas, LLC, at all material times hereto was a limited liability company organized and existing under the laws of the State of Florida, was a resident of and citizen of the State of Florida, and was authorized to sue and be sued.

81.    Viso Lasik Medspas, LLC, was organized on November 26, 2007.

82.    The majority interest in Viso Lasik Medspas, LLC, was owned by JJR Investments, LLC, and Lifestyle of Vision, Inc.

**Viso Lasik Medspas of Charlotte, LLC**

83.    Viso Lasik Medspas of Charlotte, LLC, at all material times hereto was a limited liability company organized and existing under the laws of the state of North Carolina, was a resident and citizen of the State of North Carolina, and was authorized to sue and be sued.

84.    Viso Lasik Medspas of Charlotte, LLC, was organized on November 27, 2007, by JJR Investments, LLC, Lifestyle of Vision, Inc., and Plaintiff Amir Khoshnevis.

85.    The majority interest in Viso Lasik Medspas of Charlotte, LLC, was owned by JJR Investments, LLC, and Lifestyle of Vision, Inc.

**Viso Lasik Medspas of San Antonio, LLC**

86.    Viso Lasik Medspas of San Antonio, LLC, at all material times hereto was a limited liability company organized and existing under the laws of the State of Texas, was a

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

resident and citizen of the State of Texas, and was authorized to sue and be sued.

87.  Viso Lasik Medspas of San Antonio, LLC, was organized on January 3, 2008, by JJR Investments, LLC, Lifestyle of Vision, Inc., and one Mark K. Davis & Associates, PA.

88.  The majority interest in Viso Lasik Medspas of San Antonio LLC, is owned by JJR Investments, LLC, and Lifestyle of Vision, Inc.

89.  **JJR Investments, LLC**

90.  JJR Investments, LLC, at all material times hereto was a limited liability company organized and existing under the laws of the State of Florida, was a citizen of the State of Florida, was authorized to, and actually doing business in, the State of Florida, and was authorized to sue and be sued.

91.  The address of the registered agent for JJR Investments, LLC, was 5301 Blue Lagoon Drive, Suite 520, Miami, FL.

92.  JJR Investments, LLC, was formed on July 18, 2006, the same date as Brican America, LLC, was formed, and utilizing the same lawyer.

93.  JJR Investments, LLC, was a managing member of the following limited liability companies involved in this suit:

      i.     Viso Lasik Medspas, LLC;

      ii.    Viso Lasik Medspas of Charlotte, LLC; and

      iii.   Viso Lasik Medspas of San Antonio, LLC.

20

# Facts

**(¶¶ 94- 271, pp. 21-62)**

94.     Vincens and Lemacon jointly determined to conduct the following program:

    a.     They would sell a flat screen television and computer with inexpensive display software and a library of graphics (whether graphic art, photographs, or video) to an optometrist or dentist for use in his, her or its office;

    b.     At the same time, and as the predominate feature of the contract, they would enter into a marketing or advertising agreement whereby one of their related entities would contract to pay the optometrist or dentist advertising revenue to utilize a portion of the time that the display system would be used with patients present, which revenue would be almost equal to the monthly cost of the system if the optometrist or dentist decided to lease the system;

    c.     They had already entered into a vendor relationship or program agreement with a funding source whereby the funding source would either directly enter into an equipment financing agreement under a semi-private label arrangement[7], or would receive an assignment from the vendor (their company) of an equipment financing agreement to be signed by the customer;

    d.     Once the signed equipment financing agreement and acceptance certificate were

---

[7]A semi-private label relationship is a form of institutionalized deception whereby the funding source permits the vendor to place the vendor's name and logo in one or more predominate places, using some of the largest type sizes used in the document, for the purpose of giving the customer the impression that the contract is with the vendor, while in the small type used throughout the rest of the document, it is disclosed (if one has the physical ability to read that small type) that the lessor is an entity other than the vendor.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

received by the funding source, a purchase order was issued by the funding source, and upon telephone verification with the customer that the goods had been received, the funding source would disburse the net present value of the lease payments to them;

e.   They would use the money paid to:

    i.   Pay approximately $3,500 for the equipment and software license;

    ii.   Pay a commission of either $1,000 or $2,000 dollars to the commissioned salesperson[8];

    iii.   Pay a fee equal to 4.5% of the funding amount (which was usually $24,000) to each of Vincens and Lemacon [Ellzey Tr., pp. 39-40];

    iv.   Pay the marketing or advertising contract payments coming due to each of the contracted dentists or optometrists;

    v.   Pay their indirect overhead; and

    vi.   Transfer the balance of the money to an associated entity owned by them to ultimately rent, equip, and open medical spas in three cities[9].

95.   As Vincens agreed in his deposition:

So the advertising was done to entice doctors into entering into these lease agreements so Brican could generate income that it would then lend back to Viso Lasik.

[Vincens Tr., p. 74.]

---

[8]Sales personal were compensated on either a straight commission basis, in which case the commission would be $2,000 per contract, or a combination of salary ($4,000 per month) and commission of $1,000 per contract.

[9]Over $7,000,000 was transferred to the Viso Lasik Medspas in this fashion.

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

**Fraudulent Aspect of Program**

96.    At the time of entering into the marketing or advertising agreements, the company utilized by Vincens and Lemacon as the advertising company[10], Viso Lasik Medspas, LLC, had no business and no source of income with which to meet its contractual obligations to pay for advertising; rather, it was utilizing the monetized portions of the equipment financing agreements to pay for the advertising, which payment obligations were the attraction of the Plaintiffs into the program.

97.    No Defendant reserved any money from the monetization of the leases to enable that Defendant to meet the obligation of paying advertising or marketing fees in the future, or to buy back any of the leases.

98.    In short, the financing of equipment with a related marketing or advertising contract was a Ponzi scheme orchestrated by Vincens and Lemacon through the artifice of the various Brican America entities.

99.    The existence of the Ponzi scheme was known to NCMIC by July, 2008, or with the exercise of due diligence, would have been known to NCMIC by July, 2008, as more fully alleged hereinafter.

100.   The Ponzi scheme could survive as long, and only as long, as more and more transactions were closed to fund the payment obligations coming due under the

---

[10]The marketing and advertising agreements were poorly written.  In versions 5 through 8, either Brican America, Inc., or Brican America, LLC, was the entity responsible to pay each doctor the advertising fees incurred for advertising the sevices of Viso Lasik Medspas; yet, the "Cancellation" provision of the agreements provide, "**Cancellation:** If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, ... ."  Viso Lasik Medspas had no commitment relating to advertising fees stemming from the marketing or advertising agreements.

23

marketing contracts.

101.   In fact, unless sales of contracts outpaced the payments due under the marketing and advertising contracts, the Ponzi scheme would, and did, collapse:

    a.    Each contract would generate approximately $24,000 from the funding source;

    b.    From that $24,000, $3,500 would be paid for the equipment, leaving a balance of $20,500;

    c.    From that $20,500, commissions would be paid (assuming the lowest amount) of $1,000, leaving a balance of $19,500;

    d.    From that $19,500, a 4.5% "management fee" was paid to each Vincens and Lemacon, [Ellzey Tr., pp. 39-40] which would be $2,160, leaving only $17,340, before meeting indirect overhead;

    e.    Yet, to generate the $17,340, Brican America, Inc., Brican America, LLC, and/or Viso Lasik Medspas would enter into contracts requiring them to pay a minimum of $5,800 per year for the 5-year term of the leasing agreement, for a total payout of $29,400; and,

    f.    As a result, each contract was approximately $12,000 underwater before any indirect overhead was paid.

102.   However, no Plaintiff was advised of these features of the program by any Defendant.

**Beginning of Fraudulent Program**

103.   The first step taken by Vincens and Lemacon toward the conduct of the fraud was the formation of Brican America, Inc., on July 30, 2004.

104.   Prior to July 16, 2005, NCMIC offered to Brican America, Inc., that:

a.     **Alliance Partners:** Professional Solutions Financial Services (hereinafter called "PSFS") and Brican America Inc., (hereinafter called "Brican") propose to enter into an alliance in which PSFS would provide and administer a customer-financing program for various Brican customers.

b.     **Purpose:** The purpose of this alliance is for PSFS to provide BRICAN with financing solutions that will provide creative and flexible financing alternatives to compliment Brican's product offering. Additionally, PSFS will strive to integrate this service seamlessly into Brican's sales process so BRICAN can provide its customers with a total solution from the initial point of contact through the entire sales process.

c.     **Equipment Supplier:**          Brican America Inc.
                                         5301 Blue Lagoon Dr.
                                         Suite 520
                                         Miami, FL 33126

d.     **PSFS Lead Contact:**          Fred M. Scott
                                         Phone - (877) 770-7244 x4553
                                         Toll Free - (877) 776-7244
                                         E-mail - fscott@psfs.com

e.     **Experience developing captive finance programs:** Professional Solutions Financial Services is an entrepreneurial company dedicated to providing equipment-financing solutions to a variety of industries. As a member of NCMIC Group Inc., a niche-oriented malpractice insurance company, PSFS focuses on the financing needs of a range of healthcare professionals. In doing so, PSFS has simplified the overall financing process and delivers customized and fully supported captive finance programs. PSFS's nimble size and commitment to exceptional customer service sets them apart from the rest of the industry. PSFS's investment in customer impacting technology and their efforts to redefine the financing process has created a fast growing company with the tools and capabilities to deliver big company results, with small company flexibility.

The sales and management team has over 35 years of industry and managerial experience in the equipment-leasing marketplace. They have personally developed, implemented and managed more than 35 captive finance programs that ranged from $1.0MM to $65MM in annual funded volume. These programs were developed from the ground up and have provided the foundation PSFS's business model.

## Program Hightlights

f.     **Alliance Name:** The alliance can operate under any name from a marketing perspective. The name of the alliance will not affect the terms of this proposal.

25

Three names for possible consideration are:

1. Brican Finance, Administered by Professional Solutions Financial Services (semi-private label program)
2.    Brican and Professional Solutions Financial Services (joint partnering program)
3.    Professional   Solutions   Financial   Services   (standard   third-party relationship)

g.    **Equipment to be Financed:** All hardware, software and associated materials provided by Brican.

h.    **Financial Product Offerings:**    The following is a list of standard financial products to be offered:

1. $1.00 Buyout Lease
2. 10% Buyout Lease
3. Loan and security agreement

There are a variety of "customized" financial products available and additional structures may be introduced as mutually agreed programs, including:

•    0% Finance Programs for 12, 18, 24, 36 48, 60 Months
•    30, 60, 90 Day Skip Payment Structures
•    Step Payments

**Marketing**

i.    **Business Manager/Development:** Fred Scott, Business Development Manager, will manage the relationship and oversee the development of the program. Fred is located in Des Moines, IA, and has extensive experience managing and developing captive finance programs. His responsibilities will include:
1.    Program structuring, delivery and success
2.    Customer satisfaction (Brican )
3.    Lessee satisfaction (Doctor and/or Private Clinics)
4.    Initial and ongoing training of the Brican sales force
5.    Initial and ongoing development of marketing materials
6.    Program roll out
7.    Development of new products, if necessary
8.    Manage resolution of all program issues
9.    Creating financing solutions based on the unique needs of client

j.    **Sales Support:** Supporting Fred Scott, Business Development Manager, will

26

be a Sales Associate ("SA") (and a back-up associate) who is permanently assigned to the Brican program. Once the initial terms and conditions of the financing structure have been established, the SA will be the primary point of contact for all Brican sales support related activities. Their primary responsibility is to manage the sales process by providing support that includes customer communication, documentation preparation, and overall customer service and follow-up throughout the "application-to-funding" process.

The primary point of contact for sales and transaction related activities will be:

Melissa Ehlers — extension 4593 - Primary
Jackie Heisdorffer — extension 4685 - Secondary

k. **Sales Process Overview:**
   1. Brican identifies a prospect for financing via sales activities.
   2. Brican or customer completes a Finance Application and forwards to PSFS.
   3. PSFS completes a credit evaluation, and notifies Brican and / or the customer.
   4. PSFS completes all necessary documentation and forwards to customer via e-mail or facsimile.
   5. Once all executed documentation is received, PSFS issues purchase order to Brican/Equipment Vendor.
   6. Brican/Equipment Vendor delivers and installs equipment.
   7. The customer completes Delivery and Acceptance,
   8. PSFS funds Brican/Equipment Vendor via ACH same day as Delivery and Acceptance.

l. **Product Development:** The Business Development Manager will work with the Brican's executive, sales and marketing teams to develop new and innovative Finance Programs to support sales growth objectives. In addition, PSFS will work with Brican to find creative finance alternatives to improve their Return on Investment with all associated capital equipment.

m. **Marketing Materials Development:** PSFS will create all standard marketing materials. This would include customized Brican Finance Applications, financial packets, promotional flyers, trade show materials and all product/service descriptions. The parties would mutually agree on broad mass mailings, advertisements, or other "non-standard" marketing efforts.

## Credit Underwriting

n. **Philosophy:** All transactions will be subject to credit approval by PSFS under

industry standard guidelines. Each Finance Application will be reviewed independentiy of each other and on a case-by-case basis. PSFS utilizes proprietary credit-decisioning tools that are integrated into PSFS's systems platform. This enables vastly improved response times for most transactions.In an effort to expedite the deal flow process, PSFS would endeavor to establish pre-approved lines of credit for key customers and/or prospects. Depending on the availability and completeness of the information contained on the application, or for transactions over $50,000; PSFS may require additional information from the customer in order to complete our credit review. This requested information may include:

- Bank references
- Financial statements (business and personal)
- Tax returns (business and personal)

o.   **Application Process and Turnaround:** PSFS endeavors to respond to all submittals in approximately 30 minutes. This is accomplished when a transaction is completed with an application only. If there is a need for additional information, it may take 24 — 48 hours based on waiting for information from third parties. Communication between PSFS, Brican and the Healthcare Professional is the key element to a smooth process. Regardless of the time frame we will communicate status on a regular basis.

## Pricing

p.   **Philosophy:**  PSFS's endeavors to establish pricing specific to product type, transaction size, and term. This means that interest rates are typically tiered by size of transaction and complexity of structure. PSFS will strive to provide competitive interest rates comparable to market conditions in the HealthCare sector.

q.   **Proposed Rate Structure:** PSFS commits to modify rates as necessary to remain competitive in the marketplace.

## Operations

r.   **Credit Evaluation:**  PSFS will be responsible for all credit evaluation and ECOA compliance.

s.   **Documentation:**   PSFS will be responsible for completing all required documentation.

t.   **Billing:**  PSFS will be responsible for invoicing all completed transactions.

28

u.    **Funding:**  The following outlines the normal sequence for funding: (Brican may elect to receive funds by Wire, Automated Clearing House ("ACH"), or Check.

    1.    PSFS has received all lease agreements,
    2.    PSFS has a correct invoice for the transaction,
    3.    PSFS has received signed documents including early commence agreement

v.    **Customer Service:**  PSFS will provide a "toll-free" telephone number for customer service and other customer inquiries. PSFS will endeavor to resolve all customer issues at the time of contact. PSFS will conduct its communications with customers in a courteous, prompt and efficient manner, and will monitor the quality of customer service.

w.    **Collections:**  PSFS will be responsible for collections and will commit to agree upon procedures that we regard as reasonable and customary.

x.    **Reporting:**  PSFS will provide Brican with continuous quality reports detailing the following:

    1.    Application Activity
    2.    Volume Booked
    3.    Volume Backlog
    4.    Lease Expiration Dates
    5.    Requested Reports by Brican

y.    The information contained in this Proposal is confidential and proprietary and may not be distributed to third parties without the prior written consent of PSFS.

z.    This Proposal constitutes a general non-binding expression of interest on the part of both companies to develop an alliance relationship. It is not to be construed as constituting tax or financial advice by PSFS to Brican. Brican should consult its own tax and financial advisors for any such advice.

aa.    This Proposal is not intended to, and does not, create a legally binding commitment or obligation on the part of either party. *The creation of such legally binding obligation is subject to, among other things, both parties having completed a satisfactory Due Diligence process, PSFS investment approval, and the negotiation, execution and delivery of a definitive Vendor Agreement that would contain such covenants, representations, warranties, and other provisions as the parties shall mutually agree upon.* This Proposal supersedes and replaces any prior versions thereof.

29

bb.   Our goal is to bring value to you and your customers. We are extremely excited to have the opportunity to become a part of your growing business and help you build market share.

105.   By July 15, 2005, Brican America, Inc., and NCMIC had completed whatever due diligence they elected to do (and as we will see, NCMIC decided to do none), and NCMIC obtained investment approval.

106.   On or about July 16, 2005, Brican America, Inc., accepted the offer made by NCMIC, and created the legally binding commitment or obligation on the part of each party to the other, as expressly provided in the offer, by execution and delivery of a definitive Vendor Agreement, a true and correct copy of which is attached hereto as Plaintiffs' Exhibit 1, and by reference is made a part hereof.

107.   Thereafter, NCMIC and Brican America, Inc., operated the alliance under the terms set out in ¶ 104 above.   Specifically,

a.   **Alliance Partners:**  PSFS provided and administered a customer-financing program for various Brican customers.

b.   **Purpose:** PSFS provided BRICAN with financing solutions that provided creative and flexible financing alternatives to compliment Brican's product offering. Additionally, PSFS integrated this service seamlessly into Brican's sales process, authorizing Brican's sales force to assist customers in filling out credit applications on forms created by PSFS which had Brican's logo and information predominately displayed on the forms, authorizing Brican's sales force to fill out financing contracts provided to Brican's sales force by PSFS which financing contracts had on Brican's logo and information predominately displayed on the forms, and authorizing Brican's sales force to answer whatever questions the customer might have about the terms of the financing contract, so that BRICAN could provide its customers with a total solution from the initial point of contact through the entire sales process.

c.   **Equipment Supplier:**      Brican America Inc.
5301 Blue Lagoon Dr.

30

Suite 520
Miami, FL 33126

d.      **PSFS Lead Contact:**       Fred M. Scott
Phone - (877) 770-7244 x4553
Toll Free - (877) 776-7244
E-mail - fscott@psfs.com

**Program Hightlights**

e.      **Alliance Name:**  The alliance operated under one of the tree names suggested by NCMIC, to-wit:

3.      Professional Solutions Financial Services (standard third-party relationship)

f.      **Equipment to be Financed:** All hardware, software and associated materials provided by Brican were financed.

g.      **Financial Product Offerings:** The following standard financial products were offered:

1. $1.00 Buyout Lease
2. 10% Buyout Lease
3. Loan and security agreement

A variety of "customized" financial products were made available, in varying degrees, by NCMIC, including:

•      0% Finance Programs for 12, 18, 24, 36 48, 60 Months
•      30, 60, 90 Day Skip Payment Structures

**Marketing**

h.      **Business Manager/Development:** Fred Scott, Business Development Manager, managed the relationship and oversaw the development of the program. His responsibilities will included:
1.      Program structuring, delivery and success
2.      Customer satisfaction (Brican )
3.      Lessee satisfaction (Doctor and/or Private Clinics)
4.      Initial and ongoing training of the Brican sales force
5.      Initial and ongoing development of marketing materials
6.      Program roll out
7.      Development of new products, if necessary

31

8.    Manage resolution of all program issues
9.    Creating financing solutions based on the unique needs of client

i.    **Sales Support:**  Supporting Fred Scott, Business Development Manager, was a Sales Associate ("SA") (and a back-up associate) who was permanently assigned to the Brican program. Once the initial terms and conditions of the financing structure were established, the SA was the primary point of contact for all Brican sales support related activities. Their primary responsibility was to manage the sales process by providing support that included customer communication, documentation preparation, and overall customer service and follow-up throughout the "application-to-funding" process.

The primary point of contact for sales and transaction related activities was initially:

Melissa Ehlers — extension 4593 - Primary
Jackie Heisdorffer — extension 4685 - Secondary

j.    **Sales Process Overview:**
1.    Brican identified a prospect for financing via sales activities.
2.    Brican explained the proposal to the customer, including explaining the terms of the proposed financing contract to be entered into with PSFS.
3.    Brican assisted the customer in completing a Finance Application and financing contract, and forwarded them to PSFS.
4.    PSFS completed a credit evaluation, and notified Brican of the credit decision.
5.    Brican completed all necessary documentation, if any was missing, and forwarded it to customer via e-mail, facsimile, or hand delivery for execution.
6.    Brican sent the completed documentation to PSFS, and once all executed documentation was received, PSFS issued its purchase order to Brican ordering the equipment from Brican to be delivered to the customer.
7.    Brican delivers and installs equipment.
8.    The customer completes Delivery and Acceptance.
9.    PSFS funds Brican/Equipment Vendor via ACH same day as Delivery and Acceptance.

k.    **Product Development:** The Business Development Manager worked with Brican's executive, sales and marketing teams to develop new and innovative Finance Programs to support sales growth objectives. In addition, PSFS worked with Brican to find creative finance alternatives to improve their Return on Investment with all associated capital equipment.

32

l.      **Marketing Materials Development:**  PSFS created standard marketing materials including customized Brican Finance Applications, financial packets, promotional flyers, trade show materials and product/service descriptions. Additionally, PSFS suggested to Brican that the Brican sales force represent to each customer that the equipment sold would qualify for a certain tax credit of up to $5,000 because it qualified under the American with Disabilities Act, and the equipment would qualify for certain accelerated depreciation deductions.

## Credit Underwriting

m.      **Philosophy:**  All transactions were subject to credit approval by PSFS under industry standard guidelines. PSFS utilized proprietary credit-decisioning tools which vastly improved response times for most transactions.  PSFS established pre-approved lines of credit for key customers and/or prospects having a certain targeted credit rating.

## Pricing

n.      **Proposed Rate Structure:** PSFS authorized Brican to set the monthly payment on each financing contract regardless of the interest rate charged by PSFS, and regardless of the true cost of the equipment being sold.  PSFS modified rates and passed the reduced rates on to Brican as additional profit (*i.e.*, the monthly payment remained the same before and after the reduction of the interest rate charged by PSFS, and Brican received a higher amount up front from PSFS as a result) knowing that Brican was not reducing the monthly payment to be paid by the customer.

## Operations

o.      **Credit Evaluation:**  PSFS was responsible for all credit evaluation and ECOA compliance.

p.      **Documentation:**  PSFS authorized Brican to have its sales force complete all required documentation needed from the customer, and agreed that PSFS would not have direct communication with the customer outside of the communication from Brican's sales force.

q.      **Billing:**  PSFS was responsible for invoicing all completed transactions.

r.      **Funding:**  The following outlines the normal sequence for funding: (Brican elected to receive funds by Automated Clearing House ("ACH")).

1.      PSFS received all lease agreements completed by the customer with the

33

assistance of Brican's sales force;

    2.    PSFS received a correct invoice from Brican for the transaction,

    3.    PSFS received signed documents including early commence agreement, if any.

    4.    PSFS funded the contract.

s.    **Customer Service:** PSFS provided a "toll-free" telephone number for customer service and other customer inquiries, but encouraged Brican to have its sales force answer all questions about the proposed financing contract and discourage the customer from calling the toll free number. PSFS endeavored to resolve all customer issues at the time of contact, which would designedly be after execution of the financing contract.

t.    **Collections:**  PSFS was responsible for collections.

u.    **Reporting:**  PSFS provided Brican with reports detailing the following:

    1.    Application Activity
    2.    Volume Booked
    3.    Volume Backlog
    4.    Lease Expiration Dates
    5.    Requested Reports by Brican

108.    Among other things, Plaintiffs' Exhibit 1 provides that NCMIC intended to purchase goods from Brican America, Inc., for the purpose of leasing or financing such goods to customers of Brican America, Inc.

**NCMIC Approves Use of Marketing Agreements**

109.    Prior to utilizing marketing or advertising agreements in connection with sales of the Display Systems, Vincens advised NCMIC, through its employee, Fred Scott, of Vincens' intention to utilize advertising and marketing agreements in connection with the sale of Display Systems.  [Vincens Tr., pp. 165-166.]

110.    Fred Scott, on behalf of NCMIC, voiced no objection to Vincens to his announced intention to utilize the marketing or advertising agreements, and never asked for a copy.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

[Vincens Tr., p. 166.]

111.   Had Fred Scott requested a copy of the marketing or advertising agreement from Vincens, NCMIC would have learned that those agreements contained cancellation provisions, permitting the customer to cancel the marketing or advertising agreement, and all related agreements (which would mean the equipment financing agreement), if the marketing or advertising fees were not paid.

112.   Such cancellation provisions contradicted the provisions of the equipment financing agreements which provided that they were non-cancelable.

**Agency**

113.   NCMIC and Vincens agreed that NCMIC (1) would supply an equipment financing form which would be printed with the logo of Brican America, LLC, prominently displayed on the top of the page; (2) that sales agents would be the only interface between the potential customer and NCMIC; (3) that the sales agents would gather the information as directed by NCMIC, and (4) would transmit it to NCMIC for a credit decision, (5) that the sales agents would complete the equipment financing agreements, (6) would answer all questions which the customer might have about the financing agreements; (7) would obtain the signature of the direct contract obligor and a personal guarantor on the agreements, and then (8) would transmit them to NCMIC.

114.   Accordingly, based on the foregoing, and the agreement set out in paragraph 104, the parties agreed that the sales agents would be agents for NCMIC and Brican, or at least, in the alternative, NCMIC made Brican America sales personnel apparent agents of NCMIC.

## NCMIC Receives Copy of Marketing Agreement

115.   Jean Thompson began her employment with NCMIC during September, 2004, and became an account manager for NCMIC in September, 2005, which was her position with NCMIC at the time of her deposition.  [Thompson Tr., pp. 5-6.]

116.   Sometime between September, 2005, and February, 2007, Jean Thompson learned of the use of the advertising and marketing agreements. [Thompson Tr., pp. 12-14.]

117.   After learning of the utilization of the advertising and marketing agreements, Jean Thompson conversed with Fred Scott and possibly Scott Stewart and Bill Artino, all people above her in the chain of command within NCMIC, about the utilization of these agreements by Brican America, Inc. [Thompson Tr., pp. 13-14.]

118.   From April, 2007, the date that Sandra Ellzey was first employed by Brican America, LLC, she had frequent (*i.e.*, almost daily) communication with Jean Thompson at NCMIC.

119.   Frequently, Jean Thompson would advise Sandra Ellzey that a particular customer had failed to pay his monthly payment to NCMIC because he had not received his advertising or marketing payment, and Jean Thompson would request that Sandra Ellzey speak with the customer. [Ellzey Tr., pp. 27-29.]

120.   The first such conversation took place in April, 2007, and concerned a customer named Alfonso Montemayor.  [Ellzey Tr., p. 29.]

121.   NCMIC, through Jean Thompson, had received several copies of the marketing agreement during this time, although she could not remember if any of them was the one involving Alfonso Montemayor.

36

122.    After settling the *NCMIC Finance Corporation v. Brican America, Inc.*, suit Brican America, LLC, released a press release and sent email to its customer base stating, among other things:

    a.    PSFS was fully aware of the Marketing Agreement, its scope and its use since 2006

    b.    Having full knowledge of the Marketing Agreement, PSFS never required Brican to supply copies of this Agreement or any updates related to the Marketing Agreement

    c.    PSFS never objected to any of the clauses contained in the Marketing Agreement, even after having its counsel review and approve its continued use in 2008.

123.    No one at NCMIC voiced a concern about the utilization of the advertising and marketing agreements by Brican America, Inc., and no one at NCMIC requested that Brican America, Inc., provide NCMIC with copies of the advertising and marketing agreements in use.  [Thompson Tr., pp. 14-15.]

124.    During the time that the parties operated under the vendor relationship and the Vendor Agreement, the televisions which were a part of the goods leased or financed, had a maximum cost of less than $2,000.

125.    During the time that the parties operated under the vendor relationship and the Vendor Agreement, the computers which were a part of the goods leased or financed, had a maximum cost of less than $1,000.

126.    During the time that the parties operated under the vendor relationship and the Vendor

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

Agreement, the software used on the computers which were a part of the goods financed, had a maximum fair market value of $500 per license.

127.   Plaintiffs have knowledge, information and belief, and therefore allege, that minimal (less than $10) or no license fees were paid by Brican America, Inc., for the use of the software developed by Brican Canada.

128.   NCMIC knew, or with the exercise by them of reasonable care, would have known, that the maximum value of the goods subject to the lease or finance agreement was $3,500.

129.   Upon knowledge, information and belief, Plaintiffs allege that NCMIC valued the equipment at $3,500 for tax purposes.

130.   Ignoring the maximum value of the goods subject to the financing agreement, NCMIC entered into financing contracts directly with the customers of the program, including Plaintiffs, requiring those customers to repay approximately $30,000 for the goods worth $3,500.

131.   NCMIC was to receive gross income of $6,000 per lease if the lease were paid timely and fully paid by the end of its term.

132.   NCMIC issued or obtained a total of 1,672 leases.

133.   The total gross income to be received by NCMIC from the 1,672 leases, then, was $10,032,000.

134.   NCMIC knew, or with the exercise of reasonable care, would have known that the advertising and marketing agreements were the predominate feature of the transactions with Plaintiffs.

135.   NCMIC knew, or with the exercise of reasonable care, would have known that the

38

contractual commitment to pay each Plaintiff almost the entire cost of the lease of the Display System leased by that doctor (with the contractual entitlement to stop making payments under all related contracts, including the equipment financing agreements should the advertising and marketing fees not be paid) was the reason that the Plaintiffs were entering into the leases.

136.  NCMIC permitted Defendant, Brican America, Inc., to utilize an institutionalized form of deception known as "semi-private label" leasing whereby the name and logo of Brican America, Inc., is dominant on the equipment lease application and agreement, and the fictitious name of Professional Solution Financial Services, is included on the form, but in a much smaller font.

137.  Semi-private label leasing is designed to deceive the lessee into believing that he is entering into a lease with the same entity as that selling the product to him.  In other words, lead the customer to believe that the vendor and the lessor were the same entity.

138.  The effect of that deception is that the customer believes that it will have certain legal rights against the lessor if the vendor fails to perform which the customer, in fact, does not have.

**Fraudulent Program Grows**

139.  During the early sales under the program, the vendor was Brican America, Inc., and the secured party was NCMIC, doing business as Professional Solution Financial Services, operating under the semi-private label lease form.

140.  The salesman would advise the potential customer that:

   a.      The equipment (described by various names such as the Brican Display System,

39

and later, the Exhibeo System) could be purchased for an outright payment of $22,000 or could be leased for $508 per month plus tax, for 60 months, with a $1 buy-out at the end of the lease, for a total cost of $30,481;

b.    At the same time, Brican America, Inc., would enter into a marketing or advertising agreement through which Brican America, Inc., would pay the customer almost $500 per month, resulting in the net cost of the system to the customer being next to nothing;

c.    The earliest marketing agreements (described later herein as those containing Cancellation Versions 1 through 4 which were used when the financing contract was directly with PSFS) provided that if payments on the marketing agreement were stopped, the customer could stop making payments on all related agreements (which meant the financing contract).

d.    The later marketing agreements (described later herein as those containing Cancellation Versions 5 through 8 which were used when the financing contract was directly with Brican America, Inc.) provided that Brican America, Inc., or Brican America, LLC, would buy back the lease agreement, and because there were only two parties involved at the time, the customer understood the provision to mean that Brican America, Inc., would buy back the lease agreement from the customer so that the customer would have no further financial obligation under the lease agreement.

141.  The salesmen failed to advise the Plaintiffs that:

a.    The advertising entity had no business, no income, and no source for paying the

40

financial obligations under the advertising or marketing agreement except by utilizing the monetized portion of the leases which would be insufficient to meet the financial obligations on a long-term basis, and

b.      No entity was reserving sufficient funds from the monetization of the leases to enable fulfillment of the financial obligation to pay the advertising and marketing agreements.

142.    Prior to offering the marketing agreements to customers, Vincens discussed the concept and use of marketing agreements with Fred Scott, of NCMIC, who gave his verbal consent to their use. [Vincens Tr., pp. 165-166.]

143.    An example of such a financing agreement and marketing agreement are attached hereto as Plaintiffs' Exhibit 2, and by reference, are made a part hereof.

**NCMIC Finance Corporation Affirms the Cancellation Provision**

144.    Fred Scott left the employ of NCMIC before July, 2008.

145.    A successor employee of NCMIC responsible for certain aspects of the relationship with Vincens and his companies was Todd Cook, a vice-president and manager of the equipment leasing division of NCMIC.

146.    Mr. Cook was not employed by NCMIC during the same time that Fred Scott was employed by NCMIC.

147.    According to the testimony of Todd Cook, he became aware of the marketing agreements, and the specific language which permitted the customer to cancel the lease if Brican America, Inc., failed to honor its financial commitments pursuant to the

marketing agreement, during July, 2008[11]. [Cook (Oct.) Tr., p. 13.]

148.  Mr. Cook became aware of the marketing agreements and their cancellation provision in July, 2008, when NCMIC received the *Tampa Tribune* articles and cover sheet from Dr. Daniel DelCastillo, as alleged in paragraph 30 above.

149.  Although a modicum of due diligence by NCMIC would have discovered (1) these articles, (2) the court orders which included a description of what was described as a Ponzi scheme, and (3) the ownership of Brican America, Inc., by Vincens and Manklow (now known as Briscoe) prior to NCMIC doing business with Brican, NCMIC performed no due diligence. (Vincens Tr. 137-39.)

**Todd Cook's Knowledge of Similar Fraud**

150.  At the time that the *Tampa Tribune* articles were sent to NCMIC, Todd Cook was the Vice-President and General Manager of the Office Equipment Leasing Division of NCMIC. (Cook Tr. 79.)

151.  Mr. Cook was sent the *Tampa Tribune* articles by the NCMIC employee who was the account manager for Brican America, Jean Thompson.  (Cook Dep. Ex. 39.)

152.  Immediately prior to being employed by NCMIC, Mr. Cook owned a 20% interest in an Iowa leasing company named Frontier Leasing[12].  (Cook Tr. 47.)

153.  During his time with Frontier Leasing, Mr. Cook was president, but really performed the

---

[11]Mr. Cook did not become aware of the existence of a written Vendor Agreement with Brican America, Inc., until a visit to the offices of Brican America, Inc., in November, 2008. [Cook (Oct.) Tr., p. 16.]

[12]Frontier Leasing was the real party in interest in *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC*, 784 N.W.2d 753 (Iowa 2010) and *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65 (Iowa 2011).

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

functions of a chief financial officer.  (Cook Tr. 104.)

154.    While Mr. Cook owned a 20% interest in Frontier, and was its president, Frontier Leasing

purchased equipment financing contracts which were originated by Royal Links USA.

155.    As the Supreme Court of Iowa reports about the Royal Links contracts purchased by Frontier

Leasing:

In 2003, a sales representative of Royal Links USA, Inc., an advertising company, called Lake MacBride Golf Course and informed Lake MacBride that it could receive a nonmotorized snack and beverage cart at no cost in exchange for displaying advertising on the cart. The sales representative also informed Lake MacBride that Royal Links would make all the necessary arrangements, and Lake MacBride simply had to execute a program agreement, a lease agreement, and several other documents.

* * *

The program agreement provided Lake MacBride would permit Royal Links to display advertising on the beverage cart in exchange for sixty monthly payments from Royal Links in the amount of $299 each month. Upon the expiration of this initial term, Royal Links agreed to continue to pay Lake MacBride $2000 a year for the next five years for the right to continue displaying advertising on the beverage cart. ...

... Mirroring the program agreement, the lease agreement purported to lease the beverage cart to Lake MacBride in exchange for sixty monthly payments to C & J in the amount of $299 each month. Thus, from Lake MacBride's perspective, the result of this transaction appeared to be that Lake MacBride would receive a beverage cart at no cost because the monthly amount it was obligated to pay C & J to lease the beverage cart was equal to the monthly amount it would receive from Royal Links in exchange for allowing advertising to be displayed on the beverage cart.

* * *

In October 2004, Royal Links notified Lake MacBride that it would no longer pay Lake MacBride the monthly advertising sums of $299 pursuant to the program agreement. C & J still expected Lake MacBride to continue to make the monthly lease payments of $299 pursuant to the lease agreement. Nevertheless, Lake MacBride stopped making payments to C & J.

*C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 70-71 (Iowa 2011).

156.    In other words, before Todd Cook became employed by NCMIC, he had experience with

43

financing contracts originating with a scheme similar to the Brican America scheme, and while he was so employed, he received information that one of the owners of Brican America, Inc., and Brican America, LLC, was earlier involved in an identical scheme.

157. Yet, under his watch, NCMIC funded just shy of $39 million of the total of over $41 million in Brican-originated contracts.  (Cook Dep. Ex. 19, p. 4 reflecting hire date of February 26, 2007; Cook Dep. Ex. 38, reflecting monthly funding of Brican-originated contracts as of March 31, 2009; Cole Tr. 118, agreeing that $3.4 million was funded in April, 2009.)

158. When Mr. Cook became aware of the existence of the marketing agreements, he asked Vincens and Lemacon how many such agreements existed.  [Cook (Nov.) Tr., p. 76.]

159. Vincens and Lemacon responded that there were "some."  [Cook (Nov.) Tr., p. 76.]

160. In his email response to Mr. Cook, Lemacon advised that:

   1. The sender of the email was Harold Meredith, who is the former brother-in-law of Ray Briscoe.  Harold Meredith worked as a Recomm sales representative who copied Recomm's marketing ideas to open his own company.  A person who held seminars for dentists at which display systems were demonstrated, Dr. Rondeau, preferred Brican America's systems over those of Harold Meredith.  Dr. Rondeau was aware of the Recomm history involving Briscoe and Vincens.

   2. Jeff Vincens is the same person as Jean Francois Vincens.  Jeff Vincens is President and a 50% shareholder of Brican America.  Ray Briscoe was "one of the Brican America Marketing Consultant."  Briscoe and Vincens sold their interests in Recomm "a long time before the bankruptcy."

   3. The newspaper articles "were a screen of smoke organized by the owners and their counsels in order to justify the bankruptcy."  These articles "do not reflect the reality and could be proven defamatory."

   4. Brican Corporation [the Canadian company] is selling to chiropractors without any marketing agreement, and Jeff Vincens was a 50% shareholder in Brican Corporation until November, 2006.

   5. Brican America does have a marketing agreement "with some dentists" in order to advertise VISO LASIK Centers (with the URL of Viso Lasik

44

Medspas provided).

6.   "This has nothing to do with a scam, the reasons why we advertise the VISO LASIK centers are explained in the "Strategic Alliance" document.

(Cook Dep. Ex. 37, which attaches a document named "A Strategic Alliance 4-16-08.ppt.")

161.   The Strategic Alliance document (Cook Dep. Ex. 37), which was attached to the email sent to Mr. Cook by Mr. Lemacon, disclosed that the display systems being marketed by Brican America, and financed by NCMIC, are represented to the end users as being:

### A FREE MARKETING TOOL

Give up a little bit of freedom on your 42" plasma display (a small 10% of your screen time), in order to be able to advertise its LASIK center, and VISO LASIK MEDSPAS ...

### WILL PAY YOU ENOUGH
### PER YEAR
### TO OFFSET
### THE COST OF YOUR LEASE!

(Cook Dep. Ex. 37, p. 27.)

162.   In spite of having this information, and contact information for Harold Meredith, Todd Cook did nothing further to investigate the allegations of fraud.  (Cook Tr. 53-60.)

163.   Although NCMIC had certain corporate procedures in place to investigate fraud, Mr. Cook did not employ those procedures because, at the time, he did not "feel it was fraud." [Cook Tr. 72:16 to 73:6.]

164.   Before July, 2008, NCMIC booked $11,196,481.37 in leases originated by Brican America. (Cook Dep. Ex. 38.)  After July, 2008, NCMIC booked $30,485,158.62 in leases originated by Brican America.  (Cook Dep. Ex. 38.)

**November 2008 Meeting Between NCMIC and Brican America in Miami**

165.   In November 2008, a delegation from NCMIC traveled to Miami to meet with Brican

45

America, to discuss their relationship.  (Cook Tr. 93.)

166. NCMIC was concerned that NCMIC was becoming saturated with Brican America originated leases, that is, that too much of its investment portfolio was Brican America originated leases.

167. From the beginning of the vendor relationship through December, 2008, 25% of the total business done by NCMIC was with Brican America, Inc.  That figure increased to 70% during the first four months of 2009. [Cook (Oct.) Tr., p. 23.]

168. The delegation from NCMIC consisted of Todd Cook, Jean Thompson and Lanette Henningsen.  (Cook Tr. 24-25, 36, 93.)

169. Paula Nuzum Barkley was on vacation in Miami, and joined the others from NCMIC for one or more meetings.  (Barkley Tr. 26.)

170. The delegation from NCMIC was unaware that NCMIC already had a signed General Vendor Agreement with Brican America, Inc.  (Cook Tr. 97-98, 145.)

171. Accordingly, the delegation from NCMIC brought a General Vendor Agreement to be signed by Brican America, Inc.  (Cook Tr. 97.)

172. When NCMIC requested that Brican America, Inc., sign the General Vendor Agreement, Brican America, Inc., advised that an agreement was already in place, and produced a copy of the signed agreement.  (Cook Tr. 97.)

173. The delegates discussed changing the identity of the lessor under the financing contracts to be one of the Brican America entities.

174. With such change, Brican America could attempt to find other leasing or financing companies to purchase leases originated by Brican America and thereby ease the volume of leases funded by NCMIC, lessening the saturation problem.

46

175. NCMIC advised Brican America that the same company could not be both the vendor and the lessor under the lease.

176. Brican America advised that it still had Brican America, Inc., in existence, although it had begun using Brican America, LLC, as the vendor.

177. Although Brican America, Inc., had stopped acting as a vendor in the Exhibeo System sales transactions, being replaced by Brican America, LLC, NCMIC did not request that a General Vendor Agreement between NCMIC and Brican America, LLC, be signed.  (Cook Tr. 97-98.)

178. Instead, NCMIC and Brican America (both Brican America, Inc., and Brican America, LLC) continued operating under the NCMIC agreement with Brican America, Inc.

179. Brican America requested that NCMIC provide Brican America with a lease form for its use, having Brican America, LLC, as the vendor and Brican America, Inc., as the lessor.

180. After the meeting, NCMIC provided such lease form to Brican America.

181. During the conversation concerning the General Vendor Agreement, the existence of the marketing agreement and the program NCMIC developed to support Brican America's Return Guarantee policy were also discussed.  (Cook Tr. 140; Vincens Tr. 166.)

182. Todd Cook indicated that he was uncomfortable with the language of the cancellation provision of the marketing agreement because it gave the customer the belief that the lease agreement could be canceled.  (Cook Tr. 138.)

183. At the time, the cancellation provision read:

**J)  Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitments relating to the advertising fees, the Client may request that Brican repurchase the Client's lease agreement in regarding to the Exhibeo Concept.

184. Rather than protest against Brican America advising the customers that the lease agreements

47

could be cancelled at all, and apparently in conformity with the program developed by

NCMIC to support Brican America's Return Guarantee policy, Cook recommended that the

cancellation language be modified to provide:

> **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitments relating
> to the advertising fees, the Client may request that Brican repurchase the Exhibeo
> Concept. Upon acceptance by Brican of the Client's request, Brican agrees to refund
> to the title/lien holder the outstanding balance due.  Brican does not assume or relieve
> any obligation, financial or otherwise, that the Client has entered into with regard to
> the Exhibeo Concept.

(Cook Dep. Ex. 23, p. 2.)

185.   Note that the most dominant element of the cancellation provision is the word

"Cancellation," and the language of the cancellation provision has little to do with

cancellation.

186.   Mr. Cook testified that the reason he addressed the Cancellation provision with Brican was

that he was concerned that the existence of the word "Cancellation" would give the doctors

the wrong idea that they could cancel the financing contract should they not receive their

advertising payment.  (Cook Tr. 116:15 to 117:24; 128:6 to 139:25; and, 157:8 to 162:1.)

187.   However, Mr. Cook recommended that the label of the provision, "Cancellation," be left

intact, which would, in Mr. Cook's expressed opinion, lead customers to believe that the

lease agreement could be cancelled, while at the same time, providing that Brican would pay

off the lease agreement, as contemplated and provided by the program developed by NCMIC

to support the Brican Return Guaranty policy.  (Cook Tr. 116:15 to 117:24; 128:6 to 139:25;

and, 157:8 to 162:1.)

188.   A reasonably prudent equipment financing company under these circumstances would

have demanded that copies of all marketing and advertising agreements which were

48

entered into with customers who financed the acquisition of their equipment and contracts with NCMIC, be provided to NCMIC pursuant to ¶6.c. of Plaintiffs' Exhibit 1.

189.   Additionally, a reasonably prudent equipment financing company under these circumstances, having phone contact information for its customers, would contact randomly selected customers to ask if they were given a marketing agreement at the same time as they signed the financing contract.

190.   During July, 2008, (the time when Mr. Cook admits to knowledge of the existence of the marketing agreements) the Vendor Agreement between NCMIC and Brican America, Inc., provided that Brican America, Inc., warranted and represented that:

> 6.c.   There are no other agreements or warranties given to Lessee relating to the Goods or Leases written or verbal that are not included in the documents given to PSFS.

191.   Brican America, Inc., had not provided NCMIC with copies of the marketing agreements because, as Vincens testified, nobody from NCMIC asked for them. [Vincens Tr., p. 166.]

192.   Upon learning of the apparent breach of representation and warranty contained in ¶6.c, as quoted above, rather than demanding that copies of all such agreements be provided to it, NCMIC asked Brican America, Inc., how many leases had marketing agreements connected to them. [Cook (Nov.) Tr., p. 76.]

193.   Brican America, Inc., answered that only "some" existed. [Cook (Nov.) Tr., p. 76.]

194.   NCMIC took no steps to obtain copies of all of the marketing agreements, or to advise those Plaintiffs who had marketing agreements that NCMIC would not honor the

49

representations contained in the marketing agreement, specifically the representation that the equipment financing agreement could be canceled.

195. By permitting the existence of the marketing agreements, as authorized by Fred Scott, NCMIC ratified and affirmed the cancellation provision contained therein.

196. By failing to so notify the customers of a contrary position in July, 2008 (when Todd Cook learned of the marketing agreements), NCMIC ratified and affirmed the cancellation provision of the advertising and marketing agreements.

**Change in Identity of Lessor**

197. After the meeting in Miami, Todd Cook, the vice president and general manager of the equipment finance division of NCMIC:

    a.    Changed the program from a semi-private label program (where the name and logo of Brican America, Inc., or Brican America, LLC, were dominant on the lease forms) to a private label program (where only the name of Brican America, Inc., or Brican America, LLC, appeared on the lease forms), although by agreement the leases would be immediately assigned to NCMIC;

    b.    Advised Brican America, Inc., and Brican America, LLC, that Brican America, LLC, could not be both the vendor and the lessor on leases to be assigned to NCMIC;

    c.    Suggested a rewrite the language of the marketing agreement, changing it from:

        6. **Cancellation:** If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled by the Client[13]

---

[13]The only "related agreements" would be the lease agreements.

To:

> 6. **Cancellation:** If Brican fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreement in regard to [the display system].

[Cook (Oct.) Tr., pp. 12-17.]

198.   Mr. Cook sent a copy of his email wherein he suggested the language modification while leaving the provision labeled, "Cancellation," to NCMIC's attorney, Ed McConnell.

199.   Pursuant to the direction of NCMIC, Brican America, LLC, became the vendor, Brican America, Inc., became the lessor, and Brican America, Inc., assigned the leases immediately to NCMIC pursuant to the Vendor Agreement.

200.   In spite of this direction coming from NCMIC, NCMIC failed to either amend the Vendor Agreement, or to enter into a new Vendor Agreement, whereby Brican America, LLC, would become a vendor under a written Vendor Agreement with NCMIC.

201.   The parties continued to operate with no regard for any difference between Brican America, Inc., and Brican America, LLC.

**Brican America, LLC, Sales Personnel Were Agents for Brican America, Inc.**

202.   When Brican America began using the new leases supplied by NCMIC, having Brican America, LLC, as vendor and Brican America, Inc., as lessor, Brican America, Inc., had no operational existence.

203.   The only putative employees of Brican America, Inc., were Vincens and Lemacon.

204.   All money which was transferred from NCMIC to ostensibly purchase leases held by

Brican America, Inc., was transferred by NCMIC to the account of Brican America, LLC. [Ellzey Tr. 46:13 to 47:3.]

205.   Brican America, LLC, would use that money to purchase the equipment identified in the financing contract.

206.   Whenever advertising fees were to be paid by Brican America, Inc., the money to pay those fees would be transferred from Brican America, LLC, to Brican America, Inc. [Ellzey Tr. 47:6-18.]

207.   When advertising fees were paid by Viso Lasik Medspas to the doctors, the money to pay those fees was transferred from Brican America, LLC, to Viso Lasik Medspas. [Ellzey Tr. 51:2 to 52:2.]

208.   NCMIC (1) supplied an equipment financing form which would be printed with the logo of Brican America, Inc., prominently displayed on the top of the page; (2) sales agents employed by Brican America, LLC, would be the only interface between the potential customer and Brican America, Inc.; (3) the sales agents would gather the information as directed by Brican America, Inc., and (4) would transmit it to NCMIC for a credit decision, (5) the sales agents would complete the equipment financing agreements, (6) would answer all questions which the customer might have about the financing agreements; (7) would obtain the signature of the direct contract obligor and a personal guarantor on the agreements, and then (8) would transmit them to the offices of Brican America which would then forward it to NCMIC for credit processing.

209.   NCMIC processed the credit applications, and made credit decisions with respect to each of those contracts.

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

210.   During the sales meeting, whenever the customer asked the sales person about the non-cancellation provision of the financing contract, the sales person pointed to the cancellation provision of the marketing agreement, advising that if the doctor did not receive his advertising fees, he or she could cancel the lease.  (Barbieri Tr. 69:21 to 70:21; and, Blauzvern 21:8 to 22:18, 45:8 to 48:10.)

211.   Accordingly, based on the foregoing, the parties agreed that the sales agents for Brican America, LLC, would be agents for Brican America, Inc., in connection with the financing agreements having Brican America, Inc., as the "lessor," or in the alternative, Brican America, Inc., permitted the sales agents to appear to the customers as Brican America, Inc., agents.

**Marketing Agreement Versions 5 to 8**

212.   Marketing Agreement Versions 5 through 8 include, as their cancellation provision, the following:

a.   5.   **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it, Brican will repurchase the Client's lease agreement in regard to the Exhibeo Concept.

b.   6.   **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees, the Client may request that Brican repurchase the Client's lease agreement in regard to the Exhibeo Concept.

c.   7.   **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it, Brican will repurchase the Client's lease agreement in regard to the Exhibeo Concept.

53

     d.    8. **Cancellation:** If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreement in regard to the Exhibeo Concept.

213.   In each of the Marketing Agreement Versions 5 through 8, either Brican America, Inc., or Brican America, LLC, is the entity obligated to pay Plaintiffs the advertising fees, and in no version is Viso Lasik Medspas ever committed to pay the advertising fees.

214.   Although Brican America, Inc., knew that it intended, from the inception of each lease wherein it was named as lessor, to immediately assign the lease to NCMIC, Brican America, Inc., did not advise any Plaintiff of that intention.

215.   Each Plaintiff understood that he, she or it was entering into a contract with Brican America, and the marketing agreement portion of the contract, and specifically the "repurchase of the lease agreement" portion, meant that Brican America would take back the equipment and cancel the obligation of the doctor to make any further payment on the lease, that is, that Brican America would repurchase the lease from the doctor.

216.   Therefore, the language of the Marketing Agreement Versions 5 through 8 is ambiguous.

217.   Either Brican America, Inc., or Brican America, LLC, (and there was never any real distinction between them) wrote the Marketing Agreements.

218.   As the author of the agreements, all ambiguities in the agreements are to be construed against Brican America.

219.   One tool in legally interpreting the ambiguous provisions of the document is to look to the meaning given to them by the parties.

54

220. In every case, Brican America advised the Plaintiffs that the cancellation provision of the marketing agreements was intended to permit the Plaintiff to cancel the financing contract should the advertising fees not be paid.

221. In every case, the Plaintiff understood that the cancellation provision of the marketing agreements were intended to permit the Plaintiff to cancel the financing contract should the advertising fees not be paid.

222. Each Plaintiff relied on the interpretation of the ambiguous provision as expressed by the sales person in entering into the contract.

223. If the cancellation provision of Marketing Agreement Versions 5 through 8 are not interpreted as they were represented to the Plaintiffs by Brican America, then each such Plaintiff has been fraudulently induced into entering into the contract.

224. NCMIC is the assignee of the financing contracts which have Marketing Agreement Versions 5 through 8 as part of the transaction.

225. As the assignee, NCMIC received from Brican America, Inc, only what Brican America, Inc., could convey to NCMIC.

226. Defenses to contract formation, such as fraud in the inducement, may be asserted even where a party has agreed to a hell-or-high-water clause or a waiver-of-defenses provision. *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC,* 784 N.W.2d 753 (Iowa 2011).

227. Accordingly, NCMIC took assignment of the leases subject to the contract formation defenses.

**Professional Solution Financial Services Stops Funding, but the Fraud Marches On**

228. On April 15, 2009, NCMIC stopped funding any more assignment of leases from Brican although $3,000,000 in purchase orders had been issued by NCMIC to Brican and Brican had acquired the equipment to fill those purchase orders.  [Cook (Oct.) Tr., pp. 19-21.]

229. Vincens and Lemacon immediately formed Brican Financial to be the funding source for the fraud.

230. Ultimately, the payments under the marketing and advertising agreements stopped.

231. By the time that the payments stopped, Brican America, Inc., and Brican America, LLC, transferred over $7,000,000 to Viso Lasik Medspas, LLC, Viso Lasik Medspas of Charlotte, LLC, and Viso Lasik Medspas of San Antonio, LLC.

232. Ostensibly, the money so transferred was transferred pursuant to a "Credit Agreement," dated January 1, 2008, a copy of which is attached hereto as Plaintiffs' Exhibit 3.

233. However, as Vincens testified in his deposition, it was the plan all along for the money raised by the sale of the Display Systems, and the monetization of those leases obtained during said sale, to fund the start-up of the business of the Viso Lasik Medspas.

234. On May 4, 2009, less than 3 weeks after NCMIC stopped funding, NCMIC filed suit in this court against Brican America, Inc., and only Brican America, Inc., requesting that this court enter an order requiring Brican America, Inc., to repurchase $38,000,000 in leases funded by NCMIC.  *NCMIC Finance Corporation v. Brican America, Inc.*, 09-cv-21192 (Huck) (S.D.Fla.).

235. On January 1, 2010, Brican America, Inc., and Viso Lasik Medspas, LLC, breached the marketing and advertising agreements by failing to make the quarterly payments coming

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

due thereunder to each putative class member.

236. On February 22, 2010, NCMIC and Brican America, Inc., agreed to the dismissal of the suit with prejudice.  (DE 94)

237. On February 23, 2010, this court enter its order of dismissal with prejudice.  (DE 95)

238. In a press release to the putative class members in March, 2010, NCMIC asserted that it believed that Brican America, Inc., was insolvent and to continue to incur attorneys' fees to pursue a money judgment against an apparently insolvent company "did not make business sense.[14]"

**Demand to Repurchase**

239. Many of the Plaintiffs have demanded that Defendants Brican America, Inc., and Brican America, LLC, repurchase the lease agreements.

240. Defendants Brican America, Inc., and Brican America, LLC, responded to the demands advising that neither was in a position to do so, and reiterated to each Plaintiff that he, she or it should continue making the payments coming due under the lease or finance agreements.

241. If each Plaintiff sent a written demand to repurchase to Brican America, Inc., and Brican America, LLC, the result would have been the same—Brican America, Inc., and Brican America, LLC, would have refused the demands.

**Damages**

242. Each Plaintiff has been damaged as a result of the actions of each Defendant.

---

[14]Dismissing a claim ***with prejudice*** does not make business sense if one really believed that one's opponent was insolvent.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828  • Fax (954) 983-2850

243.  Each Plaintiff has retained the undersigned attorneys to represent them, and are obligated to pay said attorneys a reasonable fee for their services.

244.  Each equipment financing agreement contains a one-way attorneys' fee-shifting provision requiring each Plaintiff to pay the attorneys' fee of NCMIC.

245.  Pursuant to § 57.105(7), FLA. STAT. (2009), said provision is made reciprocal.

246.  Plaintiffs have performed all conditions by them to be performed prior to bringing this claim for relief.

## Fraud Perpetrated on Named Plaintiffs

### Exemplar: Peter M. Blauzvern DDS PC

247.  On or about January 20, 2009, Brican America, LLC, represented to this Plaintiff that if it would enter into a lease with Brican America, Inc., for 1 Exhibeo System, which would require a monthly payment of $508 plus applicable sales tax, Brican America, LLC, would enter into a marketing agreement on behalf of Viso Lasik Medspas, LLC, through which Brican America, LLC, would pay a minimum of $5,800 per year to Plaintiff (which equates to $483.33 per month, the net result of which is that the Display System would cost the doctor $24.67 per month for 60 months, or $1,480.20), and that if it failed to pay the minimum of $5,800 per year, or if Viso Lasik Medspas, LLC, failed to make the payment, then Brican America, LLC, would at Plaintiff's request "repurchase" Plaintiff's lease agreement, leading Plaintiff to reasonably believe that the lease would be canceled.

248.  The above representations are contained in Plaintiffs' Exhibit 4 attached hereto.

249.  The above representations were false when they were made by Brican America, LLC,

and were known by Brican America, LLC, to be false when they were made.

250.   Brican America, LLC, intended that Plaintiff rely upon those representations.

251.   Plaintiff reasonably relied upon those representations to its detriment.

252.   Plaintiff has been damaged as a result of such reliance.

253.   On February 7, 2009, Brican America, Inc., executed Plaintiffs' Exhibit 4 as Lessor.

254.   On February 3, 2009, Brican America, Inc., assigned its interest in Plaintiffs' Exhibit 4 to NCMIC.

255.   Brican America, LLC, and Viso Lasik Medspas, LLC, breached the marketing agreement on or about January 1, 2010, by failing to pay Plaintiff the fee required by the contract.

256.   On or about February 1, 2010, Plaintiff demanded that Brican America, LLC, repurchase the lease, and end Plaintiff's obligation to make payments thereunder.

257.   On or about February 11, 2010, Brican America, LLC, refused to assume the lease, and advised Plaintiff that it must continue making its lease payments.

## Similar Contracting with Remaining Plaintiffs

258.   A similar scenario occurred with each of the Plaintiffs.  Copies of their contracts, marketing agreements, and communication to and from Defendants were supplied with the Rule 16 disclosures, and not attached to this complaint to avoid unnecessarily attaching a large number of exhibits to the complaint.

## Class Action Allegations: Numerosity

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

259.   Plaintiffs request that this court certify the following class and subclasses[15]:

    a.    **Main class**:  All entities which entered into contracts with any of the Defendant entities for purchase or lease of an advertising display system and also entered into a marketing or advertising agreement with one or more of the Defendant entities, and all individuals who personally guaranteed payment of the purchase or lease agreement.

    b.    **Subclass**:  Each member of the main class whose state's little FTC Act applies to protect said member.

260.   The main class consists of over 1970 entities, thus satisfying the numerosity requirement of Rule 23.

261.   Each subclass consists of more than 30 members, thereby individually satisfying the numerosity requirement of Rule 23.

262.   According to the suit filed by *NCMIC Finance Corporation v. Brican America, Inc.*, case number 09-CV-21192 (Huck) (S.D.Fla.), NCMIC has entered into 1672 leases with customers of Brican America, Inc., having a total value of more than $38,000,000.

**Commonality**

263.   There are numerous issues of law and fact which are common to the claims of the putative class representatives and class members, including:

    a.    Whether the contracts are void *ab initio* for fraud;

---

[15]The reason for the existence of the subclasses, grouped by state, is for the application of Little FTC Acts from the various states as required by *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985), if the court finds that the Florida Unfair and Deceptive Trade Practices Act does not apply in each transaction.

Plaintiffs include their request for class certification, which has already been denied by this Court in the MDL action, not to irritate the Court, but to preserve all potential appellate issues.

b.      Whether the contracts are enforceable;

c.      Whether the contracts were breached;

d.      Whether the claimants were damaged as a result of the breach;

e.      Whether the various Defendants fraudulently misrepresented material facts to the claimants which were known to the Defendants to be false or which were represented with reckless disregard for their truthfulness, with the intent that the claimants rely upon those representations, and whether the claimants relied upon those representations to their detriment;

f.      Whether Defendant NCMIC ratified and affirmed the cancellation clause contained in the marketing and advertising agreements;

g.      Whether the various Defendants conspired to defraud the claimants;

h.      Whether the Defendants violated the Little FTC Acts of the resident states of the claimants causing them damage;

i.      Whether the corporate identities of the various Defendants, except NCMIC, should be pierced and each Defendant become jointly and severally obligated for the damages claimed by the claimants; and,

j.      Such other issues as are identified as discovery is conducted in this matter.

**Typicality**

264.    The fraud perpetrated on the putative class representatives is typical of the fraud encountered by each member of the putative class, thereby satisfying the typicality requirement of Rule 23.

**Adequacy of Representation**

61

265.   The putative class representatives are adequate representatives of the class and will fairly and adequately protect the interests of the class members.

266.   The putative class members are committed to the prosecution of this action, and have retained competent counsel who are experienced in complex class action litigation growing out of equipment financing.

267.   There is no hostility among the various putative class representative and any class member.

268.   Neither the putative class representatives or their chosen counsel anticipate any difficulty in the management of this litigation as a class action.

**Predominance**

269.   The common questions of law and fact predominate over any question that may be individualized of any class member.

**Superiority**

270.   Class representation and litigation as a class in one court is far superior to having the common questions of law and fact decided by many courts in each of the two available fora—Miami-Dade County, Florida, and through a floating jurisdiction clause of questionable enforceability, the courts in Iowa.

271.   There is no particular or overriding interest of any member of any of the class members in individually controlling the prosecution of separate claims.

## Attorneys' Fees and Costs

272.   Plaintiffs have retained their respective attorneys to represent them in this action, and are obligated to pay said attorneys a reasonable fee for their services.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

273.   In addition, Plaintiffs have expended, and have committed to expend, litigation costs in in action.

274.   Plaintiffs seek recovery of their attorneys' fees and costs from Defendants.

# Count I
# Declaratory Relief

275.   Plaintiffs adopt and reallege the allegations contained in ¶ 1 through 274 as though said allegations were set forth individually herein.

276.   This is an action for declaratory relief against all Defendants, pursuant to the Declaratory Judgment Act, 28 U.S.C.A. § 2201, seeking a declaration of the court as to the rights and obligations of the parties to the respective marketing and advertising agreements, and the equipment financing agreements.

277.   Plaintiffs, and those similarly situated, are genuinely in doubt about their rights and obligations under the contracts—the equipment financing agreements and the marketing and advertising contracts.

278.   Pursuant to the Declaratory Judgment Act, 28 U.S.C.A. § 2201, Plaintiffs are entitled to declaratory relief.

279.   There is a bona fide need for the declaration sought herein because the funding source, NCMIC (in most cases) is threatening to sue each Plaintiff who has stopped paying the contract when he, she or it discovered the fraud, and when the obligor under the marketing and advertising contract stopped paying the fees required by said contracts. Wherefore, Plaintiffs request that this court enter its final judgment declaring that the

63

equipment financing agreement contracts are unenforceable. Further, Plaintiffs request that this court grant them their attorneys' fees, and such further relief as this court deems just.

# Count II
# Money Damages Breach of Contract

280.   Plaintiffs adopt and reallege the allegations contained in ¶ 1 through 274 as though said allegations were set forth individually herein.

281.   This is an action for money damages against **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial** a Florida limited liability company, **Vincens, Lemacon,** jointly and severally, in an amount exceeding $75,000, plus costs, interest and attorneys' fees.

282.   **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial** a Florida limited liability company, **Vincens,** and **Lemacon,** were alter egos of each other, with the individual Defendants, Vincens, and Lemacon, ignoring the corporate entities and conducting business without regard thereto.

283.   **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial,** a Florida limited liability company, **Vincens,** and **Lemacon,** breached the contract between the parties, Plaintiffs' Exhibits 4 and higher.

284.   Plaintiffs and each class member were damaged as a direct and proximate result of said breach.

285.   Plaintiffs and each class member will continue to incur damage throughout the life of Plaintiffs' Exhibit 4 and higher, as a direct and proximate result of said breach.

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

Wherefore, Plaintiffs on behalf of themselves and all putative class members, demand money judgment against **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial,** a Florida limited liability company, **Vincens,** and **Lemacon,** jointly and severally, plus costs, interest and attorneys' fees, and such further relief as this court deems just.

# Count III
# Money Damages for Fraudulent Misrepresentations

286.   Plaintiffs adopt and reallege the allegations contained in ¶ 1 through 274 as though said allegations were set forth individually herein.

287.   This is an action for money damages in an amount exceeding $75,000, plus costs, interest and attorneys' fees for the tort of fraudulent misrepresentation, against **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial** a Florida limited liability company, **Vincens,** and **Lemacon.**

288.   **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial** a Florida limited liability company, **Vincens,** and **Lemacon,** were alter egos of each other, with the individual Defendants, Vincens, and Lemacon, ignoring the corporate entities and conducting business without regard thereto.

289.   Said Defendants made certain representations to Plaintiffs more particularly set forth above.

290.   Said representations were false when they were made by Defendants.

291.   The falsity of the representations was known to Defendants at the time they made them, or they made them under circumstances where they should have known of the falsity thereof.

292.   Defendants intended that Plaintiffs and each class member rely upon said representations.

293.   Plaintiffs and each class member reasonably relied upon the representations to the financial detriment of Plaintiffs and each class member.

294.   Plaintiffs and each class member have been damaged as a result of said reliance upon the fraudulent misrepresentations made by Defendants.

295.   As an item of special damage, Plaintiffs and each class member have incurred attorneys' fees in defending each case brought by NCMIC to collect on the equipment financing agreements, solely, proximately and directly as a consequence of the fraudulent misrepresentations made by Defendants to Plaintiffs and each class member.

Wherefore, Plaintiffs on behalf of themselves and all putative class members, demand money judgment against the Defendants named in this Count, plus costs, interest and attorneys' fees, and such further relief as this court deems just.

# Count IV
# Money Damages for Negligent Misrepresentations

296.   Plaintiffs adopt and reallege the allegations contained in ¶ 1 through 274 as though said allegations were set forth individually herein.

297.   This is an action for money damages in an amount exceeding $75,000, plus costs, interest and attorneys' fees for the tort of negligent misrepresentation, against **Brican**

66

**America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial** a Florida limited liability company, **Vincens,** and **Lemacon.**

298.    **Brican America, Inc.,** a Florida corporation, **Brican America, LLC**, a Florida limited liability company, **Brican Financial** a Florida limited liability company, **Vincens,** and **Lemacon,** were alter egos of each other, with the individual Defendants, Vincens, Lemacon, and DeCanio ignoring the corporate entities and conducting business without regard thereto.

299.    Said Defendants made certain representations to Plaintiffs more particularly set forth above.

300.    Said representations were false when they were made by Defendants.

301.    The representations were made by Defendants under circumstances where, with the exercise of reasonable care, they should have known of the falsity thereof.

302.    Defendants intended that Plaintiffs and each class member rely upon said representations.

303.    Plaintiffs and each class member reasonably relied upon the representations to the financial detriment of Plaintiffs and each class member.

304.    Plaintiffs and each class member have been damaged as a result of said reliance upon the fraudulent misrepresentations made by Defendants.

305.    As an item of special damage, Plaintiffs and each class member have incurred attorneys' fees in defending each case brought by NCMIC to collect on the equipment financing agreements, solely, proximately and directly as a consequence of the fraudulent

misrepresentations made by Defendants to Plaintiffs and each class member.

Wherefore, Plaintiffs on behalf of themselves and all putative class members, demand money judgment against the Defendants named in this Count, plus costs, interest and attorneys' fees, and such further relief as this court deems just.

# Count IV
# Injunctive Relief and Money Damages for Violation of Florida's Deceptive and Unfair Trade Practices Act, and Other States' Applicable Little FTC Acts

306. Plaintiffs adopt and reallege the allegations contained in ¶ 1 through 274 as though said allegations were set forth individually herein.

307. This is an action for declaratory and injunctive relief, and for money damages against each Defendant, jointly and severally, in an amount exceeding $75,000, plus costs, interest and attorneys' fees, sounding in the violation by Defendants of Florida's adaptation of a Little FTC Act, codified at §§ 501.201 *et seq.*, FLA. STAT. (2009), and referred to as the Florida Deceptive and Unfair Trade Practices Act (hereafter, "FUDTPA"), and each applicable state's Little FTC Act, more particularly set forth herein.

308. Each Plaintiff is a consumer as defined in FUDTPA, specifically at § 501.203(7), FLA. STAT. (2009).

309. The above described transactions are within the statutory definition of "trade or commerce," in FUDTPA, specifically at § 501.203(8), FLA. STAT. (2009).

310. Each of the above transactions emanated from Florida because:

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

    a.     The sales agents were brought to Florida, and were trained in Florida, by Florida companies, to sell products for the Florida companies; and,

    b.     The sales agents were then sent out from Florida throughout the United States to make the representations they were taught to make in Florida.

311.    Accordingly, FUDPTA applies extra-territorially to all of the transactions involving the sale by the Brican companies of advertising display systems and related marketing contracts. *See Millennium Communications & Fulfillment, Inc. v. State of Florida*, 761 So.2d 1256 (Fla. 3d DCA 2000); and, *State of Florida v. Millennium Communications & Fulfillment, Inc.*, 800 So.2d 255, 257 (Fla. 3d DCA 2001). *See also, Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436 (Fla. 4th DCA 1999).

312.    Section 501.204(1) provides that "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

313.    The conduct of NCMIC, PSFS 3, Brican America, Inc., Brican America, LLC, and Brican Financial, as described above, constitutes a calculated, ongoing and repeated course of unfair, unconscionable and deceptive acts and practices in the conduct of trade or commerce that violates FUDTPA, specifically § 501.204, FLA. STAT. (2009).

314.    The unfair, unconscionable and deceptive acts and practices of NCMIC, PSFS 3, Brican America, Inc., Brican America, LLC, and Brican Financial, as described above, violate FDUTPA.

315.    As such, Plaintiffs are entitled to both declaratory and injunctive relief pursuant to § 501.211(1), FLA. STAT. (2009), and money damages.

316.   Plaintiffs have been damaged as a direct and proximate result of the violation by Defendants of Florida Deceptive and Unfair Trade Practices Act.

317.   All conditions precedent to be performed by Plaintiffs prior to the bringing of an action under the Florida Deceptive and Unfair Trade Practices Act have either been performed by Plaintiffs, or would be futile as is evidenced by the efforts of each individual Plaintiff to have the various Defendants fulfill their obligations under the existing contracts.

318.   The most divergent law governing the claims raised by Plaintiffs is the statutory law enacted by each state known generally as consumer protection laws, deceptive and unfair trade practices acts, or Little FTC Acts:

> The ABA Journal reported in 1986 that "business lawyers involved in commercial disputes are beginning to use what are probably the most potent litigation weapons now available—state versions of the Federal Trade Commission Act, known as 'Little FTC Acts,' and that such statutes "will play an increasingly decisive role in business litigation."[16]  This is a fairly recent development in state consumer protection litigation, but may well be a precursor of things to come.
>
> The original rationale for little FTC Acts was to provide greater protection for consumers in their private suits against deceptive or unfair sellers, due to the perceived inadequacies of common-law or UCC remedies. Business people were not thought to need any augmented legal protection because presumably they could protect themselves.
>
> After the initial wave of little FTC Acts in the late 1960s and early 1970s, some state courts and legislatures began to recognize that inexperienced purchasers of business franchises were at much the same disadvantage as consumers of automobiles or houses[17]. Thus, statutory consumer protection was extended to such purchasers either through amendment to the state law, [citation omitted] or

---

[16]Gilleran and Stadfeld, *Little FTC Acts Emerge in Business Litigation*, 72 A.B.A.J. 58, 61 (1986).

[17]Note, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Act to Small Businesses,* 96 HARV. L. REV. 1621 (1983)

the enactment of new legislation. ...

Mary Dee Pridgen, CONSUMER PROTECTION AND THE LAW § 4:3 (2009).

319.    Some states, such as Pennsylvania, confine their Little FTC Act coverage to individual claimants who have purchased goods for household or personal use.  Some, such as Florida, extend coverage to businesses.

320.    All Little FTC Acts carry with them the potential for award of treble damages, and attorneys' fees.

321.    In all of the applicable FTC Acts, found in the table below, a fraudulent misrepresentation is a basis for relief under the Act.

322.    Because common law claims for fraud carry with them the potential for an award of punitive or exemplary damages, and because generally speaking, a claimant cannot duplicate recovery of its damages, it would appear that a claimant would need to make an election of remedies between an award of compensatory and punitive damages for common law fraud, and an award of compensatory and treble damages for a violation of the Little FTC Act based upon the same fraud.

323.    However, because an election of remedy is to be made only after the return of the verdict (in a jury trial) or after return of preliminary findings by the court (in a bench trial), Plaintiffs will continue to pursue their claims individually and on behalf of those class members who have viable Little FTC Act claims.

324.    The Due Process Clause and the Full Faith and Credit Clause of the Constitution of the United States require "that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or

GOSSETT & GOSSETT, P.A. 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum v. Shutts,* 472 U.S. 797, 819 (1985) quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-313 (1981).

325.    In this case, the fraudulent conduct complained of occurred within the home state of each Plaintiff—the location where the written fraudulent representations were conveyed to the customers.   Each of those states would have a significant state interest in regulating away the fraudulent behavior, or punishing its occurrence.   Therefore, the law of each such state will be examined to see if there is a commonality sufficient to litigate this issue through a class action.

326.    A sample of the various state Little FTC Acts are as follows:

| State—Applicable to Case | Authority | Elements |
|---|---|---|
| Alabama:                   No | § 8-19-3. Definitions. | Limited to "Any natural person who buys goods or services for personal, family or household use" |
| Arkansas:                   No | § 4-88-101 | Creates no private cause of action. |
| California:                   No | § 1761. Definitions | Limited to primarily personal, family or household purposes |
| Florida                   Yes | §§ 501.201 *et seq.* | "Consumer" means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination. |
| Georgia:                   Yes | § 10-1-370 *et seq.* | The Uniform Deceptive Trade Practices Act, §§ 10-1-370 through 10-1-382 applies to businesses, while the Fair Trade Business Practices Act, found at § 10-1-392 *et seq.*, does not. |

| | | | |
|---|---|---|---|
| | | DLL has previously advised this court that "the consumer protection law statutes in ... Georgia, ... limit claims to those related to goods or services acquired for personal, family or household use. ... GA. CODE ANN. §§ 10-1-392, 10-1-393 (2009)." DE# 87, p. 74, fn. 37.  This misstates Georgia law.  Further, DLL advised this court in the same paragraph that Georgia's law "entirely prohibit[s] consumer protection class actions," then cites a portion of the inapplicable Fair Trade Business Practices Act in support of that statement.  "Chapter 5B" referred to in § 10-1-399, refers to telemarketing restrictions found in § 10-5B-101 *et seq.;* "this part" referred to in § 10-1-399 refers to the Fair Trade Business Practices Act, the first section of which, § 10-1-390, states "This part shall be known and may be cited as the "Fair Business Practices Act of 1975." | |
| Illinois:                      No | § 505/1. Definitions | Limited by the definition of consumer as being "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." | |
| Kansas:                      No | § 50-623 *et seq.* | "Consumer" means an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes.  The Kansas company involved is "Individual Assurance Company, LLC, which is most likely not a family partnership. | |
| Massachusetts:            Yes | Mass. Gen. Laws ch. | Any person  who engages in the | |

| | 93A, § 11 (2009). | conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper. |
|---|---|---|
| Missouri:            No | § 407.010 *et seq.* | Private cause of action limited to those who purchase goods for personal, family or household purposes |
| New York:           Yes | § 349. Deceptive acts and practices unlawful | In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff. |

74

| North Carolina: | Yes | § 75-16. Civil action by person injured; treble damages | If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict. |
|---|---|---|---|
| Pennsylvania: | No | 201-9.2.   Private actions. | Limited to "goods or services primarily for personal, family or household purposes " |
| Tennessee: | No | § 47-18-101 *et seq.* | Defines consumer to be a "natural person" thus, if any class member is a natural person, this law would permit a claim.  The Tennessee claimants are not natural persons. |
| Texas: | Yes | § 17.50. Relief for Consumers | "Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more. Note: DLL asserted that the statute of limitations under the Texas code is two years, and that is correct, but incomplete.  The statute of limitations is "two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading,  or  deceptive  act  or |

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

| | | | practice." § 17.565. |
|---|---|---|---|
| Virginia: | No | § 59.1-196, *et seq.* | Limits consumer transaction to one primarily for personal, family or household purposes |

327.   In each state, if the elements of a claim for relief for common law fraud are proved, that same evidence establishes a violation of the Little FTC Act.   However, for most of the states, one need not prove the elements of fraud, but rather, must prove deception.

328.   Included in the deceptive and unfair trade practices are these:

a.   That Brican America would treat the applications, forms, and rental agreement consumers signed as a unified agreement under which Brican America would provide certain equipment and services in exchange for consumers' payments;

b.   By failing to disclose the following facts that would have been material to consumers when they contracted with Brican America:

i.   that the equipment covered by the rental agreement would be of little or no value to the consumer if Brican America failed to provide the promised advertising fees and advertising services.

c.   The practice of including in its rental agreements provisions authorizing it or its assignees to file lawsuits in specified or unspecified venues other than consumers' locations or the locations where consumers executed the contracts with Brican America was likely to cause substantial injury to consumers that could not have been reasonably avoided and that was not outweighed by any countervailing benefits to consumers or to competition.

d.   That Brican America and NCMIC provided others with the means and

76

instrumentalities for the commission of deceptive and unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by furnishing third-party finance companies with rental agreements from consumers that allowed the finance companies to:

i.   Misrepresent that consumers owe money on the rental agreements regardless of whether Brican America provided the promised advertising fees and advertising services; and

ii.  File collection suits against consumers in distant fora.

*See FTC v. NorVergence, Inc.*, 2005 WL 3754864 (D.N.J.).

Wherefore, Plaintiffs request that this court issue a declaratory judgement, declaring that the contracts, and the conduct of Defendants, violate FDUPTA, and the applicable state enactments of Little FTC Acts, and are therefore, unenforceable, and demand money judgment against Defendants, jointly and severally, for all damages incurred by Plaintiffs and all putative class members similarly situated, as a direct and proximate result of their violation of said act, plus the enhanced damages provided by each such act, costs, interest and attorneys' fees, and requests that this court grant it such further relief as this court deems just.

Dated:       November 20, 2013
             Hollywood, FL

                              /s/ *Ronald P. Gossett*
                              Ronald P. Gossett (210811)
                              rongossett@gossettlaw.com
                              Gossett & Gossett, P.A.
                              4700 Sheridan St., Building I
                              Hollywood, FL 33021
                              (954) 983-2828 • (954) 212-0439 Fax
                              Attorneys for *Blauzvern* Plaintiffs

**Certificate of Service**

I HEREBY CERTIFY that on November 20, 2013, I electronically filed the foregoing document with the Clerk of this Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

| | |
|---|---|
| David H. Charlip (329932)<br>Charlip Law Group, LLC<br>17501 Biscayne Blvd., Suite 510<br>Aventura, Florida 33160<br>(305) 354-9313 • (305) 354-9314 Facsimile<br>dcharlip@charliplawgroup.com<br>Attorneys for *Wigdor* Plaintiffs | Kenneth J. Catanzarite (PHV)<br>Catanzarite Law Corporation<br>2332 W Lincoln Avenue<br>Anaheim, CA 92801<br>(714) 520-5544 • (714) 520-0680 Fax<br>kcatanzarite@catanzarite.com<br>Attorneys for *Patel* Plaintiffs |
| Catherine Rodriguez<br>Filler, Rodriguez, LLP<br>1688 Meridian Avenue, Suite 900<br>Miami Beach, FL 33139<br>(305) 672-5007 • (305) 672-0470 Fax<br>crodriguez@fillerrodriguez.com<br>Attorney for *NCMIC Finance Corporation and PSFS 3 Corporation* | Michael I. Verde (PHV)<br>Philip Nemecek (PHV)<br>Katten Muchin Rosenman, LLP<br>575 Madison Avenue<br>New York, New York 10022<br>(212) 940-8800 • (212) 940-8776 Fax<br>michael.verde@kattenlaw.com<br>Attorney for *NCMIC Finance Corporation and PSFS 3 Corporation* |
| Ryan J. Larsen (PHV)<br>Katten Muchin Rosenman LLP<br>2029 Century Park East, Ste. 2600<br>Los Angeles, CA 90067-3012<br>(310) 788-4544 • (310) 712-8223<br>ryan.larsen@kattenlaw.com<br>Attorney for *NCMIC Finance Corporation and PSFS 3 Corporation* | Paul L. Orshan<br>Paul L. Orshan, P.A.<br>150 Alhambra Circle, Suite 1150<br>Coral Gables, FL 33134<br>TEL.: 305-858-0220<br>FAX: 305-402-0777<br>paul@orshanpa.com<br>*Attorney for Brican America, Inc., Brican Financial Services, LLC, Jean Francois Vincens, and Jacques Lemacon* |
| Jeff Tomberg<br>Jeff Tomberg, JD, PA<br>626 SE 4th Street<br>Boynton Beach, Florida 33435<br>(561) 737-1345 • (561) 734-8971 Fax<br>piatty@yahoo.com<br>Attorney for *DeCanio Group of Defendants* | Brican America, LLC<br>JJR Investments, LLC<br>Viso Lasik Medspas, LLC<br>Viso Lasik Medspas Charlotte, LLC<br>Viso Lasik Medspas San Antonio, LLC<br>13030 SW 128th Street<br>Miami, FL 33186 |

**GOSSETT & GOSSETT, P.A.** 4700 Sheridan Street, Building I, Hollywood, Florida 33021 • (954) 983-2828 • Fax (954) 983-2850

| | |
|---|---|
| Robert S. Green<br>Green Welling PC<br>595 Market Street<br>Suite 2750<br>San Francisco, CA 94105<br>*Attorney for Third Party Defendant* | Mendy Halberstam<br>Rosen Switkes & Entin<br>407 Lincoln Road<br>Penthouse S.E.<br>Miami Beach, FL 33140<br>*Attorney for Third Party Defendant* |
| Rowan Keenan<br>Keenan, Ciccitto & Associates<br>376 E. Main Street<br>Collegeville, PA 19426<br>*Attorney for Third Party Defendant* | Robert Alan Selig<br>Boone & Davis PA<br>2311 North Andrews Avenue<br>Wilton Manors, FL 33311<br>*Attorney for Third Party Defendant* |

**Gossett & Gossett, P.A.**

Attorney for *Blauzvern* Plaintiffs
4700 Sheridan St., Building I
Hollywood, FL 33021
(954) 983-2828 • (954) 212-0439 Fax
rongossett@gossettlaw.com
Fla. Bar No. 210811


By:/s/ *Ronald P. Gossett*

Ronald P. Gossett
For the Firm

D:\Clients\Brican America\Pleadings\Complaint and Answer\2013 11 20 Third Amended Complaint.wpd