**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 10-md-02183-PAS

IN RE: Brican America LLC Equipment
Lease Litigation

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## NCMIC'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants NCMIC Finance Corporation and PSFS 3

Corporation's ("NCMIC") Motion for Summary Judgment on Plaintiffs' Remaining Claims [DE-

473]. There are two remaining Plaintiff groups in this MDL, the *Blauzvern* and the *Wigdor*

Plaintiffs. Both Plaintiff groups bring claims under the Declaratory Judgment Act and the

Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") against NCMIC arising out of

Financing Agreements Plaintiffs signed in connection with the purchase of an in-office Display

System. These claims are based on the oral statements of Brican America, Inc. ("BAI") and

Brican America, LLC's ("BAL") representatives[1] during the sale presentations of Brican's

Display System, as well as the written terms of a Marketing Agreement Plaintiffs signed in

connection with the purchase of the Display System. Defendants seek summary judgment on the

grounds that the record evidence is insufficient to permit a reasonable fact-finder to conclude that

(1) Brican sales personnel were the apparent agents of NCMIC, and (2) that Brican actually made

the alleged misrepresentations that Plaintiffs seek to impute to NCMIC.

The Court has reviewed the motion, Plaintiffs' responses [DE-483, 484], Defendants'

reply [DE-489], counsels' argument at the December 19, 2013 hearing, the Parties' supplemental

filings [DE-504, 505, 506], the record, and the applicable law. First, regarding Brican's

_____

[1] BAI and BAL are referred to herein collectively as "Brican."

representations that Plaintiffs could cancel the Financing Agreements if they stopped receiving monthly advertising fees, summary judgment is granted because the language of the Marketing Agreement's "Cancellation" provision can be reconciled with the hell-or-high-water clause in the Financing Agreements.  As such, any oral statements to the contrary cannot invalidate the Financing Agreements.

Second, as to Brican's remaining alleged misrepresentations – including that it would "buy back," "repurchase," or "assume assignment" of the Financing Agreement – summary judgment is granted as to those transactions involving the three-column version of the Financing Agreement.  To the extent that Brican America, Inc. was NCMIC's apparent agent, the scope of this agency relationship did not extend to statements concerning matters unrelated to the Financing Agreements, and therefore these statements cannot be imputed to NCMIC.  However, summary judgment is denied as to those transactions involving the one-column version of the Financing Agreements because issues of material fact remain as to NCMIC's liability as the assignee of these agreements.  Lastly, summary judgment is granted in part and denied in part as to Brican's alleged deceitful and/or unfair statements.

## I.     Introduction

On August 1, 2013, the Court entered an Omnibus Order on Cross-Motions for Summary Judgment of the Jugular Issue [DE-413] ("Omnibus Order") denying Plaintiffs' Motion for Summary Judgment and granting in part and denying in part NCMIC's motion for summary judgment.  Following this ruling, the Court granted Plaintiffs leave to amend their pleadings.  *See* Third Amended Complaint in *Blauzvern* [DE-464]; *Wigdor, et al.* Third Amended Complaint [DE-465].  In addition, the Court allowed Plaintiffs to retake the deposition of Gregory Cole,

2

NCMIC's corporate representative.[2]  The instant motion followed.

## II.   Legal Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001).  Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)).  The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party.  *Anderson*, 477 U.S. at 252;

---

[2] The Parties have completed all discovery.  Therefore, the Third Amended Complaint represents Plaintiffs' final statement of their claims with the benefit of a full record.

*see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III.    Undisputed Material Facts

Between 2005 and 2009, Plaintiffs purchased Display Systems from Brican, LLC or

Brican, Inc. and financed the purchase through an installment sales or loan agreement labeled as

a financing lease (the "Financing Agreement").[3]  Plaintiffs claim that Brican represented that

Plaintiffs could purchase the systems for effectively no cost.  According to Plaintiffs, Brican

proposed that it – or a company related to Brican known as Viso Lasik Medspas, LLC – would

pay Plaintiffs, under a simultaneously-executed marketing agreement (the "Marketing

Agreement"), a sum of money to offset the monthly financing payments Plaintiffs had to pay

under Financing Agreements for advertising the services offered either by Brican or Viso Lasik

on the Display Systems.  The Court has identified eight separate versions of the Marketing

Agreement.  *See infra*, § IV.A.

In 2005, Brican entered into a Vendor Agreement with NCMIC (doing business as

Professional Solutions Financial Services ("PSFS")).  As a result of this agreement, NCMIC

became the lessor under the Financing Agreement in return for making a lump sum payment of

approximately $22,000 to Brican for each Financing Agreement.  Some Plaintiffs signed

Financing Agreements, formatted in a single-column style, in which Brican, Inc. was identified

as the initial lessor ("one-column" Financing Agreements) and NCMIC became the lessor

through an assignment.  Other Plaintiffs signed agreements formatted in a three-column style

---

[3] Plaintiffs allege that NCMIC financed a total of 1,672 purchases.  *See Blauzvern* Compl., ¶ 132.  The most current list provided by Plaintiffs shows that 1,122 *Blauzvern* Plaintiffs and 181 *Wigdor* Plaintiffs remain in this MDL.  *See* [DE 464-1; 465-2].

4

directly with PSFS ("three-column" Financing Agreements).[4]  In these agreements, PSFS was

identified as the lessor.  As a result, NCMIC ultimately wound up being the lessor for the vast

majority of the Financing Agreements.[5]

## IV.    Analysis

Despite its complicated factual framework, the misrepresentations forming the basis of

Plaintiffs' claims against NCMIC can be distilled to the following two categories:

(1) representations that despite the hell-or-high-water clause in the Financing Agreements,

Plaintiffs could cancel these agreements if they stopped receiving advertising payments from

Brican – or, in later transactions, Viso Lasik Medspas; and (2) other alleged misrepresentations

or omissions not directly affecting the hell-or-high-water clause, including Brican's

representation in the Marketing Agreement that it would "buy back," "repurchase," or "assume

assignment" of the Financing Agreement.  For the reasons below, the Court grants summary

judgment on Plaintiffs' declaratory judgment and FDUTPA claims on the first category, and

grants summary judgment in part as to the second category.

---

[4]  The three-column format was used primarily between July, 2005 and October 2008, and the one-column Financing Agreement was used primarily between November, 2008 and April, 2009.  Versions 2-4 of the Marketing Agreement were mostly signed with the three-column Financing Agreement, while the one-column Financing Agreement was for the most part signed with Versions 5-8.

[5]  Rather than repeat the detailed Undisputed Material Facts section of the Omnibus Order, the Court adopts that section as part of this Order.  *See* [DE-413, at 4-20].  To the extent this Order relies on additional facts not set forth in the Omnibus Order, these are provided with the corresponding citations to the record.

### A.      The Relevant Misrepresentations

The written misrepresentations appear in Versions 2-8 of the Advertising Agreement,[6]

and consist of the following:

| | |
|---|---|
| Version 2: | Cancellation: If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled by the Client, *and Brican will, on client's demand, buy back the lease agreement.*[7] |
| Version 3: | **Cancellation:** If Brican fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement. |
| Version 4: | **Cancellation:** If the advertised VISO LASIK MEDSPAS fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement. |
| Version 5, 7: | **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it, Brican will repurchase the Client's lease agreement in regard to the Exhibeo Concept. |
| Version 6: | **Cancellation:** If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees, the Client may request that Brican repurchase the Client's lease agreement in regard to the Exhibeo Concept. |
| Version 8: | **Cancellation:** If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreements in regard to the Exhibeo Concept. |

---

[6] On January 17, 2014, the Court received notice that NCMIC has reached a settlement with Eye Care Optometrics, APC and Palmer Lee, the only Plaintiffs who entered into Version 1 of the Marketing Agreement. [DE-508].

[7] The portion in italics is handwritten.

B.      **Brican's Representations that the Financing Agreements Could be Cancelled by the Client**

1.      **Transactions involving Versions 5-8 of the Marketing Agreement**

In the Omnibus Order, the Court concluded that Versions 5-8 of the Marketing Agreement can be reconciled with the hell-or-high-water clause in the Financing Agreements. In other words, the "Cancellation" clause in these agreements did not simply give Plaintiffs the right to terminate their obligation to pay the amounts due under the Financing Agreement, but only stated Brican's promise to undertake this obligation in the event Plaintiffs stopped receiving the monthly payments. *See* Omnibus Order, at 25-28. NCMIC argues that Plaintiffs have failed to present any additional evidence giving rise to an issue of fact as to Versions 5-8 of the Marketing Agreements and that, given the Court's previous rulings as to these versions, summary judgment should be entered as to the Plaintiffs who entered into these agreements.[8]

The *Blauzvern* Plaintiffs respond that, contrary to NCMIC's assertions, the Court did not hold that the language of the "Cancellation" clauses is clear. Further, they argue that Brican's statements as to the Plaintiffs' ability to cancel the agreements were a result of a mistaken belief that the contracts could be cancelled, thus invalidating the contract pursuant to the doctrine of mutual mistake.

The *Blauzvern* Plaintiffs are mistaken. As the Court made clear in the Omnibus Order, the terms of the hell-or-high-water clause and the "Cancellation" clause are clear and unambiguous. Thus, the Court's determination as to the Parties' intent is limited to the written documents. In other words, any representations beyond those in the Marketing and Financing

---

[8] Plaintiffs' previously filed records indicating that there were 908 sales involving Versions 5-8 of the Marketing Agreement. *See* [DE 376-2].

Agreements, including the oral representations of Brican's sales staff, are not considered in determining the Parties' intent.[9] *See Silver v. Countrywide Home Loans, Inc.,* 760 F.Supp. 2d 1330, 1341 (S.D. Fla. 2011) ("Any claim of fraud based upon oral representations allegedly made to induce reliance fails where the alleged misrepresentations are at variance with the clear, written terms of the agreement in issue.").

Even if the Court were to consider statements made during the sales presentations, there is no evidence of testimony from any Brican salesperson that the Financing Agreement was cancellable. In fact, the training notes attached to the Declaration of David Richman [DE 486-1], a Brican sales representative from February 2008 through January 2009, indicate that Brican employees were *not* authorized to tell customers that the Financing Agreements could simply be cancelled. Regarding what the salesperson should say if the customer asks what happens if Viso Lasik is "not around" to make the advertising payments, the notes state: "Well there's 2 options...Brican will buyout your lease [and] you return your equipment o[r] if you see the value in Exhibeo you can pay your remaining payments." [DE 486-1, at 9]. Richman also wrote in his notes: "It's a standard lease it cannot be changed." *Id.*, at 20.

In sum, the Court reaffirms its findings and conclusions from the Omnibus Order as to the effect of the "Cancellation" clause in Versions 5-8 of the Marketing Agreement on the Non-Cancellation provision of the Financing Agreements. Viewed together, these clauses did not allow customers to unilaterally cancel their obligations under the Financing Agreement, and stated only Brican's promise to assume this obligation if a customer stopped receiving the

---

[9] Given the Court's ruling that the oral statements by Brican sales agents may not be taken into consideration in interpreting the agreements, Plaintiffs' mutual mistake argument is moot.

8

monthly advertising payments.  As such, the hell-or-high-water clause in the Financing

Agreements cannot be invalidated based on this alleged misrepresentation.

### 2.     Transactions Involving Versions 2-4 of the Marketing Agreement

Versions 2-4 contain a Cancellation clause stating that, in the event that either Brican or

Viso Lasik Medspas "fails to honor its financial commitment" to pay the advertising fees, then

"all related agreements can be cancelled" and Brican will "buy back the related lease agreement."

*See, e.g.,* [DE 342-4, at 5 (Ver. 2); 8 (Ver. 3); 11 (Ver. 4)].  In the Omnibus Order, the Court

concluded that the language of these versions of the Marketing Agreement was "ambiguous as to

whether the Financing Agreements could be cancelled." [DE-413, at 28].  The Court reached this

determination based on the evidence available at the time and before the Parties had completed

discovery.  Subsequent to the issuance of the Omnibus Order, the Court allowed Plaintiffs to file

a Third Amended Complaint, complete the deposition of NCMIC's corporate representative, and

supplement the record with evidence in support of their arguments.

For the reasons discussed below, and having reviewed the record and considered the

Parties' arguments, the Court has reconsidered its previous ruling and concludes that the

"Cancellation" clauses of these Marketing Agreements – read together with the Non-Cancellation

clause in the Financing Agreements – are unambiguous and can be reconciled as a matter of law.

As such, in interpreting these agreements, the Court will not take into consideration the oral

statements by Brican's salespeople as to whether the Financing Agreements could be cancelled.

As a general matter, the Parties' intention governs the construction and interpretation of

their respective agreements, and the best evidence of that intent is the contract's plain language.

*Whitley v. Royal Trails Property Owners' Ass'n, Inc.*, 910 So.2d 381, 383 (Fla. 5th DCA 2005).

In construing a contract, this Court must give a reasonable meaning to all provisions.

*Emmenegger v. Emmenegger*, 2013 WL 5224926, *4 (Fla. 2d DCA Sept. 18, 2013).  Further, the

Parties' agreement "will not be interpreted in such a way as to render a provision meaningless

when there is a reasonable interpretation that does not do so."  *Moore v. State Farm Mut. Auto.,*

*Ins. Co.*, 916 So.2d 871, 877 (Fla. 2d DCA 2005).[10]   The relevant portions of the three-column

Financing Agreements referring to non-cancellation state:

> By signing this Agreement: (i) you acknowledge that you have read and understand the terms and conditions on the front and back of this agreement, *(ii)You agree that this Agreement is a fixed term financing agreement that you cannot terminate or cancel...you have an unconditional obligation to make all payments due under this agreement, and you cannot withhold, set-off or reduce such payments for any reason*, even for defects of failures in the equipment.

> \*     \*     \*

> 1. **LEASE AGREEMENT AND FEES**: ... This Lease is *NON-CANCELLABLE FOR THE ENTIRE LEASE TERM.  YOU UNDERSTAND THAT WE ARE BUYING THE EQUIPMENT BASED ON YOUR UNCONDITIONAL ACCEPTANCE OF THE EQUIPMENT AND YOUR PROMISE TO PAY US UNDER THE TERMS OF THE LEASE*, WITHOUT SET-OFFS, EVEN IF THE EQUIPMENT DOES NOT WORK PROPERLY OR IS DAMAGED FOR ANY REASON INCLUDING REASONS THAT ARE NOT YOUR FAULT.

[DE 342-2, at 2] (italics supplied; uppercase as in original).

Although the effect is the same, the wording of the hell-or-high-water clause in the one-

column agreement is slightly different.  It reads as follows:

---

[10] Iowa law is the same with regard to these principles.  *See, e.g., American Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 329 (Iowa 1998) ("Except in cases of ambiguity, we determine [the Parties' intent] from what the contract says."); *Home Federal Sav. and Loan Ass'n of Algona v. Campney*, 357 N.W.2d 613, 617 (Iowa 1984) ("When interpreting a contract, we seek to give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning.").

> This Lease is *NON-CANCELLABLE FOR THE ENTIRE LEASE TERM. YOU UNDERSTAND THAT WE ARE BUYING THE EQUIPMENT BASED ON YOUR PROMISE TO PAY US UNDER THE TERMS OF THE LEASE*, WITHOUT SET-OFFS, EVEN IF THE EQUIPMENT DOES NOT WORK PROPERLY OR IS DAMAGED FOR ANY REASON INCLUDING REASONS THAT ARE NOT YOUR FAULT.

[DE 342-3, at 2] (italics supplied; uppercase as in original).

Contrary to Plaintiffs' contention, these terms are not limited to issues relating to the functioning of the Display System.  Rather, the relevant clauses in both agreements state that the customer "cannot terminate or cancel" the agreement for *any* reason.   The fact that the clause includes a reference to defects, failures, or damage to the equipment does not lessen scope of its broad terms.[11]

The only interpretation that gives a reasonable meaning to both the "Cancellation" clause in the Marketing Agreements – *i.e.*, "all related agreements can be cancelled and Brican will buy back the related lease agreement" – and the Non-Cancellation clause in the Financing Agreement is one which would allow customers to cancel "all related agreements" *except* for the Financing Agreement, which Brican promises to buy back.[12]  This interpretation is consistent with the Financing Agreement's broad language that the Financing Agreement is non-cancellable for the

---

[11] Plaintiffs' present stance is surprising given their previous position.  As reflected in the briefs filed in support of their motion for summary judgment on the "jugular" issue, Plaintiffs' claim was that the hell-or-high-water clause was broad by its own terms, but that the "Cancellation" clause in the Marketing Agreements carved out a specific exception to its otherwise ironclad terms.  They are now claiming that the hell-or-high-water clause is much narrower and applies only to the functioning of the Display System.

[12] Plaintiffs argue that "all related agreements" *must* include the Financing Agreement because, apart from the Purchase Order and the Marketing Agreement, this was the only agreement "related" to the Marketing Agreement.  This argument is not persuasive.  In fact, "all related agreements" includes the Marketing Agreement itself, which Plaintiffs could cancel by refusing to allow Viso Lasik to continue running its advertisements on the Display System.

11

entire term and that the lessor's (*i.e.* NCMIC or BAI) decision to buy the Display System was based on the customer's "unconditional obligation to make all payments due" under the Financing Agreement, which payments could not be withheld, set-off or reduced "for any reason." Therefore, as with Versions 5-8 of the Marketing Agreement, because these two provisions for Versions 2-4 can be reconciled as a matter of law, Brican's representation that "all related agreements can be cancelled" cannot serve as the basis to invalidate the Financing Agreements.

### C.   Brican's Representation That it Would Buy Back/Repurchase/Assume Assignment of the Financing Agreements

In the Third Amended Complaint, the *Wigdor* Plaintiffs allege that Brican's representation that it would buy back/repurchase/assume assignment of the Financing Agreement was fraudulent because Brican knew at the time these transactions were completed that it did not have the financial wherewithal to fulfill its promise. *See Wigdor* Compl., at 40-42. However, even assuming that Plaintiffs' characterization of these statements is true, the relevant question for purposes of this Order is whether NCMIC can be held liable for Brican's misrepresentations. The answer to this question depends on whether the particular transaction at issue involved the three-column or the one-column Financing Agreement. Accordingly, the Court will address each version of the agreement in turn.

### 1.   Three-column Financing Agreements (governed by Iowa law)

According to Plaintiffs' records, between July 2006 and April 2009 Brican sold Plaintiffs more than 500 Display Systems financed through the three-column Financing Agreements. *See* [DE 464-1; 465-2]. In each of these transactions, PSFS was the original lessor. Ultimately, these Financing Agreements were assigned to PSFS 3. Plaintiffs argue that NCMIC is liable for

12

Brican's fraudulent statements in connection with these sales because it allowed Brican to hold itself out as NCMIC's apparent agent. "Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing." *C & J Vantage Leasing Co. v. Wolfe,* 795 N.W.2d 65, 79 (Iowa 2011) (internal quotations and citation omitted). The focus is on the principal's actions and communications to the third party, not the agent's. *Id.; see also Clemens Graf Droste Zu Vischering v. Kading,* 368 N.W.2d 702, 711 (Iowa 1985) ("For apparent authority to exist, the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority.").

In the Omnibus Order, the Court concluded that, with regard to the three-column Financing Agreements, there is an issue of fact as to whether Brican's sales representatives acted as NCMIC's agents in the presentation of the Financing Agreements. The evidence supporting the Court's conclusions included the following: (1) the Financing Agreements were given to Plaintiffs during the sales presentation; (2) Brican's logo was prominently displayed at the top of the Financing Agreements; (3) Plaintiffs interacted solely with Brican's sales personnel throughout the sales process, and Brican's representatives answered all questions about the Financing Agreements and filled out the blanks in the Financing Agreements; and (4) the Plaintiffs were all informed that the Financing Agreements would be forwarded to NCMIC for credit approval and execution.

Although the evidence above creates a factual issue as to the existence of an apparent agency relationship with regard to Brican's presentation of the Financing Agreements to Plaintiffs, it does not support a finding that this relationship included authorizing Brican to promise, as stated in the Marketing Agreements, that it would take over a customer's financing

13

obligations if the advertising payments stopped.  In effect, Brican's promise to "buy back,"

"repurchase," or "assume assignment" of the Financing Agreement was not a negotiation of that

agreement's hell-or-high-water clause, but rather a promise that Brican – and Brican alone –

would undertake this obligation on the customer's behalf.  Under these circumstances, the record

is insufficient to hold NCMIC accountable under a theory of apparent agency for Brican's

promise to "buy back," "repurchase," or "assume assignment" of the Financing Agreements.

### 2.    One-column Financing Agreements (governed by Florida law)

Unlike the three-column Financing Agreements, where NCMIC was the original lessor,

the lessor in the one-column Financing Agreements was – with a few exceptions – Brican

America, Inc. (BAI) while the vendor was Brican America, LLC (BAL).[13]  BAI assigned the one-

column Financing Agreements to NCMIC after their execution.

Plaintiffs argue that NCMIC is subject to liability for BAL's written and oral statements

that it would take over the Plaintiffs' financing obligations.  Specifically, Plaintiffs argue that

NCMIC is on the hook for any defenses that could be asserted against BAI because NCMIC is

not a holder-in-due-course pursuant to Florida law, and therefore cannot seek protection from the

Financing Agreement's waiver-of-defenses clause.  The waiver-of-defenses clause provides:

---

[13]  The exceptions, according to the Plaintiffs' records, were seven transactions involving
the one-column Financing Agreement in which Brican America, Inc. was both the lessor as well
as the Brican entity that promised to "repurchase" the Financing Agreement if the advertising
payments stopped.  These transactions all involve Version 6 of the Marketing Agreement. *See*
[DE 464-1, at 36].  For all remaining one-column Financing Agreements, BAI was the lessor
while BAL was the equipment vendor.

**10. ASSIGNMENT:** You have no right to sell, transfer, assign or sublease the Equipment or this Lease. We may sell, assign or transfer the Lease and Our rights in the Equipment without notice to You or consent by You. *You agree that if We sell, assign or transfer this Lease, the new owner will not be subject to any claim, defense or set-off that You assert against Us or any other party.*

[DE 342-3, at 5] (emphasis supplied).

For NCMIC to be held liable for BAL's statements, two issues must be resolved. An initial finding is necessary that BAL was acting as BAI's agent in the course of the sales presentations. There is a question of material fact regarding this issue. The record reflects that BAI and BAL were owned by the same individuals and employed some of the same people. Both entities share the same name and have virtually identical logos. Additionally, it appears that the two entities were working so closely together that, for seven transactions, BAI was both the lessor *and* the party that promised to buy back the Financing Agreement in the event that a Plaintiff did not receive the advertising payments. While the sales personnel were BAL employees, this provides circumstantial evidence of apparent agency between the two Brican entities. And, for these seven transactions, it is beyond dispute that BAL's sales personnel were authorized to make certain material statements on BAI's behalf. The nature and scope of BAI and BAL's agency relationship as to the one-column Financing Agreements, once resolved by a fact-finder, would determine the extent of BAI's liability for these misrepresentations.

The second question of material fact is whether NCMIC was a holder-in-due-course of the Financing Agreements pursuant to Fla. Stat. § 679.4031(2), Florida's version of the Uniform Commercial Code. Section 679.4031(2) provides that a waiver-of-defenses provision may only be enforced by an assignee who receives the document: (a) for value; (b) in good faith; (c) without notice of a claim of a property or possessory right to the property assigned; and (d)

without notice of a defense or claim in recoupment of the type that may be asserted against a person entitled to enforce a negotiable instrument under § 673.3051(1). However, even if one satisfies the holder-in-due-course requirements, § 679.4031(3) carves out an exception for "defenses of a type that may be asserted against a holder in due course of a negotiable instrument under s. 673.3051(2)." Pursuant to Fla. Stat. § 673.3051(2), the obligor – in this case, the individual Plaintiff – may assert defenses against a holder in due course based on "[f]raud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms."

On the present record the evidence is sufficient for a reasonable fact-finder to conclude that a sufficiently close connection between NCMIC and BAI exists to defeat NCMIC's status as a good faith, innocent assignee of the Financing Agreements. The "close connection" doctrine acts as an evidentiary rule by which one tests the good faith of an assignee by examining the relationship between the assignor and the assignee. *Equico Lessors, Inc. v. Ramadan*, 493 So.2d 516, 518 (1st DCA 1986). However, the doctrine is "not a rule of law that says if a close connection appears, then the assignee will be denied the benefit of a waiver of defenses clause." *Id.* Courts have applied the close connection test to cases involving both consumer and commercial transactions. *Id.* In a commercial setting, more than just a close connection must be shown before an assignee will be denied the status of a holder in due course under § 679.206(1), Florida Statutes. *Id.*

Here, regardless of whether the sales of the Display System are labeled as consumer transactions, as Plaintiffs argue, or commercial transactions, as NCMIC contends, an issue of fact exists as to the extent of NCMIC's connection to the original transactions. Although NCMIC is

16

a national financial institution and has dealt with clients other than Brican throughout the time period in question, it is undisputed that both BAI and BAL dealt exclusively with NCMIC in securing financing for each individual Plaintiff.  All told, Brican sold Plaintiffs over 780 Display Systems which NCMIC financed through the one-column Financing Agreements.  *See* [DE 464-1; 465-2].  It is undisputed that, despite BAI's status as lessor, NCMIC continued to make all underwriting decisions in connection with each transaction.  BAI was not involved in making decisions as to the creditworthiness of a particular applicant.  *See Blauzvern* Compl. [DE-464, ¶¶ 208-09].

In order to establish a close connection sufficient to invalidate the waiver-of-defenses clause, Plaintiffs must also make the additional showing that NCMIC had actual or constructive knowledge of Brican's alleged fraudulent practices.  *See Leasing Service Coporation v. River City Construction, Inc.*, 743 F.2d 871, 876 (11th Cir. 1984).  Jean Francois Vincens testified that NCMIC's employee Fred Scott was aware, as early as June 19, 2006, that Brican was using Marketing Agreements with its customers.  These agreements included the promise to assume the customers' obligation under certain limited circumstances.  *See* Omnibus Order, at 15.  Thus, there is an issue of fact as to whether NCMIC was on inquiry notice – as of June, 2006 – regarding whether Brican was funding a solvent concept.

NCMIC's receipt in July 2008 of the *Tampa Tribune* articles regarding the Recomm Ponzi scheme, though not directly related to the sale of the Display System, arguably gave NCMIC constructive notice that Brican had a history of inducing its customers with a marketing tool that promised to provide advertising payments to offset financial obligations.  Moreover, it is undisputed that on or about November 25, 2008, well before the bulk of one-column Financing

17

Agreements were executed, Todd Cook made proposed changes to the "Cancellation" clause of the Marketing Agreements. Finally, Jacques Vincens also testified that he informed Cook, as early as November 2008, that NCMIC was using Marketing Agreements in connection with virtually every sale of the Display System. *See* [DE-504 at 15]. Taken together, this evidence presents a question of material fact as to whether NCMIC can enforce the waiver-of-defenses clause as a holder-in-due-course of the one-column Financing Agreements.

### D.    FDUTPA's Particularity Requirement

NCMIC contends that both Plaintiff groups failed to plead their FDUTPA claims with the particularity required by Federal Rule of Civil Procedure 9(b).[14] The *Blauzvern* Plaintiffs respond that to the extent their FDUTPA claim is based on allegations of deception rather than fraud, they are not required to comply with the Rule's particularity requirements. The *Wigdor* Plaintiffs do not provide their own position in response to this argument.

The *Blauzvern* Plaintiffs' response asserts that the following allegations from the Third Amended Complaint are based on deception but not fraud:

1.    Using the word "Cancellation" as the title of a clause in the Marketing Agreement even though the content of that clause does not actually provide for the cancellation of any agreement;

---

[14] Fed. R. Civ. P. 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Generally, Rule 9(b) may be satisfied if a plaintiff sets forth

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants "obtained as a consequence of the fraud."

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir.1997).

2.    Treating "the applications, forms, and rental agreement consumers signed as a unified agreement under which Brican America would provide certain equipment and services in exchange for consumers' payments." [DE-464, ¶ 328.a];

3.    "Failing to disclose that the equipment covered by the rental agreement would be of little or no value to the consumer if Brican America failed to provide the promised advertising fees and advertising services." *Id.*, ¶ 328.b;

4.    "[I]ncluding in its rental agreements provisions authorizing it or its assignees to file lawsuits in specified or unspecified venues other than consumers' locations or the locations where consumers executed the contracts with Brican America was likely to cause substantial injury to consumers that could not have been reasonably avoided and that was not outweighed by any countervailing benefits to consumers or to competition." *Id.*, ¶ 328.c;

5.    Providing others with the necessary means for the commission of "deceptive and unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)" by providing NCMIC with financing agreements which allowed NCMIC to a) misrepresent to consumers that their obligation to pay was unconditional, and b) file lawsuits against consumers in "distant fora." *Id.*, ¶ 328.d.

The *Wigdor* Plaintiffs do not respond to NCMIC's FDUTPA arguments with the same particular allegations as those raised in the *Blauzvern* Plaintiffs' response. Furthermore, Count III of the *Wigdor* Third Amended Complaint does not specify the particular acts or practices on which they rely to support the FDUTPA claim. Rather, in Count III – after they improperly "adopt and reallege" paragraphs 1 through 441 of their Complaint – the *Wigdor* Plaintiffs generally allege "unfair, unconscionable and deceptive acts and practices." [DE-465, ¶ 470]. Therefore, the Court will treat the *Wigdor* Plaintiffs' position as essentially the same as the *Blauzvern* Plaintiffs' position.

In order to state a claim under FDUTPA a consumer must establish: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). A deceptive practice is one that is "likely to mislead consumers," and an unfair practice is "one that offends established public policy and one that is immoral,

19

unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (internal

quotations and citations omitted).  A FDUTPA claim "based on deceptive or unfair practices that

do not involve fraud" is exempt from the particularity requirements of Rule 9(b).  *SIG, Inc. v. AT*

*& T Digital Life, Inc.,* 2013 WL 5005730, * 12 (S.D. Fla. Sept. 12, 2013).

Regarding allegations Nos. 1, 3, 4, and 5 set forth above, Plaintiffs fail to meet their

burden of providing facts sufficient to establish that Brican's representations and omissions were

deceptive or unfair.  First, as to Marketing Agreement Versions 2-4, the word "Cancellation"

alone is not likely to mislead a reasonable consumer because the clause refers to a customer's

ability to cancel "all related agreements" with the exception of the Financing Agreement, which

Brican promised to buy back.  As to Versions 5-8, although there is no expressed mention of

cancellation in the clause itself, a customer could reasonably infer from reading this clause that

his obligation to provide advertising space would cease if Viso Lasik stopped providing the

advertising payments, effectively allowing the customer to cancel the Marketing Agreements.

Second, Plaintiffs fail to state how the Display System became "of little or no value" if Brican

failed to pay the advertising fees.  Pursuant to the agreements they signed with Brican, even

without the promise of advertising fees, Plaintiffs were left with exactly what they purchased –

*i.e.*, a marketing system that they could use to promote their services.  Thus, the claim that the

Display System became worthless because the advertising payments stopped is not supported by

the record.

Third, Plaintiffs' objections to the forum selection clause in the Financing Agreement

(allegations Nos. 4-5) fail because Plaintiffs do not provide any facts as to how they would be

substantially injured by having to litigate this case in another forum.[15]  Finally, as to allegation

No. 5, the Court has already concluded that the "Cancellation" clause in the Marketing

Agreement did not create an exception to the hell-or-high-water clauses in the one-column and

three-column versions of the Financing Agreement.  Therefore, NCMIC's representation that

Plaintiffs' obligation to pay was unconditional was a true statement, and cannot serve as the basis

for a FDUTPA claim.

However, the facts supporting allegation No. 2 are sufficient to state a FDUTPA claim.

The Plaintiffs who entered into the one-column Financing Agreements could have been

reasonably misled into believing that Brican America, LLC's (as vendor) employees were

authorized by Brican America, Inc. (as lessor) to promise that Brican would buy back or

repurchase the Financing Agreements if a customer stopped receiving the advertising fee.

**E.**    ***Wigdor* Plaintiffs' Claim Under Rule 2-18.002, Florida Administrative Code**[16]

NCMIC seeks summary judgment on Count IV of the *Wigdor* Plaintiffs' Third Amended

Complaint for violation of Rule 2-18.002, Florida Administrative Code, on the grounds that this

count is limited to alleged conduct by BAI and BAL, not NCMIC.  Rule 2-18.002 requires that

any "contract for future consumer services" must contain a "Consumer's Right of Cancellation"

disclaimer allowing a buyer to cancel the contract if the services are no longer available.  The

Rule states that the seller's failure to provide this disclosure constitutes "an unfair or deceptive

---

[15]  As a general matter, Florida law presumes that forum selection clauses are valid and enforceable.  *See, e.g., Espresso Disposition Corp. 1 v. Santana Sales & Marketing Group, Inc.,* 105 So.3d 592, 594 (Fla. 3d DCA 2013).

[16]  Although the *Blauzvern* Plaintiffs attempted to add a similar claim through a motion to amend the Third Amended Complaint, the Court denied this request as untimely.  Therefore the rulings in this section apply only to the *Wigdor* Plaintiffs.

act." Fla. Admin. Code. Ann. R. 2-18.002 (1996).

The Court agrees with NCMIC, but only with regard to those transactions involving the three-column version of the Financing Agreement. For these versions, Plaintiffs fails to identify a viable means for BAI and BAL's violations of the rule to be imputed to NCMIC. As to the one-column Financing Agreements, NCMIC could be found liable for BAI and BAL's actions if a finder of fact determines that NCMIC is not a good-faith assignee of the Financing Agreements, and thus is not entitled to the usual protections afforded to a holder-in-due-course. *See supra*, § IV.C.2. Therefore, Count IV of the *Wigdor* Third Amended Complaint is dismissed as to those Plaintiffs who signed the three-column Financing Agreement.

## V.  Conclusion

As to all Plaintiffs, no issue of material fact remains regarding Brican's alleged misrepresentation that the Marketing Agreements could be cancelled despite the hell-or-high-water clause in the Financing Agreement. Thus, Plaintiffs may not seek to invalidate the Financing Agreements based on these representations. As to Brican's remaining alleged fraudulent misrepresentations and omissions, assuming an apparent agency existed between NCMIC and the Brican entities in the presentation of the three-column Financing Agreements, the scope of this agency relationship does not include the representation that Brican would "buy back," "repurchase," or "assume assignment" of the Financing Agreements. However, with regard to the misrepresentations involving the one-column Financing Agreements, there is an issue of material fact regarding whether NCMIC may enforce the waiver-of-defenses clause in these agreements.

Based on the foregoing, NCMIC's motion for summary judgment is granted in part and

denied in part, as follows:

(1)     Regarding the *Wigdor* Plaintiffs who executed the <u>three-column version</u> of the Financing Agreement, summary judgment in NCMIC's favor is GRANTED as to Counts I (Declaratory Relief); Count III (FDUTPA); and Count IV (Rule 2-18.002, Florida Administrative Code) of the *Wigdor* Third Amended Complaint. These claims are dismissed.

(2)     Regarding the *Blauzvern* Plaintiffs who executed the <u>three-column version</u> of the Financing Agreement, summary judgment in NCMIC's favor is GRANTED as to Counts I (Declaratory Relief) and Count IV (FDUTPA) of the *Blauzvern* Third Amended Complaint.  These claims are dismissed.

(3)     Regarding the *Wigdor* Plaintiffs who executed the <u>one-column version</u> of the Financing Agreement, summary judgment in NCMIC's favor is DENIED as to Counts I (Declaratory Relief); Count III (FDUTPA); and Count IV (Rule 2-18.002, Florida Administrative Code) of the *Wigdor* Third Amended Complaint.

(4)     Regarding the *Blauzvern* Plaintiffs who executed the <u>one-column version</u> of the Financing Agreement, summary judgment in NCMIC's favor is DENIED as to Counts I (Declaratory Relief) and Count IV (FDUTPA) of the *Blauzvern* Third Amended Complaint.

(5)     Regarding the *Blauzvern* and *Wigdor* Plaintiff groups, Plaintiffs may not base any of their claims on Brican's alleged misrepresentation that the Financing Agreements could be cancelled despite the express terms of the hell-or-high-water clause in the Financing Agreements.  This applies to Plaintiffs who signed either the <u>one-column</u> or the <u>three-column</u> Financing Agreements.

(6)     Regarding the *Blauzvern* and *Wigdor* Plaintiff groups, to the extent either Plaintiff group bases its FDUTPA claim on the allegations set forth in Section D of this Order (*see supra*, at 18-19), summary judgment in NCMIC's favor is GRANTED as to allegation Nos. 1, 3, 4, and 5, and DENIED as to allegation No. 2.

Accordingly, it is

ORDERED that

1.     Defendants NCMIC Finance Corporation and PSFS 3 Corporation's Motion for Summary Judgment on Plaintiffs' Remaining Claims [DE-473] is GRANTED in part and DENIED in part as specified in the Conclusion.

2.      A trial of all remaining issues is hereby scheduled for the trial period beginning

**March 24, 2014**.  A pretrial conference shall take place on **March 19, 2014**.  A schedule of other

pretrial deadlines, including but not limited to the Parties' pre-trial stipulation, will be provided

by separate Order.

DONE and ORDERED in Miami, Florida this _22nd_ day of January, 2014.

_Patricia A. Seitz_
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:     Honorable Andrea M. Simonton
        Honorable Michael Huppert, Michael.Huppert@iowacourts.gov
        Counsel of Record