# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### Case No. 10-md-02183-PAS

IN RE: Brican America LLC
Equipment Lease Litigation

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER is before the Court following a six-day bench trial. Based on the evidence at trial, the Court enters these findings of fact, *see infra* at pp. 6–44, and conclusions of law, *see infra* at pp. 44–63.

## A. INTRODUCTION

Plaintiffs are dentists and optometrists who bought multimedia systems designed for their waiting rooms ("Exhibeos") and financed these purchases through "financing leases" now held by Defendants NCMIC Finance Corporation and PSFS 3 Corporation (together, "NCMIC"). The Exhibeo vendor, initially Brican America, Inc. and later Brican America, LLC (together, "Brican"), sold these systems as being effectively free, promising in a "Marketing Agreement" executed with each purchase that a "medspa" named Viso Lasik would buy enough advertising on the Exhibeos to offset Plaintiffs' lease payments and that the vendor would buy back the leases if the advertising payments stopped. If that sounds too good to be true, that's because it was. When the advertising payments stopped, NCMIC expected Plaintiffs to continue making their lease payments and the Plaintiffs refused, asserting fraud. Now Plaintiffs and NCMIC are fighting over, essentially, who should have seen this coming.

In this litigation, Plaintiffs sought a declaratory judgment finding the leases unenforceable on the basis of various legal theories that kept changing as Plaintiffs tried to find one that would fit. Finally, after two rounds of summary judgment, the Court

held a bench trial on the legal theory that survived: that certain of these leases were fraudulently induced, and that NCMIC, who obtained them via assignment, is not a holder in due course and so cannot enforce them.

Based on all of the evidence presented at trial, the Court concludes that Plaintiffs have established that Brican fraudulently induced the Plaintiffs who signed versions 4, 5, 7, and 8 of the Marketing Agreement into signing the one-column Financing Agreements[1] that Brican then assigned to NCMIC. In these Marketing Agreements, Brican promised to buy back the Exhibeo leases if Viso Lasik stopped making advertising payments. But Brican knew it could not keep this promise because its financial wherewithal to do so was built on a house of cards: its sole revenue source was $24,000 for each Exhibeo sale, but each sale also came with a $29,000 obligation to pay advertising fees. Brican represented that these advertising fees would come from Viso Lasik, but whatever happened with Viso Lasik, the obligation to buy back the leases was Brican's. Moreover, Brican's portrayal of its relationship with Viso Lasik was misleading and incomplete because it failed to include the fact that its "strategic alliance" with Viso Lasik consisted of (1) Brican using Plaintiffs' creditworthiness (2) to get cash infusions from NCMIC (3) that Brican used to make loans to Viso Lasik (4) so that Viso Lasik could get off the ground and make the promised advertising payments.

The Court further finds that NCMIC is not entitled to the protections of a holder in due course for the one-column Financing Agreements because, by October 3, 2008, NCMIC knew that (1) Brican was marketing the Exhibeos as being effectively free and (2) Brican promised to buy back customers' leases if Viso Lasik stopped making the

---

[1]     Before October 2008, Plaintiffs who financed an Exhibeo through NCMIC signed leases ("Financing Agreements") formatted in a three-column style directly with NCMIC. Afterwards, Plaintiffs signed Financing Agreements formatted in a one-column style with Brican America, Inc., who then assigned them to NCMIC.

advertising payments that made them "free." Despite this knowledge, NCMIC continued to fund Brican's sales without inquiring into Brican's use of Marketing Agreements or into the financial relationship between Brican and Viso Lasik.

Accordingly, the Court will enter judgment in favor of those Plaintiffs who signed a one-column Financing Agreement and version 4, 5, 7, or 8 of the Marketing Agreement.

## B. PROCEDURAL BACKGROUND

In April 2009, NCMIC stopped financing new purchases of the Exhibeo and demanded that Brican repurchase all previous leases involving a Marketing Agreement. Upon Brican's refusal, NCMIC sued Brican for failing to disclose to NCMIC that it had been promising nearly all of its customers that it or Viso Lasik would buy enough advertising on their Exhibeos to offset their monthly lease payments. *NCMIC Finance Corp. v. Brican America, Inc.*, No. 09-21192 (S.D. Fla. filed May 4, 2009). This cut off Brican's and Viso Lasik's primary funding source. So in early 2010, they stopped making advertising payments, Plaintiffs stopped making lease payments, and NCMIC sued Plaintiffs in Iowa to enforce the leases. Plaintiffs then filed various actions against both NCMIC and Brican, which were consolidated into this multidistrict litigation.[2]

On March 29, 2012, the Court denied certification of the putative class of approximately 2,000 Plaintiffs. (Order Denying Class Certification [DE-285].) Because of (1) the number of interested Plaintiffs already participating as named parties and (2) NCMIC's agreement to be bound by any ruling in this multidistrict litigation concerning NCMIC's knowledge of the provisions labelled "Cancellation" ("Buyback

---

[2]     The only remaining cases are *Blauzvern v. Brican America, Inc.*, No. 10-20782 (S.D. Fla. filed Mar. 16, 2010) and *Wigdor v. NCMIC Finance Corp.*, No. 10-21608 (S.D. Fla. filed May 18, 2010).

Provisions")[3] in the Marketing Agreements, the Court concluded that the primary benefit of class certification could be achieved without the costs of litigating the formal requirements of class certification.

Two rounds of summary judgment followed. (*See* Omnibus Order on Cross-Motions for Summary Judgment on the "Jugular" Issue [DE-413] ("First SJ Order"); Order Granting in Part and Denying in Part NCMIC's Motion for Summary Judgment [DE-509] ("Second SJ Order").) In these orders, the Court ruled that the "cancellation" language in versions 2–8[4] of the Marketing Agreement could not be enforced to cancel the Financing Agreements. However, genuine issues of material fact remained as to (1) Plaintiffs' claim that Brican had fraudulently induced Plaintiffs into signing the one-column Financing Agreements before assigning them to NCMIC and (2) NCMIC's defense that it was a holder in due course when it took these assignments and therefore entitled to assert the Financing Agreements' "waiver of defenses" clause. Therefore, as to Plaintiffs' claims arising out of the three-column Financing Agreements, the Court granted summary judgment to NCMIC.

Beginning on March 24, 2014, the Court held a six-day bench trial on Plaintiffs' fraudulent-inducement claim and NCMIC's holder-in-due-course defense. The bench trial did not address Plaintiffs' other claims, NCMIC's counterclaims against Plaintiffs, or any claims against third parties. Brican did not participate. (*See* Order Following February 10, 2014 Status Conference [DE-522].)

---

[3]     Despite the label, the Court refers to these clauses as "Buyback Provisions" because, as determined at summary judgment, they reflect not a promise that the Financing Agreements could be cancelled but a promise that Brican would buy them back.

[4]     All claims arising out of version 1 of the Marketing Agreement have been settled. [*See* DE-502; DE-508.]

- 4 -

The parties filed a Joint Pre-Trial Stipulation [DE-529] ("PTS"). At the March 7, 2014 pretrial conference, the parties agreed that the bench trial would not address the reliance element of fraudulent inducement, as proof of such reliance would require testimony from each of the hundreds of individual Plaintiffs.

During the trial, the Court heard testimony from:

1) Plaintiffs' expert H. Krollfeifer, Jr. (live)

2) Plaintiff Daniel A. DelCastillo (live)

3) Brican salespersons Pamela Proehl and David Alan Richman (both live)

4) Brican principals Jean Francois Vincens and Jacques Lemacon (both video)

5) Brican employee Sandra Ellzey (video)

6) Viso Lasik founder Dr. Salvatore DeCanio, Jr. (video)

7) NCMIC President Gregory Cole (as NCMIC's corporate representative) (video)

8) NCMIC President Gregory Cole (as an individual) (video and live)

9) NCMIC Vice President Todd Cook (video and live)

10) NCMIC Business Development Managers Fred Scott and Lannette Henningsen (both video)

11) NCMIC Account Manager Jean Thompson (video)

12) NCMIC Operations Supervisor Paula Barkley (video)

13) NCMIC Collector Jo Lynn Quick (video)

The following exhibits were admitted into evidence during the trial: Plaintiffs' Exhibits ("PX") 1, 4–7, 10, 13–16, 18–25, 27, 29, 30, 32–42, 44, 45, 47–56, 58–64, 67, 70, 72, 73, 75–93, 95, 96, 98, 99, 101–105 (TT1 21:8–10; TT1 192:13; TT3 137:3–4; TT4 55:24; TT4 130:1; TT5 20:15; TT5 24:18; TT5 26:19; TT5 54:22; TT5 200:13; TT6 123:6; TT6 221:18–25;

DE-560) and Defendants' Exhibits ("DX") 1–3, 5, 6, 20, 29, 32–34, 41–47[5] (TT1 245:20; TT1 256:13; TT4 164:17; TT6 76:11–16; TT6 175:6; TT6 188:15; DE-561).[6]

After the trial, the parties submitted revised proposed findings of fact and conclusions of law [DE-562; 563]. The Court has also relied on other documents in the record, including the Stipulated Facts [DE-224] ("Stip. Facts") filed previously in connection with motions for summary judgment.

## C. FINDINGS OF FACT

The factual findings are lengthy and so are organized into three sections. The first section sets out the relevant characters, entities, and their relationships. This background is necessary to understand the four groups involved in the scheme—Brican, Viso Lasik, NCMIC, and the Plaintiffs.

The second section focuses on the facts relevant to Plaintiffs' fraudulent inducement claim. These include: (1) Brican's business model; (2) how NCMIC, Viso Lasik, and the Plaintiffs fit into that business model, particularly with regards to financing Exhibeo sales; (3) the role of the Marketing Agreements and their Buyback Provisions, which Brican used to close the Exhibeo sales quickly; (4) the flow of money from NCMIC, to Brican, then to Viso Lasik, then back to Plaintiffs, and its implications for Brican's intention and ability to perform the buyback promise; and (5) the agency relationship between Brican America, Inc. and Brican America LLC, and its implications for Brican's business model and for assessing who is responsible for the alleged misrepresentations.

---

[5]     DX 43 is limited to page TR-BR145739.

[6]     Trial transcripts are in the docket under entries 564–69. Citations to the trial will use the following format: (TT[day of trial] ([Witness Name]) [pincite].)

The third section summarizes the facts relevant to NCMIC's holder-in-due-course defense. NCMIC asserts that it can enforce the one-column Financing Agreements' waiver of defenses clause as a defense to Plaintiffs' fraudulent inducement claim because it is a holder in due course of these assigned one-column Financing Agreements. Thus the third section chronicles the facts showing NCMIC's knowledge of Brican's business model, the actions that it took that facilitated Brican's business model, and the facts that put it on notice of Brican's fraud before October 3, 2008.

## § 1. Relevant Persons and Entities

### a. Brican

1.      Jean Francois Vincens, a/k/a Jeff Vincens, is a citizen of France and Canada. (Stip. Facts ¶¶ 28–33.) Vincens formed Brican America, Inc. and Brican America, LLC.

2.      Raymond Briscoe, f/k/a Raymond Manklow, was a business associate of Vincens.

3.      In the early 1990s, Vincens and Briscoe founded Recomm International Display Corp., Ltd. and various affiliated companies (together, "Recomm"), which sold electronic bulletin boards to pharmacists, optometrists, and veterinarians. Recomm set advertising payments that matched customers' lease payments and then marketed its billboards as being free. When Recomm was unable to find third parties willing to pay for advertising, it started making advertising payments with its own funds. When it stopped paying these advertising fees in 1995, many of the customers stopped making their lease payments. Hundreds of lawsuits followed, many of them alleging that Recomm was a Ponzi scheme, and Recomm declared bankruptcy in 1996. *In re Optical Tech., Inc.*, 216 B.R. 989 (Bankr. M.D. Fla. 1997). NCMIC received news articles about Recomm's alleged Ponzi scheme in July 2008.

- 7 -

4.      Laurent Goldstein is an "old friend" of Vincens. At some point in 2004, Goldstein sold Vincens a substantial stake in Brican Corporation, a Canadian company that sold Exhibeo systems but without any advertising agreements. (TT2 (Vincens) 184:3–185:19, 187:21–188:21.)

5.      Jacques Lemacon, a/k/a Jack Lemacon, is Vincens' nephew and a citizen of France and Canada. (TT4 (Lemacon) 132:16–133:8.)

6.      Brican America, Inc. ("Brican Inc.") was formed on July 30, 2004 by Vincens and Goldstein, with each owning 50%. (DX 3.) Brican Inc.'s business was the sale of Exhibeos, initially without advertising agreements.

7.      At some point after Brican Inc.'s formation, Goldstein left and Briscoe and Lemacon joined. By mid-2006, Vincens, Lemacon, and Briscoe each owned 33% of Brican Inc. (TT2 (Vincens) 196:12–198:1.)

8.      Brican America, LLC ("Brican LLC") was formed on July 18, 2006 by Vincens, Briscoe, and Lemacon, with each owning 33%. (DX 2.) Brican Inc. and Brican LLC are both located at 5301 Blue Lagoon Dr., Suite 520, Miami, FL. (Stip. Facts ¶¶ 12, 18.) They also share a website. The Court will refer to Brican Inc. and Brican LLC together as "Brican."

9.      After October 2006, primarily for tax reasons, Brican LLC replaced Brican Inc. as the vendor. (TT4 (Lemacon) 145:17–147:10; PX 60.) The Court will refer to the Brican entity involved in any particular sale as the "Vendor."

10.     Briscoe was fired in June 2007, after which Vincens and Lemacon each owned 50% of both Brican Inc. and Brican LLC. (TT2 (Vincens) 215:2–216:4.)

11.     Pamela Proehl is based in Redmond, Washington. In 2008, she was employed by Brican LLC as a commissioned salesperson with the title of "marketing consultant." (TT1 (Proehl) 187:10–25; *see also* DX 42.)

12.     David Alan Richman is based in West Simsbury, Connecticut. In the late 2000s, he was employed by Brican LLC as a commissioned salesperson. (TT2 (Richman) 8:9–10:8.)

13.     Sandra Ellzey is a resident of Miami, Florida. Beginning in April 2007, she was employed by Brican LLC and responsible for bookkeeping, human resources, and other tasks. (TT5 (Ellzey) 143:9–149:22).

### b. Viso Lasik

14.     Dr. Salvatore M. DeCanio, Jr. is a Florida citizen and an optometrist licensed in Florida who wanted to open his own laser eye surgery clinic. (Stip. Facts ¶¶ 40–43.)

15.     On July 19, 2004, DeCanio formed Palm Beach Laser Eye Institute, Inc. (Stip. Facts ¶ 42(a).)

16.     In early 2006, DeCanio purchased an Exhibeo and became familiar with Vincens. They discussed DeCanio's plan for a laser eye surgery clinic, and Vincens decided to become involved. (TT4 (DeCanio) 105:11–107:15.)

17.     JJR Investments, LLC ("JJR") was formed on July 18, 2006 by Vincens and Lemacon. JJR was formed on the same day as Brican LLC, by the same lawyer, and with the same registered address. (Stip. Facts ¶¶ 53–57.)

18.     In September 2006, DeCanio formed Lifestyle of Vision, Inc. (Stip. Facts ¶ 42.)

19.     At all relevant times, Lifestyle of Vision, Inc. and JJR together owned the following companies (collectively, "Viso Lasik"):

- Viso Lasik Medspas, LLC
- Viso Lasik Medspas of Charlotte, LLC
- Viso Lasik Medspas of San Antonio, LLC
- Palm Beach Laser Eye Center—Wellington, LLC. (Stip. Facts ¶¶ 32(d), 42(f)–(h), 71–82.)

### c. NCMIC Finance Corporation and PSFS 3

20.     Defendant NCMIC Finance Corporation is an Iowa corporation that belongs to NCMIC Group, Inc., a group of companies that provide insurance and financial services for medical professionals. NCMIC Group, Inc. uses "Professional Solutions Financial Services" as a brand name.

21.     Defendant PSFS 3, a subsidiary of NCMIC Group, Inc., is an Iowa corporation formed in 2010 to whom NCMIC Finance Corporation assigned many of the Financing Agreements involved in this case. The Court will refer to NCMIC Finance Corporation and PSFS 3 together as "NCMIC."

22.     Gregory Martin Cole is President of NCMIC. He joined NCMIC in 2001 as Vice President and Chief Operating Officer and became President in 2004. (TT6 (Cole) 153:5–13, 158:1–21; *see also* DX 47.)

23.     Patrick E. McNerney is CEO of NCMIC Group, Inc., the parent of NCMIC.

24.     Fred Scott was a Business Development Manager at NCMIC from at least 2005 until August 17, 2007. (TT3 (Henningsen) 178:18–25.) Scott was the NCMIC employee who first initiated contact with Brican.

25.     Todd Cook was Vice President and General Manager of Equipment Finance of NCMIC from February 2007 until his termination in March 2010, during which time he was responsible for the Brican account. Previously, from 1999 to 2007, Cook had been 20% owner, President, and CFO of Frontier Leasing Corp., an equipment leasing company. (PX 32.)

26.     Jean Thompson was an account manager in Equipment Finance at NCMIC from 2005 until February 2011. (TT4 (Thompson) 211:4–213:8.) In this capacity, she was responsible for processing financing applications from Brican customers.

27.     Paula K. Barkley, f/k/a Paula Nuzum, was Operations Supervisor in Equipment Finance at NCMIC from December 19, 2005 until her termination in July 2009. She

worked with Thompson and Cook on the Brican account. (TT4 (Barkley) 226:10–13, 229:4–22; *see also* DX 47.)

28.     Lannette Henningsen was a Business Development Manager at NCMIC from April 14, 2008 until April 7, 2009, and was responsible for the Brican account. (TT3 (Henningsen) 177:21–179:7.)

29.     Jo Lynn Quick and Nick Molin were NCMIC Collectors and were responsible for collecting on delinquent accounts. In this capacity, they communicated with several Brican customers.

### d. Plaintiffs

30.     Plaintiffs are dentists and optometrists who signed a Marketing Agreement and a Financing Agreement in connection with the purchase of an Exhibeo. This trial addressed only the claims of those Plaintiffs who signed a one-column Financing Agreement and version 4, 5, 6, 7, or 8 of the Marketing Agreement. Of these Plaintiffs, the number who signed each version is reflected in the following table:

| Marketing Agreement Version | *Blauzvern* Plaintiffs | *Wigdor* Plaintiffs | Total |
|---|---|---|---|
| 4 | 40 | 0 | 40[7] |
| 5 | 300 | 27 | 327 |
| 6 | 9 | 0 | 9 |
| 7 | 154 | 29 | 183 |
| 8 | 104 | 11 | 115 |
| | | Total: | 674 |

(PX 1.)

---

[7]     This figure includes only the Plaintiffs who signed one-column Financing Agreements. It does not include the more than 300 Plaintiffs who signed version 4 along with a three-column Financing Agreement, whose claims were resolved by summary judgment. (*See* Second SJ Order.)

31.     Plaintiff Dr. Daniel A. DelCastillo[8] is a dentist who has maintained a dental practice in Miami Beach, Florida since 1998. In June 2008, Dr. DelCastillo purchased an Exhibeo and financed his purchase through NCMIC. In July 2008, he learned about Vincens' past involvement in Recomm, became concerned, and called NCMIC to explain his concerns and attempt to cancel his Financing Agreement. *See infra* at ¶¶ 103–108.

## § 2. FACTS RELEVANT TO THE FRAUDULENT INDUCEMENT CLAIM

### a. Brican's Business Model

32.     In 2004 and 2005, Brican's entire business was the sale of Exhibeos[9] to dentists and optometrists. Each Exhibeo cost roughly $24,000 and consisted of a large plasma television, a computer, a monitor, software that could display "flash shows," and five years of "custom-made animations on demand." (PX 13 at 25.) Typically installed in the waiting room, the Exhibeo promised to help medical practices "promote their practice," "educate their patients," and "increase their profits." (PX 13 at 24.) For example, a dental practice could advertise cosmetic procedures and also demonstrate proper flossing technique, which would ideally increase patient loyalty while increasing demand for the practice's most profitable services. (*See* TT2 (Richman) 96:21–98:12 (Brican salesman describing the Exhibeo's ability to drive sales).)

33.     In 2006, as further discussed below, Brican started purchasing advertising space on the Exhibeos that it sold. Vincens and Lemacon had recently invested in Viso Lasik,

---

[8]     For the purpose of deciding those factual issues identified for this trial, all other Plaintiffs were excused from testifying.

[9]     The Exhibeo was sometimes described as the "Brican Information Center" or the "MediaDoc" (the name of its software package).

and they wanted to advertise Viso Lasik to the patients of dentists and optometrists who had purchased Exhibeos.

### Financing Sales of the Exhibeo

34.     NCMIC, which began financing the Exhibeo in the summer of 2005, provided financing for most[10] Exhibeo sales. For NCMIC, the Exhibeo program offered the chance to work with a familiar, creditworthy customer base. Because NCMIC's leases had "hell-or-high-water" clauses, and because dentists and optometrists usually want to maintain their high credit ratings, NCMIC expected to collect a consistent 9% interest rate over the life of each lease.

35.     Early in 2005, NCMIC's Business Development Manager Fred Scott learned about Brican's business and reached out to Brican Inc. Thereafter, NCMIC and Brican Inc. began discussions that culminated in a General Vendor Agreement (PX 4) ("GVA") that Scott and Vincens signed, on behalf of NCMIC and Brican Inc. respectively, on July 15, 2005. (TT2 (Vincens) 187:5–20; TT5 (Scott) 63:15–64:2, 67:21–73:3.)

36.     NCMIC did not perform any particular due diligence on Brican or its owners before signing the GVA. (TT5 (Scott) 75:17–77:7; TT6 (Cole) 167:13–169:6.)

37.     Under the GVA, if a customer of Brican Inc. wanted to finance a purchase, NCMIC would purchase the Exhibeo from Brican Inc. and then lease or finance it to the customer. Before NCMIC was obligated to pay Brican Inc. for the Exhibeo, NCMIC had the right to "verbally verify delivery and installation" with the customer. (GVA ¶ 3.) NCMIC could also, "with Brican's consent," directly contact potential customers to obtain additional credit or financial information. (GVA ¶ 4.)

---

[10]     To a much lesser extent, Baytree Leasing Company, LLC and De Lage Landen Financial Services, Inc. also provided financing for the Exhibeo. (DX 34, 37.)

38.     In the GVA, Brican Inc. also warranted that "[t]here are no other agreements or warranties" with any customer relating to the Exhibeo "that are not included in the documents given to" NCMIC. (GVA ¶ 6(c).) If Brican Inc. breached any warranty in the GVA with respect to any given sale, the GVA required Brican Inc. to repurchase the lease and pay NCMIC any remaining balance. (GVA ¶ 7.)

39.     Furthermore, Brican Inc. could not assign any of its obligations or rights under the GVA without NCMIC's prior written consent. (GVA ¶ 8.)

40.     In practice, each customer who wanted to finance the $24,000 Exhibeo filled out a credit application and signed an agreement labelled as a "financing lease" ("Financing Agreement"),[11] typically for a five-year term. After each sale, the salesperson would transmit the sales order, credit application, and Financing Agreement to NCMIC, who would conduct a credit check. If satisfactory, the Vendor would issue a purchase order for the equipment. Upon proof of delivery, the Vendor would submit that proof to NCMIC with an invoice, and NCMIC would pay the purchase price to the Vendor. (*See* TT5 (Ellzey) 170:2–176:5, 180:14–17; PX 19; PX 37 at 3; PX 93 at 1.)

41.     The typical lease had a monthly payment of $508 plus tax for a term of 60 months (*see, e.g.*, PX 93 at 3; *see also* PX 70), which would result in a total payment obligation of $30,480 plus tax over the five-year lease term.

## Enter Viso Lasik

42.     In early 2006, Vincens decided to become involved in Dr. Salvatore M. DeCanio, Jr.'s plan for Viso Lasik. (TT4 (DeCanio) 105:11–107:15.) Originally, DeCanio had

---

[11]     Although the Financing Agreements are secured transactions rather than true leases, *see Conclusions of Law, infra* at p. 44 n.35, the Court will use terms like "lease" and "lessor" because the parties have consistently used these terms in their interactions and throughout this litigation.

planned to open a single, "state-of-the-art" laser eye surgery center. (*See* PX 33 at 6–18; TT4 (DeCanio) 121:21–123:4). By the time Viso Lasik opened its first center in Wellington, FL in May 2007, it aspired to become a national chain of "medspas" where patients could receive massages and cosmetic treatments while their eyes recovered from the laser eye surgery. (PX 33 at 33–61; TT4 (DeCanio) 73:12–75:6; *see also* PX 98.)

### Advertising Viso Lasik on the Exhibeos

43.     Vincens saw the Exhibeo as an innovative way to advertise Viso Lasik.

44.     As explained in Brican's marketing materials, existing patients of dentists and optometrists were likely to be affluent and potentially interested in laser eye surgery. Ideally, the most effective form of marketing would be a referral from a doctor that the potential customer already trusts. However, dentists and optometrists were unlikely to refer their patients to an unfamiliar, ambitious startup. (*See* PX 13 at 13–19.)

45.     By advertising on the Exhibeo, Brican could reach those same patients just as directly and at an ideal time: while they sat in a waiting room, in a place they associated with trustworthy medical information, likely thinking about medical concerns they might like to address. (*See* PX 13 at 20–28.)

46.     Accordingly, in June 2006, the Vendor started executing agreements (the "Marketing Agreements") with many of its customers in which it committed to buy advertising on the Exhibeo for a set quarterly price. There were eight distinct versions of the Marketing Agreement. (*See* First SJ Order at 6–9.)

47.     By 2007, Brican was entering into Marketing Agreements with nearly all Exhibeo customers. Plaintiffs thus signed both a Marketing Agreement and a Financing Agreement at the time of purchase.

### Marketing the Exhibeos as "Free"

48.     To maximize sales of the Exhibeo and thus the reach of its advertising, the Vendor set advertising payments so that they nearly matched customers' obligations under the Financing Agreements. It then marketed the Exhibeo to customers as being free.

49.     For example, Brican trained its salespersons to emphasize repeatedly that the system was virtually free because Viso Lasik would "rebate" customers on a quarterly basis enough to cover their financing payments. (*See* TT1 (Proehl) 199:18–200:11.)

50.     Brican also provided its salespersons with a Powerpoint presentation advertising the benefits of becoming a "Viso Lasik Medspas Partner," which characterized the Exhibeo as:

#### 1. A FREE MARKETING TOOL

> Give up a little bit of freedom on your 42″ plasma display (a small 10% of your screen time), in order to be able to advertise its LASIK center, and VISO LASIK MEDSPAS …

**WILL PAY YOU ENOUGH
PER YEAR
TO OFFSET
THE COST OF YOUR LEASE!**

(PX 13 at 27; *see also* TT2 (Richman) 40:4–42:24 (Brican salesman explaining how he used this Powerpoint).)

51.     Although Viso Lasik only had three planned locations, the Vendor entered into Marketing Agreements all over the country, often thousands of miles from any actual or planned location.

52.     Some potential customers (though apparently not many) were skeptical that a brand-new startup could commit to buy so much advertising, for five full years, so far from any planned locations. Brican trained its salespersons to respond to this concern

by saying that Viso Lasik sought to become a national chain and therefore wanted nationwide name recognition. (*See, e.g.*, TT1 (Proehl) 198:1–199:8.)

53.     Similarly, Brican salesman David Richman was trained to show potential customers in Connecticut a letter from Viso Lasik stating its intention to build a center there in the next 18 months,[12] and to tell them that Viso Lasik was only willing to advertise on the first 200 Exhibeos sold in Connecticut. Ideally, those customers would clamor to be one of those 200 and thus be distracted from any concerns about Viso Lasik's viability. (TT2 (Richman) 28:8–29:8, 37:4–7, 93:24–95:14.)

### Promises to Buy Back Exhibeos if Viso Lasik Failed to Pay

54.     Most importantly, the relevant Marketing Agreements included Buyback Provisions promising that, if the advertising payments stopped, then the Vendor would, in one way or another, relieve the customer of any obligation to continue making financing payments.

55.     The Buyback Provisions of the five relevant versions of the Marketing Agreement are:

- Version 4:  "**Cancellation**: If the advertised VISO LASIK MEDSPAS fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement."

- Versions 5, 7: "**Cancellation**: If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it,

---

[12]     There was no evidence presented that Viso Lasik ever planned to build a center in Connecticut. However, Richman continued to show the letter to potential customers even after he realized this.

Brican will repurchase the Client's lease agreement in regard to the Exhibeo
Concept."

- Version 6: "**Cancellation**: If VISO LASIK MEDSPAS fails to honor its
  commitment relating to the advertising fees, the Client may request that
  Brican repurchase the Client's lease agreement in regard to the Exhibeo
  Concept."[13]

- Version 8: "**Cancellation**: If Viso Lasik Medspas fails to honor its commitment
  relating to the advertising fees, and if the Client requests it, Brican will
  assume assignment of the Client's lease agreements in regard to the Exhibeo
  Concept."

(*See* First SJ Order at 8–9.)

56.     By all accounts, Brican and its salespersons expected potential customers to rely
heavily on the Buyback Provision in deciding whether to purchase an Exhibeo. For
example:

- Vincens testified that the Buyback Provision was necessary because "we
  needed to have a system where . . . we could take back the equipment" so that
  customers would be more likely to "sign on the spot." (TT3 (Vincens) 13:3–
  12.)

- Brican salesperson Pamela Proehl described the Buyback Provision as the
  "main clincher on sealing the deal" because potential customers' "main
  concern" was "what happens if this Medspa goes out of business." (TT1
  (Proehl) 210:25–213:16.)

---

[13]     Nine Plaintiffs signed version 6 of the Marketing Agreement, whose Buyback
Provision does not make a promise. For the legal implications of this, *see Conclusions of
Law, infra* at 48 n.38.

- 18 -

- Richman testified that he was trained that customers' main worry would be "what if Viso is not around?" and that he should respond by telling customers they could return the equipment and Brican would buy out their lease. (TT2 (Richman) 16:11–17:21.)

- At least some Brican salespersons had a practice of highlighting the Buyback Provision in yellow before showing potential customers the Marketing Agreement. (*See* TT4 (DelCastillo) 10:10–11:17.)

### Brican's Depiction of its Relationship With Viso Lasik

57.     Brican depicted its relationship with Viso Lasik as a "strategic alliance" in which Brican, "an international firm specializing in practice growth and development," was helping "develop for [Viso Lasik] a branding strategy, allowing them to penetrate unexplored segments of the LASIK market." (PX 13 at 4.)

58.     Brican trained its salespersons that it was "critically important [to] explain the relationship between Brican America and Viso." (TT2 (Richman) 26:15–20.)

59.     During this time, Brican was lending significant sums of money to Viso Lasik— $10,000 from each sale, which was more than it kept for itself. *See infra* at ¶¶ 76–83.

60.     However, Brican trained its salespersons never to disclose that Brican was lending these sums to Viso Lasik. (TT2 (Richman) 14:18–15:17, 26:22–28:10.) Furthermore, there is no evidence that any Plaintiffs otherwise learned that Brican was making these loans or that Viso Lasik was using these loans to make advertising payments.

### b. <u>Changes to Brican's Business Model Over Time</u>

61.     When Brican LLC became the Vendor in October 2006, NCMIC neither signed a new vendor agreement nor conducted any due diligence on Brican LLC, even though

NCMIC's GVA with Brican Inc. did not allow Brican Inc. to assign any of its obligations or rights under the GVA without NCMIC's prior written consent.[14] (TT3 (Vincens) 11:12–25; GVA ¶ 8.) Rather, Brican Inc. simply told NCMIC that Brican LLC would replace Brican Inc. as the Vendor. (PX 29; PX 60.) In this way, Brican Inc. authorized Brican LLC to conduct business with NCMIC.

62.     There is no evidence that Brican Inc. had its own employees on its payroll after Brican LLC became the Vendor.

63.     After May 2008, Exhibeo sales increased significantly. Between August 2005 and April 2008, NCMIC had financed a total net book value of less than $8 million, never financing more than $610,000 in a single month. However, in the eleven months between May 2008 and March 2009, NCMIC financed a total net book value of *more than $30 million*, averaging nearly $2.8 million per month. (*See* PX 14.) The graph below shows the net book value of NCMIC-financed sales of the Exhibeo in each month:



---

[14]     There is no evidence that NCMIC ever provided such written consent; in fact, NCMIC alleged in its lawsuit against Brican that there was no privity of contract between NCMIC and Brican LLC. (*See* NCMIC's Answer to Counterclaim [DE-13] in *NCMIC Finance Corp. v. Brican America, Inc.*, No. 09-21192 (S.D. Fla. June 18, 2009).)

64.     In the summer of 2008, Brican decided to increase the financing options available to potential customers. Around the same time, NCMIC began to worry about the high concentration of Brican leases in its portfolio.

65.     Thus, Brican principal Lemacon proposed switching to what he called a "blind lease." By using the "blind lease," Brican LLC would still be the Vendor, but the initial lessor listed on the Financing Agreement would be Brican Inc. rather than NCMIC.[15] By using Brican Inc. as an intermediary lessor, Brican LLC's salespersons would still be able to finalize each sale, including all paperwork necessary for financing, in one visit to the customer's office. Brican Inc. could then shop the lease around and assign it to NCMIC or to another financing company. (TT6 (Cook) 61:8–69:4.)

66.     In September 2008, in response to Lemacon's proposal, NCMIC gave Brican a new, one-column Financing Agreement form. Lemacon and NCMIC's Vice President and General Manager of Equipment Finance Todd Cook then discussed various modifications to the form. (PTS at 17 ¶ 13; PX 48–51.) At one point in this discussion, Lemacon asked Cook if the lease form needed to include vendor information. In his response, Cook commented: "This is a little touchy with your situation since the only difference between the two entities is 'Inc.' and 'LLC.'" (PX 49.)

67.     In October 2008, Brican Inc. started using the new one-column Financing Agreement, which listed Brican LLC as the Vendor and Brican Inc. as the lessor. On many of these Financing Agreements, Brican Inc.'s logo, found in the "lessor" box at the top of the form without any accompanying text, is indistinguishable from that of Brican LLC. (*See, e.g.*, PX 27 at 3.)

---

[15]     To avoid being held liable for a vendor's warranties, lessors will not take assignment of a lease directly from a vendor. Therefore, Brican LLC could not simultaneously be both the Vendor and the lessor.

68.     There is no evidence that Brican Inc. ever conducted credit checks or accepted lease payments by itself, suggesting that, in practice, Brican Inc. would not approve a lease until it had found a willing assignee. (TT6 (Cook) 68:20–69:4; PTS at 17 ¶¶ 14–15; *see also* TT1 (Krollfeifer) 148.) It is therefore unclear how Brican's use of what it called a "blind lease" provided any advantages over simply using a generic lease application on which no lessor was listed.[16] After all, as Cook recognized, Brican's proposed approach risked giving customers the impression that the Vendor and the lessor were the same company.[17] Nevertheless, NCMIC approved Brican's new form and otherwise maintained its existing underwriting and credit approval procedures. (TT6 (Cook) 65:9–66:17.)

69.     In practice, when a one-column Financing Agreement was assigned to NCMIC, the assignment contract was signed by "Brican America" rather than "Brican America, Inc." or "Brican America, LLC." (*See, e.g.*, PX 38 at 14–15; PX 42 at 21–22.) Because only Brican Inc., the lessor, could assign a lease, and Brican Inc. did not have employees of its own at this time, Brican LLC employees must have signed the lease assignment forms on Brican Inc.'s behalf.

70.     NCMIC continued to pay Brican LLC directly for each purchase order, rather than Brican Inc. paying Brican LLC for the goods and then NCMIC paying Brican Inc. for the assignment. (TT5 (Ellzey) 180:18–181:7; TT6 (Cook) 64:4–65:8.)

---

[16]     It is also unclear how often Brican Inc. assigned these leases to financing companies other than NCMIC.

[17]     In an attempt to mitigate this risk, these Financing Agreements contained a "no agent" clause. (*See, e.g.*, PX 39 at 5; *see also* PX 72.)

### c. Other Facts Relevant To the Relationship Between Brican LLC and Brican Inc.

**Marketing Agreement Version 4**

71.     Near the end of 2006, soon after Brican LLC became the Vendor, Brican started using version 4 of the Marketing Agreement. Versions 1–3 of the Marketing Agreement had all been with Brican Inc., because Brican Inc. had been the Vendor. In version 4, Brican LLC was the Vendor and so the signature line was for Brican LLC, but the text itself specifically obligated *Brican Inc.*[18] (*See* PX 104.)[19] By all accounts, some Brican entity made the advertising payments and thus performed on these Marketing Agreements. Thus, in at least 360 separate written agreements in 2007 and 2008, Brican Inc. authorized Brican LLC to sign these Marketing Agreements on its behalf. (*See* TT2 51:11–60:8.)

**Brican LLC's Employees Speak on Brican Inc.'s Behalf**

72.     Because Brican Inc. had no employees, Brican LLC's employees sometimes enforced the terms of the Marketing Agreements on Brican Inc.'s behalf. For example, Brican General Counsel Maureen Ryan wrote a letter, on Brican LLC letterhead, reminding a customer of Brican Inc. that he would not receive further advertising payments unless he continued to display advertising. (PX 74; *see also* [DE-444 at 60]

---

[18]     The text obligates "Brican America, Inc." to purchase advertising. The rest of the document refers to "Brican," which it does not define formally. However, Brican LLC is not mentioned anywhere in the text, so these references to "Brican" can only mean Brican Inc.

[19]     There are also a few contracts titled "Advertising Agreement Addendum" in which the signature block is for Brican LLC but the text itself obligates Brican Inc. to buy advertising. (*See, e.g.,* PX 37 at 2.)

(showing that the customer had signed the Marketing Agreement when Brican Inc. was the Vendor).)

### Authority of Brican's Salespersons

73.    Brican LLC's salespersons testified that they were unaware of any difference between Brican Inc. and Brican LLC because everyone simply referred to the company as "Brican America." (TT1 (Proehl) 220:24–221:4, 239:14–240:16; TT2 (Richman) 10:2–8.)

74.    Brican LLC authorized its salespersons to make certain amendments to the Marketing Agreements by initialing handwritten changes to the document. (*See, e.g.*, PX 93 at 5.) Brican LLC's salespersons could also help customers fill out the applications for financing. However, they testified that they were not authorized to approve or alter the terms of any Financing Agreements. (TT1 (Proehl) 231:9–233:22; TT2 (Richman) 32:1–12, 130:5–132:2; *see also* TT5 (DelCastillo) 34:12–17 (lessee testifying to his understanding that his salesman could not alter the terms of the Financing Agreement).)

75.    Once NCMIC had decided upon a particular form for the Financing Agreement, neither NCMIC's employees nor Brican LLC's salespersons nor Brican Inc. were authorized to modify the form for any customer because "the form is what it is and there are no changes." (TT6 (Cook) 69:12–13; *see also* PX 73 (Cook writes "My staff doesn't have the ability to modify the documents.").)

### d. Following the Money

### Cash Flow From A Typical Sale

76.     By the summer of 2008, most Exhibeos cost $24,115.[20] Upon receiving this sum

from NCMIC, Brican LLC—by now the Vendor for all sales—spent it in the following

way:

- The hardware for each Exhibeo cost approximately $3,000.[21]

- Brican LLC paid the salesperson either a $1,000 commission on top of their

  base salary or a commission of $2,000–$3,500, plus another ten percent for

  taxes. (Vincens Dep. 125:14–126:19, 128:3–7; Brican Inc.'s Answer [DE-67] at 7

  ¶ 97(c); TT2 (Richman) 18:3–23.)

- Brican LLC paid 9% of the purchase price as a "consultation fee."[22] (Vincens

  Dep. 126:20–127:20; Brican Inc.'s Answer at 7 ¶ 92(e), 97(d).)

- Brican LLC loaned $10,000 from each sale to Viso Lasik.[23] (TT2 (Richman)

  13:5–23; *see also* DX 8–11.)

---

[20]     The price varied over time. (*See* PX 44 at 6 ($22,089); PX 34 at 3 ($22,049); PX 10,
11, 56 ($24,115); Vincens Dep. [DE-226-22] 244:7–10.)

[21]     Brican generally represented to NCMIC that $7,645 was for hardware and
$16,470 for software. (PX 10.) However, Brican's hardware costs varied over time. (*See*
PX 41 at 14 ($2098.86); PX 38 at 6 ($2261.98); PX 44 at 5 ($3,072.33).) If a customer wanted
extra equipment, the cost could be higher. (*See, e.g.,* PX 34 at 6 ($5508.55 for a system
with two plasma televisions).)

[22]     When Brican Inc. was the Vendor, Brican Inc. had paid this consultation fee
directly to its owners. After Brican LLC became the Vendor, because Vincens' visa
required that he be employed by Brican Inc., Brican LLC would pay Brican Inc., which
would then pay the fee to its owners. Therefore, at some times, Vincens, Lemacon, and
Briscoe each received 3%, but at other times, Vincens and Lemacon each received 4.5%.

[23]     Some of this money was first loaned to Brican Inc., which then loaned it to Viso
Lasik. *See infra* at ¶ 79.

- If a doctor had referred the sale, Brican LLC would pay a $400 referral fee. (Vincens Dep. 127:21–24.)

- From the remainder, Brican LLC would pay various expenses and overhead. (*See, e.g.*, DX 42.)

77.    Overall, after deducting for the costs listed above, Brican LLC would retain roughly $4,000[24] from each sale.

**Cash Flow for Advertising**

78.    Both Viso Lasik and the Vendor signed each Marketing Agreement, which obligated them to buy at least $5,800 per year of advertising for 5 years: a $29,000 commitment.

79.    In practice, advertising payments were made variously by Brican Inc., by Brican LLC, or by Viso Lasik directly. However, after Brican LLC became the Vendor in October 2006, all of the funds to make these payments came from Brican LLC, in the following way:

- Brican Inc.'s only revenues were the 9% consultation fee from Brican LLC and a few thousand dollars every month that it received from an unidentified source. (*See* TT5 (Ellzey) 181:19–183:3; TT4 (Lemacon) 154:24–155:10.)

---

[24]    This estimate is based on the following equation:

|   | $24,000 | (purchase price) |
|---|---|---|
| - | $3,000 | (hardware) |
| - | $3,000 | (commission) |
| - | $2,000 | (consulting fees) |
| - | $10,000 | (Viso Lasik loan) |
| - | $2,000 | (overhead / referral fees) |
| = | **$4,000** | |

- Given Brican Inc.'s financial situation, Brican LLC loaned Brican Inc. money. By February 2010, Brican LLC had loaned Brican Inc. over $13 million. (TT4 (Lemacon) 168:13–24, 172:18–21.)

- Brican Inc., in turn, used some of this loaned money to make advertising payments to customers who had signed Marketing Agreements with Brican Inc., before October 2006. (TT5 (Ellzey) 181:8–18; TT4 (Lemacon) 150:9–14.) It loaned the rest, over $12 million by February 2010, to Viso Lasik. (TT4 (Lemacon) 173:13–175:2; *see also* PX 33 at 98–109; TT4 (DeCanio) 79:3–80:2; DX 8–11.)

- Brican LLC also loaned $2.6 million to Viso Lasik directly. Overall, by February 2010, Brican LLC had loaned Viso Lasik more than $15 million, either directly or through Brican Inc. (TT4 (Lemacon) 174:16–22.) Viso Lasik was only able to make advertising payments with money from these loans, of which Viso Lasik never repaid any portion. (TT5 (Ellzey) 184:16–187:14.)

80. Therefore, in effect, the overall flow of funds was as follows:

- NCMIC would pay Brican LLC approximately $24,115 for a purchase order.

- After paying costs, Brican LLC would loan $10,000—over one-half of the remainder—to Viso Lasik.

- After paying for its operations, Viso Lasik would make advertising payments to Plaintiffs.

- Plaintiffs would use the advertising payments to pay their monthly lease obligations to NCMIC.

81. As Lemacon testified, the financial relationship between Brican and Viso Lasik was thus intentionally set up to be a "full cycle." (TT4 (Lemacon) 204:13–21.)

82.     There is no evidence that Brican ever attempted to sell advertising on the Exhibeos to any entity other than Viso Lasik. (*See* TT2 (Richman) 128:4–129:22.)[25] Moreover, there was no evidence that Vincens or Lemacon considered contributing additional capital to Brican. So neither of these were sources of revenue from which Brican could make advertising payments.

83.     However, with each loop around the circle, significant portions were expended for hardware costs, commissions, consulting fees, loans, and the like. Therefore, the funding stratagem could only sustain itself if funds from some external source, such as cash infusions from NCMIC, regularly entered at some point in the circle.

### e. The Buyback Provision's Role in the Fraudulent Inducement

84.     The Buyback Provision of the Marketing Agreement was specifically designed to assuage potential customers' concerns that Viso Lasik might become unable to meet its full commitment to buy advertising. In effect, the Buyback Provision functioned as the Vendor's guaranty of Viso Lasik's obligation to make Marketing Payments.

85.     However, at the time that each Marketing Agreement was executed, Brican knew that Viso Lasik was only able to make advertising payments at that time with money borrowed from Brican. Given his past experience in the industry,[26] Vincens also knew

---

[25]     Even if Brican encouraged its customers to sell advertising on their Exhibeos to parties other than Viso Lasik (*see* TT1 (Proehl) 237:12–238:2), this would not satisfy Brican's commitment in the Marketing Agreement to buy at least $5,800 in advertising annually from each customer.

[26]     Vincens had considerable experience selling advertising display systems and arranging financing for those sales. Sometime in the 1980s, Vincens learned that pharmaceutical representatives might want to buy advertising on displays in pharmacists' offices. So in 1986, he founded and became sole owner of JVF Sales in Quebec, which sold electronic billboards to pharmacists primarily in Canada, with whom it entered into advertising agreements. In the early 1990s, he and Briscoe

that unless Brican kept receiving funds from financing companies like NCMIC, it could not keep lending money to Viso Lasik.

86.     Vincens' intention to use funds from future sales to keep the circle going is evident in his response to NCMIC's decision to cut off financing in April 2009. *See infra* at ¶ 134. By that time, Viso Lasik's sales were far below initial projections,[27] and Brican had no other sources of revenue from which to make advertising payments. Yet Vincens tried to justify Brican's business model to NCMIC by showing them a spreadsheet projecting exponential increases in sales over time. He then asked NCMIC President Gregory Cole, "tell me how this cannot work." Cole responded, "When the money runs out, it doesn't work." Vincens responded, "That's true. But why would the money run out?" Patrick McNerney, the CEO of NCMIC Group, Inc., responded, "Because we're done." (TT4 (Cole) 20:13–23:8.)[28]

87.     The purpose of the Buyback Provision was precisely to protect customers if Viso Lasik stopped buying advertising. But Vincens knew that "when the money runs out, it doesn't work"—that if Viso Lasik stopped paying advertising fees, Brican would not be able to induce new sales. Without lump-sum cash infusions from NCMIC from new

---

founded Recomm, which sold electronic bulletin boards to pharmacists, optometrists, and veterinarians until it went bankrupt in 1996 due to its inability to make advertising payments. Even later in the 1990s, Vincens was involved in Axaris, which also sold display systems to dentists and veterinarians in France, with whom it entered into advertising agreements. (TT2 (Vincens) 173:2–185:19.) Most of these companies' sales involved financing, so Vincens had to establish and maintain relationships with third-party financing companies. (TT2 (Vincens) 181:9–182:24.)

[27]     (*Compare* PX 33 at 73–75 (projections as of January 2007) *with* PX 102 (projections as of July 2009); *see also* TT4 (Lemacon) 134:1–20.)

[28]     Lemacon also understood that Brican's "business model could not be sustained without the injection of additional funds." (TT4 (Lemacon) 135:22–136:2.)

Exhibeo sales, Brican could not keep the scheme going and thus could not meet its Buyback Provision obligation to buy back the leases.

88.     Moreoever, at the time it entered into each Marketing Agreement, Brican intentionally did not disclose to Plaintiffs:

- That Viso Lasik was only able to make advertising payments at that time with money borrowed from Brican, and

- Unless Brican kept receiving funds from financing companies like NCMIC, it could not keep lending money to Viso Lasik.

89.     Brican thus left Plaintiffs with a misleadingly incomplete understanding of the relationship between Brican and Viso Lasik.

### f. **Brican's Lack of Intention to Perform the Buyback Provision Promise**

90.     Vincens did not expect Brican to be able to keep the promise in the Buyback Provision. This fact necessarily follows from the facts below, simplified and summarized for the sake of clarity:

- *Vincens knew what he was doing:* He had extensive experience selling display equipment to medical professionals, arranging financing for those sales, and promising to buy advertising on the equipment.

- *Vincens had left customers with similar unfulfilled promises before:* His earlier company, Recomm, promised its customers that third parties would pay enough for advertising to offset their lease payments. Soon after Vincens sold his stake, third parties stopped paying for advertising, causing Recomm to eventually go bankrupt. Vincens thus walked away scot-free, leaving customers with an unfulfilled promise.

- *Whatever happened with Viso Lasik, Brican was responsible for all of the promised advertising payments:* Rather than relying on independent third parties to buy

advertising, Brican promised that Viso Lasik would pay advertising fees and then loaned Viso Lasik the money for the advertising fees. At the time that each Marketing Agreement was executed, Viso Lasik was only able to make advertising payments with these loans. So Brican was effectively paying for all of the advertising.

- *Brican could only make those advertising payments with funds from future sales:* Brican's only revenue source was from the financing companies who paid a lump sum for each Exhibeo sale. With each sale, Brican received $24,000 but incurred an advertising-fee obligation of $29,000. Brican had to use funds from future sales to keep the circle going.

- *Brican hid these facts:* Brican intentionally did not disclose any of the above to its customers, suggesting that it expected people who knew these facts to balk at the deal.

- *Vincens did not consider how Brican might perform the Buyback Provision Promise if Viso Lasik did not succeed*: He testified that he expected Viso Lasik to eventually become profitable. There is no evidence that he expected Brican to be able to buy back the leases if Viso Lasik did not become profitable.

91.     By making a promise that its principal, Vincens, knew it could not keep, Brican made a promise that it did not intend to keep.

### § 3. Facts Relevant to NCMIC's Holder-In-Due-Course Defense

#### a. NCMIC's First Notice of Brican's "Return Policy"

92.     At some point in May or June 2006, Fred Scott and Vincens spoke by telephone. Afterwards, on June 19, 2006, Scott emailed William Artino, NCMIC's Vice President and General Manager of Equipment Finance, with draft language for an agreement in

which NCMIC agreed "to support the Return Guarantee conditions as discussed" and that outlined "Brican's obligation to unwind the lease" if "a customer chooses to return the Brican system." (PX 7 at 1.)

93.    Later, Scott emailed Vincens and Briscoe referencing Brican's "Return Policy" and attaching a letter (the "Scott Letter") that included the following text:

> Professional Solutions Financial Services is pleased to provide these terms to support *Brican America's return policy*. This letter represents the understanding that the payoff Professional Solutions will give Brican in the event of a *cancellation by their customer*. This program may be cancelled or suspended at any time.
>      *If the Lease Agreement is terminated by the customer due to Brican's return policy*, we will credit all amounts collected toward our funded amount. . . .

(PX 7 at 3 (emphasis added).) Briscoe responded and thanked Scott for his "quick turnaround." (PX 7 at 4.)

94.    The parties disagree as to what Vincens and Scott discussed over the phone as well as the proper interpretation of the Scott Letter.

95.    According to Vincens:

- Scott agreed in the phone call that NCMIC would authorize the use of a "system where . . . [Brican] could take back the equipment" and give the "clientele a way out," and that Scott would send a letter to Brican to that effect. (TT3 (Vincens) 13:3–14:15.)

- The Scott Letter was that letter, and the "Return Policy" mentioned in the Scott Letter referred to the Buyback Provision in the Marketing Agreement.

- Brican's subsequent use of Marketing Agreements was in reliance upon the Scott Letter. (TT3 (Vincens) 12:5–16:12; *see also* DX 18 (Brican salesperson

assuring a potential customer that Brican has an agreement with NCMIC allowing Brican to buy back the lease agreement.).)

96.     In contrast, Scott did not remember if any conversation had taken place, and did not remember or understand what he meant when he wrote "Brican America's return policy." (TT5 (Scott) 104:10–108:5.)

97.     This phone call and email exchange gave NCMIC its first notice that Brican was using side agreements to give its Exhibeo customers a way to cancel the deal and be relieved of their lease obligations. Yet NCMIC did not ask Brican for copies of these side agreements, even though the GVA required Brican to send NCMIC any "agreements or warranties given to Lessee relating to the Goods or Leases." (GVA ¶ 6(c).)

### b. NCMIC's Agreement Not to Call Brican's Customers

98.     Under the GVA, NCMIC had no obligation to finance any sale until it was able to "verbally verify delivery and installation."[29] Nevertheless, at Brican's request (*see* PX 20), NCMIC backed off this requirement. By August 2006, NCMIC had agreed not to communicate with *any* of Brican's customers before financing their purchases. (PX 19; *see also* PX 70 ("we do not . . . verbal.").)

99.     The significance of NCMIC's agreement not to "verbal" customers is apparent in the context of the equipment leasing industry. Equipment leases, in which the vendor's salesperson provides the customer with the lessor's credit application and the lessor makes credit decisions based solely on that application, are called "app-only" leases.

---

[29]     NCMIC needed Brican's prior consent to speak directly with potential customers only when it wanted additional credit or financial information. (GVA ¶ 4.)

App-only leases are not unusual for equipment valued under $25,000.[30] Because both the upside and the downside from each lease is so limited, and because a lessor can receive all necessary information through the written application, a lessor might not need to speak directly with a customer before agreeing to provide financing.[31] (TT1 (Krollfeifer) 64:12–67:6.)

100.    Additionally, a vendor's salespersons have a strong interest in a simple credit approval process because they can close a deal much more easily if they can credibly assure customers that credit will be available on predictable terms. Salespersons will therefore help customers fill out the forms and, if necessary, follow up with the lessor to ensure that the lessor has everything it needs.

101.    Yet NCMIC's new position—its agreement not to contact *any* of Brican's customers—went well beyond what the above considerations might justify. Even with regards to a potential $140,000 lease with four co-guarantors—which NCMIC's internal policy did not allow to be app-only—NCMIC could not ask customers for additional financial information. (*See* PX 22 at 6 ("Too bad we can't speak with them directly. The vendor creates this consternation inadvertently.").)

102.    It appears that NCMIC was willing to agree to this condition because it did not want to upset Brican. (*See, e.g.*, PX 17 ("[T]hey are turning out to be a really good vendor

---

[30]    In the industry, leases are generally classified as "micro ticket," "small ticket," "medium ticket," or "large ticket" based on the value of the leased equipment. (TT1 (Krollfeifer) 51:3–11.) This case involves "micro-ticket" leases.

[31]    Plaintiffs' expert Krollfeifer testified that a responsible lessor would almost always verbally confirm delivery and acceptance with the customer before paying the vendor, at least at the beginning of the lessor's relationship with a new vendor. This would allow the lessor to verify that the customer understands that any problems between the customer and the vendor would not affect the customer's obligations to the lessor. (TT1 (Krollfeifer) 57:6–58:15.) NCMIC disagreed that any industry standard required this practice, at least in micro-ticket leases.

and I do not want to upset them.").) Furthermore, some of NCMIC's employees received a commission for each sale that NCMIC financed. (TT4 (Thompson) 220:7–19.)

### c. DelCastillo's Email About Recomm

103.     In May 2008, two years after the Scott Letter, Daniel DelCastillo purchased an Exhibeo for his dental practice. Within two months of his purchase, he learned of Vincens' prior involvement in Recomm, which he understood to be a "Ponzi scheme" and "scam," and became concerned. (TT5 (DelCastillo) 11:20–15:6.)

104.     In July 2008, DelCastillo called Jean Thompson, the NCMIC account manager responsible for the Brican account, explained his concerns about Vincens and Recomm, and asked to be released from his lease. Thompson asked him to send whatever information he had about Recomm in writing. (TT5 (DelCastillo) 15:8–17:6.) She did not ask if he had a Marketing Agreement or for a copy of whatever agreements he might have with Brican. (TT5 (DelCastillo) 22:21–23:9.)

105.     DelCastillo sent Thompson an email with the subject line "FW: Recomm-Brican" that attached *Tampa Tribune* articles and a document with the following text:

#### Warning—Possible Scam to Dentists

Have you recently signed an agreement with Raymond Briscoe of Brican America?

Mr. Briscoe changed his name from Raymond Manklow, and formerly owned Recomm International out of Tampa, Florida, and Toronto, Canada.

In the 1990's, Mr. Manklow and his partners scammed millions of dollars from unsuspecting pharmacists, chiropractors, veterinarians, and others selling LED signboards with the promise to cover most of the lease costs with advertising dollars.

(PX 92 at 2.)

106.    One of the *Tampa Tribune* articles questioned whether Vincens had been
operating a Ponzi scheme:

> The alleged scheme has all the properties of a Ponzi scheme.
> Recomm marketed the electronic signs to customers, promising
> that the signs would attract advertising dollars that would be
> shared with sign owners. Recomm would sell or assign leases for
> the electronic signs to a finance company, which would collect
> monthly lease payments from customers. But the advertising
> dollars never materialized as expected, and the company found
> itself subsidizing rebate checks with money from the finance
> companies.

(Noam M.M. Neusner, *IRS to Audit Recomm*, Tampa Trib., Apr. 27, 1996, PX 92 at 4.)

107.    Another article described fraud investigations into Recomm:

> It turns out, company officials acknowledge, that Recomm
> attracted few companies to place advertisements on the message
> boards. Recomm used cash from the finance companies to send out
> the rebate checks until the practice became financially untenable.
> That practice, of paying off old customers with cash generated from
> new customers, with the intent to defraud, is the definition of a
> Ponzi scheme.

(Noam M.M. Neusner, *11 states probe Tampa marketing firm Recomm*, Tampa Trib., Mar. 5,
1996, PX 92 at 5.)

108.    Thompson told DelCastillo that NCMIC was "looking into it" and promised to
keep him informed if she learned any new information. She did not contact DelCastillo
again. (TT5 (DelCastillo) 22:3–20.)

109.    Thompson then forwarded DelCastillo's email to Todd Cook, characterizing it as
"disturbing." (PX 92 at 6.) Cook reported this to Cole and told him he would look into
it. (TT4 (Cook) 40:25–41:5.) Cole acknowledged Cook's report, and they moved on to
other topics. (TT4 (Cook) 42:19–44:16.)

- 36 -

110.    Cook emailed Lemacon, attaching the *Tampa Tribune* articles and the "Warning—Possible Scam to Dentists" document, and asked if Lemacon had any "insight into Recomm, Jean Francois Vincens, and Raymond Manklow." (PX 92 at 6.) Lemacon's response admitted that Brican had Marketing Agreements "with some dentists in order to advertise VISO LASIK Centers," denied operating a scam, invited NCMIC to visit Viso Lasik's three locations "to verify the reality of the venture," and attached a Powerpoint presentation that Brican had distributed to its salespersons in which Brican prominently promised to "PAY YOU ENOUGH PER YEAR TO OFFSET THE COST OF YOUR LEASE!" (PX 13 at 2, 27.)

111.    After receiving these materials, Cook and Thompson called Vincens. According to Cook, he understood from this call that Brican only had Marketing Agreements in the vicinity of existing Viso Lasik locations, rather than all over the country. (TT6 (Cook) 52:15–53:18.) However, he did not ask how widely Brican was using Marketing Agreements or if the Marketing Agreement promise to offset customers' lease payments might explain the recent sudden jump[32] in Brican's sales rate. (*See* TT6 (Cook) 104:15–105:3.)

112.    Cook had experience with equipment lessees who expected advertising fees that would match their lease payments. While he was part-owner, President, and CFO of Frontier Leasing Corp., it acquired leases from another leasing company that were already in default and in litigation for the same reason: the vendor had promised to buy advertising from the lessees at a price that nearly equaled their lease payments but then stopped paying for advertising. *See C & J Vantage Leasing Co. v. Wolfe*, Case No. 08-1100, 2009 WL 4115950 (Iowa Ct. App. Nov. 25, 2009), *vacated*, 795 N.W.2d 65 (Iowa 2011).

---

[32]     *See supra* at ¶ 63.

113.    Nevertheless, Cook did not employ NCMIC's established procedures for investigating fraud. (TT4 (Cook) 41:9–17.) Instead, he read a court decision in Recomm's bankruptcy that concluded that payments by non-debtors to Vincens and Briscoe did not constitute fraudulent transfers by the debtors.[33] Although Cook neither asked an attorney about the court decision nor searched for other court decisions about Recomm, he considered the court decision to be independent, third-party confirmation that Vincens had not been involved in a fraud with Recomm and was also not involved with a fraud at Brican. (TT6 (Cook) 51:25–52:11, 118:22–119:15.)

114.    If Cook had looked for other court opinions, he would have found extensive descriptions of Recomm's business model, including (1) the widespread use of advertising agreements, (2) Recomm's inability to attract advertisers and its resulting cash flow problems, (3) the cessation of advertising payments, and (4) lessees' refusal to pay their leases, all of which culminated in (5) Recomm declaring bankruptcy. For example, in September 2005, several months after the GVA, the Eleventh Circuit issued an opinion that specifically mentions Vincens:

> This case involves a scheme to use electronic billboards and kiosks (collectively "kiosks") for advertising. The promoters of the scheme [n.1: "**Jean Francois Vincens and Raymond Manklow**."] executed it in the following way. First, they organized [Recomm]. Recomm, in turn, (1) convinced several advertising agencies of the merits of advertising via kiosks, and (2) convinced pharmacists, veterinarians, optometrists, and others of the profits they would earn by locating the kiosks at their places of business. Having

---

[33]    Cook likely read *In re Optical Tech.*, 246 F.3d 1332 (11th Cir. 2001). The Eleventh Circuit affirmed the bankruptcy court's conclusion that certain transfers made by non-debtor companies to Vincens and Briscoe were not fraudulent conveyances because Vincens and Briscoe had sold their interests in Recomm before those transfers took place.

> accomplished this, Recomm (3) acquired the necessary kiosks, leased them to the [Lessees], assigned the leases to [the Lessors], and (4) entered into advertising contracts with the Lessees. These contracts provided that the Lessees would receive a stated percentage of the fees Recomm received from the advertising agencies. Recomm, the Lessees, and the Lessors contemplated that the Lessees' share of the advertising fees would more than cover the Lessees' lease payments.
>
> The scheme worked for the benefit of all parties for a few years, until mid-1995, when Recomm began to experience cash-flow problems and ceased remitting to the Lessees their portions of the advertising fees. The Lessees responded in two ways. First, they quit paying the Lessors the rent due on the kiosk leases; then, they sued Recomm. As the law suits multiplied, Recomm turned to the bankruptcy court for relief. In January 1996, Recomm filed a Chapter 11 petition in the Bankruptcy Court for the Middle District of Florida.

*In re Optical Tech., Inc.*, 425 F.3d 1294, 1296–97 (11th Cir. 2005) (footnotes 2–5 omitted) (emphasis added).

115.     It is unclear how others at NCMIC reacted to the information in DelCastillo's email. However, Paula Barkley, NCMIC's Operations Supervisor in Equipment Finance who worked with Jean Thompson, testified that she recalled discussions of the *Tampa Tribune* articles around this time and that everyone at NCMIC knew about the use of Marketing Agreements. (TT4 (Barkley) 228:5–22.)

### d. NCMIC's Collections Calls and Knowledge of Marketing Agreements

116.     In addition to having received DelCastillo's email suggesting a Ponzi scheme to fund "advertising payments" in Vincens' equipment leasing scheme, NCMIC also learned of Brican's use of Marketing Agreements from its lessees.

117.    By February 2007—eight months after the Scott Letter and sixteen months before DelCastillo's email—NCMIC had learned that at least one of its lessees had a Marketing Agreement with Brican. (PTS at 18 ¶ 19–21.) By April 2009, when NCMIC stopped financing Exhibeos, NCMIC had received a total of 19 Marketing Agreements, from its customers or from other sources. (TT3 (Cole) 107:2–4.)

118.    Moreover, between April 2007 and October 1, 2008, NCMIC's collections staff were told by at least ten different lessees that they were expecting either "reimbursements" or advertising payments from Brican that nearly matched their lease obligations. Several lessees had understood that their net monthly payments would be no more than $25, and were therefore surprised to see NCMIC's bill for $563 each month. (PX 65, 77–83, 86–87.) One lessee stated that he would not have agreed to the lease except for these advertising payments. (PX 65.)

119.    Another lessee told Cook in 2007 that the Brican salesperson had deceived him about his net monthly obligations after accounting for the advertising payments. Cook told him that he would look into the advertising claim, but he never did so. (PX 79; TT6 (Cook) 110:3–16.)

120.    In September 2008, another lessee told NCMIC that Brican had promised to take over the lease if the reimbursement payments stopped. (PX 82.)

121.    In addition, Sandra Ellzey, the Brican employee responsible for bookkeeping, spoke regularly with Jean Thompson, the account manager at NCMIC responsible for Brican. In the course of these conversations, they discussed the use of advertising agreements on multiple occasions, such as when a lessee was late on a lease payment because an advertising payment had not yet arrived. (*See* TT5 (Ellzey) 194:9–197:20, 208:3–209:19.)

122.    Various NCMIC employees testified that Brican's use of Marketing Agreements was generally known at NCMIC. (TT3 (Henningsen) 180:18–181:2, 183:17–185:12,

188:17–189:24; TT4 (Barkley) 228:6–18.) At least by November 2008, Cook's staff thought he had a copy of the Marketing Agreement.[34]

123.   Later, in February 2009, Thompson emailed Lemacon to ask: "How can Brican offer advertising/marketing dollars in an area with no current laser center location? . . . . We get questions on how the marketing dollars work quite a bit." Lemacon responded that Viso Lasik had a "national advertising budget." (DX 16.)

124.   Based on all of these factors, the Court concludes that, by October 3, 2008, when NCMIC started to take assignments of the one-column leases, NCMIC (1) had received a number of copies of the Marketing Agreement, (2) had learned from ten lessees that Brican was promising advertising or reimbursement payments, and (3) had learned from at least one lessee that Brican promised to buy back the leases if the payments stopped.

### e. NCMIC's Trip to South Florida

125.   In November 2008, a NCMIC delegation including Cook, Henningsen, and Thompson visited Brican's office in Miami and the Viso Lasik Medspa in Wellington.

126.   During this visit, Cook complained that the Buyback Provision in the Marketing Agreement "relieved [the customers] of any obligation in the lease." In response, he made "very specific suggestions" for changes to that language. (TT4 (Cook) 46:14–47:12.)

---

[34]   NCMIC Collector Jo Lynn Quick emailed Business Development Manager Lanette Henningsen to ask for "a copy of the agreement between Brican and the doctor. It would address return policy, reimbursement, etc. The doctors refer to this quite often and it would be nice to have a copy for reference." Henningsen thought Thompson had a copy, and Thompson told Henningsen to ask Cook, so Henningsen then forwarded her request to Cook. (PX 64.) It is unclear if Cook responded.

127.    While it is unclear what suggestions he made at the meeting, Cook later emailed

Brican with the following suggested changes to the Buyback Provision of version 6 of

the Marketing Agreement:

> **Cancellation**: If VISO LASIK MEDSPAS fails to honor its
> commitments relating to the advertising fees, the Client may
> request that Brican repurchase ~~the Client's lease agreement in~~
> ~~regarding to~~ the Exhibeo Concept. <u>Upon acceptance by Brican of</u>
> <u>the Client's request, Brican agrees to refund to the title/lien holder</u>
> <u>the outstanding balance due. Brican does not assume or relieve any</u>
> <u>obligation, financial or otherwise, that the Client has entered into</u>
> <u>with regard to the Exhibeo Concept.</u>

(PX 27 at 2.) His suggested edits did not remove the word "cancellation."

128.    Cook's edits do not appear in any executed Marketing Agreements. Although a

lengthy email exchange followed (*see* PX 27, 72, 73), NCMIC did not insist on any

particular changes, ask Brican to send all copies of any Marketing Agreements executed

in the future, or even follow up to verify what language Brican ultimately ended up

using in the Buyback Provision.

129.    Moreover, Cook did not ask how widely Brican was using Marketing

Agreements. Rather, according to Cook, the visit confirmed his understanding that

Brican only had Marketing Agreements in the vicinity of existing Viso Lasik locations,

rather than all over the country. (TT6 (Cook) 72:21–74:9; *see also* PX 70 at 2; PX 23.)

However, the evidence is that NCMIC did not even attempt to confirm this by asking

Brican to send all previously executed Marketing Agreements, much less to start

sending all new ones.

130.    Furthermore, at the time, Henningsen understood Viso Lasik to be a "branch" of

Brican. (TT3 (Henningsen) 186:18–187:23.) Yet Cook did not ask for Viso Lasik's

ownership structure, business plan, or financial records. (TT6 (Cook) 72:5–19.) Rather,

Cook saw that a procedure was being performed at the clinic and concluded that Viso Lasik was a "viable business." (TT6 (Cook) 73:2–13.)

### f. NCMIC Shuts Down The Program

131.   Around April 13, 2009—six months and $21 million in sales after NCMIC started taking assignments of one-column Financing Agreements—Brican salesperson James Adams called Gregory Cole. Adams left an anonymous voicemail referring to a "massive fraud being perpetrated against your company." When Cole called him back, Adams told Cole that Brican was using Marketing Agreements all over the country, not only near existing Viso Lasik locations. (TT6 (Cole) 189:9–191:15.)

132.   Cole also learned around that time that the Marketing Agreement was solely on behalf of Viso Lasik, in which Brican and its principals were heavily invested. (PX 12 at 2 ¶ 7.)

133.   On April 15, 2009, NCMIC stopped funding Brican leases. (PX 16.)

134.   Approximately one week later, a NCMIC delegation including Cook and Cole met with Brican in Miami. Vincens confirmed that Brican had Marketing Agreements with nearly every NCMIC lessee. Vincens tried to explain Brican's business model by showing a spreadsheet with projected Brican revenues several years into the future and explaining that those revenues would be used to fund the growth of Viso Lasik. Cole noted that Brican's business model "required an unlimited supply of money to fund an unlimited supply of customers." (TT6 (Cole) 192:5–194:21; *see also* PX 12.)

135.   On May 4, 2009, NCMIC sued Brican Inc. for breaching the GVA by executing Marketing Agreements without sending them to NCMIC, and demanded that Brican repurchase the entire lease portfolio. *NCMIC Finance Corp. v. Brican America, Inc.*, No. 09-cv-21192 (S.D. Fla. filed May 4, 2009). At the time, NCMIC did not notify existing lessees that it had sued Brican. (TT6 (Cole) 198:24–199:13.)

136.    At some point in February 2010, Brican notified its customers that it could no longer make advertising payments. (DX 25.) On February 9, 2010, NCMIC's motion for summary judgment in its case against Brican was denied. On February 22, 2010, Brican and NCMIC settled their lawsuit.

137.    After the settlement, NCMIC wrote its lessees explaining that it had stopped financing leases for Brican because "for each sale that Brican made they were incurring an obligation to their customers . . . in an amount larger than what [NCMIC] funded on behalf of the Lessees when they acquired an Exhibeo. In short, Brican could only stay in business by continuing to originate new sales (and receiving the upfront payment by the funding source) to pay for its existing obligations to its customers." (PX 25 at 2.)

## D. CONCLUSIONS OF LAW

If Brican Inc. fraudulently induced Plaintiffs into signing the one-column Financing Agreements, then NCMIC, as Brican Inc.'s assignee, is subject to the defense of fraudulent inducement unless it can prove that it is a holder in due course and thus entitled to enforce the Financing Agreements' "waiver of defenses" clauses.[35] Thus, the trial focused on two issues: fraudulent inducement and holder in due course. Applying governing Florida law to the facts, the Court makes the following conclusions of law, which are also divided into three sections. The first addresses jurisdiction. The second

---

[35]    The Financing Agreements are not true leases; rather, they reflect secured transactions because they allow the customer to purchase the equipment for a nominal price (one dollar) at the end of the term. *See* Fla. Stat. § 671.201(38)(a) (codifying U.C.C § 1-203(b)); *see also* I.R.S. Rev. Rul. 55-540, 1955-2 C.B. 39, at 4.01(e). Plaintiffs with one-column Financing Agreements are therefore "account debtors" under Fla. Stat. § 679.1021 and are entitled to assert against NCMIC "any defense or claim in recoupment arising from the transaction that gave rise to the contract" unless NCMIC can prove that Plaintiffs waived such claim or defense. Fla. Stat. § 679.4041.

section analyzes the legal basis for finding fraudulent inducement. The third addresses why NCMIC's holder-in-due-course defense fails.

## § 1. JURISDICTION

This Court has jurisdiction under the Class Action Fairness Act because, at the time this case was filed, it was a putative class action in which (1) the class included at least one hundred members; (2) a member of the plaintiff class was diverse from a defendant; and (3) the aggregate of the claims of individual class members exceeded $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d). The Court retains jurisdiction even though it did not certify a class in this case. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 n.12 (11th Cir. 2009) ("[P]ost-removal events (including non-certification, de-certification, or severance) do not deprive federal courts of subject matter jurisdiction.").

## § 2. PLAINTIFFS HAVE ESTABLISHED FRAUDULENT INDUCEMENT

NCMIC argued that any misrepresentations made in, or in relation to, the Marketing Agreements cannot constitute a defense to enforcement of the Financing Agreements because the two agreements were separate, and any representations in the Marketing Agreement cannot modify or alter the terms of the Financing Agreements. (*See, e.g.*, TT6 14:25–20:7.) This argument disregards the nature of fraudulent inducement.

A fraudulent inducement claim is not a breach of contract claim. The claim in this case does not seek to enforce the Marketing Agreement Buyback Provision by altering the terms of the Financing Agreements so as to be consistent with the Buyback Provision. Rather, fraud in the inducement consists of "misrepresentations, statements, or omissions which cause the complaining party to enter into a transaction." *Ladner v.*

*AmSouth Bank*, 32 So. 3d 99, 105 (Fla. 2d DCA 2009) (citation omitted). The representor becomes liable for the injury caused by those misrepresentations.

Such misrepresentations must precede the entry into contract and they must relate to the contract's procurement rather than its performance. They may be oral or written and may be extrinsic or contained in the contract itself. *See, e.g., id.* (allegation that bank fraudulently induced construction project that it wanted to finance by falsely assuring plaintiffs of the construction company's financial integrity was sufficient to state a claim)*; Mejia v. Jurich*, 781 So. 2d 1175 (Fla. 3d DCA 2001) (allegation that developer fraudulently induced purchase of homes by misrepresenting its plans for the rest of the development was sufficient to state a claim).

NCMIC has pointed to no legal authority for the proposition that a party's intentional misrepresentation in one contract cannot fraudulently induce entry into a separate contract with the same party. Brican Inc. was the lessor for the one-column Financing Agreements. Therefore, if Brican Inc. made misrepresentations in the Marketing Agreement, and Plaintiffs can prove the remaining elements of fraud, then Brican Inc. fraudulently induced Plaintiffs to sign the one-column Financing Agreements.

Furthermore, fraudulent inducement is "an independent tort in that it requires proof of facts separate and distinct from the breach of contract." *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996). Therefore, claims for fraudulent inducement are not subject to the parol evidence rule and are not barred by a merger and integration clause in the underlying contract.[36]  Rather, "one can avoid a

---

[36]     Similarly, if Plaintiffs relied on the alleged misrepresentations, such reliance was not unreasonable as a matter of law because the misrepresentations were not "directly and fully rebutted by express evidence in a governing written contract." *Hobirn, Inc. v. Aerotek, Inc.*, 787 F. Supp. 2d 1298, 1304 (S.D. Fla. 2011).

fraudulent inducement claim only by contract language which specifically and explicitly negates the right to bring such a claim." *Lower Fees, Inc. v. Bankrate, Inc.*, 74 So. 3d 517, 519 (Fla. 4th DCA 2011). The Financing Agreements do not specifically and explicitly negate the right to bring an action for fraudulent inducement.

### a. Elements of Fraudulent Inducement

To establish that Brican Inc., the lessor, fraudulently induced the one-column Financing Agreements, Plaintiffs must prove six elements:

(1) a misrepresentation of fact;

(2) that this misrepresentation was material;

(3) that Brican Inc. was responsible for this misrepresentation;

(4) that Brican Inc. knew that the representation was false;

(5) that Brican Inc. intended the representation to induce Plaintiffs into the Financing Agreements; and

(6) consequent injury to the party acting in reliance on the representation.

*See Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010); *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007). Because the relevant individual Plaintiffs were excused from testifying at trial, the Court cannot address the elements of materiality and reliance.[37]

### b. Versions 4, 5, 7, and 8 of the Buyback Provision Misrepresented a Fact

The Marketing Agreement's Buyback Provision was designed to be the "clincher" in Brican's sales pitch. Brican represented that its Exhibeo was effectively free

---

[37]     Under Florida law, a "concealed fact is material to a transaction if the plaintiff would not have entered into the contract but for the concealment." *Billian v. Mobil Corp.*, 710 So. 2d 984, 990 (Fla. 4th DCA 1998). The element of materiality thus largely overlaps with reliance.

because Viso Lasik's advertising payments would offset customers' payments over the course of the lease. With the Buyback Provision, Brican addressed customers' doubts about Viso Lasik's ability to continue making advertising payments. If Viso Lasik stopped buying advertising for any reason, Brican would rescue the customers by buying or assuming their lease obligations.

The Buyback Provision of Marketing Agreement versions 4, 5, 7, and 8[38] was a misrepresentation of fact in two ways. First, it made a promise that Brican knew it could not keep. *See Findings of Fact, supra* at ¶¶ 84–87, 90–91. Brican therefore made a promise without the intention of keeping it, which constitutes a misrepresentation of fact. *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 633 (Fla. 4th DCA 2005).

Second, the Marketing Agreement implied certain facts about Brican's relationship with Viso Lasik that were so incomplete as to be misleading:[39]

---

[38]    The Buyback Provision of Marketing Agreement version 6 did not promise to buy back the lease agreement. Instead, it only stated that "the Client *may request* that Brican repurchase the Client's lease agreement" (emphasis added).

Plaintiffs' fraud theory in this case has focused solely on the written promises in the agreements they signed. This approach not only satisfied the pleading requirements for fraud but also enabled the parties and the Court to address the issue of fraudulent inducement for similarly-situated groups of Plaintiffs. However, without a written promise to buy back the lease as the basis for fraudulent inducement, the nine one-column, version 6 Plaintiffs are not similarly situated to those one-column Plaintiffs who signed versions 4, 5, 7, or 8. Because they lack the threshold misrepresentation underlying Plaintiffs' theory of fraud, they cannot prevail on this theory.

[39]    "Fraud can occur by omission, and one who undertakes to disclose material information has a duty to disclose that information fully." *Philip Morris USA, Inc. v. Naugle*, 103 So. 3d 944, 946 (Fla. 4th DCA 2012), *review denied*, 135 So. 3d 289 (Fla. 2014). This principle applies even in arms-length transactions: "where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed." *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. 4th DCA 1994). For example,

- It implied a degree of financial independence between Brican and Viso Lasik that did not exist at the time of the promise—specifically, Brican did not disclose that until Viso Lasik took off, the business model of both Brican and Viso Lasik depended upon Brican taking advantage of the Plaintiffs' creditworthiness in order to cause NCMIC to provide a steady stream of funds which Brican could then lend to Viso Lasik.

- It promised that Viso Lasik would make advertising payments, but did not disclose that, at the time each Marketing Agreement was signed, Viso Lasik was only able to make these advertising payments with Brican's loans.

- Brican's promise to buy back the lease if Viso Lasik stopped paying only worked if Brican had the financial wherewithal that did not rely entirely on Viso Lasik's continuing to pay, but Brican's sole source of revenue was from Exhibeo sales in which it gained $24,000 but incurred an obligation of $29,000.

Brican disclosed none of these facts, leaving Plaintiffs with a misleadingly incomplete understanding of (1) the relationship between Brican and Viso Lasik and (2) Brican's ability to buy back the leases if Viso Lasik stopped paying for advertising. If Brican had disclosed these facts, an ordinary reasonable person would ask: how could Brican meet both its and Viso Lasik's obligations if it took in only $24,000 but incurred a $29,000 obligation for each Exhibeo sold?

---

in *Gutter*, investors in a restaurant venture alleged that the venture's promoters failed to disclose their previous involvement in a failed restaurant venture, and this was sufficient to state a claim. *See also Revitz v. Terrell*, 572 So. 2d 996, 998 (Fla. 3d DCA 1990) ("[W]here there is no duty on the seller to divulge material facts, once a seller makes representations regarding a condition, he is under a duty to disclose the complete truth.").

### c. Brican Inc. Is Responsible For This Misrepresentation

Brican LLC employed the Exhibeo salespersons and signed versions 4, 5, 7, and 8 of the Marketing Agreement. For Brican LLC's misrepresentations to be attributed to Brican Inc., (1) Brican Inc. must have designated Brican LLC to be its authorized agent and (2) the scope of that agency must have included the ability to speak on Brican Inc.'s behalf while making the misrepresentations. Based on the evidence at trial, the Court concludes that Brican LLC spoke on Brican Inc.'s behalf while making the misrepresentations in the Buyback Provision.

"Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 n.10 (Fla. 2003) (citation omitted). The existence and scope of an agent's authority are questions of fact and "may be inferred from acts, conduct and other circumstances." *Bd. of Trustees of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Global Markets, Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010) (citations omitted). In assessing these circumstances, a consistent course of dealing has more weight than "conclusory statements in documents with regard to the independence of the relationship of the parties." *Villazon*, 843 So. 2d at 853.

The following five facts show the nature and scope of the agency relationship between Brican Inc. and Brican LLC:

1. When the Vendor switched from Brican Inc. to Brican LLC, Brican Inc. simply told NCMIC that Brican LLC would start conducting all future sales, and in October 2006, Brican LLC started conducting all future sales.

2. Version 4 of the Marketing Agreement explicitly represents that Brican LLC is Brican Inc.'s agent. The text of the Marketing Agreement obligates Brican Inc.

to make advertising payments and to buy back the leases if the advertising payments stopped. However, the signature block is for Brican LLC. By all accounts, some Brican entity performed on these agreements, and there is no evidence that anyone at Brican regarded these as erroneous or attempted to correct them. Therefore, Brican Inc. allowed Brican LLC to sign roughly 360 Marketing Agreements on Brican Inc.'s behalf.

3. Beginning on October 3, 2008, Brican LLC was the Vendor and Brican Inc. was the lessor, who then assigned its leases to NCMIC. Typically, a lessor (Brican Inc.) should pay the vendor (Brican LLC) for the goods, and an assignee (NCMIC) should then pay the assigning lessor (Brican Inc.) for the assigned lease. Instead, NCMIC simply continued its prior practice of paying Brican LLC directly for the goods. Therefore, Brican Inc. allowed Brican LLC to receive funds on its behalf.

4. Brican Inc. allowed Brican LLC's employees, such as General Counsel Maureen Ryan, to enforce Brican Inc.'s rights under Marketing Agreements that Brican Inc. had signed with earlier customers. (*See, e.g.,* PX 74.)

5. Executed copies of the lease assignment forms were signed by "Brican America" and did not specify if they were signed by Brican Inc. or by Brican LLC. Because Brican Inc. did not have employees of its own at this time, Brican LLC employees signed the lease assignment forms on Brican Inc.'s behalf.

Brican Inc.'s control was to such an extent that it simply told Brican LLC to take over all future sales. Moreover, for several years, Brican Inc. and Brican LLC both consistently acknowledged and accepted that Brican LLC could speak on Brican Inc.'s behalf regarding the Marketing Agreements. Based on this evidence, Brican LLC, the Vendor, was Brican Inc.'s authorized agent, and the scope of that agency included the

authority to speak for Brican Inc., the lessor, when making the misrepresentations in the Buyback Provision.

NCMIC makes two primary arguments against finding an agency relationship. First, NCMIC points to the "no agent" clause in the Financing Agreements. However, the existence or scope of an agency relationship is not controlled by descriptive labels used by the parties. *Villazon*, 843 So. 2d at 853. Therefore, a conclusory "no agent" clause in the one-column Financing Agreements cannot trump a consistent pattern of behavior between Brican Inc. and Brican LLC.

NCMIC also argues that Brican LLC's salespersons could not amend the Financing Agreements by initialing handwritten changes on the documents, as they could with the Marketing Agreements. However, this is irrelevant to a fraudulent inducement claim, which consists not of amendments to a contract but of misrepresentations that induced a party to enter that contract. Moreover, Brican Inc. itself, as well as most of NCMIC's own employees, could not amend the Financing Agreements either. Thus, because Brican LLC was authorized to speak on Brican Inc.'s behalf while making the misrepresentations in the Marketing Agreements, the question of who could amend the Financing Agreements is of no moment.

### d. Brican Inc.'s Knowledge of Falsity and Intention to Induce Plaintiffs into the Financing Agreements

Brican knew that it had no intention of performing the promise in the Buyback Provision. *See Findings of Fact, supra* at ¶¶ 84–87, 90–91. Vincens testified that his intention in promising to buy back leases of customers who stopped receiving advertising payments was to induce customers to "sign on the spot." The Marketing Payment was set precisely so that it would almost fully offset Plaintiffs' monthly

obligations under the Financing Agreements. Thus Brican Inc. intended to induce Plaintiffs, with the Buyback Provision, into signing the Financing Agreements.

The Buyback Provision implied that Brican and Viso Lasik had a relationship that they did not, in fact, have. Brican knew that the independent relationship implied in the Marketing Agreement was overall misleading because it did not include the facts that (1) Brican was lending significant sums of money to Viso Lasik and (2) Viso Lasik was only able to make advertising payments with those loans. Brican's knowledge is particularly evident in that it trained its salespersons that it was "critically important" to explain the Brican-Viso Lasik "strategic alliance" relationship but that they should never disclose to potential customers that Brican was lending money to Viso Lasik. Brican knew that customers might balk at the deal if they knew that, at the time they signed, Viso Lasik's advertising payments were ultimately all coming from loans from Brican.

## § 3. NCMIC Cannot Assert the Waiver of Defenses Clause

If the Plaintiffs are able to establish the remaining elements of fraudulent inducement in individual actions, the next question will be whether NCMIC can assert the Financing Agreements' "waiver of defenses" clause, which provides that an assignee, such as NCMIC, "will not be subject to any claim, defense, or set-off" that the debtor could have asserted against Brican Inc.[40] This clause is only enforceable by an assignee that takes the assignment:

---

[40]    Generally, the assignee of a non-negotiable instrument, like the Financing Agreements, takes it with the rights of the assignor and subject to all the equities and defenses that the debtor could have asserted against the assignor. *Law Office of David J. Stern, P.A. v. Sec. Nat. Servicing Corp.*, 969 So. 2d 962, 968 (Fla. 2007); *see also* Fla. Stat. § 679.4041.

(a) For value;

(b) In good faith;

(c) Without notice of a claim of a property or possessory right to the property assigned; and

(d) Without notice of a defense or claim in recoupment of the type that may be asserted against a person entitled to enforce a negotiable instrument under s. 673.3051(1).

Fla. Stat. § 679.4031. An assignee meeting all of these requirements is considered a "holder in due course" of the assigned instrument. The assignee always bears the burden of proving that it met these requirements at the time of the assignment.

It is undisputed that NCMIC paid value for the assignments, even though it paid Brican LLC on behalf of Brican Inc. rather than paying Brican Inc. directly. Moreover, there is no allegation of any "property or possessory right to the property assigned." Therefore, only the elements of "good faith" and "without notice of a defense or claim" are contested.

### a. <u>Legal Standards</u>

**Without Notice of a Claim or Defense**

Under Florida's adaptation of the Uniform Commercial Code, a person has "notice" of a fact if the person:

(a) Has actual knowledge of it;

(b) Has received a notice or notification of it; or

(c) From all the facts and circumstances known to the person at the time in question, has reason to know that it exists.

Fla. Stat. § 671.209.

Furthermore, notice "received by an organization" is effective "from the time it would have been brought to the person [conducting the transaction]'s attention if the organization had exercised due diligence." Fla. Stat. § 671.209(6). "Due diligence" is defined as the maintenance of "reasonable routines for communicating significant information to the person conducting the transaction and . . . reasonable compliance with the routines." *Id*.

## Good Faith

Florida's legal standard for "good faith," articulated in its adoption of the Uniform Commercial Code, defines it as "honesty in fact and the observance of reasonable commercial standards of fair dealing."[41] Fla. Stat. § 679.1021(1)(qq); *see also* Fla. Stat. § 671.201(20) (same); Fla. Stat. § 673.1031(1)(d) (same). Good faith thus requires a subjective component (honesty in fact) and an objective component (the observance of reasonable commercial standards of fair dealing).

There is no evidence that NCMIC lacked subjective honesty in fact. However, an assignee cannot "act with 'a pure heart and an empty head and still obtain holder in due course status.'" *Any Kind Checks Cashed, Inc. v. Talcott*, 830 So. 2d 160, 165 (Fla. 4th DCA 2002) (quoting *Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada*, 727 A.2d 335, 342 (Me. 1999)). "'[F]air dealing' includes not being an easy, safe harbor

---

[41]     Before the pretrial conference, the Court and the parties had assumed that the "close connection" doctrine would apply in assessing NCMIC's good faith. (*See* First SJ Order; Second SJ Order; PTS at 5.) The Court asked for additional briefing on the topic [DE-541; DE-542], which clarified that the Court and the parties had been relying on earlier cases that applied a version of the statute that is no longer in force. *Compare Equico Lessors, Inc. v. Ramadan*, 493 So. 2d 516, 518 (Fla. 1st DCA 1986), *with Any Kind Checks Cashed, Inc. v. Talcott*, 830 So. 2d 160, 165 (Fla. 4th DCA 2002) (noting that the applicable statute was amended in 1992).

for the dishonest." *Talcott*, 830 So. 2d at 168. In other words, an assignee cannot ignore suspicious circumstances that cry out for investigation and then claim to have taken the assignment in good faith.

The objective component of good faith is not a reasonable-person negligence standard. *Id.* at 165. Rather, an assignee must prove that it has acted "in a way that is fair according to commercial standards that are themselves reasonable." *Id.* (quoting *Maine Family*). To do so, it must prove, first, that its conduct "comported with industry or 'commercial' standards applicable to the transaction and, second, [that] those standards were reasonable standards intended to result in fair dealing." *Id.* (quoting *Maine Family*).

### Customary Industry Practice Informs Both Inquiries

The requirement that the assignee take the assignment "without notice of a defense or claim" overlaps heavily with the objective component of good faith because both ultimately try to assess what the assignee "knew or should have known taking into consideration the customary practices of the industry." *In re Taneja*, 743 F.3d 423, 430 (4th Cir. 2014) (citation omitted). Evidence of customary industry practice can thus "establish the correct context in which to consider what the [assignee] knew or should have known," *id*. at 431, as well as to consider whether the assignee has observed "reasonable commercial standards of fair dealing." *See In re Joe Morgan, Inc.*, 985 F.2d 1554, 1562 (11th Cir. 1993) ("[T]he 'good faith' and 'notice' elements of the [holder-in-due-course] test will frequently merge so that the answer to one inquiry is the answer to the other.").

For example, the customary practice of the check cashing industry is to charge a service fee for providing quick cash to unbanked customers, such as those living paycheck-to-paycheck. *Talcott*, 830 So. 2d at 166–68. Thus, a self-identified broker with a

$10,000 check from an investor is "neither the typical customer, nor the typical transaction of a check cashing outlet," and his willingness to pay a 5% fee in exchange for speed suggests that he might want to cash the check before the drawer stops payment. *Id.* at 168. In the face of such a suspicious circumstance, or "red flag," reasonable commercial standards of fair dealing require a check cashing store to call the drawer to verify the check before cashing it, in order to protect its own interests. *Id.*

Similarly, if a vendor's or assigning lessor's behavior deviates from the customary practice of the equipment leasing industry, that deviation might suggest that something is wrong with the assigned lease, such as a defense of fraudulent inducement. If so, reasonable commercial standards of fair dealing require a lessor to investigate further before taking the assignment.

### b. Applying the Law to the Facts

#### Industry Standards

As part of its burden to establish good faith, an assignee must delineate industry standards, prove that these standards were reasonably calculated to result in fair dealing, and demonstrate that it followed these standards. *See Talcott*, 830 So. 2d at 168 (citing *Maine Family*). To the extent that NCMIC's evidence at trial established the existence of industry standards, NCMIC did not follow them.

The standards or customary practices of an industry "may be established by lay or expert testimony, or both, depending on the nature of the evidence at issue." *In re Taneja*, 743 F.3d at 431. The best evidence of what NCMIC considers to be industry standards is found in the GVA that it negotiated with Brican Inc.  Under the GVA:

- NCMIC had the right to "verbally verify delivery and installation" with the customer before paying Brican Inc. for the Exhibeo. (GVA ¶ 3.)

- Brican Inc. warranted that "[t]here are no other agreements or warranties" with any customer relating to the Exhibeo "that are not included in the documents given to" NCMIC with each sale. (GVA ¶ 6(c).)

- Brican Inc. could not assign any of its obligations or rights under the GVA without NCMIC's prior written consent. (GVA ¶ 8.)

For their part, Plaintiffs' expert Krollfeifer testified to the customary practices and standards that the equipment leasing industry has adopted to avoid fraud, to manage default and delinquency risks, and to otherwise prevent any miscommunication or confusion that might interfere with a company's ability to collect regular lease payments. For example, Krollfeifer testified that a lessor observing reasonable commercial standards would follow, *inter alia*, these procedures:

- Perform due diligence on the vendor, including investigating the background of the vendor's principals, the financial commitments made by the vendor's backers, the equipment to be leased, the full sales package presented to customers, and any "side agreements" in which vendor promises to provide services or anything else after the purchase. (TT1 (Krollfeifer) 49:1–56:19.)

- Distinguish itself from the vendor, particularly to avoid leaving impressions of agency or allowing customers to think they can stop paying the lease if they have a problem with the vendor. (TT1 (Krollfeifer) 59:1–67:6.)

- For most sales, before paying the vendor, call the customer to verbally confirm delivery and acceptance, to ask explicitly for any side agreements with the vendor, and to clarify any other misunderstandings that might interfere with the customers' understanding of their obligation to pay

regularly, such as any assumption that a lessor might be responsible for a vendor's warranties. (TT1 (Krollfeifer) 57:6–58:15, 68:18–69:7, 134:6–140:8.)

- If a vendor is telling customers they can cancel the lease, shut down the program. (TT1 (Krollfeifer) 69:19–72:10, 170:21–171:18.)

**NCMIC Received Notice and Did Not Follow Industry Standards in Response**

The evidence establishes that by October 2008, NCMIC had received notice on numerous occasions that Brican was (1) not complying with the GVA, (2) promising customers that the Exhibeo would be effectively "free," and (3) telling customers they could cancel their lease commitment. In response to these "disturbing" (PX 92 at 1) circumstances calling for investigation, NCMIC did not observe reasonable commercial standards of fair dealing.

First, NCMIC followed neither its own procedures outlined in the GVA nor the industry standards to which Krollfeifer testified. The evidence proved that:

- NCMIC performed no due diligence on any Brican entity, even when it started taking assignments from Brican Inc.

- NCMIC explicitly agreed not to contact Brican's customers even to confirm delivery and acceptance.

- NCMIC authorized the "blind lease" and started taking assignments from Brican Inc. despite knowing that Brican Inc.'s and Brican LLC's names and logos were confusingly similar, which might leave customers with the impression that Brican LLC, the Vendor, was the agent of Brican Inc., the lessor.

Second, NCMIC learned on multiple occasions that Brican was violating the GVA by using side agreements without sending them to NCMIC, but it made no attempt to enforce this requirement of the GVA. The evidence showed:

- As early as 2006, NCMIC knew from the Scott Letter that Brican had a "return policy" that, contrary to the terms of the lease, allowed customers to return the equipment and cancel the lease. Yet NCMIC did not investigate, verify Brican's ability to perform on this return policy, or even ask for a copy of the return policy.

- Between February 2007 and October 2008, ten lessees told NCMIC that Brican had promised to pay enough advertising to offset the lease payments and to take over the lease if the reimbursement payments stopped. Cook told one such lessee that he would look into the advertising claim, but never did so. NCMIC did not ask for copies of the side agreements that promised those payments.

- In July 2008, NCMIC knew definitively from DelCastillo's email that Brican was entering into side agreements to pay advertising and offset customers' lease obligations but was not sending these side agreements to NCMIC along with the purchase orders. However, NCMIC did not ask Brican how many side agreements it had signed, ask Brican to start sending these side agreements with each purchase order in the future, or even ask DelCastillo to send NCMIC his own side agreement.

- By October 2008, NCMIC had received at least one copy of a Marketing Agreement with a Buyback Provision in which Brican promised to buy back the customer's lease if the advertising payments stopped. If NCMIC had exercised due diligence pursuant to section 671.209(6), that Marketing Agreement would have been brought to Cook's or Cole's attention. No such evidence of due diligence was presented.

Third, NCMIC received definitive notice from DelCastillo's July 2008 email that Brican was using Marketing Agreements, but, as the evidence established, it did not conduct a reasonable investigation. For example:

- Cook knew from DelCastillo's email that some of Brican's principals had been involved in Recomm, which had also promised to pay lessees enough in advertising payments to offset their lease obligations but went bankrupt when it was unable to make these advertising payments. Cook was also familiar with leases that had defaulted for the same reason from his time at Frontier Leasing Corp. Nevertheless, NCMIC did not ask Brican or Viso Lasik about their business plan or how they planned to continue making advertising payments.

- Cook knew from Brican's sales Powerpoint, attached to Lemacon's response to Cook's inquiry, that Brican was marketing the Exhibeos as "free" for customers who signed Marketing Agreements. Two months earlier, sales per month began increasing rapidly; sales in May 2008 more than tripled the previous monthly record. Even as NCMIC became concerned about the high concentration of Brican leases in its portfolio, it did not ask Brican if its use of Marketing Agreements had increased similarly quickly. Instead, Cook interpreted Lemacon's use of the word "some" to mean that Brican only had Marketing Agreements with a small minority of its customers.

- Although NCMIC had established procedures for investigating fraud, it did not use them.

Even in November 2008, after it had started taking leases by assignment, NCMIC continued its pattern of ignoring suspicious circumstances when diligence demanded an investigation. The facts show:

- 61 -

- Cook saw a Marketing Agreement with a Buyback Provision that he testified could be interpreted as allowing customers to cancel the lease, and even suggested edits. However, he never followed up to ensure that his edits were made, to request copies of each Marketing Agreement signed in the future, or even to learn what Buyback Provision Brican ended up using.

- When NCMIC visited Brican's offices in Miami and the Viso Lasik clinic in Wellington, Florida, at least one NCMIC employee understood Viso Lasik to be a "branch" of Brican. Nevertheless, NCMIC never inquired into Viso Lasik's ability to meet its commitment to buy advertising, such as by asking for Viso Lasik's or Brican's financial records.

- NCMIC knew that Viso Lasik only had three locations. If Brican had only been using Marketing Agreements near those three locations, as Cook testified that he assumed, then Exhibeo sales would likely have been much higher in those areas than elsewhere. Nevertheless, NCMIC did not ask where Brican had been entering into Marketing Agreements.

Based on the evidence, NCMIC failed to satisfy its burden to meet the elements of "good faith" and "without notice of a defense or claim" when it took assignment of the one-column Financing Agreements and is therefore not a holder in due course.

## E. Conclusion

Plaintiffs who signed a one-column Financing Agreement and version 4, 5, 7, or 8 of the Marketing Agreement have established every element of fraudulent inducement, with the exception of proving the individualized facts necessary to show that Brican's promise was material to them and that they relied upon it. If there is undisputed record evidence, in either this case or the Iowa cases, that any of this group of Plaintiffs have

established these individualized elements of materiality and reliance, then those Plaintiffs have met their burden to prove fraudulent inducement. As to those Plaintiffs in this group for whom the record has not been developed, the parties shall submit proposals for addressing these issues in the most cost-effective manner.

As to all one-column Plaintiffs who signed version 4, 5, 7, or 8 of the Marketing Agreement and who have or will prove their individualized elements of reliance and materiality, NCMIC has failed to prove that it is a holder in due course of their Financing Agreements that it took by assignment from Brican Inc. Accordingly, in order to bring this case to closure, it is

ORDERED that

By **August 8, 2014**, counsel for the parties shall confer and file:

1) Proposed final judgments, consistent with the Court's prior summary judgment orders in favor of NCMIC and these Findings of Fact and Conclusions of Law.

2) Proposals for addressing the claims of Plaintiffs who signed a one-column Financing Agreement and version 4, 5, 7, or 8 of the Marketing Agreement but for whom the record has not been developed as to reliance or materiality.

3) If necessary, proposals to address any other matter necessary for finalizing the closure of this case.

DONE and ORDERED in Miami, Florida, this _18th_ day of July, 2014.

_Patricia A. Seitz_
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   The Hon. Andrea M. Simonton
      The Hon. Michael Huppert, Michael.Huppert@iowacourts.gov
      Counsel of Record