# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### Case No. 10-md-02183-SEITZ

IN RE: Brican America LLC
Equipment Lease Litigation

_____/

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a six-day bench trial. After the Court entered Findings of Fact and Conclusions of Law [DE-570], Defendant NCMIC moved for reconsideration [DE-571]. At a hearing on NCMIC's motion, the Court advised the parties that it would grant the motion to clarify the basis for the Court's decision concerning NCMIC's holder-in-due-course status but would otherwise deny the motion. [DE-579.] Accordingly, these are the amended findings of fact, *see infra* at pp. 5–36, and conclusions of law, *see infra* at pp. 36–59.

## A. INTRODUCTION

Plaintiffs are dentists and optometrists who bought multimedia systems for their waiting rooms ("Exhibeos") and financed these purchases through "financing leases" now held by Defendants NCMIC Finance Corporation and PSFS 3 Corporation (together, "NCMIC"). The Exhibeo vendor, initially Brican America, Inc. and later Brican America, LLC (together, "Brican"), sold these systems as being effectively free, promising in a "Marketing Agreement" executed with each purchase that a "medspa" named Viso Lasik would buy enough advertising on the Exhibeos to offset Plaintiffs' lease payments and that the vendor would buy back the leases if the advertising payments stopped. If that sounds too good to be true, that's because it was. When the advertising payments stopped, NCMIC expected Plaintiffs to continue making their

lease payments and Plaintiffs refused, asserting fraud. Now Plaintiffs and NCMIC are fighting over, essentially, who should have seen this coming.

In this litigation, Plaintiffs sought a declaratory judgment that the leases were unenforceable on the basis of various legal theories. After two rounds of summary judgment, the Court held a bench trial on the surviving legal theory: that some of these leases were fraudulently induced, and that NCMIC, who obtained them via assignment, is not a holder in due course and so cannot enforce them.

Based on all of the evidence presented, the Court finds that Plaintiffs have established, by the greater weight of the evidence, that Brican intended to fraudulently induce the Plaintiffs who signed versions 4, 5, 7, and 8 of the Marketing Agreement into signing the one-column Financing Agreements[1] that Brican then assigned to NCMIC. In these Marketing Agreements, Brican promised to buy back the Exhibeo leases if Viso Lasik stopped making advertising payments. But when Brican made this promise, it knew it could not keep it because its financial ability to do so was built on a house of cards: its sole revenue source was $24,000 for each Exhibeo sale, but with each sale came a $29,000 obligation to pay advertising fees. Brican said that these advertising fees would come from Viso Lasik, but the obligations—to pay advertising fees and to buy back the leases—were Brican's, and it could only meet these obligations by inducing third parties to finance new sales. Moreover, Brican's portrayal of its "strategic alliance" with Viso Lasik was misleading because it prevented Plaintiffs from learning the truth about Brican's business model.

---

[1]     Before October 3, 2008, Plaintiffs who financed through NCMIC signed agreements ("Financing Agreements") formatted in a three-column style directly with NCMIC. After that date, Plaintiffs signed Financing Agreements formatted in a one-column style with Brican America, Inc., who then assigned them to NCMIC.

The Court further concludes that NCMIC is not entitled to the protections of a holder in due course for the more than 650 one-column Financing Agreements because, by October 3, 2008, NCMIC knew that Brican was (1) marketing the Exhibeos as being essentially free and (2) promising to buy back customers' leases if Viso Lasik stopped making the advertising payments that made the leases "free." Yet as NCMIC learned more and more about Brican's promises, it responded not with caution but by sharply *increasing* its lending. By April 2009, NCMIC was financing $5 million per month—*ten times* the monthly rate only a year earlier.

Accordingly, the Court will enter a partial declaratory judgment in favor of those Plaintiffs who signed a one-column Financing Agreement and version 4, 5, 7, or 8 of the Marketing Agreement. However, due to the case's posture, the reliance element of each Plaintiff's fraudulent-inducement claim will need to be established through further proceedings.

## B. PROCEDURAL BACKGROUND

In April 2009, NCMIC stopped financing new Exhibeo purchases and demanded that Brican repurchase all previous leases involving a Marketing Agreement. When Brican refused, NCMIC sued Brican for failing to disclose to NCMIC that it had been promising nearly all of its customers that it or Viso Lasik would buy enough advertising on their Exhibeos to offset their monthly lease payments. *NCMIC Fin. Corp. v. Brican Am., Inc.*, No. 09-21192 (S.D. Fla. filed May 4, 2009). This cut off Brican's and Viso Lasik's primary funding source. When Brican stopped making advertising payments in early 2010, Plaintiffs stopped making lease payments and NCMIC sued Plaintiffs in Iowa to enforce the leases. Plaintiffs then filed various putative class actions against both NCMIC and Brican, which were consolidated into this multidistrict litigation.

After NCMIC agreed to be bound by any ruling as to NCMIC's knowledge of the provisions labelled "Cancellation" ("Buyback Provisions")[2] in the Marketing Agreements, and in light of the number of interested Plaintiffs already joined as parties, the Court denied class certification.[3] [DE-285.] In two summary-judgment orders, the Court held that the Buyback Provisions in versions 2 through 8[4] of the Marketing Agreement did not allow Plaintiffs to cancel their Financing Agreements. Thus, it granted NCMIC summary judgment as to the three-column Financing Agreements. However, as to the one-column Financing Agreements, factual issues remained as to (1) whether Brican America, Inc. had fraudulently induced Plaintiffs to sign the one-column Financing Agreements and (2) whether NCMIC was a holder in due course when it took assignments of these Financing Agreements and thus entitled to assert the waiver-of-defenses clauses. [DE-413; DE-509.]

The trial focused solely on Plaintiffs' fraudulent-inducement claim and NCMIC's holder-in-due-course defense; it did not address Plaintiffs' other claims, NCMIC's counterclaims against Plaintiffs, or any claims against third parties. Brican did not participate. [DE-522.] As agreed at the March 7, 2014 pretrial conference, the trial did

---

[2]     Despite their label, the Court will refer to these clauses as "Buyback Provisions" because they reflect not a promise that the Financing Agreements could be cancelled but a promise that Brican would buy them back and assume responsibility for the remaining payments.

[3]     The Court retains jurisdiction under 28 U.S.C. § 1332(d) because, when this case was filed, the putative class included more than 1,500 Plaintiffs, some of whom were diverse from Defendants and whose claims together were for more than $5 million. "[P]ost-removal events (including non-certification, de-certification, or severance) do not deprive federal courts of subject matter jurisdiction." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 n.12 (11th Cir. 2009).

[4]     All claims arising out of version 1 of the Marketing Agreement have been settled. [*See* DE-502; DE-508.]

not address the reliance element of fraudulent inducement, and the individual Plaintiffs were excused from testifying. [DE-580.]

In addition to the testimony and exhibits at trial,[5] the Court has also considered other documents in the record, including the Stipulated Facts [DE-224] ("Stip. Facts"), the Joint Pre-Trial Stipulation [DE-529] ("PTS"), the parties' trial briefs concerning the interpretation and application of Florida Statutes, section 679.4031(2) to NCMIC's holder-in-due-course defense [DE-541; DE-542; *see also* DE-537], the parties' proposed findings of fact and conclusions of law [DE-562; DE-563], and the briefing and oral argument on NCMIC's motion for reconsideration [DE-571; DE-574; DE-575; DE-580].

## C. FINDINGS OF FACT

The factual findings are organized into three sections. The first sets out the four groups involved in the scheme—Brican, Viso Lasik, NCMIC, and Plaintiffs. The second focuses on the facts relevant to Plaintiffs' fraudulent-inducement claim, including: (1) Brican's business model and the respective roles of NCMIC, Viso Lasik, and Plaintiffs in that model; (2) Brican's use of the Marketing Agreement and its Buyback Provision as the "clincher" for closing Exhibeo sales quickly; (3) the circular flow of money from NCMIC, to Brican, then to Viso Lasik, then back to Plaintiffs, and its implications for Brican's fraudulent intent as to the buyback promise; and (4) the agency relationship between Brican America, Inc. and Brican America, LLC. The third details the facts relevant to NCMIC's holder-in-due-course defense, including: (1) NCMIC's knowledge of Brican's business model, (2) NCMIC's actions facilitating that business model, (3) the

---

[5]     Trial transcripts are docketed under entries 564–69. Citations to the transcript use the format: (TT[day of trial] ([Witness Name]) [pincite].) Plaintiffs' Exhibits are prefaced with "PX" and Defendants' Exhibits with "DX."

closeness of its connection with Brican, and (4) its notice of Brican's fraud before October 3, 2008.

## § 1. RELEVANT PERSONS AND ENTITIES

### a. Brican

1.      Jean Francois Vincens, a/k/a Jeff Vincens, is a citizen of France and Canada. (Stip. Facts ¶¶ 28–33.) Vincens formed Brican America, Inc. and Brican America, LLC.

2.      Raymond Briscoe, f/k/a Raymond Manklow, was a business associate of Vincens.

3.      In the early 1990s, Vincens and Briscoe founded Recomm International Display Corp., Ltd. and various affiliated companies (together, "Recomm"), which sold electronic bulletin boards to pharmacists, optometrists, and veterinarians. Recomm set advertising payments that matched customers' lease payments and then marketed its billboards as being free. When Recomm was unable to find third parties willing to pay for advertising, it started making advertising payments with its own funds. When it stopped paying these advertising fees in 1995, many of the customers stopped making their lease payments. Hundreds of lawsuits followed, many of them alleging that Recomm was a Ponzi scheme, and Recomm declared bankruptcy in 1996. *In re Optical Tech., Inc.*, 216 B.R. 989 (Bankr. M.D. Fla. 1997). NCMIC received news articles describing Recomm's alleged Ponzi scheme in July 2008.

4.      Laurent Goldstein is an "old friend" of Vincens who, in 2004, sold Vincens a substantial stake in Brican Corporation, a Canadian company that sold Exhibeo systems without any advertising agreements. (TT2 (Vincens) 184:3–185:19, 187:21–188:21.)

5.      Jacques Lemacon, a/k/a Jack Lemacon, is Vincens' nephew and a citizen of France and Canada. (TT4 (Lemacon) 132:16–133:8.)

- 6 -

6.      Brican America, Inc. ("Brican Inc.") was formed on July 30, 2004 by Vincens and Goldstein, with each owning 50%. (DX 3.) Brican Inc.'s business was the sale of Exhibeos, initially without advertising agreements.

7.      At some point after Brican Inc.'s formation, Goldstein left and Briscoe and Lemacon joined. By mid-2006, Vincens, Lemacon, and Briscoe each owned 33% of Brican Inc. (TT2 (Vincens) 196:12–198:1.)

8.      Brican America, LLC ("Brican LLC") was formed on July 18, 2006 by Vincens, Briscoe, and Lemacon, with each owning 33%. (DX 2.) Brican Inc. and Brican LLC shared a website and were both located at 5301 Blue Lagoon Dr., Suite 520, Miami, FL. (Stip. Facts ¶¶ 12, 18.)

9.      After October 2006, primarily for tax reasons, Brican LLC replaced Brican Inc. as the Exhibeo vendor. (TT4 (Lemacon) 145:17–147:10; PX 60.) The Brican entity involved in any particular sale will be referred to as the "Vendor."

10.      Briscoe was fired in June 2007, after which Vincens and Lemacon each owned 50% of both Brican Inc. and Brican LLC. (TT2 (Vincens) 215:2–216:4.)

11.      Brican LLC commissioned salespeople to sell Exhibeos, including Pamela Proehl (based in Redmond, Washington) and David Alan Richman (based in West Simsbury, Connecticut). (TT1 (Proehl) 187:10–25; TT2 (Richman) 8:9–10:8; *see also* DX 42.)

12.      Sandra Ellzey was a Brican LLC employee who was responsible for bookkeeping, human resources, and other tasks. (TT5 (Ellzey) 143:9–149:22.)

### b. <u>Viso Lasik</u>

13.      Dr. Salvatore M. DeCanio, Jr. is a Florida optometrist who wanted to open his own laser eye surgery clinic and so formed Palm Beach Laser Eye Institute, Inc. on July 19, 2004. (Stip. Facts ¶¶ 40–43.)

14.     In early 2006, DeCanio purchased an Exhibeo and became familiar with Vincens. They discussed DeCanio's plan for a laser eye surgery clinic, and Vincens decided to become involved. (TT4 (DeCanio) 105:11–107:15.)

15.     On July 18, 2006, Vincens and Lemacon formed JJR Investments, LLC ("JJR"). JJR and Brican LLC were formed on the same day, by the same lawyer, and with the same registered address. (Stip. Facts ¶¶ 53–57.)

16.     Two months later, in September 2006, DeCanio formed Lifestyle of Vision, Inc. (Stip. Facts ¶ 42.)

17.     Lifestyle of Vision, Inc. and JJR together owned the following companies (collectively, "Viso Lasik"):

- Viso Lasik Medspas, LLC

- Viso Lasik Medspas of Charlotte, LLC

- Viso Lasik Medspas of San Antonio, LLC

- Palm Beach Laser Eye Center—Wellington, LLC. (Stip. Facts ¶¶ 32(d), 42(f)–(h), 71–82.)

## c. NCMIC Finance Corporation and PSFS 3

18.     Defendant NCMIC Finance Corporation is an Iowa corporation that belongs to NCMIC Group, Inc., a group of companies providing insurance and financial services for medical professionals. NCMIC Group, Inc. uses "Professional Solutions Financial Services" as a brand name.

19.     Defendant PSFS 3, a subsidiary of NCMIC Group, Inc., is an Iowa corporation formed in 2010 to whom NCMIC Finance Corporation assigned many of the Financing Agreements involved in this case. The Court will refer to NCMIC Finance Corporation and PSFS 3 together as "NCMIC."

20.     Gregory Martin Cole is President of NCMIC. He joined NCMIC in 2001 as Vice President and Chief Operating Officer and became President in 2004. (TT6 (Cole) 153:5–13, 158:1–21; *see also* DX 47.)

21.     Fred Scott, a NCMIC Business Development Manager from 2005 until August 17, 2007, was NCMIC's first contact with Brican. (TT3 (Henningsen) 178:18–25.)

22.     Todd Cook, NCMIC Vice President and General Manager of Equipment Finance from February 2007 until his termination in March 2010, was responsible for the Brican account. Previously, from 1999 to 2007, Cook had been 20% owner, President, and CFO of Frontier Leasing Corp., an equipment leasing company. (PX 32.) During Cook's time at Frontier, it acquired leases from another leasing company that were in default and in litigation because the vendor had promised to buy advertising space from the lessees at a price that nearly equaled their lease payments but then stopped paying the advertising fees. *See C & J Vantage Leasing Co. v. Wolfe*, Case No. 08-1100, 2009 WL 4115950 (Iowa Ct. App. Nov. 25, 2009), *vacated*, 795 N.W.2d 65 (Iowa 2011).

23.     Jean Thompson, a NCMIC account manager in Equipment Finance from 2005 until February 2011, was responsible for processing financing applications from Brican customers. (TT4 (Thompson) 211:4–213:8.)

24.     Other NCMIC employees who worked on the Brican account included:

- Paula K. Barkley, f/k/a Paula Nuzum, Operations Supervisor in Equipment Finance from December 19, 2005 until her termination in July 2009. (TT4 (Barkley) 226:10–13, 229:4–22; *see also* DX 47.)

- Lannette Henningsen, Business Development Manager from April 14, 2008 until April 7, 2009. (TT3 (Henningsen) 177:21–179:7.)

### d. Plaintiffs

25.    For this trial, the relevant Plaintiffs are the 674 dentists and optometrists who signed a one-column Financing Agreement and version 4, 5, 6, 7, or 8 of the Marketing Agreement when they purchased an Exhibeo, as shown below:

| Marketing Agreement Version | *Blauzvern* Plaintiffs | *Wigdor* Plaintiffs | Total |
|---|---|---|---|
| 4 | 40 | 0 | 40[6] |
| 5 | 300 | 27 | 327 |
| 6 | 9 | 0 | 9 |
| 7 | 154 | 29 | 183 |
| 8 | 104 | 11 | 115 |
| | | Total: | 674 |

(PX 1.)

26.    Plaintiff Dr. Daniel A. DelCastillo is a dentist with a practice in Miami Beach, Florida. In June 2008, Dr. DelCastillo purchased an Exhibeo and financed his purchase through NCMIC. In July 2008, he learned about Vincens' past involvement in Recomm, became concerned, and called NCMIC to explain his concerns and attempt to cancel his Financing Agreement.

### § 2. Facts Relevant to the Fraudulent-Inducement Claim

### a. Brican's Business Model

27.    In 2004 and 2005, Brican's entire business was the sale of Exhibeos to dentists and optometrists.[7] Each Exhibeo cost roughly $24,000 and consisted of a large plasma television, a computer, a monitor, software that could display "flash shows," and five

---

[6]    The claims of the more than 300 Plaintiffs who signed version 4 with a *three-column* Financing Agreement were resolved by summary judgment. [DE-509.]

[7]    The Exhibeo was sometimes described as the "Brican Information Center" or the "MediaDoc" (the name of its software package).

years of "custom-made animations on demand." (PX 13 at 25.) Typically installed in the waiting room, the Exhibeo promised to help medical practices "promote their practice," "educate their patients," and "increase their profits." (PX 13 at 24.) For example, a dental practice could advertise cosmetic procedures and also demonstrate proper flossing technique, which would ideally increase patient loyalty while increasing demand for the practice's most profitable services. (*See* TT2 (Richman) 96:21–98:12.)

28.     In 2006, Brican began purchasing advertising space on the Exhibeos. Vincens and Lemacon had recently invested in Viso Lasik, and they wanted to advertise Viso Lasik to the patients of dentists and optometrists who had purchased Exhibeos.

**Financing Exhibeo Sales**

29.     NCMIC began financing Exhibeo sales in the summer of 2005 and ultimately provided financing for the vast majority of Exhibeo sales.[8] For NCMIC, the Exhibeo program offered the chance to work with a familiar, creditworthy customer base. Because NCMIC's leases had "hell-or-high-water" clauses, and because dentists and optometrists usually want to maintain their high credit ratings, NCMIC expected to collect a consistent 9% interest rate over the life of each lease.

30.     Early in 2005, Fred Scott, NCMIC's Business Development Manager, learned of Brican's business and contacted Brican Inc. Thereafter, NCMIC and Brican Inc. began discussions that culminated in a General Vendor Agreement (PX 4) ("GVA") that Scott and Vincens signed, on behalf of NCMIC and Brican Inc. respectively, on July 15, 2005. (TT2 (Vincens) 187:5–20; TT5 (Scott) 63:15–64:2, 67:21–73:3.)

31.     NCMIC did not perform any particular due diligence on Brican or its owners before signing the GVA. (TT5 (Scott) 75:17–77:7; TT6 (Cole) 167:13–169:6.)

---

[8]     Baytree Leasing Company, LLC and De Lage Landen Financial Services, Inc. also financed a small number of Exhibeo sales. (DX 34, 37.)

32.     Under the GVA, if a Brican Inc. customer wanted to finance an Exhibeo purchase, NCMIC would purchase the Exhibeo from Brican Inc. and then lease it to the customer. NCMIC had the right to "verbally verify delivery and installation" before paying Brican Inc. for the Exhibeo, but it could not contact potential customers directly for additional credit or financial information without Brican's consent. (GVA ¶¶ 3, 4.)

33.     In the GVA, Brican Inc. warranted that "[t]here are no other agreements or warranties" with any customer relating to the Exhibeo "that are not included in the documents given to" NCMIC. (GVA ¶ 6(c).) The GVA also provided that, if Brican Inc. breached any warranty in the GVA with respect to any given sale, Brican Inc. was required to repurchase the lease and pay NCMIC any remaining balance. (GVA ¶ 7.)

34.     Furthermore, Brican Inc. could not assign any of its obligations or rights under the GVA without NCMIC's prior written consent. (GVA ¶ 8.)

35.     In practice, each customer who wanted to finance the $24,000 Exhibeo filled out a credit application and signed a Financing Agreement, typically for a five-year term. After each sale, the salesperson would transmit the sales order, credit application, and Financing Agreement to NCMIC, who would conduct a credit check. If satisfactory, the Vendor would issue a purchase order for the equipment. Upon proof of delivery, the Vendor would submit that proof to NCMIC with an invoice, and NCMIC would pay the purchase price to the Vendor. (*See* TT5 (Ellzey) 170:2–176:5, 180:14–17; PX 19; PX 37 at 3; PX 93 at 1.)

36.     The typical Financing Agreement had a monthly payment of $508 plus tax for a term of 60 months (*see, e.g.,* PX 93 at 3; *see also* PX 70), resulting in a total payment obligation of $30,480 plus tax over the five-year lease term.

**Advertising Viso Lasik on the Exhibeos**

37.      In 2004, DeCanio's plan had been to open a single, "state-of-the-art" laser eye surgery center. But after Vincens became involved, Viso Lasik aspired to become a national chain of "medspas" where patients could receive massages and cosmetic treatments while their eyes recovered from the laser eye surgery. (PX 33 at 6–18, 33–61; TT4 (DeCanio) 73:12–75:6, 121:21–123:4; *see also* PX 98.)

38.      Vincens saw the Exhibeo as an innovative way to advertise Viso Lasik. As explained in Brican's marketing materials, existing patients of dentists and optometrists were likely to be affluent and potentially interested in laser eye surgery. Ideally the most effective form of marketing would be a referral from a doctor that the potential customer already trusts, but dentists and optometrists were unlikely to refer their patients to an unfamiliar, ambitious startup. However, by advertising on the Exhibeo, Brican could reach those same patients just as directly and at an ideal time: while they sat in a waiting room, in a place they associated with trustworthy medical information, likely thinking about medical concerns they might like to address. (*See* PX 13 at 13–28.)

39.      Accordingly, in June 2006, the Vendor started executing Marketing Agreements with many of its customers in which it committed to buy advertising on the Exhibeo for a set quarterly price. There were eight versions of the Marketing Agreement. [DE-413 at 6–9.]

40.      By 2007, Brican was entering into Marketing Agreements with nearly all Exhibeo customers. Thus, Plaintiffs signed both a Marketing Agreement and a Financing Agreement at the time of purchase.

## Marketing the Exhibeos as "Free"

41.     To maximize sales of the Exhibeo and the reach of its advertising, the Vendor set advertising payments so that they nearly matched customers' obligations under the Financing Agreements. It then marketed the Exhibeo to customers as being "free."

42.     Brican trained its salespeople to emphasize repeatedly that the system was virtually free because Viso Lasik would "rebate" customers on a quarterly basis enough to cover their financing payments. (*See* TT1 (Proehl) 199:18–200:11.) It also gave them a Powerpoint presentation advertising the benefits of becoming a "Viso Lasik Medspas Partner," which characterized the Exhibeo as:

### 1. A FREE MARKETING TOOL

Give up a little bit of freedom on your 42" plasma display (a small 10% of your screen time), in order to be able to advertise its LASIK center, and VISO LASIK MEDSPAS ...

**WILL PAY YOU ENOUGH
PER YEAR
TO OFFSET
THE COST OF YOUR LEASE!**

(PX 13 at 27; *see also* TT2 (Richman) 40:4–42:24 (Brican salesman explaining how he used this Powerpoint).)

43.     Although Viso Lasik only had three planned locations, the Vendor entered into Marketing Agreements all over the country, often thousands of miles from any actual or planned location.

44.     Some potential customers were skeptical that a brand-new startup could commit to pay $5,800 every year for five full years to buy advertising so far from any planned locations. Brican trained its salespeople to respond to this concern by saying that Viso Lasik sought to become a national chain and therefore wanted nationwide name recognition. (*See, e.g.*, TT1 (Proehl) 198:1–199:8.)

- 14 -

45.     Similarly, Brican salesman David Richman was trained to show potential customers in Connecticut a letter from Viso Lasik stating its intention to build a center there in the next 18 months,[9] and to tell them that Viso Lasik was only willing to advertise on the first 200 Exhibeos sold in Connecticut. Ideally, those customers would clamor to be one of those 200 and thus be distracted from any concerns about Viso Lasik's viability. (TT2 (Richman) 28:8–29:8, 37:4–7, 93:24–95:14.)

### Promises to Buy Back Exhibeos if Viso Lasik Failed to Pay

46.     Most importantly, the relevant Marketing Agreements included Buyback Provisions promising that, if the advertising payments stopped, then the Vendor would relieve the customer of any obligation to continue making financing payments.

47.     The Buyback Provisions of the five relevant versions of the Marketing Agreement are:

- Version 4: "**Cancellation**: If the advertised VISO LASIK MEDSPAS fails to honor its financial commitment pursuant to this agreement, then all related agreements can be cancelled and Brican will buy back the related lease agreement."

- Versions 5, 7: "**Cancellation**: If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees and if the Client requests it, Brican will repurchase the Client's lease agreement in regard to the Exhibeo Concept."

- Version 6: "**Cancellation**: If VISO LASIK MEDSPAS fails to honor its commitment relating to the advertising fees, the Client may request that

---

[9]     Richman continued to show the letter to potential customers even after he realized that Viso Lasik did not plan to build a center in Connecticut.

Brican repurchase the Client's lease agreement in regard to the Exhibeo Concept."

- Version 8: "**Cancellation**: If Viso Lasik Medspas fails to honor its commitment relating to the advertising fees, and if the Client requests it, Brican will assume assignment of the Client's lease agreements in regard to the Exhibeo Concept."

[DE-413 at 8–9.]

48.     Brican and its salespeople expected potential customers to rely heavily on the Buyback Provision in deciding whether to purchase an Exhibeo. For example:

- Vincens testified that the Buyback Provision was necessary because "we needed to have a system where . . . we could take back the equipment" so that customers would be more likely to "sign on the spot." (TT3 (Vincens) 13:3–12.)

- Brican salesperson Pamela Proehl described the Buyback Provision as the "main clincher on sealing the deal" because the potential customers' "main concern" was "what happens if this Medspa goes out of business." (TT1 (Proehl) 210:25–213:16.)

- Richman testified that he was trained that customers' main worry would be "what if Viso is not around?" and that he should respond by telling customers they could return the equipment and Brican would buy out their lease. (TT2 (Richman) 16:11–17:21.)

- At least some Brican salespeople had a practice of highlighting the Buyback Provision in yellow before showing potential customers the Marketing Agreement. (*See* TT4 (DelCastillo) 10:10–11:17.)

**Brican's Depiction of its Relationship With Viso Lasik**

49.     Brican described its relationship with Viso Lasik as a "strategic alliance" in which Brican, "an international firm specializing in practice growth and development," was helping "develop for [Viso Lasik] a branding strategy, allowing them to penetrate unexplored segments of the LASIK market." (PX 13 at 4.)

50.     Brican trained its salespeople that it was "critically important [to] explain the relationship between Brican America and Viso" but that they must never disclose that Brican was lending Viso Lasik $10,000 from each sale. (TT2 (Richman) 14:18–15:17, 26:15–28:10.)

51.     There is no evidence that any Plaintiffs otherwise learned that Brican was making these loans or that Viso Lasik was using these loans to make advertising payments.

**b. Changes to Brican's Business Model After October 2006**

52.     When Brican LLC became the Vendor in October 2006, NCMIC neither signed a new vendor agreement nor conducted any due diligence on Brican LLC, even though NCMIC's GVA with Brican Inc. did not allow Brican Inc. to assign any of its obligations or rights under the GVA without NCMIC's prior written consent.[10] (TT3 (Vincens) 11:12–25; GVA ¶ 8.) Rather, Brican Inc. simply told NCMIC that Brican LLC would replace Brican Inc. as the Vendor. (PX 29; PX 60.) In this way, Brican Inc. authorized Brican LLC to conduct business with NCMIC.

53.     There is no evidence that Brican Inc. had its own employees on its payroll after Brican LLC became the Vendor, other than Vincens and Lemacon.

_____

[10]     There is no evidence that NCMIC ever provided such written consent; in fact, NCMIC alleged in its lawsuit against Brican that there was no privity of contract between NCMIC and Brican LLC. (*See* NCMIC's Answer to Counterclaim [DE-13] in *NCMIC Fin. Corp. v. Brican Am., Inc.*, No. 09-21192 (S.D. Fla. June 18, 2009).)

54.     After May 2008, Exhibeo sales increased significantly. Between August 2005 and April 2008, NCMIC had financed a total net book value of less than $8 million, never financing more than $610,000 in a single month. However, in the eleven months between May 2008 and March 2009, NCMIC financed a total net book value of *more than $30 million*, averaging nearly $2.8 million per month. (*See* PX 14.) The graph below shows the net book value of NCMIC-financed Exhibeo sales in each month:



55.     As the sales rate increased, Brican decided in the summer of 2008 to add flexibility to its financing model. Around the same time, NCMIC began to worry about the high concentration of Brican leases in its portfolio.

56.     Thus, Brican's Lemacon proposed switching to what he called a "blind lease," in which Brican LLC would still be the Vendor, but the initial lessor listed on the Financing Agreement would be Brican Inc. rather than NCMIC.[11] By using Brican Inc. as an intermediary lessor, Brican LLC's salespeople would still be able to finalize each sale,

---

[11]     The Vendor and lessor had to be separate entities because potential assignees generally refuse to take assignments directly from vendors, fearing being held liable for the vendor's warranties.

including all paperwork necessary for financing, in one visit to the customer's office. Brican Inc. could then shop the lease around and assign it either to NCMIC or to another financing company. (TT6 (Cook) 61:8–69:4.)

57.     In response to Lemacon's proposal, NCMIC gave Brican a new, one-column Financing Agreement form in September 2008. Lemacon and NCMIC Vice President Todd Cook then discussed various modifications to the form. (PTS at 17 ¶ 13; PX 48–51.) At one point in this discussion, Lemacon asked Cook if the lease form needed to include vendor information. Cook responded: "This is a little touchy with your situation since the only difference between the two entities is 'Inc.' and 'LLC.'" (PX 49.)

58.     In October 2008, Brican Inc. started using the new one-column Financing Agreement, which listed Brican LLC as the Vendor and Brican Inc. as the lessor. On many of these Financing Agreements, Brican Inc.'s logo, located in the "lessor" box at the top of the form but without any accompanying text, is indistinguishable from that of Brican LLC. (*See, e.g.*, PX 27 at 3.)

59.     It is unclear if this new approach provided any benefits. There was no evidence that Brican Inc. ever performed the functions of a lessor, such as credit checks or accepting lease payments, suggesting that it would not approve a lease until it had found a willing assignee. (TT6 (Cook) 68:20–69:4; PTS at 17 ¶¶ 14–15; *see also* TT1 (Krollfeifer) 148.) Moreover, the record contains very few examples of Brican Inc. actually assigning Financing Agreements to financing companies other than NCMIC. But as Cook recognized, the new approach risked giving customers the impression that the Vendor and the lessor were the same company.[12] Nevertheless, NCMIC approved Brican's new form and otherwise maintained its existing underwriting and credit-approval procedures. (TT6 (Cook) 65:9–66:17.)

---

[12]     In an attempt to mitigate this risk, these Financing Agreements contained a "no agent" clause. (*See, e.g.*, PX 39 at 5; *see also* PX 72.)

60.     In practice, when a one-column Financing Agreement was assigned to NCMIC, the assignment contract was signed by "Brican America" rather than "Brican America, Inc." or "Brican America, LLC." (*See, e.g.*, PX 38 at 14–15; PX 42 at 21–22.) Because only Brican Inc., the lessor, could assign a lease, and because Brican Inc. did not have employees of its own at this time, Brican LLC employees signed the lease assignment forms on Brican Inc.'s behalf.

61.     Typically, a lessor (Brican Inc.) would have paid the vendor (Brican LLC) for the goods, and then the assignee (NCMIC) would pay the lessor (Brican Inc.) for the assignment. But despite the new approach, NCMIC continued to pay Brican LLC directly for each purchase order. (TT5 (Ellzey) 180:18–181:7; TT6 (Cook) 64:4–65:8.)

**c. Other Facts Relevant to Brican LLC and Brican Inc.'s Agency Relationship**

62.     Brican began using Marketing Agreement version 4 in late 2006 and used it inconsistently until late 2008. In versions 1–4, the text obligated Brican Inc. to perform the agreement. But the signature line in version 4 was for *Brican LLC*.[13] (*See* PX 104.) By all accounts, some Brican entity performed these Marketing Agreements by making the advertising payments. Thus, in at least 360 separate written agreements, Brican Inc. authorized Brican LLC to sign on its behalf.[14] (*See* TT2 51:11–60:8.)

63.     Brican LLC's salespeople testified that they were unaware of any difference between Brican Inc. and Brican LLC because everyone simply referred to the company as "Brican America." (TT1 (Proehl) 220:24–221:4, 239:14–240:16; TT2 (Richman) 10:2–8.)

---

[13]     The text obligates "Brican America, Inc." to purchase advertising. The rest of the document refers to "Brican," which it does not define. However, Brican LLC is not mentioned anywhere in the text, so the references to "Brican" can only mean Brican Inc.

[14]     There are also a few contracts titled "Advertising Agreement Addendum" in which the signature block is for Brican LLC but the text itself obligates Brican Inc. to buy advertising. (*See, e.g.*, PX 37 at 2.)

64.     Because it had no employees of its own other than Vincens and Lemacon, Brican Inc. authorized Brican LLC's employees to enforce Brican Inc.'s Marketing Agreements. For example, Brican General Counsel Maureen Ryan wrote a letter on Brican LLC letterhead reminding a customer of Brican Inc. that he had to display advertising if he wanted to keep receiving advertising fees. (PX 74; *see also* [DE-444 at 60] (showing that the customer had signed the Marketing Agreement when Brican Inc. was the Vendor).)

### d. Following the Money

**Cash Flow From A Typical Sale**

65.     By the summer of 2008, most Exhibeos cost $24,115.[15] Upon receiving this sum from NCMIC, Brican LLC—by now the Vendor for all sales—spent it as follows:

- The hardware for each Exhibeo cost approximately $3,000.[16]

- Brican LLC paid the salesperson either a $1,000 commission on top of his or her base salary or a commission of $2,000–$3,500, plus another ten percent for taxes. (Vincens Dep. 125:14–126:19, 128:3–7; Brican Inc.'s Answer [DE-67] at 7 ¶ 97(c); TT2 (Richman) 18:3–23.)

- Brican LLC paid 9% of the purchase price as a "consultation fee."[17] (Vincens Dep. 126:20–127:20; Brican Inc.'s Answer at 7 ¶ 92(e), 97(d).)

---

[15]     The price varied over time. (*See* PX 44 at 6 ($22,089); PX 34 at 3 ($22,049); PX 10, 11, 56 ($24,115); Vincens Dep. [DE-226-22] 244:7–10.)

[16]     Brican told NCMIC that $7,645 was for hardware and $16,470 for software. (PX 10.) However, Brican's hardware costs varied over time. (*See* PX 41 at 14 ($2,098.86); PX 38 at 6 ($2,261.98); PX 44 at 5 ($3,072.33); PX 34 at 6 ($5,508.55 for two televisions).)

[17]     Initially, Brican Inc. had paid this consultation fee directly to its owners. After Brican LLC became the Vendor, because Vincens' visa required that he be employed by Brican Inc., Brican LLC would pay Brican Inc., which would then pay the fee to its owners. Therefore, at some times, Vincens, Lemacon, and Briscoe each received 3%, but at other times, Vincens and Lemacon each received 4.5%.

- Brican LLC loaned $10,000 from each sale to Viso Lasik.[18] (TT2 (Richman) 13:5–23; *see also* DX 8–11.)

- If a doctor had referred the sale, Brican LLC would pay a $400 referral fee. (Vincens Dep. 127:21–24.)

- From the remainder, Brican LLC would pay various expenses and overhead. (*See, e.g.*, DX 42.)

66.    Overall, after deducting the costs listed above, Brican LLC would retain roughly $4,000[19] from each sale.

### Cash Flow for Advertising

67.    Both Viso Lasik and the Vendor signed the Marketing Agreements, which obligated them to buy at least $5,800 per year of advertising for 5 years: a $29,000 commitment.

68.    In practice, advertising payments were made either by Brican Inc., by Brican LLC, or by Viso Lasik directly. After Brican LLC became the Vendor in October 2006, all of the funds to make these payments came from Brican LLC, as follows:

---

[18]    Some of this money was first loaned to Brican Inc., which then loaned it to Viso Lasik. *See infra* at ¶ 68.

[19]    This estimate is based on the following equation:

|   | $24,000 | (purchase price) |
|---|---|---|
| - | $3,000 | (hardware) |
| - | $3,000 | (commission) |
| - | $2,000 | (consulting fees) |
| - | $10,000 | (Viso Lasik loan) |
| - | $2,000 | (overhead / referral fees) |
| **=** | **$4,000** | |

- Brican Inc.'s only revenues were the 9% consultation fee from Brican LLC and a few thousand dollars every month that it received from an unidentified source. (*See* TT5 (Ellzey) 181:19–183:3; TT4 (Lemacon) 154:24–155:10.)

- Given Brican Inc.'s financial situation, Brican LLC loaned Brican Inc. money. By February 2010, Brican LLC had loaned Brican Inc. over $13 million. (TT4 (Lemacon) 168:13–24, 172:18–21.)

- Brican Inc., in turn, used some of this loaned money to pay advertising fees to customers who had signed Marketing Agreements with Brican Inc., before October 2006. (TT5 (Ellzey) 181:8–18; TT4 (Lemacon) 150:9–14.) It loaned the rest, over $12 million by February 2010, to Viso Lasik. (TT4 (Lemacon) 173:13–175:2; *see also* PX 33 at 98–109; TT4 (DeCanio) 79:3–80:2; DX 8–11.)

- Brican LLC also loaned $2.6 million to Viso Lasik directly. Overall, by February 2010, Brican LLC had loaned Viso Lasik more than $15 million, either directly or through Brican Inc. (TT4 (Lemacon) 174:16–22.) Viso Lasik was only able to make advertising payments with money from these loans. It never repaid any of them. (TT5 (Ellzey) 184:16–187:14.)

69. The overall flow of funds was thus:

- NCMIC would pay Brican LLC approximately $24,115 for a purchase order.

- After paying its own costs, Brican LLC would loan $10,000—over one-half of the remainder—to Viso Lasik.

- After paying for its operations, Viso Lasik would make advertising payments to Plaintiffs.

- Plaintiffs would use the advertising payments to pay their monthly lease obligations to NCMIC.

70. There was no evidence that Brican ever attempted to sell advertising on the Exhibeos for any entity other than Viso Lasik. (*See* TT2 (Richman) 128:4–129:22.)

Moreover, there was no evidence that Vincens or Lemacon considered contributing additional capital to Brican or Viso Lasik, even as their advertising commitments spiraled upwards while Viso Lasik increasingly failed to meet its projections.

71.    Because none of these were potential revenue sources, Brican's revenue could only come from the financing companies who paid a lump sum of $24,000 for each Exhibeo sale. But with each sale came obligations: $10,000 in immediate costs and $29,000 in advertising fees over five years.

72.    Therefore, Brican's business model was only sustainable if it could maintain exponential sales growth and induce similar growth in cash infusions from third-party financers like NCMIC. Lemacon understood this: he testified that the financial relationship between Brican and Viso Lasik was intentionally set up to be a "full cycle," which "could not be sustained without the injection of additional funds." (TT4 (Lemacon) 204:13–21, 135:22–136:2.)

### e. The Buyback Provision's Role in the Fraudulent Inducement

73.    The Buyback Provision of the Marketing Agreement was Brican's "clincher" to ensure quick sales: it assuaged potential customers' concerns that Viso Lasik might not meet its full commitment to buy advertising. In short, it functioned as the Vendor's guarantee of Viso Lasik's obligation to make advertising payments.

74.    But Brican was in no position to make such a guarantee because its business model required constant infusions of third-party financing, which required new sales, which Brican could not induce unless Viso Lasik continued to pay advertising fees.

75.    Brican's principals understood this. A legitimate, credible plan to advertise Viso Lasik would have evaluated the impact of its expenditures on sales and adjusted its marketing strategy and budget accordingly. But Brican kept committing to buy as much advertising as was necessary to induce as many new Exhibeo sales as possible. It kept

making five-year commitments with no apparent consideration of Viso Lasik's prospects or plans.

76.     Vincens' April 2009 attempt to justify Brican's business model confirms that he knew it did not depend upon Viso Lasik's becoming profitable or Brican's generating other revenues. Brican never had other sources of revenue from which to make advertising payments, and Viso Lasik's sales at that time were far below initial projections. (TT4 (Lemacon) 134:1–20; *see also* PX 102 (projections as of July 2009).) But when NCMIC President Gregory Cole confronted him about his business model, Vincens confidently showed him a spreadsheet projecting exponential increases in sales over time and demanded that Cole explain "how this cannot work." Vincens even acknowledged that "when the money runs out, it doesn't work" and asked Cole rhetorically: "but why would the money run out?" (TT4 (Cole) 20:13–23:9.)

77.     Throughout, Vincens knew what he was doing, having had twenty years of experience selling advertising display systems, arranging financing for those sales, and promising to buy advertising to offset customers' lease payments.[20] He had left customers with similar unfulfilled promises before—namely, his Recomm scheme to use third-party advertisers to pay fees to match customers' lease payments, which went bankrupt after the advertisers stopped paying. *See infra* at ¶¶ 96–104. Vincens learned from his Recomm experience: the Brican model gave him control over the advertiser. This further underscores that advertising was not the real purpose of the Marketing Agreement.

---

[20]     In 1986, Vincens founded JVF Sales, which sold electronic billboards to Canadian pharmacists with whom it entered into advertising agreements. In the early 1990s, he founded Recomm, which sold electronic bulletin boards to pharmacists, optometrists, and veterinarians but went bankrupt in 1996. Later in the 1990s, he was involved in Axaris, which sold display systems to French dentists and veterinarians, with whom it entered into advertising agreements. (TT2 (Vincens) 173:2–185:19.)

78.     Moreover, Brican intentionally did not disclose any of the information from which Plaintiffs could have learned that Brican never expected to buy back the Financing Agreements. To keep the scheme afloat, it needed to induce sales to Plaintiffs because their credit ratings would be attractive to third-party financers like NCMIC. It knew that these customers would balk if they knew that:

- Viso Lasik was only able to make advertising payments at that time with money borrowed from Brican, and

- Unless Brican kept receiving funds from financing companies like NCMIC, it could not keep lending money to Viso Lasik.

79.     By withholding this information, Brican intentionally left Plaintiffs with an incomplete and thus misleading understanding of the relationship between Brican and Viso Lasik.

## § 3. FACTS RELEVANT TO NCMIC'S HOLDER-IN-DUE-COURSE DEFENSE

### a. NCMIC's First Notice of Brican's "Return Policy"

80.     In May or June 2006, Fred Scott, NCMIC's Business Development Manager, spoke with Vincens by telephone. Afterwards, on June 19, 2006, Scott emailed William Artino, NCMIC's Vice President and General Manager of Equipment Finance, draft language for an agreement in which NCMIC agreed "to support the Return Guarantee conditions as discussed." The email outlined "Brican's obligation to unwind the lease" if "a customer chooses to return the Brican system." (PX 7 at 1.)

81.     Later, Scott emailed Vincens and Briscoe referencing Brican's "Return Policy" and attaching a letter (the "Scott Letter") stating:

> Professional Solutions Financial Services is pleased to provide these terms to support *Brican America's return policy*. This letter represents the understanding that the payoff Professional

> Solutions will give Brican in the event of a *cancellation by their customer*. This program may be cancelled or suspended at any time.
>
> > *If the Lease Agreement is terminated by the customer due to Brican's return policy*, we will credit all amounts collected toward our funded amount . . . .

(PX 7 at 3 (emphasis added).) Briscoe thanked Scott for a "quick turnaround." (*Id*. at 4.)

82.    The parties disagree as to what Vincens and Scott discussed over the phone as well as the proper interpretation of the Scott Letter.

83.    According to Vincens:

- Scott agreed in the phone call that NCMIC would authorize the use of a "system where . . . [Brican] could take back the equipment" and give the "clientele a way out," and that Scott would send a letter to Brican to that effect. (TT3 (Vincens) 13:3–14:15.)

- The Scott Letter was that letter, and the "Return Policy" mentioned in the Scott Letter referred to the Buyback Provision in the Marketing Agreement.

- Brican's subsequent use of Marketing Agreements was in reliance upon the Scott Letter. (TT3 (Vincens) 12:5–16:12; *see also* DX 18 (Brican salesperson assuring a potential customer that Brican has an agreement with NCMIC allowing Brican to buy back the lease agreement).)

84.    In contrast, Scott did not remember if any conversation had taken place, and did not remember or know what he meant when he wrote "Brican America's return policy." (TT5 (Scott) 104:10–108:5.)

85.    This phone call and email exchange gave NCMIC its first notice that Brican had side agreements allowing Exhibeo customers to cancel the deal and be relieved of their lease obligations. Yet NCMIC did not ask Brican for copies of these agreements, even though the GVA required Brican to send NCMIC any "agreements or warranties given to Lessee relating to the Goods or Leases." (GVA ¶ 6(c).)

### b. NCMIC's Agreement Not to Call Brican's Customers

86.     Under the GVA, NCMIC had no obligation to finance any sale until it was able to "verbally verify delivery and installation." Nevertheless, at Brican's request (*see* PX 20), NCMIC backed off this requirement. By August 2006, NCMIC had agreed not to communicate with *any* of Brican's customers before financing their purchases. (PX 19; *see also* PX 70 ("we do not . . . verbal.").)

87.     NCMIC apparently agreed to this condition because it did not want to upset Brican. (*See, e.g.,* PX 17 ("[T]hey are turning out to be a really good vendor and I do not want to upset them.").) Furthermore, some of NCMIC's employees received a commission for each sale that NCMIC financed. (TT4 (Thompson) 220:7–19.)

### c. NCMIC's Collections Calls and Knowledge of Marketing Agreements

88.     NCMIC learned of Brican's use of Marketing Agreements from its lessees. By February 2007—eight months after the Scott Letter—NCMIC had learned that at least one of its lessees had a Marketing Agreement with Brican. (PTS at 18 ¶ 19–21.) By April 2009, NCMIC had received a total of 19 Marketing Agreements from its customers or from other sources. (TT3 (Cole) 107:2–4.)

89.     Between April 2007 and October 2008, NCMIC's collections staff were told by at least ten different lessees that they were expecting either "reimbursements" or advertising payments from Brican that nearly matched their lease obligations. Several lessees had understood that their net monthly payments would be no more than $25, and were therefore surprised to see NCMIC's bill for $563 each month. (PX 65, 77–83, 86–87.) One lessee stated that he would not have agreed to the lease except for these advertising payments. (PX 65.) Another lessee told Cook in 2007 that the Brican salesperson had deceived him about his net monthly obligations after accounting for the

advertising payments. Cook told him that he would look into the advertising claim, but he never did. (PX 79; TT6 (Cook) 110:3–16.)

90.     In September 2008, another lessee told NCMIC that Brican had promised to take over the lease if the reimbursement payments stopped. (PX 82.)

91.     In addition, Sandra Ellzey, the Brican employee responsible for bookkeeping, spoke regularly with Jean Thompson, the account manager at NCMIC responsible for Brican. During these conversations, they discussed the use of advertising agreements on multiple occasions, such as when a lessee was late on a lease payment because an advertising payment had not yet arrived. (*See* TT5 (Ellzey) 194:9–197:20, 208:3–209:19.)

92.     Various NCMIC employees testified that Brican's use of Marketing Agreements was generally known at NCMIC. (TT3 (Henningsen) 180:18–181:2, 183:17–185:12, 188:17–189:24; TT4 (Barkley) 228:6–18.) At least by November 2008, Cook's staff thought he had a copy of the Marketing Agreement. (PX 64.)

93.     Based on the above facts, by October 3, 2008, when NCMIC began taking assignments of the one-column leases, NCMIC (1) had received a number of copies of the Marketing Agreement, (2) had learned from ten lessees that Brican was promising advertising or reimbursement payments that would make the Exhibeos "free," and (3) had learned from at least one lessee that Brican promised to buy back the leases if the payments stopped.

### d. DelCastillo's Email About Recomm

94.     In May 2008, two years after the Scott Letter, Daniel DelCastillo purchased an Exhibeo for his dental practice. Within two months of his purchase, he learned of Vincens' prior involvement in Recomm, which he understood to be a "Ponzi scheme" and "scam," and became concerned. (TT5 (DelCastillo) 11:20–15:6.)

95.     In July 2008, DelCastillo called Jean Thompson, the NCMIC account manager

responsible for the Brican account, explained his concerns about Vincens and Recomm,

and asked to be released from his lease. Thompson asked him to send whatever

information he had about Recomm in writing. (TT5 (DelCastillo) 15:8–17:6.) She did not

ask if he had a Marketing Agreement or for a copy of whatever agreements he might

have with Brican. (TT5 (DelCastillo) 22:21–23:9.)

96.     DelCastillo sent Thompson an email with the subject line "FW: Recomm-Brican"

that attached *Tampa Tribune* articles and a document with the following text:

### Warning—Possible Scam to Dentists

> Have you recently signed an agreement with Raymond Briscoe of
> Brican America?

> Mr. Briscoe changed his name from Raymond Manklow, and
> formerly owned Recomm International out of Tampa, Florida, and
> Toronto, Canada.

> In the 1990's, Mr. Manklow and his partners scammed millions of
> dollars from unsuspecting pharmacists, chiropractors,
> veterinarians, and others selling LED signboards with the promise
> to cover most of the lease costs with advertising dollars.

(PX 92 at 2.)

97.     One of the attached *Tampa Tribune* articles questioned whether Recomm had been

operating a Ponzi scheme:

- 30 -

> The alleged scheme has all the properties of a Ponzi scheme. Recomm marketed the electronic signs to customers, promising that the signs would attract advertising dollars that would be shared with sign owners. Recomm would sell or assign leases for the electronic signs to a finance company, which would collect monthly lease payments from customers. But the advertising dollars never materialized as expected, and the company found itself subsidizing rebate checks with money from the finance companies.

(Noam M.M. Neusner, *IRS to Audit Recomm*, Tampa Trib., Apr. 27, 1996, PX 92 at 4.)

98.     Another attached article described fraud investigations into Recomm:

> It turns out, company officials acknowledge, that Recomm attracted few companies to place advertisements on the message boards. Recomm used cash from the finance companies to send out the rebate checks until the practice became financially untenable. That practice, of paying off old customers with cash generated from new customers, with the intent to defraud, is the definition of a Ponzi scheme.

(Noam M.M. Neusner, *11 states probe Tampa marketing firm Recomm*, Tampa Trib., Mar. 5, 1996, PX 92 at 5.)

99.     Thompson told DelCastillo that NCMIC was "looking into it" and promised to keep him informed if she learned any new information. She did not contact DelCastillo again. (TT5 (DelCastillo) 22:3–20.)

100.    Thompson then forwarded DelCastillo's email to Todd Cook, characterizing it as "disturbing." (PX 92 at 6.) Cook reported this to Cole and told him he would look into it. (TT4 (Cook) 40:25–41:5.) Cole acknowledged Cook's report, and they moved on to other topics. (TT4 (Cook) 42:19–44:16.)

101.    Cook "looked into it" by emailing Lemacon the *Tampa Tribune* articles and the "Warning—Possible Scam to Dentists" document and asking if he had any "insight into

Recomm, Jean Francois Vincens, and Raymond Manklow." (PX 92 at 6.) Lemacon's response admitted that Brican had Marketing Agreements "with some dentists in order to advertise VISO LASIK Centers," denied operating a scam, invited NCMIC to visit Viso Lasik's three locations "to verify the reality of the venture," and attached a Powerpoint presentation that Brican had distributed to its salespeople in which Brican prominently promised to "PAY YOU ENOUGH PER YEAR TO OFFSET THE COST OF YOUR LEASE!" (PX 13 at 2, 27.)

102.    After receiving Lemacon's response, Cook and Thompson called Vincens. According to Cook, he understood from this call that Brican only had Marketing Agreements in the vicinity of existing Viso Lasik locations, rather than all over the country. (TT6 (Cook) 52:15–53:18.) However, he did not ask how widely Brican was using Marketing Agreements, nor did he consider if the Marketing Agreement promise of a free Exhibeo might explain the recent sudden jump in Exhibeo sales, almost all of which NCMIC was financing. (*See* TT6 (Cook) 104:15–105:3.)

103.    Despite Cook's prior personal experience at Frontier Leasing with litigation stemming from advertising fees calculated to match lease payments, he did not employ NCMIC's established procedures for investigating fraud. (TT4 (Cook) 41:9–17.) Instead, as his sole independent confirmation that Vincens was not involved in a fraud, he read a court decision in Recomm's bankruptcy that concluded that payments by non-debtors to Vincens and Briscoe did not constitute fraudulent transfers.[21] (TT6 (Cook) 51:25–52:11, 118:22–119:15.)

104.    If Cook had looked for other court opinions on Recomm or Vincens, he would have found, for example, a September 2005 Eleventh Circuit opinion describing Vincens

---

[21]    Cook likely read *In re Optical Tech.*, 246 F.3d 1332 (11th Cir. 2001).

as the "promoter" of a scheme that collapsed because of its heavy reliance on advertising agreements:

> This case involves a scheme to use electronic billboards and kiosks (collectively "kiosks") for advertising. The promoters of the scheme [n.1: "*Jean Francois Vincens and Raymond Manklow*."] executed it in the following way. First, they organized [Recomm]. Recomm, in turn, (1) convinced several advertising agencies of the merits of advertising via kiosks, and (2) convinced pharmacists, veterinarians, optometrists, and others of the profits they would earn by locating the kiosks at their places of business. Having accomplished this, Recomm (3) acquired the necessary kiosks, leased them to the [Lessees], assigned the leases to [the Lessors], and (4) entered into advertising contracts with the Lessees. These contracts provided that the Lessees would receive a stated percentage of the fees Recomm received from the advertising agencies. Recomm, the Lessees, and the Lessors contemplated that the Lessees' share of the advertising fees would more than cover the Lessees' lease payments.
>
> The scheme worked for the benefit of all parties for a few years, until mid-1995, when Recomm began to experience cash-flow problems and ceased remitting to the Lessees their portions of the advertising fees. The Lessees responded in two ways. First, they quit paying the Lessors the rent due on the kiosk leases; then, they sued Recomm. As the law suits multiplied, Recomm turned to the bankruptcy court for relief. In January 1996, Recomm filed a Chapter 11 petition in the Bankruptcy Court for the Middle District of Florida.

*In re Optical Tech., Inc.*, 425 F.3d 1294, 1296–97 (11th Cir. 2005) (footnotes 2–5 omitted) (emphasis added).

105.    It is unclear how others at NCMIC reacted to the information in DelCastillo's email. However, Paula Barkley, NCMIC's Operations Supervisor in Equipment Finance

who worked with Jean Thompson, testified that she recalled discussions of the *Tampa Tribune* articles around this time and that everyone at NCMIC knew about the use of Marketing Agreements. (TT4 (Barkley) 228:5–22.)

### e. NCMIC's Continued Facilitation of Brican's Use of Marketing Agreements

106.    During Cook, Henningsen, and Thompson's November 2008 visit to Brican's Miami office and the Viso Lasik Medspa in Wellington, Florida, Cook reviewed a Marketing Agreement, complained that the Buyback Provision "relieved [the customers] of any obligation in the lease," and made "very specific suggestions" for changes to that language. (TT4 (Cook) 46:14–47:12.)

107.    While it is unclear what suggestions Cook made during the visit, he later suggested these changes to the Buyback Provision of Marketing Agreement version 6:

> **Cancellation**: If VISO LASIK MEDSPAS fails to honor its commitments relating to the advertising fees, the Client may request that Brican repurchase ~~the Client's lease agreement in regarding to~~ [sic] the Exhibeo Concept. <u>Upon acceptance by Brican of the Client's request, Brican agrees to refund to the title/lien holder the outstanding balance due. Brican does not assume or relieve any obligation, financial or otherwise, that the Client has entered into with regard to the Exhibeo Concept.</u>

(PX 27 at 2.) His suggested edits did not remove the word "cancellation."

108.    Brican never used Cook's edits in any executed Marketing Agreements. Although a lengthy email exchange followed (*see* PX 27, 72, 73), NCMIC did not insist on any particular changes, request copies of any executed Marketing Agreements, or even follow up to verify what language Brican ultimately ended up using.

109.    Moreover, Cook did not ask how widely Brican was using Marketing Agreements. Rather, he assumed from his visit that Brican only had Marketing

Agreements in the vicinity of existing Viso Lasik locations, rather than nationwide. (TT6 (Cook) 72:21–74:9; *see also* PX 70 at 2; PX 23.)

110.    However, others at NCMIC did not share this assumption. For example, Thompson emailed Lemacon in February 2009 asking: "How can Brican offer advertising/marketing dollars in an area with no current laser center location? . . . . We get questions on how the marketing dollars work quite a bit." (DX 16.)

111.    Moreover, although Henningsen, at the time of the visit, understood Viso Lasik to be a "branch" of Brican (TT3 (Henningsen) 186:18–187:23), Cook did not ask for Viso Lasik's ownership structure, business plan, or financial records. (TT6 (Cook) 72:5–19.) Rather, Cook saw that a procedure was being performed at the clinic and concluded that Viso Lasik was a "viable business." (TT6 (Cook) 73:2–13.)

### f. NCMIC Shuts Down The Program

112.    On April 13, 2009—six months and $21 million in sales after NCMIC began taking assignments of one-column Financing Agreements—Brican salesperson James Adams told Gregory Cole of a "massive fraud being perpetrated against your company" and that Brican was using Marketing Agreements all over the country, not only near existing Viso Lasik locations. (TT6 (Cole) 189:9–191:15.) Cole also learned around that time that Brican and its principals were heavily invested in Viso Lasik—the sole advertiser in the Marketing Agreements. (PX 12 at 2 ¶ 7.)

113.    Two days later, on April 15, 2009, NCMIC stopped funding Brican leases. (PX 16.)

114.    On May 4, 2009, NCMIC sued Brican Inc. for breaching the GVA by executing Marketing Agreements without sending them to NCMIC, and demanded that Brican repurchase the entire lease portfolio, pursuant to paragraph 7 of the GVA.

115.    In February 2010, Brican stopped paying advertising fees. (DX 25.) On February 22, 2010, after NCMIC's summary-judgment motion was denied, NCMIC and Brican

settled their lawsuit. *See NCMIC Fin. Corp. v. Brican Am., Inc.*, No. 09-cv-21192 (S.D. Fla. filed May 4, 2009).

116.    After the settlement, NCMIC wrote its lessees that it had stopped financing leases for Brican because "for each sale that Brican made they were incurring an obligation to their customers . . . in an amount larger than what [NCMIC] funded on behalf of the Lessees when they acquired an Exhibeo. In short, Brican could only stay in business by continuing to originate new sales (and receiving the upfront payment by the funding source) to pay for its existing obligations to its customers." (PX 25 at 2.)

## D. Conclusions of Law

Applying governing Florida law to the facts, the Court makes two primary conclusions of law: (1) Brican Inc. intentionally used misrepresentations to induce Plaintiffs into signing the one-column Financing Agreements and (2) NCMIC is not a holder in due course, and so cannot enforce the Financing Agreements' waiver-of-defenses clauses, because it had notice of Brican's fraud and its conduct facilitated that fraud.

## § 1. Plaintiffs Have Established Fraudulent Inducement

As an assignee of the one-column Financing Agreements, NCMIC's right to enforce them is subject to any fraudulent-inducement defense or claim that Plaintiffs

could have asserted against the assignor: Brican Inc.[22] Plaintiffs assert that Brican Inc.
fraudulently induced them to sign the one-column Financing Agreements via
misrepresentations in the Marketing Agreements. But Plaintiffs signed the Marketing
Agreements with *Brican LLC*. For NCMIC's rights to be affected, Plaintiffs must prove
that Brican Inc. is responsible for the Marketing Agreement misrepresentations.

   NCMIC argued at trial that any misrepresentations made in or in relation to the
Marketing Agreements could not affect the Financing Agreements because they were
separate agreements and thus the Marketing Agreements could not alter the terms of
the Financing Agreements. (*See, e.g.*, TT6 14:25–20:7.) This argument confuses a
fraudulent-inducement claim with a contractual claim. A contractual claim requires an
enforceable promise, whereas a fraudulent-inducement claim requires an inducing
misrepresentation. In this case the difference can cause confusion because the Buyback
Provision was both: a promise that was false and also misrepresented the Brican-Viso
Lasik relationship. But a fraudulent-inducement claim requires proof of different facts
than those necessary to prove a breach. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*,
685 So. 2d 1238, 1239 (Fla. 1996). If Brican Inc. induced Plaintiffs to sign the Financing
Agreements via misrepresentations in the Marketing Agreements, any claim based on
that fraudulent inducement arises "from the transaction that gave rise to" the one-

---

[22]   The one-column Financing Agreements are secured transactions because they
allow the customer to purchase the equipment for a nominal price (one dollar) at the
end of the term. *See* Fla. Stat. § 671.201(38)(a) (codifying U.C.C. § 1-203(b)). Plaintiffs are
therefore "account debtors" under section 679.1021 (which codifies section 9-102(a)(3) of
the UCC) and can assert against NCMIC "any defense or claim in recoupment arising
from the transaction that gave rise to the contract" unless NCMIC can prove that
Plaintiffs waived such defense or claim. Fla. Stat. § 679.4041 (codifying U.C.C. § 9-
404(a)). However, these Findings use the terms "lease" and "lessor" because the parties
have consistently used them in their interactions and throughout this litigation.

column Financing Agreements. Fla. Stat. § 679.4041 (2014). Thus, even though the agreements are separate for purposes of contract interpretation, NCMIC's right to enforce the Financing Agreements is subject to the fraudulent-inducement claim.

The facts that Plaintiffs must prove to establish fraudulent inducement by Brican Inc. are (1) a misrepresentation of fact (2) for which Brican Inc. was responsible (3) which Brican Inc. knew was false (4) which Brican Inc. intended would induce Plaintiffs into the Financing Agreements (5) but for which Plaintiffs would not have signed the one-column Financing Agreement. *See Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010); *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007); *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984) ("What one purchaser may rely upon in entering into a contract may not be material to another purchaser."); *Billian v. Mobil Corp.*, 710 So. 2d 984, 990 (Fla. 4th DCA 1998) (A "concealed fact is material to a transaction if the plaintiff would not have entered into the contract but for the concealment.").

### a. Versions 4, 5, 7, and 8 of the Buyback Provision Misrepresented a Fact

Under Florida law, the misrepresentation must be of fact but it need not take any particular form: it can be oral, written in the allegedly fraudulently-induced contract itself, or even written in a different contract.[23] *See, e.g., Ladner v. AmSouth Bank*, 32 So. 3d 99, 105 (Fla. 2d DCA 2009) (citation omitted) (claim that bank fraudulently induced construction project it wanted to finance by falsely assuring plaintiffs of the

---

[23]     Similarly, claims for fraudulent inducement are not subject to the parol evidence rule and are not barred by a merger and integration clause in the underlying contract. *Lower Fees, Inc. v. Bankrate, Inc.*, 74 So. 3d 517, 519 (Fla. 4th DCA 2011). Moreover, if Plaintiffs relied on the alleged misrepresentations, such reliance was not unreasonable as a matter of law because the misrepresentations were not "directly and fully rebutted by express evidence in a governing written contract." *Hobirn, Inc. v. Aerotek, Inc.*, 787 F. Supp. 2d 1298, 1304 (S.D. Fla. 2011).

construction company's financial integrity); *Mejia v. Jurich*, 781 So. 2d 1175 (Fla. 3d DCA 2001) (claim that developer fraudulently induced home purchases by misrepresenting its plans for the rest of the development).

The misrepresentation in this case is the Marketing Agreement's Buyback Provision, which was designed to be the "clincher" in Brican's sales pitch. Brican represented that its Exhibeo was effectively free because Viso Lasik's advertising payments would offset customers' payments over the course of the lease. With the Buyback Provision, Brican addressed customers' concerns about Viso Lasik's ability to continue making advertising payments. If Viso Lasik stopped buying advertising for any reason, Brican would rescue the customers by buying or assuming their lease obligations.

The Buyback Provision in versions 4, 5, 7, and 8[24] was a misrepresentation of fact in two ways. First, it made a promise that Brican knew it could not keep. By misrepresenting its own intention to keep its promise, Brican misrepresented a fact. *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 633 (Fla. 4th DCA 2005). Second, the Marketing Agreement implied facts about Brican's relationship with Viso Lasik but omitted that (1) Brican was lending significant sums of money to Viso Lasik, (2) Viso Lasik was only able to make advertising payments with those loans, and (3) Brican

---

[24]    Version 6's Buyback Provision did not promise to buy back the lease agreement. Instead, it only stated that "the Client *may request* that Brican repurchase the Client's lease agreement" (emphasis added).

Plaintiffs' fraud theory in this case has focused solely on the written promises in the agreements they signed, which satisfied the pleading requirements for fraud and also enabled the parties and the Court to address the issue of fraudulent inducement for similarly-situated groups of Plaintiffs. However, without a written promise to buy back the lease as the basis for fraudulent inducement, the nine one-column, version 6 Plaintiffs lack the threshold misrepresentation underlying Plaintiffs' theory of fraud and so cannot prevail on this theory.

needed to maintain exponential growth in the infusion of third-party financing to keep making these loans.[25] If Brican had disclosed that Viso Lasik's ability to pay advertising fees depended upon Brican loans, and the loans depended on Brican's ability to keep inducing new sales, common sense would raise the question: how could this work? The intentionally-withheld truth was that, without the exponential sales growth needed to induce exponentially growing lump-sum funding from third-party financers, it didn't work. In short, it was a house of cards.

### b. Brican Inc. Is Responsible For This Misrepresentation

Brican LLC employed the Exhibeo salespeople and signed versions 4, 5, 7, and 8 of the Marketing Agreement. For Brican LLC's misrepresentations to be attributed to Brican Inc., (1) Brican Inc. must have designated Brican LLC to be its authorized agent and (2) the scope of that agency must have included the ability to speak on Brican Inc.'s behalf while making the misrepresentations. As the evidence shows, Brican LLC spoke on Brican Inc.'s behalf while making the misrepresentations in the Buyback Provision.

"Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 n.10 (Fla. 2003)

---

[25]     "Fraud can occur by omission, and one who undertakes to disclose material information has a duty to disclose that information fully." *Philip Morris USA, Inc. v. Naugle*, 103 So. 3d 944, 946 (Fla. 4th DCA 2012), *review denied*, 135 So. 3d 289 (Fla. 2014). This principle applies even in arms-length transactions. *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. 4th DCA 1994) (claim based on venture promoter's failure to inform investors of its previous failed venture); *see also Revitz v. Terrell*, 572 So. 996, 998 (Fla. 3d DCA 1990) ("[W]here there is no duty on the seller to divulge material facts, once a seller makes representations regarding a condition, he is under a duty to disclose the complete truth.").

(citation omitted). The existence and scope of an agent's authority are questions of fact and "may be inferred from acts, conduct and other circumstances." *Bd. of Trustees of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Global Markets, Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010) (citations omitted). In assessing these circumstances, a consistent course of dealing has more weight than "conclusory statements in documents with regard to the independence of the relationship of the parties." *Villazon*, 843 So. 2d at 853.

Five facts show the nature and scope of the agency relationship between Brican Inc. and Brican LLC:

1. When the Vendor switched from Brican Inc. to Brican LLC, Brican Inc. simply told NCMIC that Brican LLC would start conducting all future sales, and in October 2006, Brican LLC did so.

2. Version 4 of the Marketing Agreement explicitly represents that Brican LLC is Brican Inc.'s agent: the text of the agreement obligates *Brican Inc.* to pay advertising fees and to buy back the leases if the fees stopped, yet the signature block is for *Brican LLC*. Moreover, Brican Inc. obviously considered itself bound by these agreements: it performed them by paying advertising fees, and there is no evidence that anyone at Brican regarded these as erroneous or attempted to correct them. In this way, Brican Inc. allowed Brican LLC to sign roughly 360 Marketing Agreements on Brican Inc.'s behalf.

3. Beginning on October 3, 2008, Brican LLC was the Vendor and Brican Inc. was the lessor, who then assigned its leases to NCMIC. Typically, a lessor (Brican Inc.) pays the vendor (Brican LLC) for the goods, and an assignee (NCMIC) then pays the assigning lessor (Brican Inc.) for the assigned lease. Instead, NCMIC continued its prior practice of paying Brican LLC directly for the

goods. Therefore, Brican Inc. allowed Brican LLC to receive funds on its behalf.

4. Brican Inc. had Brican LLC's employees, such as General Counsel Maureen Ryan, enforce Brican Inc.'s rights under Marketing Agreements that Brican Inc. had signed with earlier customers. (*See, e.g.*, PX 74.)

5. Executed copies of the lease assignment forms were signed by "Brican America" without specifying whether that meant Brican Inc. or Brican LLC. Because Brican Inc. had no employees of its own by then, Brican LLC employees signed the lease assignment forms on Brican Inc.'s behalf.

Brican Inc.'s control was to such an extent that it simply told Brican LLC to take over all future sales. Moreover, for several years (and especially after Brican Inc. had no employees of its own), Brican Inc. and Brican LLC both consistently acknowledged and accepted that Brican LLC could speak on Brican Inc.'s behalf regarding the Marketing Agreements. Based on this evidence, Brican LLC, the Vendor, was Brican Inc.'s authorized agent, and the scope of that agency included the authority to speak for Brican Inc., the lessor, when making the misrepresentations in the Buyback Provision.

NCMIC makes two primary arguments against finding an agency relationship. First, NCMIC points to the "no agent" clause in the Financing Agreements. However, the existence or scope of an agency relationship is not controlled by the parties' use of descriptive labels. *Villazon*, 843 So. 2d at 853. Therefore, a conclusory "no agent" clause in the one-column Financing Agreements cannot trump a consistent pattern of behavior between Brican Inc. and Brican LLC.

Second, NCMIC argues that Brican LLC's salespeople could not amend the Financing Agreements by initialing handwritten changes on the documents, as they could with the Marketing Agreements. (*See, e.g.*, PX 93 at 5; TT1 (Proehl) 231:9–233:22; TT2 (Richman) 32:1–12, 130:5–132:2.) However, this is irrelevant to a fraudulent-

inducement claim, which consists not of amendments to a contract but of misrepresentations that induced a party to enter that contract. Thus, because Brican LLC was authorized to speak on Brican Inc.'s behalf while making the misrepresentations in the Marketing Agreements, the question of who could amend the Financing Agreements is of no moment.

### c. Brican Inc.'s Knowledge of Falsity and Intention to Induce Plaintiffs into the Financing Agreements

As Vincens testified, he promised to buy back the leases of customers who stopped receiving advertising payments because he wanted to induce them to "sign on the spot." But Brican had no intention of performing the promise in the Buyback Provision. Thus Brican Inc. fraudulently intended to induce Plaintiffs, with the Buyback Provision, into signing the Financing Agreements.

The Buyback Provision implied that Brican and Viso Lasik had a relationship that they did not in fact have. Brican knew that the independent relationship implied in the Marketing Agreement was misleading because it did not include the truth about where the advertising fees were coming from. Brican's knowledge is particularly evident in that it trained its salespeople that it was "critically important" to explain the Brican-Viso Lasik "strategic alliance" relationship but that they must never disclose to potential customers that Brican was lending money to Viso Lasik.

With the exception of the individualized element of reliance that will be subject to further proceedings, Plaintiffs have established all elements of fraudulent inducement—that Brican Inc. used an intentional misrepresentation of fact to induce quick sales to fund its scheme.

## § 2. NCMIC CANNOT ENFORCE THE WAIVER-OF-DEFENSES CLAUSE

NCMIC's affirmative defense is that, even assuming proof of reliance by each individual Plaintiff, Plaintiffs waived their fraudulent-inducement claim because the one-column Financing Agreements had a waiver-of-defenses clause providing that NCMIC "will not be subject to any claim, defense, or set-off" that could have been asserted against Brican Inc. However, an assignee can only enforce a waiver-of-defenses clause if it took the assignment:

> (a) For value;
>
> (b) In good faith;
>
> (c) Without notice of a claim of a property or possessory right to the property assigned; and
>
> (d) Without notice of a defense or claim in recoupment of the type that may be asserted against a person entitled to enforce a negotiable instrument under s. 673.3051(1).

Fla. Stat. § 679.4031(2) (2014) (codifying U.C.C. § 9-403).[26] An assignee meeting all of these requirements is a "holder in due course" of the assigned instrument. The assignee bears the burden of proving it met these requirements at the time of the assignment. *Hobley v. Metz*, 630 So. 2d 625, 625 (Fla. 3d DCA 1994).

It is undisputed that NCMIC paid value (even though it paid Brican LLC rather than paying Brican Inc. directly). And there are no claims of any "property or

---

[26]     Cases before 2002 refer to Florida Statutes, section 679.206 or Uniform Commercial Code, section 9-206, which contained essentially the same requirements.

possessory right." Therefore, the only elements at issue are "good faith" and "without notice of a defense or claim in recoupment."[27]

### a. Notice and Good Faith under Florida Law

Before 1965, Florida law defined "notice" as "actual knowledge of the infirmity or defect, or knowledge of such facts that [the holder's] action in taking the instrument amounted to bad faith." *Mutual Fin. Co. v. Martin*, 63 So. 2d 649 (Fla. 1953) (quoting Fla. Stat. § 674.58 (1953)). Florida's subsequent adoption of the Uniform Commercial Code added an objective "reason to know" standard. Thus, under Florida law, a person has "notice" of a fact if the person:

> (a) Has actual knowledge of it;
>
> (b) Has received a notice or notification of it; or
>
> (c) From all the facts and circumstances known to the person at the time in question, has reason to know that it exists.

Fla. Stat. § 671.209 (2014) (codifying U.C.C. § 1-202).

As to "good faith," Florida and the Uniform Commercial Code previously defined it as "honesty in fact in the conduct of the transaction concerned," which created a purely subjective test. *See, e.g., Barnett Bank of Palm Beach Cnty., N.A. v. Regency Highland Condo. Ass'n, Inc.*, 452 So. 2d 587, 590 (Fla. 4th DCA 1984) ("[L]ack of good faith must be the result of actual, not constructive, knowledge of the wrongdoing tantamount to dishonesty or bad faith."); *Seinfeld v. Commercial Bank & Trust Co.*, 405 So. 2d 1039, 1042 (Fla. 3d DCA 1981) ("[T]he Florida version of the holder in due course provision of

---

[27]     Because many of the authorities discussed arise in the context of negotiable instruments, it is noteworthy that holders in due course must meet essentially the same requirements in both contexts. *Compare* Fla. Stat. § 673.3021(1)(b) (codifying U.C.C. § 3-302) (negotiable instruments) *with* § 679.4031(2) (codifying U.C.C. § 9-403) (secured transactions).

the U.C.C. does seem to protect the objectively stupid so long as he is subjectively pure of heart.").

But when the Uniform Commercial Code later amended its definition, Florida followed suit. Good faith now requires "honesty in fact and the observance of reasonable commercial standards of fair dealing." Fla. Stat. § 679.1021(1)(qq) (2014) (codifying U.C.C. § 9-102(a)(43)); *accord* Fla. Stat. § 673.1031(1)(d) (same, but in the context of negotiable instruments). As one Florida court explained:

> To the old, subjective good faith, "honesty in fact" standard, the legislature added an objective component—the pure heart of the holder must now be accompanied by reasoning that assures conduct comporting with reasonable commercial standards of fair dealing. No longer may a holder of an instrument act with a pure heart and an empty head and still obtain holder in due course status.

*Any Kind Checks Cashed, Inc. v. Talcott*, 830 So. 2d 160, 165 (Fla. 4th DCA 2002). Thus, "good faith" now has both a subjective component (honesty in fact) and an objective component (the observance of reasonable commercial standards of fair dealing). "'[F]air dealing' includes not being an easy, safe harbor for the dishonest." *Id.* at 168. Therefore, an assignee cannot ignore suspicious circumstances that cry out for investigation and then claim to have taken the assignment in good faith.

While the objective component of good faith is not a reasonable-person negligence standard, it does require the assignee to prove that it has acted "in a way that is fair according to commercial standards that are themselves reasonable." *Id.* at 165. To do so, it must prove, first, that its conduct "comported with industry or 'commercial' standards applicable to the transaction and, second, [that] those standards were reasonable standards intended to result in fair dealing." *Id.*

The element of notice is concerned with the assignee's knowledge as to the particular instrument, whereas the element of good faith is concerned with the

assignee's knowledge as to the assignor's practices more generally. 2 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform Commercial Code § 18-12 (6th ed. 2013). However, because both elements have come to incorporate objective as well as subjective criteria, they now frequently merge such that "the answer to one inquiry is the answer to the other." *In re Joe Morgan, Inc.*, 985 F.2d 1554, 1562 (11th Cir. 1993) (applying Ala. Code § 7–1–201(25), which codifies U.C.C. § 1-202).

### b. The Close-Connection Doctrine

NCMIC's motion for reconsideration argues that the Court should ignore the statutory test and instead apply the "close connection" doctrine. This doctrine originated before the UCC and has been used as an evidentiary tool to assess holder-in-due-course status under the UCC as well (though much less frequently since the definition of good faith acquired an objective component). Because the doctrine has changed over time, it is worth examining the rationales underpinning holder-in-due-course status generally as well as the close-connection doctrine specifically.

The purpose of holder-in-due-course status is to encourage independent third parties to supply credit for transactions in which they had no prior involvement by protecting them from liabilities that they could not reasonably be expected to investigate. In other words, it encourages lending by sparing lenders from having to worry about every possible defect in the underlying transaction. But in practice, because the statutory standards were formerly only subjective, it was easy for an assignee to appear to qualify as a holder in due course even if it was not in any meaningful sense an

independent third party.[28] In such cases, "courts sympathetic to consumer needs" developed the "close-connection doctrine" as one way "to circumvent the statutory test of actual knowledge." *First New England Fin. Corp. v. Woffard*, 421 So. 2d 590, 593 n.4 (Fla. 5th DCA 1982). As the Supreme Court of New Jersey explained in a case that Florida courts have cited approvingly:[29]

> The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. It would seem to follow, therefore, that the more the holder knows about the underlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value; the closer his relationship to the underlying agreement which is the source of the note, the less need there is for giving him the tension-free rights considered necessary in a fast-moving, credit-extending commercial world.

*Unico v. Owen*, 232 A.2d 405, 410 (N.J. 1967).

The Florida Supreme Court first applied the close-connection doctrine in *Mutual Finance Co. v. Martin*, which held that a finance company was not a holder in due course of a promissory note because it had "notice of the note's infirmity" under the Uniform

---

[28]   For example, a "subsidiary might sell shoddy goods to a consumer and then sell the negotiable paper to the parent. Technically, the parent was a holder in due course because it gave value, had no notice, and took in good faith. Under the 'close connection' doctrine, the courts attributed the subsidiary's knowledge to the parent if the two were sufficiently closely connected." 2 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform Commercial Code § 18-14 (6th ed. 2013).

[29]   *See, e.g., Ramadan v. Equico Lessors, Inc.*, 448 So. 2d 60, 62 (Fla. 1st DCA 1984); *Rehurek v. Chrysler Credit Corp.*, 262 So. 2d 452, 453 (Fla. 2d DCA 1972).

Negotiable Instruments Act. 63 So. 2d 649, 652 (Fla. 1953) (quoting Fla. Stat. § 674.54(3)–(4) (1953)). In reaching this conclusion, the Supreme Court of Florida adopted the reasoning of the Supreme Court of Arkansas:

> [A]ppellant was so closely connected with the entire transaction or with the deal that it can not be heard to say that it, in good faith, was an innocent purchaser of the instrument for value before maturity. It financed the deal, prepared the instrument, and on the day it was executed took an assignment of it from the Arkansas Motors, Inc. Even before it was executed it prepared the written assignment thereon to itself. Rather than being a purchaser of the instrument after its execution it was to all intents and purposes a party to the agreement and instrument from the beginning.

*Commercial Credit Co. v. Childs*, 137 S.W.2d 260, 262 (Ark. 1940).

Importantly, *Martin*'s analysis did not require any inference of collusion or dishonesty. Even if the assignor-dealer had equally deceived both the buyer and the assignee, a closely-connected assignee was still "better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers." *Martin*, 63 So. 2d at 653. So the *Martin* court imputed the dealer's knowledge to the finance company and then found that the finance company had "notice of any infirmity" under the statute.

Since *Martin*, the close-connection doctrine under Florida law has evolved in three major ways. First, although *Martin* used the doctrine in the context of a negotiable instrument, Florida courts have also used it to assess the enforceability of a waiver-of-defenses clause. Because the governing statutes in both contexts require holders in due course to meet essentially the same requirements—specifically, to have acquired the instrument or contract (1) in good faith and (2) without notice of the underlying infirmity—the close connection doctrine is equally applicable to both. *Compare Martin*

- 49 -

(promissory note) *with Rehurek v. Chrysler Credit Corp.*, 262 So. 2d 452 (Fla. 2d DCA 1972) (automotive retail installment contract).[30]

Second, because courts use the doctrine as an evidentiary tool for applying the statute, it has evolved following each amendment to the statute. In 1953, *Martin* used it to assess whether the holder had "notice" under the Uniform Negotiable Instruments Act's subjective standard. Since then, Florida courts have increasingly connected the doctrine to the UCC's requirement of good faith. For example, in *Ramadan v. Equico Lessors, Inc.*, 448 So. 2d 60 (Fla. 1st DCA 1984), the assignee of a commercial lease initially won summary judgment because there was no genuine issue of material fact as to its subjective good faith. The appellate court reversed because there was evidence of a close connection, and "if the financing company is closely connected with the transaction, it cannot be heard to say that it, in good faith, was an innocent purchaser." *Id.* at 61; *see also Rehurek*, 262 So. 2d at 453 (assignor and assignee were too closely connected for the assignee to have taken the assignment in good faith). Since the most recent amendment to the definition of good faith, only one case has used it under Florida law. *See Cunningham v. LeGrand*, No. 2:11-CV-0142, 2012 WL 2054112 (S.D.W. Va. June 5, 2012) (using a close connection as evidence of a failure to follow reasonable commercial standards).

Finally, because the close-connection doctrine arose primarily to protect consumers, Florida courts expanded it in commercial cases to create a close-connection-plus doctrine. *See Equico Lessors, Inc. v. Ramadan*, 493 So. 2d 516, 519 (Fla. 1st DCA

---

[30]    NCMIC argues that the close connection doctrine applies only to secured transactions, and so cases assessing holder-in-due course status in the context of negotiable instruments are not relevant. [*See* DE-571 at 13.] But NCMIC overlooks the fact that *Martin*, which is still good law, applied it to negotiable instruments.

1986).[31] But contrary to NCMIC's contention, a close connection plus has never required that the assignor and assignee be "so closely linked that the entities were indistinguishable." [*See* DE-541 at 3.] This phrase appears only in *Leasing Service Corp. v. River City Const., Inc.*, 743 F.2d 871 (11th Cir. 1984). There, it referred to cases that denied holder-in-due-course status not under the close-connection doctrine but for a different reason: because the assignee was so involved in the original transaction that it could be held *affirmatively liable for damages* as well as unable to enforce the assigned instrument or contract.[32] *Id.* at 876 (citing *Massey-Ferguson Credit Corp. v. Brown*, 567 P.2d 440, 444–45 (Mo. 1977) (assignee's participation in the original transaction was such that the obligor could recover damages from the assignee "over and above being absolved from making any payment on the contract") and *Massey-Ferguson, Inc. v. Utley*, 439 S.W.2d 57, 60 (Ky. 1969) (an assignee "should not be accorded the protection of an assignee against defenses that derived from its actions as a seller")).

### NCMIC's Characterizations of the Close-Connection Doctrine

NCMIC also contends that, at least in a commercial secured transaction, an assignee need not prove that it meets the four-prong test set out in section 679.4031(2). Rather, it asserts that the assignee's *opponent* must prove that the "assignor and assignee were so closely linked that the entities were indistinguishable and that the assignee had

---

[31]     There are two opinions in the *Ramadan* case. The 1984 opinion reversed the trial court's grant of summary judgment and remanded for trial. *Ramadan v. Equico Lessors, Inc.*, 448 So. 2d 60 (Fla. 1st DCA 1984). Upon remand, the trial court found a close connection, which the 1986 opinion reversed on grounds of insufficient evidence. *Equico Lessors, Inc. v. Ramadan*, 493 So. 2d 516 (Fla. 1st DCA 1986).

[32]     Otherwise, the only relief available for a claim against an assignee is to "reduce the amount the account debtor owes" under the contract. Fla. Stat. § 679.4041(2).

knowledge of the assignor's fraudulent acts or significantly participated in the original transaction." [DE-541 at 2 (quotation marks omitted).][33]

NCMIC has made two different arguments in support of this position. Before trial, NCMIC conceded its burden to establish each statutory element but argued that, because this is a commercial case, it was entitled to a presumption of good faith which Plaintiffs could rebut only by proving a close-connection-plus. [DE-541 at 2.] NCMIC's post-trial motion for reconsideration, however, takes a different tack. It argues that the statutory test does not apply at all because Florida's close-connection-plus doctrine is "law other than this chapter which gives effect to an agreement by an account debtor not to assert a claim or defense against an assignee" under section 679.4031(6), which the statute says the four-prong test "does not displace." [DE-571 at 10.]

Florida law does not support either argument. First, the statute applies. Florida law has never suggested that the close-connection doctrine relieves an assignee of its statutory burden to prove holder-in-due-course status. Every court that has applied it, whether in a commercial secured transaction or anywhere else, has used it as an evidentiary tool for applying the statutory tests for 'good faith' or 'without notice' under the applicable statute—either the Uniform Negotiable Instruments Act, *see Martin*, 63 So. 2d at 652, or the UCC, *see Ramadan*, 448 So. 2d at 60. NCMIC has not pointed to a single case or commentator, in any jurisdiction, that treats the close-connection doctrine as allowing a party to enforce a waiver-of-defenses clause even if it fails to meet the statutory requirements.[34] *Leasing Service* was clear that it used the

---

[33]     Notably, under NCMIC's proposed standard, an assignee who significantly participated in the original transaction *and* took the assignment with actual knowledge of fraud would still be a holder in due course in the absence of a close connection.

[34]     In fact, every single case listed in NCMIC's trial brief that used the close-connection doctrine did so while applying U.C.C. § 9–206. [*See* DE-541 at 11–15.]

doctrine to assess the holder's good faith under the Uniform Commercial Code. 743 F.2d at 875 (applying Ala. Code § 7–9–206(1), Ga. Code Ann. § 109A–9–206(1), and N.Y.U.C.C. § 9–206(1)).[35] Similarly, *Ramadan* applied section 679.206(1), which is the precursor to today's section 679.4031. *See Ramadan*, 448 So. 2d at 60. And even the few close-connection cases that contain no explicit reference to a governing statute never characterize the doctrine as the exclusive determinant of holder-in-due-course status. *See, e.g.*, *Schneberger v. Wheeler*, 859 F.2d 1477, 1482 (11th Cir. 1988) (describing "bad faith" and "close connection" as distinct grounds for denying holder-in-due-course status under Florida law). As such, the close-connection-plus doctrine is an evidentiary tool used to apply section 679.4031 (and its precursor, former section 679.206), *see Ramadan*, 493 So. 2d at 518, not "other law" to which section 679.4031(6) could defer.

Moreover, under the statute, there is no presumption of good faith. Florida repealed the presumption when it adopted the UCC in 1965. *Compare Antonacci v. Denner*, 149 So. 2d 52, 53 (Fla. 3d DCA 1963) ("Every holder is deemed prima facie to be a holder in due course." (quoting Fla. Stat. § 674.61 (1963))) *with* Fla. Stat. § 674.61 (2014).

### c. <u>Application to the Facts</u>

In this case, the statute required NCMIC to prove that it (1) observed reasonable commercial standards of fair dealing and (2) had no reason to know, when it took any given assignment, that Brican Inc. had fraudulently induced the Plaintiff into entering that Financing Agreement. If the Court uses the close-connection-plus doctrine as an evidentiary tool in applying the statute, NCMIC's close connection with Brican Inc. (1)

---

[35]     Interestingly, most commentators interpret *Leasing Service* as holding that the close connection doctrine is inapplicable in commercial contexts. *See, e.g.*, 2 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform Commercial Code § 18-14 (6th ed. 2013).

gave NCMIC reason to know of Brican Inc.'s fraud and (2) underscored its failure to follow reasonable commercial standards of fair dealing. *See Cunningham,* 2012 WL 2054112 at *11–12.

### Evidence of a Close Connection

Courts have recognized various indicia of a close connection, including: (1) the assignee's approval of the assignor's underwriting and credit-approval procedures, (2) an independent credit check on the obligor by the assignee, (3) the assignor's reliance on the assignee to accept transfer of a substantial part of the assignee's portfolio, and (4) common ownership between assignor and assignee. *See Arcanum Nat. Bank v. Hessler*, 433 N.E.2d 204, 210 (Ohio 1982) (citing White & Summers, Uniform Commercial Code (1972)); *see also Unico*, 232 A.2d at 417 (assignee who "approved the standards established by the dealer, and has agreed to take all or a predetermined or substantial quantity of the negotiable paper which is backed by such standards" is closely connected).[36]

The record evidence in this case shows that Brican Inc. performed none of the usual functions of a lessor—instead, it relied on NCMIC to perform these functions on its behalf. In terms of the indicia:

- NCMIC did more than approve Brican Inc.'s procedures: it performed those procedures on Brican Inc.'s behalf. Brican Inc. would not execute a Financing Agreement until after NCMIC had already agreed to take the assignment.

---

[36]     *Arcanum* also considered "the assignee's drafting of forms for the assignor." 433 N.E.2d at 210. However, even though NCMIC assisted in drafting the "blind lease" form, this is a common practice in commercial transactions, *see Leasing Serv. Corp.*, 743 F.2d at 876, so the Court disregards it here.

- Similarly, NCMIC did more than run an independent credit check on each obligor before taking an assignment: it effectively ran credit checks on Brican Inc.'s behalf. Because Brican Inc. would not execute a Financing Agreement until after NCMIC had already agreed to take the assignment, Brican Inc. had no need to perform its own credit checks and never did so.

- As soon as Brican Inc. started using a "blind lease," it relied on NCMIC to accept transfer of not just a "substantial portion" but the *vast majority* of its portfolio. This was simply a continuation of their previous practice of NCMIC financing the vast majority of Brican Inc.'s sales.[37] As a result of this reliance, NCMIC ended up financing the vast majority of Exhibeo sales from 2005 until NCMIC terminated the relationship in April 2009.

**Evidence of NCMIC's Notice of Brican's Fraud and Lack of Good Faith**

Turning to the "plus" component of the doctrine, the evidence was substantial that NCMIC had notice and lacked good faith. By October 2008, NCMIC had received notice on numerous occasions that (1) Brican was violating the GVA by using side agreements without sending them to NCMIC and (2) these side agreements promised customers that the Exhibeo would be effectively "free" because the advertising fees would offset the lease payments and that they could cancel their lease obligation if the payments ceased.[38] In response to these "disturbing" (PX 92 at 1) circumstances that

---

[37]   The GVA fostered this close relationship. Brican promised to use its best efforts to give NCMIC a first right of refusal for all Exhibeo sales, and NCMIC promised to accept or reject each credit applicant within one day. (GVA ¶¶ 4, 13.)

[38]   *Ramadan* is not to the contrary. As it recognized, the "plus" component is satisfied if the assignee had "prior knowledge of the seller's guarantee, and therefore of potential claims that might arise." *Ramadan*, 493 So. 2d at 519. Unlike the lessor in *Ramadan*, NCMIC had a standing arrangement to accept assignments of the vast majority of Brican Inc.'s Financing Agreements as well as notice of Brican Inc.'s

called for investigation, NCMIC took no action constituting the observance of reasonable commercial standards of fair dealing, which it easily could have done given its close connection with Brican Inc.

First, by October 3, 2008, NCMIC had received multiple notices that Brican was using side agreements and paying advertising fees calculated to offset customers' lease obligations:

- The Scott Letter notified NCMIC as early as 2006 that Brican had a "return policy" that, contrary to the terms of the lease, allowed customers to return the equipment and cancel the lease.

- Between February 2007 and October 2008, ten lessees told NCMIC that Brican had promised to pay enough advertising to offset the lease payments and to take over the lease if the reimbursement payments stopped. Cook told one such lessee that he would look into the advertising claim but never did so.

- In July 2008, NCMIC knew from DelCastillo's email that (1) Vincens had been accused in the past of operating a Ponzi scheme involving promises of advertising fees that would offset customers' lease obligations and (2) Brican was entering into side agreements that promised to pay advertising fees that would offset customers' lease obligations.

- By October 2008, NCMIC had received at least one copy of a Marketing Agreement with a Buyback Provision in which Brican promised to buy back the customer's lease if the advertising payments stopped. If NCMIC had exercised due diligence, it would have been brought to Cook's or

---

fraudulent promises. Moreover, *Ramadan* did not consider the obligation to observe reasonable commercial standards of fair dealing because the governing statute at the time did not define "good faith" as including an objective component.

Cole's attention. Because NCMIC presented no evidence of such due diligence, it had notice as a matter of law of the Marketing Agreement and its Buyback Provision.[39]

Second, NCMIC's response to this notice did not observe the reasonable commercial standards of fair dealing that it set for itself in the GVA. For example:

- By July 2008, NCMIC knew definitively from DelCastillo's email that Brican had side agreements with customers that it was not sending to NCMIC along with the purchase orders, in violation of the GVA. But NCMIC made no effort to enforce this requirement of the GVA. It did not even ask DelCastillo, or any other lessee who had told NCMIC about the advertising fee arrangement, to send their copies of their own agreements.

- By July 2008, Cook knew from Brican's sales Powerpoint that Brican was marketing the Exhibeos to customers as "free." Two months earlier, Exhibeo sales per month began increasing rapidly—May 2008 *tripled* the previous monthly record—creating a strong likelihood of cause and effect between the promise of free Exhibeos and the increase in Exhibeo sales. But NCMIC responded not by asking Brican if its use of Marketing Agreements had increased similarly quickly, but by increasing its lending to such an extent that, only a month later, it began to worry about the concentration of Brican leases in its portfolio.

---

[39]     Under the UCC, notice "received by an organization" is effective "from the time it would have been brought to the person [conducting the transaction]'s attention if the organization had exercised due diligence." Fla. Stat. § 671.209 (2014) (codifying U.C.C. § 1-202). "Due diligence" means maintaining "reasonable routines for communicating significant information to the person conducting the transaction and . . . reasonable compliance with the routines." *Id.*

- Cook knew from DelCastillo's July 2008 email that some of Brican's principals had been involved in Recomm, which went bankrupt after promising to pay lessees enough in advertising payments to offset their lease obligations. Cook was also familiar with leases that had defaulted for the same reason from his time at Frontier Leasing. Nevertheless, NCMIC did not ask Brican or Viso Lasik about their business plan or how they planned to continue making advertising payments.

- Although NCMIC had established procedures for investigating fraud, it did not use them.

Third, even in November 2008, after it had started taking assignments of one-column Financing Agreements, NCMIC blithely continued increasing its lending while ignoring suspicious circumstances when diligence demanded an investigation.[40] The facts show:

- Cook recognized that Brican Inc.'s and Brican LLC's names and logos on the form were confusingly similar, which could leave customers with the impression that Brican LLC, the Vendor, was the agent of Brican Inc., the lessor. But he never followed up to address this.

- Cook suggested edits to a Marketing Agreement with a Buyback Provision that he testified could be interpreted as allowing customers to cancel the lease. However, he never followed up to ensure that his edits were made or even to learn what Buyback Provision Brican ended up using.

---

[40]     Because an assignee need only meet the requirements of holder in due course at the time of assignment, knowledge acquired after the assignment does not matter. However, NCMIC's conduct after November 2008 is consistent with its earlier pattern and so underscores its failure to observe reasonable commercial standards of fair dealing before then.

- When NCMIC visited Brican's offices in Miami and the Viso Lasik clinic in Wellington, Florida, at least one NCMIC employee understood Viso Lasik to be a "branch" of Brican. Nevertheless, NCMIC never inquired into Viso Lasik's ability to meet its commitment to buy advertising, such as by asking for Viso Lasik's or Brican's financial records.

- NCMIC knew that Viso Lasik only had three locations. If Brican had only been using Marketing Agreements near those three locations, as Cook testified that he assumed, then Exhibeo sales would likely have been much higher in those areas than elsewhere. Nevertheless, NCMIC did not ask where Brican had been entering into Marketing Agreements.

Based on the evidence, NCMIC failed to satisfy its burden to prove that it took assignment of the one-column Financing Agreements "in good faith" and "without notice" of Brican's fraudulent inducement. Therefore it is not a holder in due course. NCMIC and Brican Inc. had a standing arrangement under which Brican Inc. assigned the vast majority of its Financing Agreements to NCMIC as a matter of course. As NCMIC heard more and more about Brican's sales pitch and the promises it was making in the Marketing Agreements, NCMIC responded not by investigating but by doubling down on that standing arrangement, taking more and more assignments every month. An assignee, particularly a closely-connected one, cannot become "an easy, safe harbor for the dishonest," *Talcott*, 830 So. 2d at 168, and then claim to be a holder in due course.

## E. CONCLUSION

Plaintiffs who signed a one-column Financing Agreement and version 4, 5, 7, or 8 of the Marketing Agreement have established every element of fraudulent inducement, with the exception of proving the individualized facts necessary to establish reliance. By

separate order, the Court will require the parties to confer as to the best procedure for addressing these individualized issues. As to all one-column Plaintiffs who signed version 4, 5, 7, or 8 of the Marketing Agreement and who have or will prove reliance, NCMIC has failed to prove that it is a holder in due course of their Financing Agreements that it took by assignment from Brican Inc. As to all one-column Plaintiffs who signed version 6, they have not met their burden to prove fraudulent inducement by Brican Inc. Final Judgment will be entered separately.

DONE and ORDERED in Miami, Florida, this 16 day of January, 2015.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:     Counsel of Record