UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 10-md-02183-SEITZ

IN RE: Brican America LLC
Equipment Lease Litigation
_____/

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER is before the Court following a bench trial on the reliance issue as to nine of the Plaintiffs in this case. This order supplements the Amended Findings of Fact and Conclusions of Law [DE-596] ("Amended Findings"). Based on the evidence presented, seven of the nine Plaintiffs met their burden to establish (1) that Brican's written promise to buy back the Financing Agreement if the advertising payments ceased induced them into purchasing the Brican Exhibeo System and signing the Financing Agreement and (2) that, under the totality of the circumstances, it was not obvious that (a) Brican did not intend to perform its promise to buy back the Financing Agreement if Viso Lasik stopped advertising and (b) the advertising payments were being made with funds from Brican's Exhibeo sales to other customers, rather than from a separately-capitalized advertising budget for Viso Lasik. A final judgment will be entered in favor of these seven plaintiffs: Drs. Blauzvern, Korpan, Newman, Johnson, Elias, Pyun, and Patel, and their associated practices.

### A. BACKGROUND: SUMMARY OF AMENDED FINDINGS

Brican Corporation began in Canada, selling the Exhibeo as a means of education and non-aggressive marketing to promote medical professionals' practices to patients in their waiting rooms and increase demand for their most profitable services. It consisted of a large flat-screen TV, a computer, and customized software for each medical professional.

In 2004, Jean Francois Vincens bought a substantial stake in Brican Corporation, and with the corporation's other principal formed Brican America, Inc. ("Brican Inc."). Brican Inc. had corporate headquarters in Miami, set up a website, and used commissioned salespersons to sell Exhibeos throughout the United States to dentists and optometrists. It sold the Exhibeo in the United States for approximately $24,000.

Early in 2005, NCMIC learned of Brican Inc.'s business. NCMIC is a finance company that belongs to a group of companies that provides insurance and financial services for medical professionals and uses Professional Solutions Financial Services as its brand name. On July 15, 2005, NCMIC signed a General Vendor Agreement with Brican Inc. Pursuant to this agreement, if a Brican Inc. customer wanted to finance an Exhibeo System, NCMIC agreed to purchase the Exhibeo System from Brican Inc. and then lease it to the customer for a five-year term. A typical financing payment was $508 per month over the life of the lease, resulting in a total $30,480 obligation.[1] From July 2005 until April 2009, NCMIC provided financing for the vast majority of Exhibeo sales.

In early 2006, Dr. Salvatore DeCanio, a Florida optometrist, purchased an Exhibeo and told Vincens about his ideas to expand the laser eye surgery clinic he had opened two years earlier. Vincens decided to become involved and formed Brican America, LLC ("Brican LLC")[2] and JJR Investments with his nephew and another one of Brican's principals. JJR Investments and DeCanio's holding company together owned what became "Viso Lasik." The concept was to create a national chain of "medspas" so patients could receive massages and cosmetic treatments while recovering from laser

---

[1]    The Financing Agreement only noted the customer's monthly payments. A customer had to do the math to determine the 9% interest rate.

[2]    Brican Inc. and Brican LLC will each be referred to as "Brican" except where the distinction is particularly important. See the Amended Findings for more details about their agency relationship.

eye surgery. Viso Lasik had three locations: Charlotte, San Antonio, and Palm Beach – Wellington.

Drawing on his past experiences in selling display systems to medical professionals and then buying advertising space on those systems, Vincens decided to use the Exhibeo System to promote Viso Lasik to an affluent audience while simultaneously raising capital for Viso Lasik and Brican. Thus, Brican started executing "Marketing Agreements" with many of its customers whereby Brican, in a "strategic alliance" with Viso Lasik, committed to buy advertising on the customer's Exhibeo at a quarterly price ($1,450) that would offset approximately all but $300 per year of the financing payments. Brican used eight versions of the Marketing Agreement from June 2006 until the scheme collapsed in 2010. The versions relevant to this order (4, 5, 7, and 8) contained a specific paragraph that provided that Brican would buy back the lease agreement if "Viso Lasik fails to honor its commitment" relating to the advertising fees (the "Buyback Provision"). By 2007, Brican was entering Marketing Agreements with nearly all of its Exhibeo customers.

## The Exhibeo Sales Presentation

Brican's salespersons used a sales presentation that introduced Brican as an "international firm specializing in practice growth and development" for medical professionals and described the Exhibeo as a means to "promote their practice, educate their patients, [and] increase their profits." It stated that Brican had a "strategic alliance" with Viso Lasik, a "new Lasik chain opening across the country," and that Brican's "mandate" was the development of a branding strategy for Viso Lasik.[3] It included charts laying out Brican's analysis of the untapped segments of the Lasik market, the relative effectiveness of different forms of advertising, and the reasons why Viso Lasik

---

[3]   This presentation was Plaintiffs' Exhibit 13 in the first bench trial.

wanted to advertise on the Exhibeo in the customer's waiting room and would pay to do so. The sales staff emphasized that Viso Lasik would pay enough in advertising fees to "offset the cost of your lease," thus being a win for the doctors (a high-tech, low-cost, customized way to market their most profitable services), a win for the patient (educational content while sitting in the waiting room), and a win for Viso Lasik (national branding before an affluent target audience). If the customer asked what would happen if Viso Lasik stopped buying advertising for any reason, Brican sales representatives pointed to the Marketing Agreement's Buyback Provision, in which Brican promised to repurchase the Financing Agreement. If a customer decided to purchase an Exhibeo, the salesperson presented the Financing Agreement and the Marketing Agreement together as one package, in some instances stapled together.

## The Collapse

Beginning in May 2008, the Exhibeo sales rate spiked. In the summer of 2008, Brican decided to switch to what it called a "blind lease" to increase its flexibility in obtaining financing. Previously, either Brican Inc. or Brican America, LLC ("Brican LLC") had been the vendor on the Marketing Agreement and NCMIC had been the lessor on the "three-column Financing Agreement." After the switch, Brican LLC became the vendor on the Marketing Agreement, and *Brican Inc.* became the lessor on the "one-column Financing Agreement." Brican Inc. planned to assign the "blind lease" to NCMIC or any other financing company who would accept the assignment. NCMIC approved the new one-column Financing Agreement form, and Brican started using it in October 2008. But now the Marketing Agreement, the purchase order, and the Financing Agreement all had the same Brican logo with only a very subtle distinction between "Inc." and "LLC" in two spots in small text. Although concerned about the

lack of clear distinction, NCMIC took immediate assignment of nearly all one-column Financing Agreements, as if nothing had changed from when it was the direct lessor.

At some point in 2008 and certainly by October, it was clear to Brican's principals that Viso Lasik was not meeting its original revenue projections and could only pay for its rapidly increasing advertising-fee commitments by borrowing heavily from Brican, which could only raise funds by making more and more new sales. But rather than re-evaluating the advertising strategy, Brican continued to sell as many Exhibeo Systems as possible, despite the fact that each sale incurred a five-year advertising commitment and a promise to buy back the Financing Agreement if the advertising payments stopped. Chasing the endless supply of new customers it needed to fund its growing obligations to its old customers, Brican's approximate average monthly sales rate went from $150,000 in 2006, $350,000 in 2007, and $400,000 in January–April 2008 to *$2,000,000* in May–December 2008 and *$4,300,000* in January–March 2009. NCMIC stopped taking Brican's assignments in April 2009, and Brican's house of cards collapsed in early 2010.

When Plaintiffs stopped receiving advertising payments, they tried to invoke the Buyback Provision and NCMIC sued each individually to enforce the assigned Financing Agreements.[4]

---

[4]   As of March 26, 2015, NCMIC seeks the following sums [DE-619 at 3]:

| Plaintiff | Lease Balance | Late Fees | Penalty Interest | Property Taxes | Sales Tax | Estimated Legal Fees | Total |
|---|---|---|---|---|---|---|---|
| Blauzvern | $26,416.00 | $2,540.00 | $23,774.40 | $0.00 | $2,278.12 | $6,500.00 | $61,508.52 |
| Korpan | $25,400.00 | $2,540.00 | $22,479.00 | $0.00 | $1,587.50 | $6,500.00 | $58,506.50 |
| Newman | $24,384.00 | $2,438.40 | $20,848.32 | $231.09 | $1,480.82 | $6,500.00 | $55,882.63 |
| Johnson | $24,384.00 | $2,438.40 | $22,311.36 | $0.00 | $1,737.17 | $6,500.00 | $57,370.93 |
| Arden | $25,908.00 | $2,590.80 | $23,317.20 | $0.00 | $2,299.13 | $6,500.00 | $60,615.13 |
| Elias | $36,576.00 | $3,657.60 | $26,883.36 | $0.00 | $2,194.56 | $6,500.00 | $75,811.52 |
| Pyun | $24,892.00 | $2,489.20 | $22,029.42 | $0.00 | $2,084.46 | $6,500.00 | $57,995.08 |
| Patel | $23,368.00 | $2,336.80 | $21,381.72 | $0.00 | $1,965.96 | $6,500.00 | $55,552.48 |

## B. FINDINGS OF FACT

1. Plaintiff Dr. Peter Blauzvern has been a dentist since 1983 and has a practice, Peter M. Blauzvern DDS PC, in Jericho, NY. He heard about Brican from his colleague Dr. Lindsay Wolfer, who introduced him to Brican salesperson Tess Ballas. Ms. Ballas visited Dr. Blauzvern's office, showed him a printed-out marketing presentation, described the benefits of the Exhibeo, and gave him a three-page package with the Financing Agreement and Marketing Agreement stapled together. (Ex. 1 at 3–4; Ex. 2.)

2. To Dr. Blauzvern, the Exhibeo was a low-cost way to market his practice to his patients in exchange for allowing Viso Lasik and other potential advertisers to advertise to his patients. He learned of Brican through a referral from a trusted colleague, and it appeared to be a large, established company with a global presence and a satisfied network of existing customers. He thought of Brican as an "advertising guru and a leasing company" that put together this deal for its client Viso Lasik and that had similar deals for other clients. He thought it made sense for a medspa in Florida to advertise in New York because some of his patients were "snowbirds" who often travelled to Florida.

3. Dr. Blauzvern took the documents home to review them and then signed them two days later, on January 20, 2009, along with a purchase order that he had not previously seen. (Ex. 1 at 1.) He noticed that the Financing Agreement was non-cancellable but he interpreted the Buyback Provision as meaning that, if the marketing payments stopped, he could return the equipment and his lease would "essentially dissolve." He did not consult a lawyer until he stopped receiving marketing payments. On February 1, 2010, he wrote a letter to NCMIC demanding that it repurchase the Financing Agreement. (Ex. 22.)

4.     Plaintiff Dr. Kenneth Korpan is a dentist who has had his own practice, Kenneth A. Korpan DDS, PC, in Batavia, IL since around 1997.  Dr. Korpan met Brican salesperson Verona Cooper at a booth at an event for his local dental association. Ms. Cooper visited his office and assured him that the Exhibeo would cost him nothing and that he could terminate the deal if the marketing payments stopped. At a subsequent visit, she showed him the agreements and explained the numbers. Although he looked at the Marketing Agreement, he did not read the agreements carefully before signing them on March 23, 2009. (Ex. 3; Ex. 4.)

5.     Dr. Korpan thought that $25,000 was too expensive for the hardware and "some software that is basically a slideshow that you can get off the internet," but the deal made sense to him overall because it would provide a focus in his otherwise-empty waiting room, his net costs were minimal, and there was little risk because of the Buyback Provision. It made sense as an advertising plan for Viso Lasik because he understood that Viso Lasik planned to build a clinic nearby in Chicago and he was used to seeing companies building brand names by advertising nationwide, such as a dental office in Chicago "advertising on a nationally-televised hockey game." He thought Viso Lasik was smaller than Brican but knew nothing else about their relationship. When he stopped receiving advertising payments, he wrote Brican to demand it assume his lease. (Ex. 26.)

6.     Plaintiff Dr. Donald Newman is a dentist with a practice, Donald Newman DDS, P.A., in Boca Raton, FL. He heard of Brican when someone he had known for 40 years (the wife of one of his dental distributors) called about an "opportunity" and asked if he would be willing to receive someone to discuss it with him. He agreed, and Brican salesperson Jennifer Bailey visited his office and told him that Brican would give him an educational device for his office nearly for free if he would let Viso Lasik show advertising on it. He read the Financing Agreement, saw that it was non-cancellable,

and asked what would happen if the advertising payments stopped. Ms. Bailey pointed to the Buyback Provision in his Marketing Agreement and said he would no longer be responsible for payments. He already had a screen in his office, but he saw the exchange as a service for a service: Viso Lasik could advertise to his patients, and his patients would get better educational and entertainment content. He assumed there may have been tax advantages of structuring it as a lease or loan, but it did not strike him as odd that the deal required him to sign the Financing Agreement and commit to paying more than $30,000. He signed both agreements on March 25, 2009. (Ex. 11; Ex. 12.) When he stopped receiving advertising payments, he contacted either NCMIC or Viso Lasik to ask why they had stopped.

7.      Plaintiff Dr. Angela P. Johnson is an optometrist who started her own practice, Advanced Vision Clinic & Optical, LLC, in St. Paul, MN in 2007 and whose husband also has his own practice. She heard about Brican from her husband, who heard about it at a marketing meeting for VisionSource, a group of optometrists. Her husband then met with Brican salesperson Ed Santana, which she attended. After her husband discussed it with her and he decided to buy an Exhibeo for his practice, she set up a meeting with Mr. Santana to discuss buying one for her own practice.

8.      Dr. Johnson was initially skeptical because her practice was brand-new, but Mr. Santana kept pointing to the Buyback Provision, which Dr. Johnson read fully, although she did not read the Financing Agreement or the rest of the Marketing Agreement. She saw the Exhibeo as an exchange: by allowing Viso Lasik to market to her patients, she would get educational materials for her patients that might help grow her practice. Although she had never heard of either Brican or Viso Lasik, she knew at least five other optometrists at VisionSource who had Exhibeos and were receiving regular payments. She thought Brican and Viso Lasik were essentially the same entity, so the whole deal would be cancellable if the advertising payments stopped. She signed the

agreements in November and December 2008. (Ex. 13; Ex. 14.) When she stopped receiving advertising payments, she wrote NCMIC asking them to forward all future payment requests to Brican. (Ex. 25.)

9.     Plaintiff Dr. Wanda Arden is a dentist with a practice, Wanda Arden, DDS, in Maspeth, NY. When she bought the Exhibeo, she was under significant stress, and she only bought it because Brican salesperson Tess Ballas convinced her that it would be good for her patients, that she would receive reimbursements for the costs, and that it was risk-free. She did not understand that the "reimbursements" were for advertising and did not ask what they were for because, if she did not receive the reimbursements, she would not have to keep making lease payments. She read the agreements but did not focus on each provision specifically. She thought that she could get out of the deal if her patients were not benefitting and relied heavily on this understanding. She signed both agreements on January 16, 2009. (Ex. 7; Ex. 8.) When she stopped receiving advertising payments, she wrote Brican to cancel the lease. (Ex. 23.)

10.    Plaintiff Dr. Uri Elias is a dentist whose practice, Uri Elias, P.A., has locations in Plantation, FL and in Dade County. A colleague referred Brican salesperson Jordana Mesner to him, and she visited his office and spent 30 minutes discussing the Exhibeo. She explained the numbers and emphasized that Brican would buy back the lease if the advertising payments stopped. He read the Buyback Provision of the Marketing Agreement, but did not read the Financing Agreement. He liked that the Exhibeo was an educational and entertainment system for his patients as well as an affordable way to market his practice, especially compared to newspaper ads costing $100 each. It seemed to make sense as an advertising plan for Viso Lasik, but he did not think much about it from Viso Lasik's perspective. He knew that Brican was aggressively marketing the Exhibeo to other doctors and assumed that they would not market so aggressively unless they were making money. He did not know Brican's relationship with Viso

Lasik, but he trusted that Brican would buy back the Financing Agreement because it had made a written promise to do so. He bought two Exhibeos, one for each office, on December 10, 2008. (Ex. 15; Ex. 16; Ex. 17.) After the advertising payments stopped, he wrote Brican demanding that it repurchase his Financing Agreements. (Ex. 18.)

11.     Plaintiff Dr. Richard Pyun is a dentist with a practice, Richard Pyun, DMD, in Pearl River, NY. Although other companies had tried to advertise in his office before, he was more receptive to Brican because he heard about it through a referral from his InvisAlign representative Kelly Richardson. Because he knew her professionally, he termed this a "warm referral" (as opposed to a "cold call"). Brican salesperson Charles Serra then visited his office.

12.     Based on his first meeting with Mr. Serra, Dr. Pyun liked that the Exhibeo was an effective way to educate his patients while subtly marketing his services. He did not think it was worth $25,000, but his net costs were minimal because of the advertising payments, and there was "no reason not to" because Brican would buy back the system if the advertising payments stopped. He did not ask why he had to sign two distinct agreements, including a Financing Agreement that said it could not be cancelled, but he read both agreements, saw that both were with Brican, and trusted that Brican would buy back the Financing Agreement because it had made a clear written promise to do so and he had no reason to doubt Brican's ability to do so. It seemed to make sense as an advertising plan for Viso Lasik because laser eye surgery was gaining popularity, even though Viso Lasik had no clinic nearby. He signed the agreements in February and March 2009. (Ex. 9; Ex. 10.)  When he stopped receiving advertising payments, he wrote Brican, NCMIC, and Viso Lasik to demand that Brican assume his lease. (Ex. 27.)

13.     Plaintiff Dr. Vijay Patel is a dentist with a practice at Montclair Plaza Dental Group in Montclair, CA. Before he heard about Brican, he already had a video system that looped a 15-minute educational video in his patient rooms, which he found very

effective for marketing to his patients. He was considering replacing it with a $345 software and video package sold by the California Dental Association, but then, at a meeting for a professional association, he heard a group of doctors discussing a system for educating and marketing to patients for very little cost and with some chance of making money. He followed up, and Brican salesperson Ms. Holmes visited his office first to drop off a marketing brochure and again to meet with him.

14.     When Dr. Patel asked why he should replace his current system, Ms. Holmes told him to view the Exhibeo as an investment, gave examples of others whose Exhibeos were paying for themselves because of Viso Lasik's advertising payments, and suggested that other companies might also start making advertising payments in the future. He liked that the Exhibeo was a far larger TV than his current system and that it would go in his waiting room rather than his patient rooms. He reviewed the agreements and focused on his payments and the Buyback Provision, which he read to allow him to cancel the Financing Agreement if either the equipment broke or the advertising payments stopped. He would not have bought the Exhibeo if not for the Buyback Provision, especially given the $25,000 price and that he had not seen the equipment yet. He saw that both agreements were with Brican and he understood from Ms. Holmes that it was Brican leasing, Brican doing the marketing, and Brican doing the selling. He did not ask about Brican's relationship with Viso Lasik. He assumed that the deal was structured as a lease in order to help generate seed money for Brican to expand its business, as "nobody in their right mind" would pay $30,000 for a TV and a computer. He admitted in hindsight that his decision was hasty, but he was not skeptical at the time because, in 34 years of practice, he had never before had a professional equipment salesperson lie to him. He signed the agreements in October 2008. (Ex. 5; Ex. 6.)

15.     The Court finds the testimony of these Plaintiffs credible. Each Plaintiff spoke forthrightly, answered questions directly, told consistent stories, and readily admitted things that could make them look foolish, easily duped, or careless. None appeared to exaggerate how carefully or closely they had read the underlying agreements before signing, and there was no indication that they phrased their answers so as to appear more consistent with the agreements. Moreover, their testimony varied, and there was no indication that any were testifying on the basis of a common script, but their stories were all consistent with other evidence in the record showing how Brican marketed the Exhibeo to potential customers: using warm referrals, making introductions through professional associations, brandishing the benefits of co-branding, and pointing to other satisfied Exhibeo customers.

16.     Plaintiff Dr. Michael Barbieri is a dentist with a practice at Michael J. Barbieri, DDS. He did not testify in court because he had knee surgery, but he did not inform the Court of this until the morning of trial and no effort was made to preserve his testimony or to continue his trial date.

## C. CONCLUSIONS OF LAW

In the first bench trial, Plaintiffs here established the first three elements of fraudulent inducement. The Marketing Agreement's Buyback Provision was a false statement of fact in two ways: (1) it made a material promise without the intention of keeping it and (2) it implied that Brican and Viso Lasik had a certain relationship but omitted that Brican needed to maintain exponential growth in the infusion of third-party financing to keep lending Viso Lasik the money it needed to make the promised advertising payments. Brican knew it was a false statement, and Brican made it with the intention of inducing its customers into signing the Financing Agreements. The second bench trial focused on whether Plaintiffs had proven the two remaining elements of

fraudulent inducement by the greater weight of the evidence, namely whether Plaintiffs relied on the Buyback Provision and whether they would have signed the Financing Agreements if not for the Buyback Provision. *See In re Standard Jury Instructions— Contract & Bus. Cases*, 116 So. 3d 284, 325–26 (Fla. 2013) (listing the five elements of fraudulent inducement); *Atl. Nat'l Bank of Florida v. Vest*, 480 So. 2d 1328, 1332 (Fla. 2d DCA 1985) ("A fact is material if, but for the alleged nondisclosure or misrepresentation, the complaining party would not have entered into the transaction.").

### § 1. Legal Standard

Under Florida law, a person "may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla. 1980)). There is no indication that any Plaintiff in this case knew that Brican's representation was false, but the issue remains whether the falsity of the Buyback Provision was "obvious."

Consistent with the Second Restatement, Florida law considers falsity to be "obvious" if "a mere cursory glance would have disclosed the falsity of the representation." *Besett*, 389 So. 2d at 997 (quoting Restatement (Second) of Torts (1976) § 540 cmt. a). Determining whether falsity is obvious requires considering "the totality of the circumstances surrounding the type of information, the nature of the communication between the parties, and the relative positions of the parties." *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95 (Fla. 2002). However, a person's reliance does not need to be "reasonable." *See Field v. Mans*, 516 U.S. 59, 70 (1995)

(adopting the Second Restatement's definition of "justifiable reliance" and contrasting it with "reasonable reliance").[5]

In evaluating the issues before the Court in the totality of the circumstances, the Court must consider what each Plaintiff was told by his or her Brican salesperson[6] because it is relevant to (1) the Plaintiff's understanding of the overall deal, (2) the Buyback Provision's materiality to the decision to sign the Financing Agreement, and (3) whether its falsity would have been obvious upon a cursory glance. Because the parties have stipulated that the sole misrepresentations at issue are those on the face of the Marketing Agreement, each Plaintiff must have relied on Brican's written promise in the Buyback Provision and cannot assert fraudulent inducement based on a salesperson's oral representations that are contrary to the written agreements. [*See* DE-182; DE-192 at 1; DE-193 at 41–43; DE-196.]

---

[5] The Florida Supreme Court has consistently maintained this substantive standard, though with inconsistent terminology. *Compare Besett*, 389 So. 2d at 997 (adopting the Second Restatement's definition of "justifiable reliance") *and Azam*, 813 So. 2d at 94 (elaborating on when reliance is not justifiable because falsity is "obvious") *with Butler*, 44 So. 3d at 105 (rejecting the term "justifiable reliance" but reaffirming that reliance is improper if the representation is obviously false or known to be false). Thus, any cases requiring more than a "cursory glance" are inconsistent with Florida Supreme Court precedent. *See, e.g, JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F. Supp. 2d 1205, 1233 (N.D. Fla. 2010) (requiring "ordinary diligence").

[6] These statements were not hearsay. *See U.S. v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking at the time or what motivated him to do something." (emphasis in original)).

## § 2. **Plaintiffs' Reliance on the Buyback Provision**

Of the eight Plaintiffs testifying at trial, seven have proven that they relied on the Buyback Provision in the Marketing Agreement and that they would not have signed the Financing Agreement if not for the Buyback Provision.

Some, like Dr. Blauzvern, testified that they read both documents thoroughly, were concerned that the advertising payments might stop, relied specifically on the written Buyback Provision, and would not have agreed to the Financing Agreement if not for the Buyback Provision. Others, like Dr. Korpan, testified that they did not read the documents closely and instead listened to the salesperson, but ultimately relied on an understanding that Brican was promising, consistent with the written Buyback Provision, to buy back the Financing Agreements if the advertising payments stopped. All testified that they would not have agreed to the Financing Agreement if not for that understanding. They knew the promise was in writing and they understood its content, regardless of whether they understood the precise mechanism by which Brican would buy back the Financing Agreement or interpreted Brican's promise correctly in terms of contract law.[7] They also acted consistently with this understanding when they made termination demands invoking the Buyback Provision. Although they varied in their understandings of Brican's relationship with Viso Lasik, and Dr. Patel even suspected that Brican was using Exhibeo sales revenue as seed money for expanding its business, there is no evidence that any of them knew that the advertising payments were all coming from new Exhibeo sales money.

---

[7] NCMIC argued at trial that any Plaintiff who did not read the specific wording of the Buyback Provision could not, as a matter of law, have relied on it. However, the Court cannot locate any authority to support this proposition. *Infante v. Bank of America Corp.* simply held that a person must be aware of a misrepresentation to rely on it. 680 F. Supp. 2d 1298, 1304–05 (S.D. Fla. 2009).

However, one testifying Plaintiff, Dr. Arden, did not have a clear answer for why she bought the Exhibeo. She believes that Brican took advantage of her and that the salesperson convinced her that it would be good for her patients. She expected to receive "reimbursements" and thought she could get out of the deal if her patients were not benefitting, but did not understand that the reimbursements were for advertising and that the purpose of the Buyback Provision was to cover her specifically in case the advertising payments stopped. Therefore, she has not met her burden to prove reliance on the promise to buy back the lease if the advertising payments stopped.

The ninth Plaintiff, Dr. Barbieri, did not testify and made no effort to preserve his testimony or continue his trial. He has therefore failed to meet his reliance burden.

### § 3. Obviousness of the Falsity

In determining whether the falsity of an alleged misrepresentation would have been obvious upon a cursory glance, Florida courts have sought to balance the need for stability in commercial transactions, *see Azam*, 813 So. 2d at 96, with the principle that "the law should not permit an inattentive person to suffer loss at the hands of a misrepresenter," *Besett*, 389 So. 2d at 998. For example, a person cannot sign a contract that he did not read and then claim to have relied on earlier oral representations that are flatly contradicted by the contract itself. *See Addison v. Carballosa*, 48 So. 3d 951, 956 (Fla. 3d DCA 2010); *Ioannides v. Romagosa*, 93 So. 3d 431, 435 (Fla. 4th DCA 2012). But the law does not blame a person for failing to "take several steps and make various logical deductions" to "untangle the web of deception to uncover fraud" when "on the face of the transaction" it appeared to be "business as usual." *Stewart Title Guar. Co. v. Roberts-Dude*, 497 B.R. 143 (S.D. Fla. 2013), *aff'd sub nom. In Re Denise Roberts-Dude*, No. 13-13620, 2015 WL 545463 (11th Cir. Feb. 11, 2015); *Azam*, 813 So. 2d at 93 (falsity of a seller's representation of the size of a parcel of land is not necessarily obvious, even though the

correct size is in the public record); *accord Field v. Mans*, 516 U.S. 59, 70 (1995) (it is no defense to fraud that the buyer "could have walked across the street to the office of the register of deeds" and learned of the misrepresentation's falsity).

In this case, there is nothing that would have made it obvious on a cursory glance that Brican did not intend to keep its promise in the Buyback Provision or that Viso Lasik's advertising payments were all being made with funds from Brican's Exhibeo sales to other customers. The Buyback Provision was a formal, written promise with numerous trappings of normality and reliability. Brican presented itself as an established international advertising company; it had a well-trained sales staff; its sales presentations seemed to include detailed market research; and each Plaintiff heard about Brican from a trusted colleague or through a professional setting and knew someone who already had an Exhibeo. Co-branding is a frequently-used marketing mechanism, and Viso Lasik's basic plan for a "medspa" had intuitive appeal because laser eye surgery was gaining popularity among those affluent enough to afford spa treatments.

In arguing the fraud was obvious, NCMIC points to many problems with the deal being offered to each Plaintiff. Why would something supposedly "free" require a personal commitment to pay more than $25,000? What kind of relationship could Brican have with Viso Lasik such that it would make sense for Brican to assume the Financing Agreements if Viso Lasik's advertising payments stopped? If the Marketing Agreement and the Financing Agreement were both with the same entity, why were there two separate agreements, and why was it structured so that one promised to relieve customers of their obligations under the other? And why would a brand-new startup make such expensive, long-term advertising commitments in cities where it had not even started building a location?

While these are pertinent questions, recognizing the fraud required examining the business model. Maybe finance professionals would have been able to see these as red flags for fraud on a "cursory glance," but none of the Plaintiffs had the background in marketing or finance that might enable them to look at a business model and determine that they were being duped. While Plaintiffs were interested in marketing their services on a waiting-room TV system, there was no evidence that any of them were sophisticated in modern marketing techniques or familiar with the reasonable cost for a customized marketing plan. At most, they had some experience with leasing cars, and Dr. Newman had leased equipment for his office.

Moreover, it was Brican's very purpose to use the Buyback Provision to induce customers to "sign on the spot" by quelling any doubts they might have about Brican or Viso Lasik. Most Plaintiffs testified consistently with this: they did not ask hard questions precisely because Brican promised to buy it back if Viso Lasik stopped paying. The purpose of a fraudulent statement is often to frustrate the recipient's ability to determine that he or she is being duped. *See, e.g, Stev-Mar, Inc. v. Matvejs*, 678 So. 2d 834, 838 (Fla. 3d DCA 1996) (someone who intentionally frustrates the recipient's investigation through false statements "cannot be heard to say that the recipient has relied upon an inquiry that has come to nothing through his own machinations") (quoting Restatement (Second) of Torts (1976) § 547 cmt. b).

Moreover, Plaintiffs had no obvious reason to be skeptical. Unlike NCMIC, they were not told about Brican's principal's involvement in a similar scheme with Recomm and they never received news articles describing Recomm's business model as a Ponzi scheme. In fact, the one Plaintiff who *did* learn of this connection (Dr. Daniel DelCastillo, who testified in the first bench trial) immediately concluded that Brican's promise had been fraudulent and tried to cancel his Financing Agreement. None of these seven Plaintiffs had the same knowledge.

## § 4. Remedies

Under Florida law, a fraudulently-induced party can ordinarily elect either (1) to ratify the contract and seek damages for the fraud or (2) to rescind the contract. *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000). Although rescission ordinarily requires putting all parties back in their original positions, a "defrauded person is excused from restoration to the extent he is rendered incapable thereof by reason of the wrongful conduct of the wrongdoer." *Mulle v. Scheiler*, 484 So. 2d 47, 48 (Fla. 5th DCA 1986), *rev. denied*, 492 So. 2d 1334 (Fla. 1986). The record reflects that these seven Plaintiffs all demanded termination in 2010 consistent with the Buyback Provision, when restoration might have been possible, but never heard back.[8]

Therefore, Plaintiffs are entitled to a declaration that NCMIC cannot enforce these Plaintiffs' Financing Agreements because they were fraudulently induced and, for the reasons set out in the Amended Findings, NCMIC is not a holder in due course.[9]

## D. CONCLUSION

While it can be argued that both Plaintiffs and NCMIC let their pocketbooks cloud their vision, the law puts them in different positions. While Plaintiffs cannot rely

---

[8] Moreover, the Florida cases rejecting rescission as a remedy for fraud do so on grounds such as (1) the defrauded party retaining the contract's benefits while trying to rescind only its obligations, *see Mazzoni Farms*, or (2) rescission being unduly protective of the maker of the fraudulent statement, *see Bush v. Palm Beach Imports, Inc.*, 610 So. 2d 68, 69 (Fla. 4th DCA 1992) (post-sale depreciation precluded rescinding the sale of a car because the defrauded person "should not have been required to absorb the loss in value of the automobile"). Neither situation is present here.

[9] Because the Federal Rules allow for pleading in the alternative, Plaintiffs have not ratified the Financing Agreements simply because they sued Brican for damages for the fraud.

on obviously false representations, NCMIC is charged with knowledge of what it would have "reason to know" and is expected to observe "reasonable commercial standards of fair dealing." *See* Fla. Stat. § 671.209 (2014) (codifying U.C.C. § 1-202); Fla. Stat. § 679.1021(1)(qq) (2014) (codifying U.C.C. § 9-102(a)(43)). NCMIC's close relationship with Brican, its approval of the "blind lease" form notwithstanding the lack of apparent distinction between Brican LLC and Brican Inc., its knowledge of the Marketing Agreements' Buyback Provisions, and its receipt in July 2008 of news articles describing Recomm as a Ponzi scheme all put it in the better position to stop the runaway train and avoid the loss it has incurred by accepting assignment of Brican's fraudulently-induced Financing Agreements.

DONE and ORDERED in Miami, Florida, this 27th day of March, 2015.

*[signature]*
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   Counsel of Record